# 26-1325

## United States Court of Appeals
## for the Second Circuit

507 SUMMIT LLC and KOA CAPITAL L.P.,

*Applicant-Appellants,*

-against-

BALANCE LAW PLLC, D/B/A BALANCE LAW FIRM,

*Respondent-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**JOINT APPENDIX**
Volume I of II (Pages JA-1-JA-212)

AMINI LLC
*Attorneys for Applicant-Appellants*
131 West 35th Street, 12th Floor
New York, New York 10001
(212) 490-4700
jchubak@aminillc.com
jbrewer@aminillc.com

BALANCE LAW FIRM
*Attorneys for Respondent-Appellee*
One World Trade Center, Suite 8500
New York, New York 10007
(212) 741-8080
robert.liu@balancelawfirm.com

5494

ELECTRONIC PARALEGAL

## TABLE OF CONTENTS

Docket Entries ....................JA-1

Respondent's Opposing Memorandum of Law
(ECF No. 16)....................JA-6

Respondent's Opposing Declaration of B. Robert Liu,
Dated August 8, 2025 (ECF No. 17)....................JA-19

Exhibit A to Liu Declaration -
Subpoena *Duces Tecum* in *Oasis Investment II Master Fund Ltd. v. Vincent Tianquan Mo, et al.*, Index No. 652607/2023,
Dated May 7, 2025, with Exhibit (ECF No. 17-1) ....................JA-29

Exhibit B to Liu Declaration -
E-Mail from B. Robert Liu to Jeffrey Chubak,
Dated July 23, 2025 (ECF No. 17-1) ....................JA-117

Applicants' Reply Declaration of Jeffrey Chubak,
Dated August 22, 2025 (ECF No. 18)....................JA-118

Exhibit 1 to Chubak Reply Declaration -
Directions Order of The Grand Court of The Cayman Islands *in the Matter of the Companies Act (2023 Revision) and in the Matter of China Index Holdings Limited*, Case No.
FSD 201 OF 2023 (IKJ), Dated May 27, 2025
(ECF No. 18-1) ....................JA-119

Exhibit 2 to Chubak Reply Declaration -
Decision of The Court of Appeals of The Cayman Islands in *Qunar Cayman Islands Limited v. Athos Asia Event Driven Master Fund, et al.*, CICA No. 24 of 2017, Dated November 13, 2017
(ECF No. 18-2) ....................JA-171

Exhibit 3 to Chubak Reply Declaration -
Decision of The Grand Court of The Cayman Islands *In re New Frontier Health Corporation*, Case No. FSD2022-0072,
Dated April 24, 2024 (ECF No. 18-3)....................JA-207

Exhibit 4 to Chubak Reply Declaration -
Decision of The Grand Court of The Cayman Islands *In re 51Job, Inc.*, Cause Nos. FSD 155 & 156 of 2022 (DDJ),
Dated November 29, 2022 (ECF No. 18-4) ....................................JA-267

Exhibit 5 to Chubak Reply Declaration -
Decision of The Grand Court of The Cayman Islands in *Phoenix Meridian Equity Limited v. Lyxor Asset Management, S.A., et al.*, Cause No. 311 of 2007, Dated May 22, 2009
(ECF No. 18-5) ....................................JA-281

Exhibit 6 to Chubak Reply Declaration -
Letter from Carey Olsen to Alecia Johns and Tonicia Williams,
Dated August 12, 2025 (ECF No. 18-6) ....................................JA-296

Exhibit 7 to Chubak Reply Declaration -
E-Mail from Jeffrey Chubak to B. Robert Liu,
Dated July 31, 2025 (ECF No. 18-7) ....................................JA-302

Opinion and Order of Hon. Katharine H. Parker on Application for Discovery for Use in A Foreign Proceeding, Dated January 26, 2026
(ECF No. 21) ....................................JA-305

Respondent's Notice of Motion to Quash Petitioners' Subpoena,
Dated February 25, 2026 (ECF No. 22) ....................................JA-325

Respondent's Supporting Declaration of B. Robert Liu,
Dated February 25, 2026 (ECF No. 23) ....................................JA- 327

Exhibit 1 to Liu Declaration -
Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action,
Dated January 27, 2026 (ECF No. 23-1) ....................................JA-330

Exhibit 2 to Liu Declaration -
Stipulation and Order of Hon. Andrew Brrok for the Production and Exchange of Confidential Information in *Oasis Investment II Master Fund Ltd. v. Vincent Tianquan Mo, et al.*, Index No. 652607/2023, Dated November 19, 2024 (ECF No. 23-2) ..............JA-343

Respondent's Supporting Memorandum of Law,
Dated February 25, 2026 (ECF No. 24) ....................................JA-354

Applicants' Opposing Memorandum of Law, Dated March 1, 2026 (ECF No. 25)....................JA-370

Respondent's Supplemental Declaration of B. Robert Liu, Dated March 3, 2026 (ECF No. 26)....................JA-380

Exhibit A to Liu Supplemental Declaration - Certificate of Incorporation of Lorelei NCC Inc., Dated March 03, 2026 (ECF No. 26-1)....................JA-382

Exhibit B to Liu Supplemental Declaration - Stipulation in *Oasis Investment II Master Fund Ltd. v. Vincent Tianquan Mo, et al.*, Index No. 652607/2023, Dated March 31, 2025 (ECF No. 26-2)....................JA-388

Respondent's Reply Memorandum of Law, Dated March 3, 2026 (ECF No. 27)....................JA-392

Letter from Jeffrey Chubak to Hon. Katherine H. Parker, Dated March 5, 2026 (ECF No. 28)....................JA-407

Letter from Jeffrey Chubak to Hon. Katherine H. Parker, Dated March 9, 2026 (ECF No. 29)....................JA-408

Exhibit 1 to Letter - Applicants' Sur Reply of Jeffrey Chubak, Dated March 9, 2026 (ECF No. 29-1) ....................JA-409

Letter from Beixiao Robert Liuto Hon. Katherine H. Parker, Dated March 12, 2026 (ECF No. 30)....................JA-412

Order of Hon. Katherine H. Parker, Dated March 12, 2026 (ECF No. 31)....................JA-414

Letter from Jeffrey Chubak to Hon. Katherine H. Parker, Dated April 16, 2026 (ECF No. 33)....................JA-415

Letter from Jeffrey Chubak to Hon. Katherine H. Parker, Dated April 16, 2026 (ECF No. 34)....................JA-416

Applicants' Notice of Appeal, Dated May 11, 2026 (ECF No. 35)....................JA-417

Query Reports Utilities Help Log Out

APPEAL,ECF,MAGCONSENT

# U.S. District Court
# Southern District of New York (Foley Square)
# CIVIL DOCKET FOR CASE #: 1:25-mc-00235-KHP

507 Summit LLC and KOA CapitaL L.P. v. Balance Law PLLC
Assigned to: Magistrate Judge Katharine H. Parker
Cause: M 77 Application to have subpoena issued to person living in this district re: action in foreign cou

Date Filed: 05/22/2025

**Respondent**

**Balance Law PLLC**
*dba Balance Law Firm*

represented by **Beixiao Robert Liu**
Balance Law Firm
1 World Trade Ctr
Ste 8500
New York, NY 10007
212-741-8080
Fax: 631-490-4465
Email: robert.liu@balancelawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Applicant**

**507 Summit LLC**

represented by **Jeffrey Scott Chubak**
Amini LLC
131 West 35th Street
Ste 12th Floor
New York, NY 10001
212-490-4700
Email: jchubak@aminillc.com
*ATTORNEY TO BE NOTICED*

**Applicant**

**KOA Capital L.P.**

represented by **Jeffrey Scott Chubak**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/22/2025 | 1 | EX PARTE MISCELLANEOUS CASE INITIATING DOCUMENT - MOTION for Discovery *Application for Order of Judicial Assistance under 28 U.S.C. § 1782*. (Filing Fee $ 52.00, Receipt Number ANYSDC-31125608)Document filed by 507 Summit LLC, KOA Capital L.P.. (Attachments: # 1 Exhibit 1 - Proposed Subpoena)(Chubak, Jeffrey) (Entered: 05/22/2025) |
| 05/22/2025 | 2 | MISCELLANEOUS COVER SHEET filed..(Chubak, Jeffrey) (Entered: 05/22/2025) |

| | | |
|---|---|---|
| 05/22/2025 | 3 | STATEMENT OF RELATEDNESS re: that this action be filed as related to 23-mc-427. Document filed by 507 Summit LLC, KOA Capital L.P...(Chubak, Jeffrey) (Entered: 05/22/2025) |
| 05/22/2025 | 4 | MEMORANDUM OF LAW in Support re: 1 EX PARTE MISCELLANEOUS CASE INITIATING DOCUMENT - MOTION for Discovery *Application for Order of Judicial Assistance under 28 U.S.C. § 1782*. (Filing Fee $ 52.00, Receipt Number ANYSDC-31125608) . Document filed by 507 Summit LLC, KOA Capital L.P...(Chubak, Jeffrey) (Entered: 05/22/2025) |
| 05/22/2025 | 5 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent Lepercq Multi-Asset Fund SICAV FIS for 507 Summit LLC. Document filed by 507 Summit LLC..(Chubak, Jeffrey) (Entered: 05/22/2025) |
| 05/22/2025 | 6 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by KOA Capital L.P...(Chubak, Jeffrey) (Entered: 05/22/2025) |
| 05/23/2025 | | Case Designated ECF. (vba) (Entered: 05/23/2025) |
| 05/23/2025 | | MISCELLANEOUS CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Gregory H. Woods. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district-judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at http://https://nysd.uscourts.gov/rules/ecf-related-instructions. .(vba) (Entered: 05/23/2025) |
| 05/24/2025 | 7 | ORDER REFERRING CASE TO MAGISTRATE JUDGE. Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for General Pretrial (includes scheduling, discovery, non-dispositive pretrial motions, and settlement) and Dispositive Motion (i.e., motion requiring a Report and Recommendation )All such motions. Referred to Magistrate Judge Katharine H. Parker. Motions referred to Katharine H. Parker. (Signed by Judge Gregory H. Woods on 5/24/2025) (sgz) (Entered: 05/27/2025) |
| 05/27/2025 | | Magistrate Judge Katharine H. Parker is designated to handle matters that may be referred in this case. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (tro) (Entered: 05/27/2025) |
| 05/30/2025 | 8 | ORDER SCHEDULING CASE MANAGEMENT CONFERENCE: This case has been referred to me for general pretrial supervision purposes (ECF #7). A Case Management Conference in this matter will be held on Wednesday, June 18, 2025 at 10:00 a.m. in Courtroom 17-D, United States Courthouse, 500 Pearl Street, New York, New York. Case Management Conference set for 6/18/2025 at 10:00 AM in Courtroom 17D, 500 Pearl Street, New York, NY 10007 before Magistrate Judge Katharine H. Parker. (Signed by Magistrate Judge Katharine H. Parker on 5/30/2025) (rro) (Entered: 05/30/2025) |
| 06/13/2025 | 9 | AFFIDAVIT OF SERVICE of 1782 Motion Papers served on Balance Law PLLC on 06/12/2025. Service was accepted by Kayla Moore. Document filed by 507 Summit LLC, KOA Capital L.P...(Chubak, Jeffrey) (Entered: 06/13/2025) |
| 06/17/2025 | 10 | ORDER RESCHEDULING CASE MANAGEMENT CONFERENCE: Because Respondent has yet to make an appearance on the record, the case management conference scheduled for Wednesday, June 18, 2025 at 10:00 a.m. is hereby rescheduled to Tuesday, July 8, 2025 at 11:30 a.m. in Courtroom 17-D, United States Courthouse, 500 Pearl Street, New York, New York 10007. SO ORDERED. (Signed by Magistrate Judge Katharine H. Parker on 6/17/2025) (Case Management Conference set for 7/8/2025 at 11:30 AM in |

| | | |
|---|---|---|
| | | Courtroom 17D, 500 Pearl Street, New York, NY 10007 before Magistrate Judge Katharine H. Parker.) (ar) (Entered: 06/17/2025) |
| 06/24/2025 | 11 | NOTICE OF APPEARANCE by Beixiao Robert Liu on behalf of Balance Law PLLC.. (Liu, Beixiao) (Entered: 06/24/2025) |
| 07/07/2025 | | NOTICE TO COUNSEL: REMINDER of the Case Management Conference set for 7/8/2025 at 11:30 AM in Courtroom 17D, 500 Pearl Street, New York, NY 10007 before Judge Katharine H. Parker re: 10 Order (ca) (Entered: 07/07/2025) |
| 07/08/2025 | 12 | Minute Entry for proceedings held before Magistrate Judge Katharine H. Parker - Courtroom 17D: Initial Pretrial Conference / Case Management / Discovery/ Scheduling / Status - held on 7/8/2025 : See Transcript for Details. A transcript of this proceeding is available by utilizing the attached order form. (ca) (Entered: 07/08/2025) |
| 07/08/2025 | 13 | POST-CONFERENCE ORDER: On July 8, 2025, the parties appeared before the undersigned for a case management conference. As discussed at the conference and set forth below: The parties shall meet and confer in an attempt to reach a resolution on the discovery sought in this matter. If the parties are able to reach a compromise, they shall file a letter informing the Court of said compromise by August 8, 2025. Alternatively, in the event the parties are unable to reach a compromise, Respondent shall file its response to the Application for an Order of Judicial Assistance Under 28 U.S.C. § 1782 by August 8, 2025. Applicants' reply is due by August 22, 2025. SO ORDERED. ( Replies due by 8/22/2025., Responses due by 8/8/2025) (Signed by Magistrate Judge Katharine H. Parker on 7/8/2025) (vfr) (Entered: 07/08/2025) |
| 07/10/2025 | 14 | PROPOSED CONSENT TO MAGISTRATE JUDGE DISPOSITION OF MOTION by 507 Summit LLC, KOA Capital L.P. re 1 EX PARTE MISCELLANEOUS CASE INITIATING DOCUMENT - MOTION for Discovery *Application for Order of Judicial Assistance under 28 U.S.C. § 1782*. (Filing Fee $ 52.00, Receipt Number ANYSDC-31125608). Document filed by 507 Summit LLC, KOA Capital L.P...(Chubak, Jeffrey) (Entered: 07/10/2025) |
| 07/11/2025 | 15 | CONSENT TO JURISDICTION BY A US MAGISTRATE JUDGE by 507 Summit LLC, Balance Law PLLC, KOA Capital L.P.. (Case No Longer Referred to Magistrate Judge) CASE ASSIGNED to Magistrate Judge Katharine H. Parker. (Signed by Judge Gregory H. Woods on 7/11/2025) (sgz) (Entered: 07/11/2025) |
| 08/08/2025 | 16 | MEMORANDUM OF LAW in Opposition re: 1 EX PARTE MISCELLANEOUS CASE INITIATING DOCUMENT - MOTION for Discovery *Application for Order of Judicial Assistance under 28 U.S.C. § 1782*. (Filing Fee $ 52.00, Receipt Number ANYSDC-31125608) . Document filed by Balance Law PLLC..(Liu, Beixiao) (Entered: 08/08/2025) |
| 08/08/2025 | 17 | DECLARATION of B. Robert Liu, Esq. in Opposition re: 1 EX PARTE MISCELLANEOUS CASE INITIATING DOCUMENT - MOTION for Discovery *Application for Order of Judicial Assistance under 28 U.S.C. § 1782*. (Filing Fee $ 52.00, Receipt Number ANYSDC-31125608). Document filed by Balance Law PLLC. (Attachments: # 1 Exhibit A. Subpoena on 507 Summit LLC, # 2 Exhibit B. Respondent's Proposal).(Liu, Beixiao) (Entered: 08/08/2025) |
| 08/22/2025 | 18 | REPLY AFFIDAVIT of Jeffrey Chubak in Support re: 1 EX PARTE MISCELLANEOUS CASE INITIATING DOCUMENT - MOTION for Discovery *Application for Order of Judicial Assistance under 28 U.S.C. § 1782*. (Filing Fee $ 52.00, Receipt Number ANYSDC-31125608). Document filed by 507 Summit LLC, KOA Capital L.P.. (Attachments: # 1 Exhibit 1 - Directions Order, # 2 Exhibit 2 - Qunar Cayman Islands Limited v. Athos Asia Event Driven Master Fund, # 3 Exhibit 3 - In re New Frontier Health Corporation, # 4 Exhibit 4 - In re 51job, Inc., # 5 Exhibit 5 - Phoenix Meridian Equity Limited v. Lyxor Asset Management, S.A., # 6 Exhibit 6 - 08/12/2025 Letter from Carey |

| | | |
|---|---|---|
| | | Olsen to Conyers Dill & Pearman re: Default of Discovery Obligations under Directions Order, # 7 Exhibit 7 - Emails with Respondent's Counsel).(Chubak, Jeffrey) (Entered: 08/22/2025) |
| 08/22/2025 | 19 | REPLY MEMORANDUM OF LAW in Support re: 1 EX PARTE MISCELLANEOUS CASE INITIATING DOCUMENT - MOTION for Discovery *Application for Order of Judicial Assistance under 28 U.S.C. § 1782*. (Filing Fee $ 52.00, Receipt Number ANYSDC-31125608) . Document filed by 507 Summit LLC, KOA Capital L.P...(Chubak, Jeffrey) (Entered: 08/22/2025) |
| 12/14/2025 | 20 | LETTER addressed to Magistrate Judge Katharine H. Parker from Jeffrey Chubak dated 12/14/2025 re: Developments Underscoring Need to Obtain Requested Document Discovery from Respondent. Document filed by 507 Summit LLC, KOA Capital L.P... (Chubak, Jeffrey) (Entered: 12/14/2025) |
| 01/26/2026 | 21 | OPINION AND ORDER ON APPLICATION FOR DISCOVERY FOR USE IN A FOREIGN PROCEEDING re: 1 EX PARTE MISCELLANEOUS CASE INITIATING DOCUMENT - MOTION for Discovery *Application for Order of Judicial Assistance under 28 U.S.C. § 1782*. For the above-stated reasons, the Petition is GRANTED in part and DENIED in part. Any motion to quash, modify or for other relief by Respondent shall be filed within thirty days of this Order. The Clerk of Court is respectfully directed to terminate the pending motion at ECF No. 1. SO ORDERED. (Filing Fee $ 52.00, Receipt Number ANYSDC-31125608) filed by 507 Summit LLC, KOA Capital L.P. (Signed by Magistrate Judge Katharine H. Parker on 1/26/2026) (mml) Transmission to Orders and Judgments Clerk for processing. (Entered: 01/27/2026) |
| 02/25/2026 | 22 | MOTION to Quash subpoena duces tecum . Document filed by Balance Law PLLC..(Liu, Beixiao) (Entered: 02/25/2026) |
| 02/25/2026 | 23 | DECLARATION of B. Robert Liu in Support re: 22 MOTION to Quash subpoena duces tecum .. Document filed by Balance Law PLLC. (Attachments: # 1 Exhibit 1-subpoena duces tecum, # 2 Exhibit 2-Confidentiality Order).(Liu, Beixiao) (Entered: 02/25/2026) |
| 02/25/2026 | 24 | MEMORANDUM OF LAW in Support re: 22 MOTION to Quash subpoena duces tecum . . Document filed by Balance Law PLLC..(Liu, Beixiao) (Entered: 02/25/2026) |
| 03/01/2026 | 25 | MEMORANDUM OF LAW in Opposition re: 22 MOTION to Quash subpoena duces tecum . . Document filed by 507 Summit LLC, KOA Capital L.P...(Chubak, Jeffrey) (Entered: 03/01/2026) |
| 03/03/2026 | 26 | REPLY AFFIRMATION of B. Robert Liu in Support re: 22 MOTION to Quash subpoena duces tecum .. Document filed by Balance Law PLLC. (Attachments: # 1 Exhibit A. Lorelei Corporate Records, # 2 Exhibit B. Lorelei's Withdrawal from the State Court Action).(Liu, Beixiao) (Entered: 03/03/2026) |
| 03/03/2026 | 27 | REPLY MEMORANDUM OF LAW in Support re: 22 MOTION to Quash subpoena duces tecum . . Document filed by Balance Law PLLC..(Liu, Beixiao) (Entered: 03/03/2026) |
| 03/05/2026 | 28 | LETTER MOTION for Oral Argument addressed to Magistrate Judge Katharine H. Parker from Jeffrey Chubak dated March 5, 2026. Document filed by 507 Summit LLC, KOA Capital L.P...(Chubak, Jeffrey) (Entered: 03/05/2026) |
| 03/09/2026 | 29 | LETTER MOTION for Leave to File Sur Reply addressed to Magistrate Judge Katharine H. Parker from Jeffrey Chubak dated 03/09/2026. Document filed by 507 Summit LLC, KOA Capital L.P.. (Attachments: # 1 Exhibit 1 - Sur Reply).(Chubak, Jeffrey) (Entered: 03/09/2026) |
| 03/12/2026 | 30 | LETTER RESPONSE to Motion addressed to Magistrate Judge Katharine H. Parker from B. Robert Liu, Esq. dated March 12, 2026 re: 29 LETTER MOTION for Leave to File Sur |

| | | |
|---|---|---|
| | | Reply addressed to Magistrate Judge Katharine H. Parker from Jeffrey Chubak dated 03/09/2026. . Document filed by Balance Law PLLC..(Liu, Beixiao) (Entered: 03/12/2026) |
| 03/13/2026 | 31 | ORDER denying 28 Letter Motion for Oral Argument; denying 29 Letter Motion for Leave to File Document. Those requests are DENIED. The issues which the Court must review are clear and the briefing is sufficient for the Courts consideration. The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 28 and 29. SO ORDERED. (Signed by Magistrate Judge Katharine H. Parker on 3/12/26) (yv) (Entered: 03/13/2026) |
| 04/10/2026 | 32 | OPINION AND ORDER ON MOTION TO QUASH re: 22 MOTION to Quash subpoena duces tecum filed by Balance Law PLLC. For the reasons set forth above, the motion to quash is GRANTED. Within one week of this Opinion and Order, the parties shall submit a letter to the Court indicating whether there are any outstanding issues for the Court to address or whether, alternatively, this matter can be closed. The Clerk of Court is respectfully directed to terminate the pending motion at ECF No. 22 SO ORDERED. (Signed by Magistrate Judge Katharine H. Parker on 4/10/2026) (vfr) (Entered: 04/10/2026) |
| 04/16/2026 | 33 | JOINT LETTER addressed to Magistrate Judge Katharine H. Parker from Jeffrey Chubak dated 04/16/2026 re: Joint Letter Pursuant to ECF #32. Document filed by 507 Summit LLC, KOA Capital L.P...(Chubak, Jeffrey) (Entered: 04/16/2026) |
| 04/17/2026 | 34 | MEMO ENDORSEMENT on re: 33 Letter filed by 507 Summit LLC, KOA Capital L.P. ENDORSEMENT: APPLICATION GRANTED. (Signed by Magistrate Judge Katharine H. Parker on 4/17/2026) (vfr) (Entered: 04/17/2026) |
| 05/11/2026 | 35 | NOTICE OF APPEAL from 32 Memorandum & Opinion,,. Document filed by 507 Summit LLC, KOA Capital L.P.. Filing fee $ 605.00, receipt number ANYSDC-32831759. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit.. (Chubak, Jeffrey) (Entered: 05/11/2026) |
| 05/12/2026 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 35 Notice of Appeal,..(nd) (Entered: 05/12/2026) |
| 05/12/2026 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 35 Notice of Appeal, filed by 507 Summit LLC, KOA Capital L.P. were transmitted to the U.S. Court of Appeals..(nd) (Entered: 05/12/2026) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 08/14/2026 15:08:35 | | | |
| **PACER Login:** | blandy33 | **Client Code:** | blandy33 |
| **Description:** | Docket Report | **Search Criteria:** | 1:25-mc-00235-KHP |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

**UNITED STATES DISTRICT COURT**
**SOUTHEN DISTRICT OF NEW YORK**

| | |
|---|---|
| 507 SUMMIT LLC and KOA CAPITAL L.P.<br><br>Applicants,<br><br>v.<br><br>BALANCE LAW PLLC dba Balance Law Firm<br><br>Respondent. | Case No. 1:25-mc-00235-GHW-KHP<br><br>Honorable Katherine Parker |

# Memorandum of Law in Opposition to Application For Discovery Pursuant To 28 U.S.C. § 1782

## Table of Contents

**PRELIMINARY STATEMENT** .......................................................... 1

**STATEMENT OF FACTS** .......................................................... 2

**ARGUMENT** .......................................................... 4

I. THE APPLICATION FAILS TO SATISFY THE STATUTORY REQUIREMENTS OF § 1782 .......................................................... 4

*A. The Requested Discovery Is Not "For Use" in the Cayman Appraisal Proceeding* .......................................................... 4

II. THE *INTEL* FACTORS WEIGH STRONGLY AGAINST GRANTING THE APPLICATION .......................................................... 5

*A. Factor 1: The Target Is Not a Participant in the Foreign Proceeding* .......................................................... 5

*B. Factor 2: The Cayman Tribunal Is Not Receptive to This Assistance* .......................................................... 6

*C. Factor 3: The Application Is an Attempt to Circumvent Foreign Proof-Gathering Restrictions and Is Motivated by Retaliation* .......................................................... 6

*D. Factor 4: The Request Is Unduly Intrusive and Burdensome* .......................................................... 7

III. THE COURT SHOULD APPLY HEIGHTENED SCRUTINY TO § 1782 APPLICATIONS FOR DISCOVERY MADE TO LAW FIRMS OR COUNSEL .......................................................... 8

**CONCLUSION** .......................................................... 9

## Table of Authorities

**Cases**

*BonSens.org v. Pfizer, Inc.*,
95 F.4th 75 (2d Cir. 2024) ....5

*Grupo Qumma, S.A.*,
No. M 8-85, 2005 WL 937486 (S.D.N.Y. Apr. 21, 2005) ....6

*In re Application of Microsoft Corp.*,
428 F. Supp. 2d 188 (S.D.N.Y. 2006) . ....5, 6

*Intel Corp. v. Advanced Micro Devices, Inc.*,
542 U.S. 241 (2004) ....1, 4, 5, 7

*Kiobel v. Cravath, Swaine & Moore L.L.P.*,
895 F.3d 238 (2d Cir. 2018) ....8

*Klein v. Altara RK Invs. Ltd.*,
No. 24-228-cv, 2025 U.S. App. LEXIS 3869 (2d Cir. Feb. 20, 2025) ....8, 9

*Schlich v. Broad Inst., Inc. (In re Schlich)*
(In re Schlich), 893 F.3d 40 (1st Cir. 2018) ....5

*Schmitz v. Bernstein Liebhard & Lifshitz, L.L.P.*,
376 F.3d 79 (2d Cir. 2004) ....8

**Statutes**

28 U.S.C. § 1782 .... i, 1, 3, 4, 8

Section 238 ....1

**Other**

*507 Summit LLC et al v. Jiao Hayes, 3:24-cv-10260*
(D.N.J. 2024) ....7

*507 Summit LLC v. Kroll LLC et al, 1:2023-mc-00043*
(D. Del. 2023) ....7

*507 Summit LLC et al v. General Atlantic, L.P., 1:23-mc-00427*
(KHP) (S.D.N.Y. 2024) ....7

*507 Summit LLC et al v. Roth Capital Partners, LLC, 8:2023-mc-00018*
(C.D. Cal. 2023) ....7

*In re Application of 507 Summit LLC, et al., Case No. 2:23-mc-00040-MTL*
(D. Ariz. 2023) ....7

Respondent Balance Law PLLC respectfully submits this memorandum of law to oppose 507 Summit LLC and KOA Capital L.P.'s application for discovery pursuant to 28 U.S.C. § 1782.

**PRELIMINARY STATEMENT**

Non-Party Respondent Balance Law PLLC ("Respondent") opposes the application of 507 Summit LLC and KOA Capital L.P. ("Applicants") for an order pursuant to 28 U.S.C. § 1782 authorizing discovery for use in a Cayman Islands appraisal proceeding under Section 238 of the Cayman Islands Companies Act (the "Application"). The Application seeks broad production of documents that Respondent produced on behalf of its clients in an ongoing shareholder derivative action in the New York State Supreme Court, Commercial Division, before the Honorable Andrew Borrok (the "NY Action" or "State Court Action").

The Application should be denied in its entirety. It fails the statutory requirements of 28 U.S.C. § 1782 because the requested discovery—documents from the NY Action concerning alleged breaches of fiduciary duty—is not "for use" in the Cayman appraisal, which is limited to determining the fair value of shares in a former subsidiary of the Cayman Islands company. The requested documents, as identified in the chart from the Fang Derivative Action, are pertinent to fiduciary duty issues, not share valuation, and Petitioner's attempt to characterize them as valuation-related is a pretext for retaliation. Even if the statutory threshold is met, the discretionary factors set forth in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004), weigh heavily against granting the Application. Respondent is not a participant in the Cayman proceeding; the Cayman Grand Court is not receptive to such broad U.S. discovery that circumvents its own limited procedures; the Application is a transparent attempt to

retaliate against Respondent's clients for serving a subpoena on Applicants in the NY Action; and the request is unduly burdensome, seeking a significant portion of over 300,000 pages of documents, many of which are irrelevant, confidential, or protected.

Petitioner's refusal to engage in good-faith negotiations, as directed by this Court, further underscores the retaliatory motive. Instead of reciprocating on the NY Action subpoena (authorized by Justice Borrok for discovery from minority shareholders like Petitioner), Petitioner insists on unilateral imposition of this subpoena without compromise. Petitioner's conduct fits a pattern of forum-shopping and abuse of the § 1782 process across multiple districts. This abuse of process warrants denial.

**STATEMENT OF FACTS**

This Application arises from Petitioner's ongoing Cayman Islands appraisal proceeding to determine the fair value of shares in a former subsidiary of Fang Holdings Limited (the "Company"). The Cayman proceeding is limited to valuation issues under Section 238 of the Companies Act, focusing on expert reports and fair market value, with restricted discovery compared to U.S. standards.

Separately, in the NY Action, Oasis Fund Master II alleges breaches of fiduciary duty by Respondent's clients–including Mr. Tianquan Mo and Mr. Jiangong Dai–the CEO and former Chairman of the Company, related to a related-party transaction. Justice Borrok has overseen extensive discovery, including Respondent's production of over 300,000 pages of documents to the plaintiff at significant cost (exceeding $300,000 through vendor Alvarez & Marsal). Justice Borrok also authorized non-party subpoenas to minority shareholders, including Petitioner, to explore their understanding of the transaction at issue. Respondent, on behalf of the CEO, served such a subpoena on Petitioner.

Shortly thereafter, Petitioner filed this ex parte Application, seeking all documents listed in a chart produced in the Fang Derivative Action (a related NY proceeding involving similar fiduciary claims against Mr. Mo and others for suppressing CIH equity prices). The Application was filed without notice to Respondent, despite the ongoing NY Action and the clear connection between the two matters. This Court directed the parties to negotiate a resolution, but Petitioner refused good-faith engagement, demanding full production without reciprocating on the NY subpoena or narrowing its request. Petitioner's counsel stated they would not comply with the NY subpoena unless Respondent capitulated here, confirming the retaliatory intent.

Petitioner's conduct fits a pattern: Applicants have filed multiple ex parte 28 U.S.C. § 1782 applications in various U.S. districts (SDNY, D.N.J., D. Del., C.D. Cal., D. Ariz., D. D.C., D. Ariz.) for discovery in Cayman appraisals, often targeting valuation-related information. For instance,

– in *507 Summit LLC et al v. General Atlantic, L.P., 1:23-mc-00427* (S.D.N.Y. 2024), an ex parte grant was obtained for CIH valuation documents;

– in 507 *Summit LLC et al v. Jiao Hayes, 3:24-cv-10260* (D.N.J. 2024), for a deposition;

– in 507 *Summit LLC v. Kroll LLC et al, 1:2023-mc-00043* (D. Del. 2023), for Kroll LLC (f/k/a Duff & Phelps LLC) and Kroll Securities LLC documents;

– in *507 Summit LLC et al v. Roth Capital Partners, LLC, 8:2023-mc-00018* (C.D. Cal. 2023), for valuations;

– *In re Application of 507 Summit LLC, et al., Case No. 2:23-mc-00040-MTL* (D. Ariz. 2023), for similar appraisal-related discovery; and

– *In re Application of 507 Summit LLC*, Case No. 4:23-mc-80243-DMR (N. D. Cal 2023)

These actions further evidence Applicants' intentional efforts to circumvent restrictions in foreign proceedings.

## ARGUMENT

I. The Application Fails to Satisfy the Statutory Requirements of § 1782

Section 1782 authorizes discovery only if: (1) the target resides or is found in the district; (2) the applicant is an "interested person" in the foreign proceeding; and (3) the discovery is "for use" in a foreign tribunal. 28 U.S.C. § 1782(a). While the first two may be met (Respondent is in this district, and Applicants are parties in the Cayman appraisal proceeding), the third is not.

A. The Requested Discovery Is Not "For Use" in the Cayman Appraisal Proceeding

The "for use" requirement demands a "dispositive ruling by the foreign tribunal" be within "reasonable contemplation" and the discovery must be relevant to that ruling (*Intel Corp.*, 542 U.S. at 259). Cayman appraisal proceedings under Section 238 are narrow, focusing on fair value determination through expert reports, with limited discovery (e.g., no broad document production or interrogatories). *See In the matter of Qunar Cayman Islands Ltd.* [2017] (1) CILR 1 (Cayman Grand Court emphasizing expert-driven process).

The NY documents—internal communications, board minutes, and discovery on fiduciary duties—are irrelevant to share valuation and outside the Cayman proceeding's scope. The chart from the Fang Derivative Action identifies documents pertinent to fiduciary duties, not CIH valuation, despite Applicants' mischaracterization. Petitioner

seeks them not for "use" in Cayman but to harass Respondent's clients in retaliation for the NY subpoena. Courts deny § 1782 where discovery is speculative or unrelated. *See Schlich v. Broad Inst., Inc. (In re Schlich)* (*In re Schlich*), 893 F.3d 40 (1st Cir. 2018) (the court denied discovery because the requested information was deemed irrelevant to the foreign tribunal's jurisdiction and the proceedings before it, rendering the request speculative); *see also BonSens.org v. Pfizer, Inc.*, 95 F.4th 75 (2d Cir. 2024) (the court found the discovery request speculative because the applicant failed to demonstrate that the foreign tribunal would consider the requested evidence).

The Application should also be denied as a fishing expedition. Applicants' pattern of similar applications in multiple districts further shows an intent to abuse U.S. discovery processes rather than genuinely assist the Cayman tribunal.

II. The *Intel* Factors Weigh Strongly Against Granting the Application

Even if statutory requirements are met, the Court has discretion to deny the Application under the *Intel* factors: (1) target's participation in the foreign proceeding; (2) foreign tribunal's receptivity; (3) circumvention of foreign proof-gathering rules; and (4) undue burden. *Intel Corp.*, 542 U.S. at 264–65. All favor denial.

A. Factor 1: The Target Is Not a Participant in the Foreign Proceeding

Respondent is not a party to the Cayman appraisal, favoring discovery (*Id.* at 264). However, this factor is outweighed by others, as the Application is abusive. Respondent holds the documents as counsel for parties indirectly involved (via the subsidiary), making the request duplicative and improper. *See In re Application of Microsoft Corp.*, 428 F. Supp. 2d 188, 194 (S.D.N.Y. 2006) (denying despite non-participation due to circumvention). Applicants' assertion that Fang (a non-party in Cayman) is the "real target" ignores the retaliatory context and overstates relevance.

B. Factor 2: The Cayman Tribunal Is Not Receptive to This Assistance

Cayman courts are generally receptive to U.S. aid but prefer their own procedures in appraisals, which limit discovery to expert exchanges. *See In the matter of Qunar Cayman Islands Ltd Ltd.* [2017] (1) CILR 1. The Grand Court would not welcome broad U.S. production circumventing its rules. *See In re Application of Microsoft Corp.*, 428 F. Supp. 2d 188, 194 (S.D.N.Y. 2006) (finding that Microsoft's discovery request was a "blatant end-run" around such restrictions or policies of a foreign country. The European Commission itself had stated that Microsoft's subpoenas were "not objectively necessary but rather an attempt to circumvent the established rules on access to file in proceedings before the Commission"). Applicants' reliance on *Lyxor Asset Mgmt S.A. v. Phoenix Meridian Equity Limited* [2009] CILR 553 is misplaced, as that case involved targeted aid, not broad production like here. Applicants' similar applications across districts underscore the lack of genuine receptivity, as it suggests a pattern of overreach rather than targeted assistance.

C. Factor 3: The Application Is an Attempt to Circumvent Foreign Proof-Gathering Restrictions and Is Motivated by Retaliation

This factor is dispositive. The Application conceals a retaliatory motive: Filed shortly after Respondent's clients served a subpoena on Petitioner in the NY Action (authorized by Justice Borrok for minority shareholder discovery), it demands unilateral production without reciprocation. Petitioner's refusal to negotiate, as directed by this Court, confirms bad faith—insisting on imposition while ignoring the NY subpoena. *See Grupo Qumma, S.A.*, No. M 8-85, 2005 WL 937486, at *3 (S.D.N.Y. Apr. 21, 2005) (holding the lack of ulterior motive for seeking discovery relevant in granting application).

Moreover, Applicants' pattern of ex parte § 1782 filings in multiple districts (SDNY, D.N.J., D. Del., C.D. Cal., D. Ariz., D. D.C., D. Ariz.) for discovery in Cayman appraisals demonstrates forum-shopping to obtain evidence unavailable in Cayman. For instance,

- in *507 Summit LLC et al v. General Atlantic, L.P., 1:23-mc-00427 (KHP)* (S.D.N.Y. 2024), an ex parte application was made for CIH valuation documents;
- in 507 *Summit LLC et al v. Jiao Hayes, 3:24-cv-10260* (D.N.J. 2024), an application was made for a deposition;
- in 507 *Summit LLC v. Kroll LLC et al, 1:2023-mc-00043* (D. Del. 2023), for Kroll LLC (f/k/a Duff & Phelps LLC) and Kroll Securities LLC documents;
- in *507 Summit LLC et al v. Roth Capital Partners, LLC, 8:2023-mc-00018* (C.D. Cal. 2023), for valuations;
- *In re Application of 507 Summit LLC, et al., Case No. 2:23-mc-00040-MTL* (D. Ariz. 2023), for similar appraisal-related discovery; and
- *In re Application of 507 Summit LLC*, Case No. 4:23-mc-80243-DMR (N. D. Cal 2023)

This circumvents Cayman's limited discovery in appraisal proceeding, favoring denial (*Intel Corp*., 542 U.S. at 265). Applicants' mischaracterization of the Fang Derivative Action chart as "valuation" evidence ignores its focus on fiduciary duties, further evidencing pretext.

D. Factor 4: The Request Is Unduly Intrusive and Burdensome

The subpoena seeks a significant portion of the over 300,000 pages of State Court Action documents, many irrelevant to Cayman valuation (e.g., fiduciary duty details vs. share fair value). Applicants' reliance on the State Court Action chart

overlooks that those documents were produced for fiduciary claims, not CIH valuation. This imposes undue burden on Respondent, requiring review and production of confidential materials protected in the State Court Action. Costs should shift to Applicants if any production is ordered. The retaliatory nature and Applicants' pattern amplify the burden.

III. The Court Should Apply Heightened Scrutiny to § 1782 Applications for Discovery Made to Law Firms or Counsel

Under the Second Circuit's jurisdiction, courts should exercise heightened scrutiny when reviewing applications for discovery under 28 USCS § 1782 that seek documents from law firms or counsel. *See Kiobel v. Cravath, Swaine & Moore L.L.P.*, 895 F.3d 238, 249 (2d Cir. 2018)

Law firms often hold sensitive, privileged, or confidential information due to their role as legal counsel. In *Kiobel*, 895 F.3d 238, the Second Circuit emphasized the need for caution when § 1782 applications target law firms. The court noted that such applications may effectively seek discovery from an adversary in foreign litigation, raising concerns about fairness and the circumvention of foreign proof-gathering restrictions *Kiobel*, 895 F.3d 238, *Klein v. Altara RK Invs. Ltd.*, No. 24-228-cv, 2025 U.S. App. LEXIS 3869 (2d Cir. Feb. 20, 2025). Similarly, in *Schmitz v. Bernstein Liebhard & Lifshitz, L.L.P.*, 376 F.3d 79 (2d Cir. 2004), the Second Circuit highlighted the risk of using § 1782 to obtain discovery indirectly from an opponent in foreign proceedings, particularly when the discovery is sought from a law firm. *Klein*, 2025 U.S. App. LEXIS 3869.

Here, Applicants are adversaries of both Fang and CIH in Cayman Islands. The Court should see through Applicants' ulterior motive to circumvent Cayman Islands court rules on discovery to obtain discovery from adverse parties.

**CONCLUSION**

For the foregoing reasons, the Court should deny the Application in its entirety or, at minimum, modify it to narrow the scope and require cost-sharing. Respondent requests oral argument if needed.

Respectfully submitted,

B. Robert Liu

Beixiao Robert Liu (Bar #: 5697552)
Balance Law Firm
1 World Trade Ctr Ste 8500
New York, NY 10007
(212) 741-8080
(646) 558-4889 fax
robert.liu@balancelawfirm.com
*Attorneys for Respondent Balance Law PLLC.*

Certificate on Local Civil Rule 7.1 Compliance

Relying on the word count of the word-processing program used to prepare this document, the undersigned states that the number of words in this document is 2,175 and certifies that this document complies with the word-count limitation as set forth in Local Civil Rule 7.1.

B. Robert Liu

Beixiao Robert Liu (Bar #: 5697552)
Balance Law Firm
1 World Trade Ctr Ste 8500
New York, NY 10007
(212) 741-8080
(646) 558-4889 fax
robert.liu@balancelawfirm.com
*Attorneys for Respondent Balance Law PLLC*

**UNITED STATES DISTRICT COURT**
**SOUTHEN DISTRICT OF NEW YORK**

| | |
|---|---|
| 507 SUMMIT LLC and KOA CAPITAL L.P.<br><br>Applicants,<br><br>v.<br><br>BALANCE LAW PLLC dba Balance Law Firm<br><br>Respondent. | Case No. 1:25-mc-00235-GHW-KHP<br><br>**Declaration of B. Robert Liu, Esq. In Opposition to the Application for Discovery under 28 U.S.C. § 1782**<br><br>Honorable Katherine Parker |

I, B. Robert Liu, Esq., subscribe the following matter as true under penalty of perjury:

1. I am the Managing Partner of Balance Law PLLC, Respondent in the above-captioned case. I have personal knowledge of the facts set forth herein, except where stated on information and belief, and as to those matters, I believe them to be true. I submit this declaration in opposition to the application of Petitioner 507 Summit LLC and KOA Capital L.P. ("Applicants") for an order pursuant to 28 U.S.C. § 1782.

2. I am also counsel of record for Mr. Vincent Tianquan Mo and Mr. Richard Jiangong Dai–current and former Chairman of Fang Holding Limited ("Fang")–in a shareholder derivative lawsuit currently pending before the Honorable Andrew Borrok in the New York State Supreme

Court, Commercial Division, captioned *OASIS INVESTMENTS II MASTER FUND LTD. v. VINCENT TIANQUAN MO et al*, Index No. 652607/2023 (the "State Court Action").

**Applicants and plaintiffs in the State Court Action**

3. Applicant 507 Summit LLC is acting in concert with the plaintiff in the State Court Action.

4. When the State Court Action was initially filed in May 2023, there were two plaintiffs, Oasis Investments II Master Fund Ltd ("Oasis Master Fund") and Lorelei NCC Inc ("Lorelei").

5. After Defendants in the State Court Action raised the affirmative defense of champerty, Lorelei offered to and did withdraw from the State Court Action in March 2025.

6. After the State Court Action was filed and while Lorelei was still a derivative plaintiff, Lorelei sold all of its Fang shares except for one share to 507 Summit LLC at the end of 2023.

7. Approximately one month after it acquired these Fang shares from Lorelei, in January 2024, 507 Summit LLC (together with KOA Capital L.P.) commenced a winding up petition against Fang in Cayman Islands, seeking a winding up of Fang.

8. This share purchase transaction and the winding up petition filed immediately thereafter indicates coordinated efforts between Applicants and the State Court Action plaintiffs, as it aligns their economic interests and suggests shared strategies in challenging the Fang's transactions.

9. Applicants have a well-documented history of seeking discovery under 28 U.S.C. § 1782 in federal district courts around the country for the same type of appraisal actions in the Cayman Islands, including:

- in *507 Summit LLC et al v. General Atlantic, L.P., 1:23-mc-00427* (S.D.N.Y. 2024), seeking discovery for CIH valuation documents;
- in 507 *Summit LLC et al v. Jiao Hayes, 3:24-cv-10260* (D.N.J. 2024), seeking deposition;
- in 507 *Summit LLC v. Kroll LLC et al, 1:2023-mc-00043* (D. Del. 2023), seeking discovery for Kroll LLC (f/k/a Duff & Phelps LLC) and Kroll Securities LLC documents;
- in *507 Summit LLC et al v. Roth Capital Partners, LLC, 8:2023-mc-00018* (C.D. Cal. 2023), seeking discovery for valuations;
- *In re Application of 507 Summit LLC, et al., Case No. 2:23-mc-00040-MTL* (D. Ariz. 2023), seeking similar appraisal-related discovery; and

– *In re Application of 507 Summit LLC*, Case No. 4:23-mc-80243-DMR (N. D. Cal 2023), seeking deposition.

10. In most if not all of these § 1782 proceedings in other judicial districts, the applications were unopposed.

11. Further evidence of this concert of action is that the counsel for the plaintiffs in the State Court Action–Reid Collins & Tsai LLP ("Reid Collins")–has appeared for or otherwise assisted 507 Summit LLC in applications in the District of Arizona and the Northern District of California, seeking discovery for similar Cayman Islands appraisal proceedings.

12. This overlapping representation demonstrates a collaborative relationship between Applicants and the State Court Action plaintiffs, aimed at advancing mutual litigation goals.

13. In fact, another Oasis fund affiliated with the plaintiff in the State Court Action Oasis Master Fund joined Applicant 507 Summit LLC in some of these § 1782 proceedings in other federal district courts and they were jointly represented by Reid Collins.

**<u>The Appraisal Proceeding of CIH in the Cayman Islands</u>**

14. Applicants filed this application purportedly for use in an appraisal proceeding they commenced against CIH in the Cayman Islands.

15. Applicants correctly stated that CIH became a publicly traded company through a spin-off transaction from Fang in 2019.

16. This spin-off transaction in 2019 and the following four transactions/events are at issue in the State Court Action:

- Fang's purchase of CIH shares from Vincent Tianquan Mo in 2019–2020;
- Fang's delisting from the New York Stock Exchange;
- Vincent Tianquan Mo and Richard Jiangong Dai's purchase of Fang shares after the Fang delisting; and
- CIH's go-private transaction on NASDAQ.

17. Applicants' appraisal action against CIH in the Cayman Islands only concerns the last transaction above "CIH's go-private transaction on NASDAQ," and seeks to challenge the consideration paid by majority shareholders to minority shareholders in the CIH go-private transaction.

18. Applicants' appraisal action is currently in the discovery phase under the Cayman Grand Court process. Applicants are scheduled to receive document production from CIH in that appraisal proceeding this month (August 2025).

19. Upon information and belief, the discovery process in this appraisal action in the Cayman Islands is proceeding smoothly in due course.

20. Any relevant and responsive documents in the requested discovery in this Application—documents already produced in the State Court Action—are duplicative of what Applicants will obtain directly in Cayman, underscoring the lack of necessity.

**<u>This Application is Made with Retaliatory Intent</u>**

21. This application was made by Applicants to retaliate the nonparty subpoena that Respondent issued to Applicants in the State Court Action.

22. In the State Court Action, Justice Borrok has specifically authorized discovery from non-parties, including minority shareholders such as Applicants, to obtain their understanding of the transactions at issue in the State Court Action. Pursuant to that authorization, Respondent served a non-party subpoena on Applicants. A true and correct copy of Respondent's subpoena is annexed hereto as Exhibit A.

23. Applicants' filing of this § 1782 Application shortly thereafter is a clear retaliation for that subpoena, as it seeks to impose burdensome production obligations without having a real need for this production.

24. After the case management conference on July 8, 2025, I had a sit-down meeting with opposing counsel in the jury room for approximately 30 minutes regarding resolving these issues amicably. The opposing counsel seemed to be receptive to an amicable resolution.

25. Based on that meeting, I made a proposal to opposing counsel, under which Respondent would produce documents related to the CIH go-private transaction to Applicants, which is all that Applicants are entitled to obtain under this Application, because the other four transactions/events at issue in the State Court Action are irrelevant to the appraisal proceeding in the Cayman Islands. A true and correct copy of my proposal is annexed hereto as Exhibit B. As part of this amicable resolution, I also proposed that Applicants produce documents responsive to my nonparty subpoena issued to them.

26. However, not only did Applicants refuse to even engage in any discussion about producing documents in responsive to my nonparty subpoena issued in the State Court Action, but they also rejected my offer to produce documents relevant to the CIH go-private transaction and insisted on getting documents related to the entire State Court Action.

27. That's patently unreasonable and disproportional because out of the five transactions/events at issue in the State Court Action, only one is

arguably relevant to the appraisal proceeding in the Cayman Islands; the other four are irrelevant, and Applicants are not entitled to obtain documents related to those transactions.

28. Applicants, through their refusal to engage in good-faith negotiations as directed by this Court, have further evidenced their retaliatory intent. Despite the Court's instruction to negotiate, Applicants insisted on unilateral imposition of its subpoena on me (as Respondent) without any compromise or reciprocity regarding the State Court Action subpoena.

29. Applicants' retaliatory intent is also manifested through their unreasonable, overbroad, and burdensome discovery requests to Respondent that are not only way beyond the scope of their appraisal proceeding in the Cayman Islands, but are also duplicative–to the extent of the document production they will receive in the Cayman Islands proceeding later this month.

30. Respondent assisted defendants in the State Court Action with producing over 300,000 pages of documents, and the chart attached to Applicants' application include a significant portion of these 300,000 pages' document production. Applicants have no real need for these documents.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 8, 2025, in New York, New York.

B. Robert Liu

Beixiao Robert Liu (Bar #: 5697552)
Balance Law Firm
1 World Trade Ctr Ste 8500
New York, NY 10007
(212) 741-8080
(646) 558-4889 fax
robert.liu@balancelawfirm.com
*Attorneys for Respondent Balance Law PLLC*

Certificate on Local Civil Rule 7.1 Compliance

Relying on the word count of the word-processing program used to prepare this document, the undersigned states that the number of words in this document is 1,419 and certifies that this document complies with the word-count limitation as set forth in Local Civil Rule 7.1.

B. Robert Liu

Beixiao Robert Liu (Bar #: 5697552)
Balance Law Firm
1 World Trade Ctr Ste 8500
New York, NY 10007
(212) 741-8080
(646) 558-4889 fax
robert.liu@balancelawfirm.com
*Attorneys for Respondent Balance Law PLLC*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| OASIS INVESTMENTS II MASTER FUND LTD., derivatively on behalf of nominal defendant FANG HOLDINGS LIMITED,<br><br>Plaintiff,<br><br>-against-<br><br>VINCENT TIANQUAN MO, RICHARD JIANGONG DAI, ACE SMART INVESTMENTS LIMITED, NEXT DECADE INVESTMENTS LIMITED, MEDIA PARTNER TECHNOLOGY LIMITED, and TRUE KNIGHT LIMITED,<br><br>Defendants. | Index No.: 652607/2023<br><br>**Hon. Andrew Borrok**<br><br>**SUBPOENA *DUCES TECUM*** |

To: 507 Summit LLC
853 Broadway, Suite 1109
New York, NY 10003
Attn: Lepercq De Neuflize Asset Management LLC
Phone: 212-698-0700

YOU ARE HEREBY COMMANDED TO PRODUCE, pursuant to Articles 23 and 31 of the Civil Practice Law and Rules ("**CPLR**"), on or before May 30, 2025, at 10:00 A.M., at the offices of Balance Law Firm at One World Trade Center, Suite 8500, New York, New York 10007, for inspection, copying, testing, or sampling, in connection with the above-captioned case, pending in the Supreme Court of the State of New York, New York County, Index No. 652607/2023, complete and accurate copies of all documents and things in your possession, custody, or control that are described in the attached Schedule A (the "**Requests**").

Disclosure is being sought from you because, upon information and belief, you possess documents and things material and necessary to the prosecution or defense of this action. A copy of the Amended Complaint in this action is attached hereto as Exhibit 1.

Business records produced pursuant to this subpoena must be accompanied by a certification, sworn in the form of an affidavit and subscribed by the custodian or other qualified witness charged with responsibility of maintaining the records, stating certain information as set forth in CPLR 3122-a.

In lieu of a personal appearance, you may deliver the material by mail or overnight delivery service, or by electronic means, to the undersigned attorney, so as to be received by the date set forth above.

Failure to comply with this subpoena is punishable as a contempt of Court and shall make you liable to the person on whose behalf this subpoena was issued for a penalty not to exceed fifty dollars and all damages sustained by reason of Your failure to comply.

Dated: May 7, 2025
New York, New York

**Balance Law Firm**

By: s/ B. Robert Liu
B. Robert Liu, Esq.
One World Trade Center, Suite 8500
New York, New York 10007

*Attorneys for Defendants Vincent Tianquan Mo, Richard Jiangong Dai, ACE Smart Investment Limited, Next Decade Investments Limited, Media Partner Technology Limited, and True Knight Limited, and Nominal Defendant Fang Holdings Limited*

## Schedule A

**Instructions and Definitions**

As used herein, the following terms shall have the meanings indicated below:

"Action" shall refer to the above-captioned proceeding.

"All," "any," and "each" shall each be construed in their most inclusive form as encompassing any and all.

"Amended Complaint" shall refer to the amended complaint filed in the above-captioned proceeding on August 18, 2023 (Exhibit 1).

"Communication(s)" shall mean the transmittal or exchange of information, in any form and by any means, including but not limited to, documents, writings, letters, notes, face-to-face conversations, telephone conversations, meetings, conferences, correspondence, electronic mail, text message, sound recordings, video recordings, instant message, or other exchange of information in any form.

"CIH" shall refer to China Index Holdings Limited.

"Document(s)" is synonymous in meaning and equal in scope to the usage of the term in Article 31 or the N.Y. C.P.L.R., except that "document" specifically includes, without limitation, any electronically-stored data or information. Drafts and non-identical duplicates constitute separate documents. Attachments, exhibits, appendices, schedules, and enclosures to documents are considered part of the same document.

"Evenstar" shall mean Evenstar Master Fund SPC and Evenstar Capital Management Limited, and each and all of their current and former parents, owners, subsidiaries, affiliates, divisions, predecessors, successors, employees, managers, officers, directors, shareholders, partners, general partners, limited partners, members, agents, or any other Person acting, or purporting to act, with or on behalf of any of the foregoing.

"Fang" shall refer to Fang Holdings Limited, the nominal Defendant in the above-captioned proceeding.

"Including" shall mean including but not limited to.

"Koa Capital LP" shall mean Koa Capital LP, a Delaware entity located at 344 Grove Street, Unit 960, Jersey City, New Jersey, 07302, and each and all of their current and former parents, owners, subsidiaries, affiliates, divisions, predecessors, successors, employees, managers, officers, directors, shareholders, partners, general partners, limited partners, members, agents, or any other Person acting, or purporting to act, with or on behalf of any of the foregoing, including but not limited to, Henry Patner, Chief Investment Officer.

"Lepercq Group" shall mean the Lepercq Group located at 853 Broadway, New York, NY 10003, with additional offices located at 14 Hanover Square, #4.02, Mayfair, London W1S 1HP, and at 2 Havelock Road, #07-25, Havelock II, Singapore 059763, including but not limited to, Lepercq de Neuflize Asset Management LLC, a Delaware limited liability company, and Lepercq Capital Management LLC, a Delaware limited liability company, and each and all of their current and former parents, owners, subsidiaries, affiliates, divisions, predecessors, successors, employees, managers, officers, directors, shareholders, partners, general partners, limited partners, members, agents, or any other Person acting, or purporting to act, with or on behalf of any of the foregoing, including but not limited to, Thomas Riboud-Seydoux, Chairman, CEO, Co-Chief Investment Officer and Kyle Cleeton, Co-Chief Investment Officer.

"Lorelei NCC Inc." shall mean Lorelei NCC Inc., a New York entity located at 32 Elm Place, 3rd Floor, Rye, NY 10580, and each and all of their current and former parents, owners, subsidiaries, affiliates, divisions, predecessors, successors, employees, managers, officers, directors, shareholders, partners, general partners, limited partners, members, agents, or any other Person acting, or purporting to act, with or on behalf of any of the foregoing, including but not limited to, Sina Toussi, Chief Executive Officer.

"Oasis Capital Partners (Texas) Inc." shall mean Oasis Capital Partners (Texas) Inc, with its principal office located at 100 Congress Ave, Ste 780, Austin, TX 78701, and with additional offices located at 25/F, LHT Tower, 31 Queen's Road Central, Hong Kong, and at Nan-O Bldg. Shintora 5th Floor, 2-20-1, Nishi-Shinbashi, Minato-Ku, Tokyo, Japan, 105-0003, and at 7 Rival Street, Tel-Aviv-Yafo, Israel, 6777840, and each and all of their current and former parents, owners, subsidiaries, affiliates, divisions, predecessors, successors, employees, managers, officers, directors, shareholders, partners, general partners, limited partners, members, agents, or any other Person acting, or purporting to act, with or on behalf of any of the foregoing.

"Ownership Interest(s)" shall refer to, but not limited to, shares of stocks, equity interests, American Depositary Shares ("ADSs") representing shares of stocks, or American Depositary Receipts ("ADRs") evidencing the ADSs.

"Person(s)" shall include both the singular and the plural, and means any natural person, business entity, corporation, cooperative, public corporation, partnership, joint venture, or organization.

"Plaintiff" shall mean Oasis Investments II Master Fund Ltd., and each and all of their current and former parents, owners, subsidiaries, affiliates, divisions, predecessors, successors, employees, managers, officers, directors, shareholders, partners, general partners, limited partners, members, agents, or any other Person acting, or purporting to act, with or on behalf of any of the foregoing.

"Reflecting" and "Concerning" shall mean regarding, referring to, enumerating, listing, summarizing, describing, embodying, evidencing, mentioning, analyzing, pertaining to, concerning, arising out of, in connection with, constituting, or in any way legally, logically, or factually connected with the matter discussed.

"Thing" refers to any tangible object other than a document and includes objects of every kind and nature, including but not limited to prototypes, models, specimens, computer disks and tapes, videotapes, and audiotapes

"Two Seas Capital LP" shall mean Two Seas Capital LP, a Delaware limited liability company based in New York at 32 Elm Place, 3rd Floor, Rye, NY 10580, and each and all of their current and former parents, owners, subsidiaries, affiliates, divisions, predecessors, successors, employees, managers, officers, directors, shareholders, partners, general partners, limited partners, members, agents, or any other Person acting, or purporting to act, with or on behalf of any of the foregoing, including but not limited to, Sina Toussi, Chief Investment Officer, and Lawrence Palermo, Chief Financial Officer.

"You," and "Your" means 507 Summit LLC, a Delaware limited liability company based in New York, and each and all of their current and former parents, owners, subsidiaries, affiliates, divisions, servants, in-house and outside attorneys, accountants, consultants, predecessors in interest, successors, employees, managers, officers, directors, shareholders, partners, general partners, limited partners, members, agents, or any other Person acting, or purporting to act, with or on behalf of any of the foregoing, including but not limited to Kyle Cleeton.

As used herein, the singular includes the plural and the plural includes the singular; the conjunctive includes the disjunctive and the disjunctive includes the conjunctive; the masculine includes the feminine and the feminine includes the masculine; and the present tense includes the past tense and the past tense includes the present tense so as to bring within the scope of these Document Requests all responses that might otherwise be construed to be outside of their scope.

If you are unable to respond to any part of the requests for production in full, please respond to the extent possible and specify your reasons for not responding completely. If you lack information necessary to respond fully to any request for production, please describe the specific efforts made by you or anyone on your behalf to ascertain the information and state as definitively as possible when you anticipate obtaining the information sought and supplementing your response. If any requested document cannot be produced in full, produce it to the extent possible, specifying your reasons for your inability to produce the remainder and stating whatever information, knowledge, or belief you have Concerning the unproduced portion.

If you object to any request as overly broad or unduly burdensome, you shall produce those documents and/or things that are unobjectionable and specifically identify the respect in which the request is allegedly overly broad or burdensome.

If you are aware that any document or thing responsive to any request once existed but has been destroyed, or is no longer available for production, you shall identify who destroyed it, why it was destroyed, and the circumstances under which it was destroyed or is no longer available.

If any document or thing is not produced based on a claim of privilege, or if you contend a document or thing is otherwise exempt from discovery, please identify the document by

providing the following information: (1) name, position, and title of the author; (2) name, position, and title of the addressee; (3) purpose for preparing the document; (4) date of the document; (5) number of pages, attachments, or appendices; (6) brief description or summary of the document's content; (7) all persons to whom the document was distributed, shown, or explained; (8) present custodian; and (9) the nature of the privilege or objection asserted.

Respond to each of the requests separately. Identify to which specific request every document is responsive. If the same document is responsive to more than one request, identify all requests to which it is responsive.

Produce all documents as they are kept in the usual course of business so that Defendants can ascertain the files in which the documents are located, their relative order in such files, and how such files are maintained.

**Requests**

1. All Documents and Communications Concerning or reflecting Your purchase, sale (including short sale), ownership, retention, acquisition, transfer, or disposition of any securities or financial instruments Reflecting Your Ownership Interests in Fang and/or CIH, including but not limited to, forwards, options, futures, swaps, warrants, swaptions, and any other financial derivatives that reference your Ownership Interests in Fang and/or CIH, if any, the date of each transaction, the number and type of securities or derivatives involved in each transaction, and the price paid or received in each transaction during the time periods:

    1) June 21, 2018 through and including July 31, 2019;
    2) August 1, 2019 through and including October 31, 2019;
    3) November 1, 2019 through and including January 31, 2020;
    4) February 1, 2020 through and including September 30, 2021;
    5) October 1, 2021 through and including January 31, 2022;
    6) February 1, 2022 through and including April 30, 2022;
    7) May 1, 2022 through and including May 29, 2023; and
    8) May 30, 2023 through and including April 25, 2025.

2. All Documents and Communications between You, on the one hand, and any directors, officers, employees, or agents of Plaintiff, Oasis Capital Advisors, LLC, Oasis Management (Hong Kong), and/or Oasis Capital Partners (Texas) Inc., on the other, Concerning the allocation of and/or payment of any potential settlement proceeds or judgment proceeds resulting from this Action.

3. All Documents and Communications between You, on the one hand, and any directors, officers, employees, or agents of Lorelie NCC Inc. or Two Seas Capital Partners LP on the other, Concerning the allocation of and/or payment of any potential settlement proceeds or judgment proceeds resulting from this Action.

4. All Documents and Communications between You, on the one hand, and any directors, officers, employees, or agents of Lepercq Group on the other, Concerning the allocation

of and/or payment of any potential settlement proceeds or judgment proceeds resulting from this Action.

5. All Documents and Communications between You, on the one hand, and any directors, officers, employees, or agents of Koa Capital LP on the other, Concerning the allocation of and/or payment of any potential settlement proceeds or judgment proceeds resulting from this Action.

6. All Documents and Communications between You, on the one hand, and any directors, officers, partners, employees, or agents of Reid Collin & Tsai LLP on the other, Concerning the allocation of and/or payment of any potential settlement proceeds or judgment proceeds resulting from this Action.

7. All Documents and Communications between You, on the one hand, and any directors, officers, employees, or agents of Plaintiff, Oasis Capital Advisors, LLC, Oasis Management (Hong Kong), and/or Oasis Capital Partners (Texas) Inc. on the other, Concerning any of the allegations in the Amended Complaint and/or Your understanding and views of the at-issue transactions in this Action.

8. All Documents and Communications between You, on the one hand, and any directors, officers, employees, or agents of Lorelie NCC Inc. or Two Seas Capital Partners LP on the other, Concerning any of the allegations in the Amended Complaint and/or Your understanding and views of the at-issue transactions in this Action.

9. All Documents and Communications between You, on the one hand, and any directors, officers, employees, or agents of Lepercq Group on the other, Concerning any of the allegations in the Amended Complaint and/or Your understanding and views of the at-issue transactions in this Action.

10. All Documents and Communications between You, on the one hand, and any directors, officers, employees, or agents of Koa Capital LP on the other, Concerning any of the allegations in the Amended Complaint and/or Your understanding and views of the at-issue transactions in this Action.

11. All Documents and Communications between You, on the one hand, and any directors, officers, employees, or agents of Evenstar on the other, Concerning any of the allegations in the Amended Complaint and/or Your understanding and views of the at-issue transactions in this Action.

12. All Documents and Communications between You, on the one hand, and any directors, officers, partners, employees, or agents of Reid Collin & Tsai LLP on the other, Concerning any of the allegations in the Amended Complaint and/or Your understanding and views of the at-issue transactions in this Action.

13. All Documents and Communications between You, on the one hand, and any directors, officers, employees, or agents of Plaintiff, Oasis Capital Advisors, LLC, Oasis Management (Hong Kong), and/or Oasis Capital Partners (Texas) Inc. on the other, Concerning the Winding-Up Petition brought by Petitioners Koa Capital LP and You

against Respondents Tianquan Mo and Fang Holdings Ltd. in the Grand Court of the Cayman Islands on January 19, 2024.

14. All Documents and Communications between You, on the one hand, and any directors, officers, employees, or agents of Lorelie NCC Inc. or Two Seas Capital Partners LP on the other, Concerning the Winding-Up Petition brought by Petitioners Koa Capital LP and You against Respondents Tianquan Mo and Fang Holdings Ltd. in the Grand Court of the Cayman Islands on January 19, 2024.

15. All Documents and Communications between You, on the one hand, and any directors, officers, employees, or agents of Lepercq Group on the other, Concerning the Winding-Up Petition brought by Petitioners Koa Capital LP and You against Respondents Tianquan Mo and Fang Holdings Ltd. in the Grand Court of the Cayman Islands on January 19, 2024.

16. All Documents and Communications between You, on the one hand, and any directors, officers, employees, or agents of Koa Capital LP on the other, Concerning the Winding-Up Petition brought by Petitioners Koa Capital LP and You against Respondents Tianquan Mo and Fang Holdings Ltd. in the Grand Court of the Cayman Islands on January 19, 2024.

17. All Documents and Communications between You, on the one hand, and any directors, officers, employees, or agents of Evenstar on the other, Concerning the Winding-Up Petition brought by Petitioners Koa Capital LP and You against Respondents Tianquan Mo and Fang Holdings Ltd. in the Grand Court of the Cayman Islands on January 19, 2024.

18. All Documents and Communications between You, on the one hand, and any directors, officers, partners, employees, or agents of Reid Collin & Tsai LLP on the other, Concerning the Winding-Up Petition brought by Petitioners Koa Capital LP and You against Respondents Tianquan Mo and Fang Holdings Ltd. in the Grand Court of the Cayman Islands on January 19, 2024.

# Exhibit 1

Case 1:25-mc-00235-KHP Document 17-1 Filed 08/08/25 Page 10 of 88

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

OASIS INVESTMENTS II MASTER FUND LTD., and LORELEI NCC INC., derivatively on behalf of nominal defendant FANG HOLDINGS LIMITED,

Plaintiff(s),

*-against-*

VINCENT TIANQUAN MO, RICHARD JIANGONG DAI, ACE SMART INVESTMENTS LIMITED, NEXT DECADE INVESTMENTS LIMITED, MEDIA PARTNER TECHNOLOGY LIMITED, and TRUE KNIGHT LIMITED,

Defendant(s).

Index No.

# Summons

Date Index No. Purchased:

To the above named Defendant(s)

VINCENT TIANQUAN MO, RICHARD JIANGONG DAI, ACE SMART INVESTMENTS LIMITED, NEXT DECADE INVESTMENTS LIMITED, MEDIA PARTNER TECHNOLOGY LIMITED, and TRUE KNIGHT LIMITED

You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

The basis of venue is CPLR 503 and 509
which is where a substantial portion of the events or omissions giving rise to Plaintiffs' claims occurred.

Dated: Austin, Texas

May 29, 2023

Reid Collins & Tsai LLP

by ______________________
William T. Reid, IV
Attorneys for Plaintiff
420 Lexington Avenue, Suite 2731
New York, NY 10170
Tel: 212-344-5200
Fax: 212-344-5299

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------X

OASIS INVESTMENTS II MASTER FUND LTD. and LORELEI NCC INC., derivatively on behalf of nominal defendant FANG HOLDINGS LIMITED,

Plaintiffs,

-against-

VINCENT TIANQUAN MO, RICHARD JIANGONG DAI, ACE SMART INVESTMENTS LIMITED, NEXT DECADE INVESTMENTS LIMITED, MEDIA PARTNER TECHNOLOGY LIMITED, and TRUE KNIGHT LIMITED,

Defendants.
------------------------------------------------------------------X

Index No.:

**SHAREHOLDER DERIVATIVE COMPLAINT**

**REID COLLINS & TSAI LLP**
William T. Reid, IV
Yonah Jaffe
Aaron A. Brown
420 Lexington Avenue, Suite 2731
New York, New York 10170
T: 212-344-5200
F: 212-344-5299
wreid@reidcollins.com
yjaffe@reidcollins.com
abrown@reidcollins.com

Nathaniel J. Palmer (*pro hac vice to be filed*)
Michael Yoder (*pro hac vice to be filed*)
1301 S. Capital of Texas Hwy, C-300
Austin, Texas 78746
T: 512-647-6100
F: 512-647-6129
npalmer@reidcollins.com
myoder@reidcollins.com

*Counsel for Plaintiffs Oasis Investments II Master Fund Ltd. and Lorelei NCC Inc.*

## TABLE OF CONTENTS

NATURE OF ACTION ........ 1

PARTIES ........ 7

A. Plaintiffs ........ 7

B. Defendants ........ 8

C. Nominal Defendant Fang Holdings ........ 10

RELEVANT NON-PARTIES ........ 11

JURISDICTION AND VENUE ........ 12

FACTUAL BACKGROUND ........ 20

A. Defendant Mo Caused Fang to Spin-Off CIH in New York and then Buy Back the CIH Shares His Affiliates Received to Benefit Himself at Fang's Expense. ........ 20

1. Defendant Mo Caused Fang to Spin-Off CIH to Advantage Himself and Facilitate Self-Dealing. ........ 20

2. Defendant Mo Caused Fang to Purchase His Affiliates' CIH Shares at Above-Market Prices and to Facilitate that Self-Dealing through Buybacks. ........ 23

B. Defendant Mo's Egregious Self-Dealing Triggered a Chain Reaction that Defendant Mo and Defendant Dai Utilized as Cover to Further Enrich Themselves. ........ 31

1. Defendant Mo's History of Self-Dealing Gave Rise to a Winding-up petition Filed in the Cayman Islands and Acceleration of Debt Owed by Fang. ........ 31

2. Defendant Mo and Defendant Dai Used the Winding-up petition—that Defendant Mo Caused—as an Excuse to Not File Fang's Securities Filings. ........ 34

3. Defendant Mo and Defendant Dai Used Fang's NYSE Delisting to Acquire Massive Positions in Fang and CIH at Steep Discounts. ........ 41

C. Defendant Mo and Defendant Dai Cause Fang to Buy Out Minority Holders in CIH, Enabling Them to Take CIH Private Without Paying a Dime Themselves. ........ 48

D. Defendants Have Been Unjustly Enriched Through Defendant Mo's and Defendant Dai's Interrelated Breaches of Fiduciary Duty to Fang and Systemic Abuses of New York's Capital Markets. ........ 54

PLAINTIFFS' DERIVATIVE STANDING ........ 60

CAUSES OF ACTION ..... 61

Count I: Breach of Fiduciary Duty (Against Defendants Mo and Dai) ..... 61

Count II: Dishonest Assistance (Against Defendants Mo, ACE, and True Knight) ..... 67

Count III: Alter Ego (Against Defendants Mo and ACE) ..... 69

Count IV: Alter Ego (Against Defendants Dai and True Knight) ..... 70

Count V: Dishonest Assistance (Against Defendants Media Partner and Next Decade) ..... 71

Count VI: Knowing Receipt (Against Defendants Media Partner and Next Decade) ..... 72

NOTICE OF INTENT TO RAISE ISSUES UNDER FOREIGN LAW ..... 73

PRAYER FOR RELIEF ..... 73

## NATURE OF ACTION

1. This shareholder derivative action is brought on behalf of nominal defendant Fang Holdings Limited ("Fang") to seek redress against two of its directors, Defendants Vincent Tianquan Mo ("Mo") and Richard Jiangong Dai ("Dai"), for breaching the fiduciary duties they owed to Fang, and against their affiliated entities that they utilized in connection with those breaches. Defendants Mo and Dai serially breached their fiduciary duties by exploiting New York's capital markets to enrich themselves through self-dealing and by acting in bad faith against Fang's bests interests.

2. Fang, formerly known as SouFun Holdings Limited, went public on September 17, 2010, when its American Depositary Shares ("Fang ADSs") were listed on the New York Stock Exchange ("NYSE"). Defendant Mo, Fang's founder and controlling stocker and then CEO and Chairman, traveled to New York to ring the opening bell on the day of Fang's IPO. Fang ADSs priced at $42.50 in the IPO and skyrocketed over 72.9% to close at $73.50 that day.

3. While Fang's IPO was superficially a success, Defendant Mo primarily used it as a tool to serve his own self-interest rather than Fang's interests. Indeed, Fang itself received only $10.5 million in IPO proceeds, just 8.4% of the total raised, and incurred over $3 million in related expenses for professional fees. Defendant Mo, meanwhile, utilized Fang's IPO and a related private placement transaction to remove a large Fang shareholder, thereby eliminating a potential check on Defendant Mo's ability to operate Fang as he saw fit. And in the process, Defendant Mo, through an affiliate, increased his Fang holdings and obtained an instant unrealized gain of almost $6.9 million plus stock options for nearly two million additional Fang shares. Thus, from the inception of Fang's listing on the NYSE, Defendant Mo utilized Fang's access to New York's capital markets as a vehicle to further his own selfish interests.

4. Following Fang's IPO, the market price for Fang ADSs peaked in January 2014 and then gradually declined in the years thereafter. Defendant Mo's pervasive self-dealing through related party transactions, many involving properties located in New York and debt instruments incorporating New York law, was a contributing factor for the decline. Due to those transactions and other factors, Defendant Mo, once a paper billionaire based on the market price of his Fang holdings, suffered a substantial decline in his net worth.

5. By 2019, Defendant Mo sought to monetize some of his substantial Fang holdings to salvage what he could, as much of his remaining—albeit deflated—net worth was still tied up in Fang.[1] But Defendant Mo faced a dilemma because selling large blocks of his Fang securities to a third party was undesirable for several reasons:

- First, as Fang's chairman, founder, and controlling stockholder, Defendant Mo was an "affiliate" of Fang under U.S. securities laws, meaning that his Fang securities were deemed restricted securities. As a result, Defendant Mo's Fang holdings were illiquid absent a registered offering (which was itself undesirable for Defendant Mo due to disclosure requirements and possible securities fraud litigation risks);

- Second, large sales of Fang securities by Defendant Mo were likely to trigger a significant negative reaction in the marketplace, thereby reducing the value of his remaining Fang holdings; and

- Third, selling his Fang shares would reduce his control over and potential future upside in the business.

6. Defendant Mo's self-serving "solution" to his predicament was to orchestrate an integrated, two-part scheme through which: (1) Fang would spin-off its highly profitable, wholly owned subsidiary, China Index Holdings Limited ("CIH") as a new publicly traded company in New York; and (2) then Defendant Mo would exploit his complete control over Fang to cause

[1] Defendant Mo resigned as Fang's CEO on January 21, 2019. He remained in his role as Fang's chairman of the board of directors until February 28, 2022, however, and has at all relevant times been Fang's controlling stockholder and ultimate human controller.

Fang to buy back —at inflated prices—the CIH interests that Defendant Mo received through the spin-off of CIH from Fang.

7. This self-enrichment scheme eliminated each of the downsides—described above—that Defendant Mo would have faced in trying to sell his Fang interests to third parties:

- First, while the CIH interests that Defendant Mo would obtain through the CIH spin-off would also be restricted securities, he had a pre-arranged buyer under his control in Fang. By splitting his holdings in two and causing Fang to buy back his restricted CIH securities, Mo could obtain liquidity outside of a registered offering (and while avoiding the steep discount normally associated with sales of restricted securities);
- Second, Defendant Mo could avoid the appearance of insider selling that could trigger a large Fang ADS price drop;[2] and
- Third, Defendant Mo would not need to give up control over Fang or the operating business spun off through CIH because his complete control of Fang enabled him to control how Fang would vote its newly acquired CIH shares.

As an added bonus, this scheme enabled Defendant Mo to retain significant indirect economic upside in the CIH shares he sold back to Fang by virtue of his substantial stake in Fang.

8. To carry out this self-interested scheme, Defendant Mo utilized New York's capital markets. Defendant Mo initiated the first step of this scheme in June 2019 by causing Fang to spin-off CIH as a new publicly traded company with its own ADSs listed on the NASDAQ exchange in New York. As part of this transaction, each Fang shareholder—including Defendant Mo and his affiliates—received new CIH shares or CIH ADSs on a pro rata basis in accordance with their prior ownership interest in Fang.

[2] While Fang's ADS price would be expected to drop through the spin-off, the combined price of Fang ADSs and CIH ADSs would have been expected to equal or exceed the Fang ADS price prior to the transaction. A typical rationale behind a spin-off is that the combined value of two companies when separated is greater than the value of the integrated company prior to the spin-off, *i.e.,* the sum of the parts is worth more than the whole.

9. Defendant Mo then implemented the second step of the scheme by causing Fang to purchase over $81.2 million in CIH securities from his affiliates in December 2019 and June 2020. Those transactions constituted brazen self-dealing because the $5.99 per CIH share price that Fang paid to Defendant Mo's affiliates dwarfed both the prevailing market prices and the average prices of $3.32 and $2.48 that Fang paid for CIH securities on the open market in New York during those periods. At the same time, Defendant Mo caused Fang to purchase CIH ADSs in New York in furtherance of this scheme, as those purchases both helped disguise the extent of his self-dealing and offset some of the overall economic interest he lost in CIH from selling CIH securities to Fang (because Defendant Mo held a large stake in Fang and thus held indirect ownership in CIH through his Fang holdings).

10. In carrying out his two-part scheme, Defendant Mo breached his fiduciary duties as Fang's chairman. Using Fang as a personal liquidity provider and causing Fang to pay double the prevailing NASDAQ market price for his affiliates' CIH securities only served to benefit Defendant Mo, not Fang. Through this scheme, Defendant Mo and his affiliates received nearly $81.2 million in cash (from Fang) without losing any control over Fang (or CIH) and while avoiding the many pitfalls of selling Fang interests to third parties. Fang, meanwhile, spent over $95.4 million to end up with an 18.5% non-controlling interest in an entity that had been its wholly owned subsidiary just one year before. These interrelated transactions were against Fang's best interests, made no rational business sense, and contradicted the stated reasons for the spin-off as set forth in Fang's and CIH's securities filings.

11. Ultimately, Defendant Mo's egregious self-dealing and breaches of fiduciary duty in this two-part scheme involving CIH, along with Defendant Mo's prior history of abuse towards Fang in related party transactions involving New York properties and New York debt instruments,

led certain Fang investors to institute a winding-up petition in the Grand Court of the Cayman Islands in November 2020.

12. Although it was clear by late 2021 that the winding-up petition no longer posed any ongoing threat to Fang, it nevertheless presented Defendant Mo with a pretextual excuse to further abuse Fang and enrich himself. Specifically, Defendant Mo (and later Defendant Dai, who was Defendant Mo's nephew and replaced Defendant Mo as Fang's chairman of the board on February 28, 2022) used the winding-up petition as an excuse for Fang not to file its required Form 20-F annual reports with the Securities and Exchange Commission ("SEC"). Defendants Mo and Dai caused Fang to cease filing its required SEC filings (*i.e.,* "go dark") so that they could procure large chunks of Fang and CIH shares cheaply for themselves.

13. As Defendants Mo and Dai were aware from Fang's communications with the NYSE, under NYSE rules, the failure to timely make securities filings necessarily would result in Fang's delisting from the NYSE. NYSE delisting, in turn, would reduce the liquidity and price of Fang securities. Thus, by creating a dark cloud of uncertainty over Fang due to the threat of NYSE delisting (and Fang's failures to report any financial results, more broadly), Defendant Mo and Defendant Dai could artificially devalued Fang by driving down its share price. At the same time, creating substantial doubt over Fang's prospects would artificially depress the price of CIH securities because of: (a) the interrelationships and financial entanglements between the two companies; (b) Defendant Mo's common control over both; and (c) that most large investors in Fang were also large investors in CIH and would be prone to exit both positions.

14. Ultimately, Defendant Mo and his nephew, Defendant Dai, executed their self-serving "going dark" scheme to perfection. They caused Fang to cease all financial reporting after March 2021, and the NYSE eventually delisted Fang ADSs on June 2, 2022. In the months (and

days) leading up to the delisting, Defendants Mo and Dai exploited the threat of Fang's NYSE delisting and devaluation to buy 24.8% of Fang's equity and 22.6% of CIH's equity for themselves through their affiliated entities.

15. The large stakes that Defendants Mo and Dai obtained in Fang and/or CIH were the fruits of their fiduciary duty breaches in causing Fang's NYSE delisting to benefit themselves to Fang's detriment and in exploiting material non-public information in the process. By the end of 2021, the winding-up petition was no longer a threat to Fang and all related fall-out had been resolved. But rather than resume filing public financial disclosures, Defendant Mo and Defendant Dai continued to use the winding-up petition as a pretext to assert doubts over whether Fang could continue as a going concern and as an excuse for Fang to continue to not timely file its securities filings in 2022. That Defendant Mo and Defendant Dai—in securities filings they signed—stated that Fang faced a going concern question was particularly galling in that: (a) Fang was highly solvent and financially sound, with over $1.9 billion in assets compared to just $1.2 billion in liabilities; and (b) Defendant Mo and Defendant Dai used Fang to fund a take private transaction of CIH shortly after Fang's NYSE delisting.

16. Indeed, barely two months after Fang's delisting from the NYSE, Defendant Mo and Defendant Dai compounded their breaches of fiduciary by announcing that Fang would "sponsor" a take private transaction involving CIH. Even though Defendant Mo and Defendant Dai had used purported questions over Fang's ability to continue as a going concern as an excuse for failure to file Fang's securities filings, the take private transaction was structured so that Fang itself would "sponsor" the transaction and provide $14.8 million in equity financing—with cash on hand—to buy-out CIH's few remaining minority investors. Defendant Mo and Defendant Dai, meanwhile, would keep their economic interests in CIH's business without paying one cent. That

Defendant Mo and Defendant Dai exploited Fang to "sponsor" and fully fund a CIH take private transaction shortly after they gobbled up huge stakes of Fang and CIH further establishes that (1) Defendant Mo and Defendant Dai knew that there was no genuine question over Fang's ability to continue as a going concern in 2022; (2) that the pretextual reason given for Fang's NYSE delisting was an utter sham; (3) and that Defendant Mo and Defendant Dai acted against Fang's best interests to benefit themselves by exploiting market uncertainty that they themselves had created through prior misconduct. This take private transaction, which required performance in New York and utilized New York law, closed on April 17, 2023.

17. Plaintiffs, registered shareholders of Fang, now seek to bring this derivative action on Fang's behalf to redress Defendant Mo's and Defendant Dai's compound breaches of fiduciary duty to Fang and related abuses of New York's capital markets to enrich themselves. Defendant Mo and Defendant Dai should be forced to account for and disgorge all profits received in connection with the 24.8% stake in Fang and 22.6% collective stake in CIH they procured by their bad faith actions in causing Fang to "go dark" and suffer NYSE delisting. Defendant Mo and his affiliates should likewise be held accountable for the $81.2 million they received from Fang to obtain CIH shares at above-market prices. And Defendant Mo should be forced to compensate Fang for the harm it suffered as a result of his serial fiduciary breaches, including spending over $130 million to end up with a 35.8% minority interest in CIH's business, which Fang had owned entirely before Defendant Mo set off a chain reaction of fiduciary duty breaches.

## PARTIES

### A. Plaintiffs

18. Plaintiff Oasis Investments II Master Fund Limited ("Oasis") is an exempted company incorporated under the laws of the Cayman Islands. Oasis carries out its investment management activities through two primary investment advisors, one based in Hong Kong and one

based in Austin, Texas. Oasis is a registered holder in Fang and has held shares or beneficial interest in such shares through Fang ADSs at the time of the transactions complained of herein and continues to hold its shares through the present.

19. Plaintiff Lorelei NCC Inc. ("Lorelei") is a corporation incorporated under the laws of New York. Lorelei carries out its management activities from New York. Lorelei is a registered shareholder of Fang. Lorelei obtained a beneficial interest in Fang securities prior to the completion of take private transaction involving CIH complained of herein and continues to hold its shares through the present.

**B. Defendants**

20. Defendant Vincent Tianquan Mo is Fang's founder and served as chairman of Fang's board of directors from 1999 until February 28, 2022. Defendant Mo, directly and through affiliated entities he owns and/or controls, is Fang's controlling shareholder. He held approximately 71.7% of aggregate voting power during 2019 according to Fang's last Form 20-F filing for the year ended December 31, 2019. Since then, Defendant Mo materially added to his interests, as described below. As of their most recent amended Schedule 13D filed on May 24, 2022, Defendant Mo and his affiliates beneficially own and control 45.5% of Fang Class A shares and 95.9% of Fang Class B shares, meaning that Defendant Mo now effectively controls over 85.15% of the aggregative voting power of Fang shareholders and holds a 59.09% economic interest in Fang. Defendant Mo also served as a CIH director and chairman of CIH's board of directors from the time that CIH was spun-off in June 2019 until February 28, 2022, and was CIH's

controlling shareholder during the relevant period. Defendant Mo is a citizen of the People's Republic of China ("PRC").

21. Defendant ACE Smart Investments Limited ("ACE"), a Hong Kong entity, is an affiliate of Defendant Mo and is wholly owned, controlled, and dominated by him. Its principal place of business is Room 1901, 19/F, Lee Garden One, 33 Hysan Avenue, Causeway Bay, Hong Kong SAR. As described below, Mo utilized ACE as a vehicle to obtain significant stakes in Fang and CIH from third-party investors in the months leading up to Fang's delisting from NYSE. According to Defendant Mo's most recent securities filings, ACE owns 22,381,344 Fang Class A shares and owned 11,669,921 CIH Class A shares (of which 9,962,597 were at one time held in the form of CIH ADSs) prior to the completion of the merger transaction in which Defendant Mo, ACE, and others took CIH private.

22. Defendant Next Decade Investments Limited ("Next Decade"), a British Virgin Islands company, is an affiliate of Defendant Mo under his control. Although Mo's wife has served as its director, recent securities filings state that Next Decade "is controlled by Mr. Mo." Its principal business address is P.O. Box 957, Offshore Incorporations Centre, Road Town, Tortola, British Virgin Islands. As described below, Next Decade was one of Defendant Mo's two holding vehicles (along with Defendant Media Partner Technology Limited) for a large portion of his Fang and CIH interests, and Mo caused it to sell CIH shares to Fang in December 2019 and June 2020. According to its recent securities filings, Next Decade owns 2,505,502 Fang Class A shares and 11,985,145 Fang Class B shares.

23. Defendant Media Partner Technology Limited ("Media Partner"), a British Virgin Islands company, is an affiliate of Defendant Mo under his control. Although Mo's wife has served as its director, recent securities filings state that Media Partner "is controlled by Mr. Mo." Its

principal business address is P.O. Box 957, Offshore Incorporations Centre, Road Town, Tortola, British Virgin Islands. Media Partner was one of Defendant Mo's two holding vehicles (along with Next Decade) for a large portion of his Fang and CIH interests, and Mo caused it to sell CIH shares to Fang in December 2019 and June 2020. According to its recent securities filings, Media Partner owns 1,367,378 Fang Class A shares and 11,355,645 Fang Class B shares.

24. Defendant Richard Jiangong Dai served as a Fang officer (including stints as president and chief executive officer) from 1999 to 2014, and as a Fang director from the time of its IPO in September 2010 until February 2016. On February 28, 2022, Defendant Dai replaced Defendant Mo as a Fang director and Fang's chairman of the board. On that same date, Defendant Dai replaced Defendant Mo as a CIH director and chairman of CIH's board. Defendant Dai is a nephew of Defendant Mo. Defendant Dai is a citizen of the PRC.

25. Defendant True Knight Limited ("True Knight"), a British Virgin Islands entity, is an affiliate of Defendant Dai and is wholly owned, controlled, and dominated by Defendant Dai. Its principal place of business is Vistra Corporate Services Centre, Wickhams Cay II, Road Town, Tortola, VG1110, British Virgin Islands. As described below, Dai used True Knight to obtain over 8.8 million CIH ADSs and CIH Class A shares on or about April 30, 2022 from Fang/CIH investors shortly before Fang's NYSE delisting.

**C. Nominal Defendant Fang Holdings**

26. Fang, formerly known as SouFun Holdings Limited, is an exempted company incorporated with limited liability under the laws of the Cayman Islands with registration number 136949. Fang's registered office is at Vistra (Cayman) Limited, P.O. Box 31119, Grand Pavilion, Hibiscus Way, 802 West Bay Road, Grand Cayman, KY1 – 1205 Cayman Islands.

27. Fang is principally engaged in the provision of marketing services, listing services, lead generation, financial services, value-added services and e-commerce services to the real estate and home furnishing industries in the PRC. Fang ADSs were listed on the NYSE under the ticker symbol "SFUNY" from the time of its IPO in September 2010 until June 2022, when NYSE delisted Fang ADSs due to Fang's failures to timely file its annual reports and other securities filings.

28. Fang's ADSs are subject to a deposit agreement with JPMorgan Chase Bank, N.A. in New York. Under the exchange ratio in effect from 2010 to 2014 and then from June 25, 2019, until June 2020, one Fang ADS represents one Fang Class A ordinary share. From June 19, 2020, until present, each Fang ADS has represented ten Fang Class A ordinary shares. Fang Class B ordinary shares have the same economic rights as Class A ordinary shares, but each Class A ordinary share is entitled to one vote per share whereas each Class B ordinary share is entitled to 10 votes per share.

**RELEVANT NON-PARTIES**

29. Prior to the merger described herein, CIH was an exempted company incorporated with limited liability under the laws of the Cayman Islands with registration number 340560.

30. Ateefa Limited ("Ateefa"), a British Virgin Islands company, is an affiliate of Defendant Mo. Defendant Mo is the sole shareholder of Ateefa. Ateefa owns a 28.0% interest in Safari Group Holdings Limited, through which Ateefa indirectly owns approximately 957,265 Fang Class A ordinary shares.

31. Deanhale Limited ("Deanhale") is an affiliate of Defendant Mo that owns or owned approximately 1,472,298 Fang Class A shares. Deanhale is wholly owned by Defendant Mo.

32. Karistone Limited ("Karistone"), a Hong Kong company, is an affiliate of Defendant Mo that owns approximately 926,461 Fang Class A ordinary shares. Karistone is wholly owned by Defendant Mo.

33. Safari Group Holdings Limited ("Safari") held approximately 3,418,803 Class ordinary shares of Fang as of Fang's most recent for the fiscal year ended December 31, 2019, although Safari subsequently exited its position in January 2022 (in large part as a result of selling shares to ACE, a different affiliate of Defendant Mo). Defendant Mo indirectly holds a 28.0% interest in Safari through Ateefa.

34. Open Land Holdings Limited ("Open Land"), a British Virgin Islands company, is an affiliate of Defendant Mo that owns or owned approximately 441,650 Fang Class A ordinary shares. Open Land is wholly owned by Defendant Mo.

## JURISDICTION AND VENUE

35. This court has subject-matter jurisdiction over this action because Plaintiffs seek relief exceeding $150 million, which is in excess of this Court's jurisdictional minimum, in addition to equitable remedies.

36. Nominal defendant Fang and all Defendants are subject to personal jurisdiction under CPLR 302 because the derivative claims asserted in this suit arise out of the transaction of business in New York by those parties and/or their jurisdictional agents.

37. Plaintiffs' derivative claims arise out Defendant Mo's and Defendant Dai's breaches of fiduciary duty in several interrelated self-interested transactions involving Fang and CIH that are inseparable from many New York jurisdictional contacts and New York's public markets. Fang had numerous contacts in New York that give rise to the claims asserted in this Action, including spinning-off CIH in New York, buying CIH ADSs on the open market in New York, communicating with the NYSE in New York and getting delisted by the NYSE, and leading

the New York-centered take private of CIH. Because Plaintiffs' claims arise out of those New York-based transactions, nominal defendant Fang is subject to personal jurisdiction in New York.

38. First, Defendant Mo's two-part scheme of causing Fang to spin-off CIH and then buy back CIH shares was implemented through New York. Indeed, Defendant Mo would not have had CIH shares to force Fang to buy from his affiliates but for the New York-centric spin-off of CIH through which Defendant Mo's affiliates obtained CIH interests (that were promptly sold back to Fang). The spin-off was effectuated through a Separation and Distribution Agreement between Fang and CIH dated May 24, 2019, which Defendant Mo signed on Fang's behalf and was governed by New York law. The new CIH ADSs created through the spin-off were subject to a Deposit Agreement with a depositary, JPMorgan Chase Bank, N.A. ("JPMorgan"), located in New York. That Deposit Agreement contains a New York choice of law clause and a New York forum selection clause. And the spin-off resulted in CIH ADSs becoming publicly traded in New York on the NASDAQ exchange.

39. Second, in connection with the part of his scheme involving Fang purchasing CIH shares from his affiliates in 2019 and 2020, Defendant Mo caused Fang to purchase millions of CIH ADSs on the open market in New York. Those open market purchases in New York were part of Defendant Mo's over-arching self-dealing scheme. By increasing Fang's stake in CIH in the lead-up to Defendant Mo's sales of CIH interests to Fang, Defendant Mo partially offset some of his lost economic upside from selling CIH interests to Fang. Moreover, Fang's open market purchases in New York were intended to manipulate the market price higher to lessen the gap between the prevailing market price and the $5.99 per share price that Defendant Mo forced Fang to pay for his affiliates' CIH interests. Accordingly, those purchases in New York were designed to conceal the extent of Defendant Mo's self-dealing and were part of the overall breach of

fiduciary duty in causing Fang to spin-off CIH and then pay $95 million in 2019 and 2020 to buy back an 18.5% non-controlling stake in CIH.

40. Third, in connection with its delayed securities filings and eventual delisting from NYSE, Fang engaged in "ongoing cooperation and correspondence with the NYSE" (as admitted in Fang securities filings signed by Defendant Mo and Defendant Dai) to extend the cure date for filing as long as possible, eventually to May 17, 2022. The extensions procured via Fang's frequent correspondence with the NYSE afforded Defendant Mo and Defendant Dai additional time to obtain Fang and CIH shares and ADSs from Fang investors seeking to exit their positions before Fang's delisting. As a direct, inevitable, and intended consequence of Fang's failure to file its annual reports and other securities filings by the cure date, Fang's ADSs were delisted by NYSE. Yet at the same time that Defendant Mo and Defendant Dai caused Fang's delisting over the sham excuse that there was a question over whether it could continue as a going concern, they also caused Fang to make open market purchases of CIH ADSs in New York in May and June 2022 to facilitate the take private transaction they orchestrated shortly thereafter. Fang's delisting in New York was integral to Defendant Mo's and Defendant Dai's bad faith, self-interested machinations, and attempt to avoid further accountability by causing Fang to "go dark."

41. Fourth, the CIH take private transaction orchestrated by Defendant Mo and Defendant Dai was a New York-centered transaction in numerous respects. Almost all of the agreements executed on Fang's behalf to effectuate the transaction included New York choice of law clauses, including: (a) section 10 of the commitment letter that Fang Holdings provided in connection with its commitment to advance $14.8 million to fund the transaction; (b) section 13 of the Limited Guaranty that Fang Holdings provided to CIH in connection with the take private; and (c) section 1.3(l) of the Equity Contribution Agreement signed by all Defendants. And section

10.8 of the Agreement and Plan of Merger, pursuant to which the take private transaction was consummated, likewise included a New York choice of law clause.

42. Moreover, section 4 of the Equity Contribution Agreement for the take private transaction required performance by the Defendants and all other participating shareholders (collectively, the "Rollover Shareholders") in New York to the extent that they held any CIH ADSs or held any CIH shares in street name. Specifically, "[t]o the extent that any Rollover Shares of a Rollover Shareholder are held in street name or otherwise represented by ADSs, such Rollover Shareholder shall execute such instruments and take such other actions…to convert his/her/its ADSs into Rollover Shares … pursuant to the terms of the Deposit Agreement, and each Rollover Shareholder shall pay any applicable fees, charges and expenses of the Depositary and government charges due to or incurred by the Depositary in connection with such conversion." Because the Depositary, JPMorgan, was in New York, this provision necessarily required performance in New York by rollover shareholders participating in the take private transaction, including Fang, Defendant Mo's entity ACE, and Defendant Dai's entity True Knight. And ensuring that they and Fang first converted ADSs into shares in New York was integral to the self-serving short-form merger transaction structure that Defendant Mo and Defendant Dai utilized.

43. Fang was Defendant Mo's jurisdictional agent in each of those New York contacts because Defendant Mo exercised at least some control over Fang in those transactions and Defendant Mo, directly or indirectly through his affiliates, benefitted from those transactions.

44. Defendant Mo was and is Fang's controlling stockholder and prior to February 28, 2022, was the chairman of its board. At all times, Defendant Mo has dominated and controlled Fang through his power to appoint lackeys as directors (including by installing his nephew, Defendant Dai, as Fang's chairman in February 2022) and to remove any directors who fail to

adhere to his wishes and demands. Fang's securities filings acknowledged that it was "controlled by our significant shareholders and their affiliated entities," and that Defendant Mo and his affiliates had the power to "exert substantial influence over the outcome of any corporate transaction or other matters submitted to the shareholders for approval, including mergers, consolidations, the sale of all or substantially all of our assets, election of directors and other significant corporate actions." Fang's securities filings further acknowledged that absent Defendant Mo's and his affiliates' "consent or cooperation," Fang "could be prevented from entering into transactions or conducting business that could be beneficial to us." Similarly, Fang's securities filings state that Defendant Mo's and his affiliates' Class B shares gave them "concentrated control" and "significant voting power over matters requiring shareholder approval, including election of directors and significant corporate transactions."

45. In addition to his controlling voting power, Defendant Mo has influenced the composition of Fang's board of directors to ensure that Fang's board is full of compliant puppets. Defendant Mo has done so by wielding power and influence through his roles as Fang's chairman of the board, chairman of Fang's two-member compensation committee (enabling him to dictate director compensation), and role on Fang's two-member nominating and corporate governance committee (giving him direct influence over director selection). Fang has suffered high director turnover due to Defendant Mo's influence.

46. Finally, the blatant self-dealing alleged herein further demonstrates Defendant Mo's domination and control. Independent directors acting in Fang's best interests rather than at Defendant Mo's direction (and in furtherance of Defendant Mo's interests to curry favor for themselves) would never agree to the lopsided and grossly unfair transactions that Defendant Mo foisted upon Fang.

47. Defendant Mo reaped significant benefits from wielding his control over Fang in the transactions at issue. Defendant Mo and his affiliates obtained $81.2 million in cash from Fang through his scheme to spin-off CIH and then sell his CIH interests back to Fang. As a result of Fang's delisting from the NYSE, Defendant Mo (through his wholly-owned, alter ego affiliate, ACE) was able to obtain 11,669,921 CIH Class A shares (of which 9,962,597 were obtained as CIH ADSs) at an artificially deflated price. And by using Fang to "sponsor" the CIH take private, Defendant Mo eliminated CIH's minority investors and took CIH private without needing to pay a dime himself to do so.

48. Fang was also Media Partner's and Next Decade's jurisdictional agent in connection with Defendant Mo's scheme to cause Fang to spin-off CIH in New York and then purchase CIH units from his affiliates, including Media Partner and Next Decade. Media Partner and Next Decade exercised at least some control over Fang in those transactions because Media Partner and Next Decade were controlling shareholders of Fang and the entities through which Defendant Mo exercised his influence as ultimate human controller and controlling shareholder of Fang. Specifically, Media Partner and Next Decade owned 11,355,645 and 11,985,145 Fang Class B shares, respectively, which (along with their Fang Class A shares) gave them 37.3% and 39.6% voting power in Fang, respectively, as of March 31, 2019 (and they maintained similar voting control thereafter).[3] Fang's securities filings acknowledged that Media Partner and Next Decade had the power to "exert substantial influence over the outcome of any corporate transaction or other matters submitted to the shareholders for approval, including mergers, consolidations, the sale of all or substantially all of our assets, election of directors and other significant corporate actions." Media Partner and Next Decade benefitted from the two-part scheme involving the spin-

[3] Media Partner and Next Decade reported the same Fang Class B ownership in the most recent joint Schedule 13D filed jointly with Defendant Mo.

off of CIH and Fang's subsequent purchase of CIH securities because, as part of that scheme, Media Partner and Next Decade sold restricted CIH shares to Fang at a price of $5.99 per share, even though the prevailing New York market price for CIH ADSs was significantly less at the time those sales occurred.

49. ACE is subject to jurisdiction to New York because it knowingly participated in and was the beneficiary of Defendant Mo's scheme to cause Fang to "go dark" and suffer NYSE delisting so that ACE could obtain Fang ADSs and shares and CIH ADSs and shares at depressed prices. Moreover, ACE is an alter ego of Defendant Mo. ACE also directly participated in and benefitted from the CIH take private transaction.

50. ACE was also Defendant Mo's jurisdictional agent because Defendant Mo exercised complete domination and control over ACE and benefitted from ACE's participation in the transactions at issue. Defendant Mo controlled ACE in the transactions and signed transactional documents on its behalf, and ACE is wholly owned by Defendant Mo. ACE and in turn, its sole shareholder Defendant Mo benefitted from the transactions because they were able to obtain CIH shares at artificially deflated prices and to participate in a lopsided take private transaction funded by Fang.

51. Fang was also Defendant Dai's jurisdictional agent from the time that Defendant Dai became Fang's chairman on February 28, 2022 onward. Defendant Dai exercised some control over Fang as its chairman and signed filings with the SEC pertaining to Fang's delisting from the NYSE. In particular, Defendant Dai signed Fang's Form 12b-25 filed May 3, 2022, which set forth the pretextual excuse for Fang's failure to timely file its securities filings. Shortly thereafter, around the time of Fang's delisting, Defendant Dai also caused Fang to purchase CIH ADSs on the open market as part of the scheme he orchestrated with his uncle, Defendant Mo. Defendant

Dai benefitted from his role in Fang's delisting, as just days before (April 30, 2022) he obtained—through his wholly-owned and controlled entity, True Knight—over 8.8 million CIH Class A shares/ADSs at discount prices from Fang investors.

52. Defendant Dai also exercised some control over Fang as its chairman in connection with the CIH take private, and Defendant Dai benefitted from the take private through his wholly owned affiliate True Knight. Defendant Dai signed each of the key documents for the take private on Fang's behalf, such as the Equity Commitment Letter provided by Fang, the Equity Contribution Agreement, and the Limited Guarantee provided by Fang.

53. True Knight is subject to jurisdiction to New York because it knowingly participated in and was the beneficiary of Defendant Dai's and his uncle Mo's scheme to cause Fang to "go dark" and suffer NYSE delisting so that ACE and True Knight could obtain CIH ADSs and shares at depressed prices. Moreover, True Knight is an alter ego of Defendant Dai. True Knight also directly participated in and benefitted from the CIH take private transaction.

54. True Knight was also Defendant Dai's jurisdictional agent because Defendant Dai exercised complete domination and control over True Knight and benefitted from True Knight's participation in the transactions at issue. Defendant Dai controlled True Knight in the transactions and signed transactional documents on its behalf, and True Knight is wholly-owned by Defendant Dai. True Knight and in turn, its sole shareholder Defendant Dai, benefitted from the transactions because they were able to obtain CIH shares at artificially deflated prices and participate in a lop-sided take private transaction financed by Fang.

55. In addition to the foregoing jurisdictional contacts in New York, Section 20(c) of the CIH Deposit Agreement includes a forum selection clause providing for exclusive jurisdiction in state or federal New York Courts, as follows:

> By holding an ADS or an interest therein, Holders and Beneficial Owners each irrevocably agree that…any legal suit, action or proceeding…arising out of or based upon…the ADSs…or the transactions contemplated herein, therein or hereby, may only be instituted in a state or federal court in New York, New York, and by holding an ADS or an interest therein each irrevocably waives any objection which it may now or hereafter have to the laying of venue of any such proceeding, and irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding.

56. Venue is proper under CPLR 503 and 509 because a substantial portion of the events or omissions giving rise to Plaintiffs' claims occurred in New York County.

## FACTUAL BACKGROUND

### A. Defendant Mo Caused Fang to Spin-Off CIH in New York and then Buy Back the CIH Shares His Affiliates Received to Benefit Himself at Fang's Expense.

#### *1. Defendant Mo Caused Fang to Spin-Off CIH to Advantage Himself and Facilitate Self-Dealing.*

57. During the first half of 2019, Fang began moving forward with a spin-off of its wholly owned and controlled subsidiary, CIH, which prior to the contemplated spin-off previously had operated Fang's real estate information, analytics and marketplace services business. In their securities filings with the SEC, Fang and CIH represented that the spin-off was undertaken for the following reasons, amongst others:

- "Fang's board of directors believe that it is in the *best interests of Fang* and its shareholders *that [CIH] operate* the commercial property-related business *independently*;"
- "The separation and distribution will permit *each company to concentrate its financial resources solely on its own operations*, to provide greater flexibility to invest capital in its business in a timely manner appropriate for its distinct strategy and business needs and to facilitate a more efficient allocation of capital;" and
- "The separation and distribution will facilitate incentive compensation arrangements for employees more directly tied to the performance of the relevant company's business."

(Emphasis added). After the spin-off, CIH was to focus primarily on the commercial property sector in China, while Fang would retain its real estate internet portal focusing primarily on the residential property sector.

58. On June 11, 2019, Fang completed the spin-off of CIH. Through the spin-off, CIH became a new public company with CIH ADSs, each representing one CIH Class A share, traded in New York on the NASDAQ exchange. Fang shareholders received one share of CIH common stock for every one share of Fang common stock held as of the record date for the distribution. Fang also disposed of $19.9 million of cash in connection with the spin-off.

59. Because Defendant Mo was a large Fang shareholder (and Fang's controlling stockholder), he and his affiliates received large numbers of CIH shares through the spin-off. Specifically, Defendant Mo and his affiliates received 7,359,473 CIH Class A shares (convertible into ADSs) and 25,391,206 CIH Class B shares in connection with the spinoff, giving them a 34.1% economic stake in CIH and over 80.6% of voting power in CIH.

60. As a result, following Fang's spin-off of CIH, Defendant Mo became the controlling stockholder of both Fang and CIH with the same proportionate interest in each. This was highly advantageous for Defendant Mo because Defendant Mo then controlled two entities instead of one, and Mo could exploit his complete control over Fang to cause Fang to "buy back" his newly acquired CIH interests at a self-determined price. Causing Fang to "buy back" the CIH shares that Mo's affiliates acquired through the spin-off instead of selling off his interests in Fang prior to the spin-off was a far more advantageous way for Mo to monetize his Fang interest for several reasons.

61. First, causing Fang to spin-off CIH shares to his affiliates and then causing Fang to buy them back would enable Defendant Mo to monetize a portion of his ownership interest in the

overall business while avoiding obstacles he would have in selling his Fang shares to a third party under federal securities laws. Specifically, because Defendant Mo was Fang's founder, chairman, and controlling stockholder, he was an "affiliate" of Fang within the meaning of federal securities laws. His Fang holdings were thus "restricted securities," limiting Defendant Mo's sale options. For instance, Defendant Mo could not avail himself of the Rule 144 safe harbor for any sizeable sales because the trading volume of Fang ADSs was too thin. A registered offering would have been an unattractive option for Defendant Mo because it would have forced him to make market disclosures, been accompanied by potential securities fraud litigation risk, and could trigger a market sell-off (reducing the value of his remaining Fang holdings). And in a third-party sale, he would have been forced to take a large haircut and discount for the lack of liquidity associated with restricted shares compared to freely tradeable Fang ADSs. Using Fang itself as a path to liquidity side-stepped these obstacles.

62. Second, by causing Fang to spin-off CIH and then buy back the CIH shares his affiliate obtained in the spin-off, Mo would minimize the risk of a negative market reaction and sell-off of Fang shares because he would not be selling any Fang shares. In contrast, any large public sale of his Fang shares would risk triggering a market sell-off in Fang ADSs, especially given Defendant Mo's large stake and historical role at Fang as its founder, controlling stockholder, and face of the company.

63. Third, causing Fang to spin-off CIH and then buy back the CIH shares his affiliates obtained in the spin-off would enable Defendant Mo to obtain liquidity without losing any control of Fang. Because Defendant Mo would remain as Fang's controlling stockholder and ultimate human controller, he could dictate how Fang would vote for any CIH shares it obtained from his affiliates, meaning that Defendant Mo would lose no control over either Fang's or CIH's

businesses. In contrast, Defendant Mo necessarily would have lost some degree of control over Fang in selling Fang shares to a third party.

64. Fourth, causing Fang to spin-off CIH and then buy-back CIH shares from his affiliates meant that Defendant Mo would not totally lose all upside associated with the shares he sold. If Defendant Mo sold Fang shares (or CIH shares) to a third party, he would necessarily lose 100% of the economic interest in the shares sold. By instead causing Fang to buy CIH shares, however, Defendant Mo would still retain—indirectly through Fang as a result of his substantial ownership of Fang—some portion of the economic upside associated with the CIH interests sold.

65. In effect, therefore, causing Fang to spin-off CIH positioned Defendant Mo to monetize a portion of his pre-existing interest in the overall business while avoiding many significant drawbacks that he would have faced in obtaining liquidity if he sold his Fang shares directly. This was no coincidence, but rather part of the reason for the CIH spin-off in the first place. Indeed, the CIH spin-off was merely the first step in a two-part interrelated series of transactions designed to benefit Defendant Mo and his affiliates at Fang's expense. The second step was causing Fang to buy back CIH interests. And as described below, Defendant Mo exploited this opportunity and his conflict of interest as chairman and controlling stockholder of both CIH and Fang to obtain a windfall of tens of millions of dollars in the year after Fang spun-off CIH.

***2. Defendant Mo Caused Fang to Purchase His Affiliates' CIH Shares at Above-Market Prices and to Facilitate that Self-Dealing through Buybacks.***

66. Barely six months after the CIH spin-off was completed, on December 24, 2019, Fang and two of Mo's affiliates, Next Decade and Media Partner, entered into a Sale and Purchase Agreement. That agreement gave Fang the option to buy up to 15 million aggregate CIH Class A shares and CIH Class B shares from those two Defendant Mo affiliates within the next twelve months at a fixed price of $5.99 per share (more than double the closing price on the date of the

agreement of $2.97 per ADS). The agreement limited Fang's ability to obtain a controlling stake in CIH, however, meaning that Fang would remain a minority, non-controlling investor in CIH to the extent it purchased any CIH shares under the agreement.

67. Notably, because Defendant Mo, Next Decade and Media Partners were "affiliates" of CIH within the meaning of federal securities laws, CIH shares held by them were deemed "restricted securities." Thus, the Sale and Purchase Agreement contained an express acknowledgement by Fang that any shares it acquired would be unregistered, "restricted securities" and a further acknowledgement that, absent registration of those shares, Fang's ability to sell or transfer the CIH shares it obtained would be severely limited.

68. Because restricted securities may not be sold outside of a registered offering unless narrow exemptions to registration are satisfied, restricted securities are inherently less liquid—and thus less valuable—than equivalent, unrestricted securities that are freely tradeable on open public markets.[4] Thus, each freely tradeable CIH ADS (representing and readily exchangeable into one CIH share) was inherently more valuable than each restricted CIH share held by Defendant Mo's affiliates, notwithstanding that both CIH ADSs and restricted CIH shares represent the same economic interest.

69. Nevertheless, Defendant Mo caused Fang to exercise its option to purchase restricted CIH shares from his affiliates, Next Decade and Media Partners, at prices that were significantly *higher* than both the prevailing market price of CIH ADSs and the prices that Fang could and did purchase CIH ADSs on the open market in New York.

[4] The same was true of Defendant Mo's Fang restricted securities.

70. On December 27, 2019, Fang exercised part of its option and purchased 5 million CIH shares from Defendant Mo's affiliates, Next Decade and Media Partner, for a total price of $29.95 million.

71. The $5.99 per CIH share price that Fang paid to Defendant Mo's affiliates was far above the prevailing market price for CIH ADSs in New York at that time, even though Defendant Mo's affiliates' illiquid restricted securities were inherently less valuable than liquid CIH ADSs freely tradeable on the open market. Specifically, $5.99 was far above the NASDAQ-traded CIH ADS closing price of $3.09 on both December 23, 2019 (the day before Fang entered into the Sale and Purchase Agreement) and December 26, 2019 (the day before Fang exercised its option to buy CIH shares at $5.99 per share).

72. Moreover, the $5.99 price that Fang paid to Defendant Mo's affiliates far exceeded the price that Fang had paid on the open market in New York for CIH ADSs during 2019. For example, in the month leading up to Defendant Mo's self-dealing on December 27, 2019, Fang purchased 353,763 CIH ADSs on the open market in New York on ten different days at an average price of $3.3220. These purchases (and other purchases made during 2019) were manipulative and intended to drive up the price of CIH ADSs to: (a) attempt to justify Fang paying a higher price for Defendant Mo's CIH interests than if the CIH ADS price had bottomed out; (b) conceal the extent of Defendant Mo's windfall; and (c) further benefit Defendant Mo by driving up the book value of his remaining CIH holdings. In addition, Fang increasing its position in CIH prior to Defendant Mo's sales to Fang increased Defendant Mo's indirect interest in CIH that he enjoyed through his ownership of Fang, thereby offsetting some of the upside in CIH that Defendant Mo otherwise would give up by selling CIH interests.

73. On June 23, 2020, Fang again exercised its option and purchased an additional 8,549,249 CIH shares from Defendant Mo's affiliates, Next Decade and Media Partner, for a total of $51.21 million.

74. Once again, the $5.99 per CIH share price that Fang paid to Defendant Mo's affiliates was far above the prevailing market price for CIH ADSs in New York, even though Defendant Mo's affiliates' illiquid restricted securities were inherently less valuable than liquid CIH ADSs freely tradeable on the open market. Specifically, $5.99 was more than the $3.10 closing price of CIH ADSs on June 22, 2020. And $5.99 far exceeded the $2.484 per ADS weighted average price that Fang actually paid in purchasing 1,872,836 CIH ADSs on the open market in New York in the weeks before:

| Date | ADSs Purchased | Class A Share Equiv. | Price | Total Spent |
|---|---|---|---|---|
| 5/29/2020 | 56,300 | 56,300 | $1.2474 | $70,228.62 |
| 6/1/2020 | 10,700 | 10,700 | $1.2841 | $13,739.87 |
| 6/2/2020 | 16,792 | 16,792 | $1.3947 | $23,419.80 |
| 6/3/2020 | 42,176 | 42,176 | $1.5819 | $66,718.21 |
| 6/4/2020 | 121,009 | 121,009 | $1.9886 | $240,638.50 |
| 6/5/2020 | 133,089 | 133,089 | $2.1022 | $279,779.70 |
| 6/8/2020 | 86,673 | 86,673 | $2.2152 | $191,998.03 |
| 6/9/2020 | 56,442 | 56,442 | $2.4242 | $136,826.70 |
| 6/10/2020 | 74,200 | 74,200 | $2.4066 | $178,569.72 |
| 6/11/2020 | 134,581 | 134,581 | $2.3265 | $313,102.70 |
| 6/15/2020 | 75,700 | 75,700 | $2.4019 | $181,823.83 |
| 6/16/2020 | 82,677 | 82,677 | $2.3837 | $197,077.16 |
| 6/17/2020 | 142,619 | 142,619 | $2.5395 | $362,180.95 |
| 6/18/2020 | 207,944 | 207,944 | $2.6300 | $546,892.72 |
| 6/19/2020 | 56,633 | 56,633 | $2.7737 | $157,082.95 |
| 6/22/2020 | 222,277 | 222,277 | $2.9339 | $652,138.49 |
| 6/23/2020 | 353,024 | 353,024 | $2.9455 | $1,039,832.19 |
| **TOTALS** | 1,872,836 | 1,872,836 | | $4,652,050.14 |

75. Moreover, before Defendant Mo caused Fang to begin making those CIH ADSs purchases on the open market in New York, the prevailing price for CIH ADSs had been far lower. Specifically, the 10-day, 20-day, and 30-day average CIH ADS closing prices up to May 28, 2020 (the last day before Fang's purchases commenced) were $1.185, $1.194, and $1.201, respectively.

76. Defendant Mo caused Fang to purchase CIH ADSs on the open market in New York in order to disguise his planned, brazen self-dealing. Fang's purchases created additional demand for CIH ADSs, resulting in an increase in the prevailing market price. As the prevailing market price of CIH ADSs increased, Defendant Mo's planned self-dealing in forcing Fang to buy his affiliates' CIH shares would appear less egregious. For instance, while the $5.99 price paid to Defendant Mo's affiliates still grossly exceeded the $3.10 closing price on June 22, 2020, the gap between the price Defendant Mo extracted from Fang and the prevailing market price on that date was still much smaller than what it would have been had it not been for the manipulative trading activity in June 2020 that drove the CIH ADS market price up from the $1.18-$1.20 range.

77. Defendant Mo was also motivated to inflate CIH's open market ADS price because of the way that Fang accounted for its purchases of CIH equity interests from his affiliates. Fang's audited financial statements for the year ended December 31, 2019, expressly acknowledged that Fang's purchase from Defendant Mo's affiliates on December 17, 2019, was "not commensurate to other non-employee shareholders," and, in turn, the "excess of consideration transferred" was accounted for as compensation expense for Defendant Mo in an amount of $13.6 million. This was more than a ten-fold increase from Fang's executive compensation expense in the prior year. Using Fang to artificially drive up the price of CIH ADSs through market purchases in New York would reduce the amount of reported excess compensation expense.

78. Defendant Mo's self-interested motives for causing Fang to purchase CIH ADSs on the open market are further evidenced by the timing of Fang's CIH share purchases. Aside from Fang's daily open market purchases of CIH ADSs from May 29, 2020 through June 23, 2020, Fang did not make even a single purchase of any CIH ADSs at any other point during 2020. It is thus clear that Fang's purchases in the three weeks leading up to its purchase from Defendant Mo's affiliates were not merely coincidental but were made in furtherance of Defendant Mo's self-dealing.

79. In addition to concealing the extent of Defendant Mo's self-dealing, Fang's purchases of CIH ADSs on the open market during May and June 2020 also helped offset some of the financial upside in CIH that Defendant Mo would give up by selling his CIH interests to Fang (because Fang's open market purchases increased his indirect ownership in CIH through Fang).

80. In sum, Defendant Mo's actions in causing Fang to spin-off CIH, causing Fang to exercise its option to buy his affiliates' CIH interests, and causing Fang to buy CIH ADSs on the open market in New York (to conceal the magnitude of his self-dealing and to increase his indirect ownership in the CIH shares his affiliates sold) were part of an interrelated self-enrichment scheme. Through this scheme, Defendant Mo avoided many pitfalls he would have encountered had he instead sought to monetize part of his ownership in the combined business by selling Fang shares directly. And the scheme was a resounding success for Defendant Mo in that he and his affiliates extracted $81.2 million from Fang, while still maintaining complete control over CIH's business because Defendant Mo controlled how Fang would vote the CIH shares it purchased.

81. The condensed timeline for these transactions and the conspicuous lack of sales from Defendant Mo and his affiliates to any third parties further reveals Mo's intentions and the interrelatedness of the different components of his self-enrichment scheme. Fang spun off CIH

and paid $95.4 million to buy back CIH securities (of which $81.2 million was paid to Defendant Mo's affiliates) within one year, including exercising its option to purchase CIH shares from Defendant Mo's affiliates a mere six months after the spin-off. Notably, Defendant Mo and his affiliates *never* sold any CIH interests to anyone other than Fang, demonstrating that Mo used Fang as a buyer of his CIH interests to side-step liquidity challenges posed by federal securities laws and to obtain a higher price for his CIH interests than he could obtain from a third party.

82. The existence and wrongfulness of Defendant Mo's inter-related self-enrichment scheme is further evident by the lack of any legitimate reason, or rational business purpose, for these transactions from Fang's perspective. Indeed, the transactions were not in Fang's best interests for several reasons.

83. First, prior to the spin-off, CIH was a wholly owned Fang subsidiary. Yet, the net effect of these transactions and Defendant Mo's scheme was that Fang depleted over $95.4 million of its cash reserves to obtain a less than 18.5% non-controlling interest in CIH (while also disposing of $19.9 million in connection with the spin-off itself). It was against Fang's best interests to expend such substantial sums only to end up in a worse position vis-à-vis CIH than it had occupied just one year before, prior to the spin-off.

84. Second, Fang and CIH securities filings related to the spin-off expressly provide that Fang's board of directors had determined that it was "in the best interests of Fang" that CIH operate "independently," and that the spin-off would allow Fang "to concentrate its financial resources solely on its own operations." It was contrary to those stated interests for Fang to expend over $95.4 million while remaining entangled with CIH (by holding a minority, non-controlling position worse than before).

85. Third, Fang and CIH securities filings related to the spin-off further provide that one of Fang's interests was to "facilitate incentive compensation arrangements for employees more directly tied to the performance of the relevant company's business." Transferring $81.2 million to Defendant Mo by purchasing CIH interests from his affiliates—at prices above the prevailing market price—was untethered to Fang's financial performance, and reducing Defendant Mo's CIH stake could reduce his direct incentive to operate CIH as profitably as possible.

86. Fourth, it was obviously against Fang's interests to pay more than the prevailing market price for CIH ADSs. Fang could and did obtain CIH ADSs at prices far less than the $5.99 per share price it paid to Defendant Mo's affiliates.

87. Fifth, there was no reason for Fang to exercise its options at an exercise price ($5.99 per share) far above the spot price of CIH securities and long before the options' December 2020 expiration date. Even if there were some risk that CIH shares might increase in price over time, there was no logical or rational business reason to exercise an option at a strike price far above the spot price with many months left until the option expired. Moreover, just two months after exercising the option early and transferring $51.2 million to Defendant Mo's affiliates in June 2020, Fang announced an intended capital raise (through a dilutive share issuance to management), further indicating that the early option exercise, which depleted Fang's cash reserves, made no rational business sense for Fang.

88. Sixth, obtaining restricted CIH securities from Defendant Mo's affiliates was the worst possible way for Fang to hold its interest in CIH given the significant liquidity constraints that holding restricted securities entails. Fang had far more liquid and attractive means of owning an interest in CIH at its disposal. Specifically, prior to the spin-off, when CIH was still Fang's wholly owned subsidiary, Fang could monetize and benefit from that interest without any

limitations imposed by securities laws. For instance, Fang could have sold the entire business to a third-party, procured cash from a new minority investor in CIH, obtained debt financing secured by CIH's operating business and assets, or simply held the business and up-streamed dividends paid out of profits. After the spin-off, Fang could—and did—obtain CIH ADSs on the open market, which it could freely resell.

89. Accordingly, Defendant Mo's actions in perpetrating this self-dealing scheme on Fang involved egregious breaches of the fiduciary duties he owed to Fang: (a) to act in good faith for Fang's best interests; and (b) to act loyally, to avoid conflicts of interest, to avoid self-dealing, and to avoid enriching himself at Fang's expense.

**B. Defendant Mo's Egregious Self-Dealing Triggered a Chain Reaction that Defendant Mo and Defendant Dai Utilized as Cover to Further Enrich Themselves.**

***1. Defendant Mo's History of Self-Dealing Gave Rise to a Winding-up petition Filed in the Cayman Islands and Acceleration of Debt Owed by Fang.***

90. Defendant Mo's interrelated scheme in causing Fang to spin-off CIH, to buy back CIH interests from Defendant Mo at above-market prices, and to cause Fang to buy back additional CIH ADSs on the open market (to help disguise his wrongdoing and to help obtain an offsetting indirect interest in CIH through Fang) was not the only self-dealing that Defendant Mo had engaged in at Fang's expense through 2020. Defendant Mo had a long history of prior self-dealing.

91. For instance, beginning in 2011 and continuing thereafter, Defendant Mo utilized several New York Section 402 not-for-profit corporations he created, including Wall Street Global Training Center, Inc. ("WSGTC") and Research Center on Natural Conservation, Inc. ("RCNC"), to engage in related party transactions with Fang involving New York real estate. The notable New York properties inculcated in such related party transactions include: 72 Wall Street in Manhattan, the Arden House in Harriman, New York, New York Military Academy in Cornwall-on-Hudson, and Briarcliff College in Westchester County.

92. As another example, in the fourth quarter of 2019, Defendant Mo caused Fang to redeem multiple portions of convertible notes (governed by New York law) that were beneficially owned by Defendant Mo *at no discount* to par value and more than two years before the maturity date of those notes. Defendant Mo received approximately $83 million dollars from the early redemption, and Fang's Form 20-F annual report for fiscal year 2019 admitted that the purpose of the redemptions were to "redeem the portion[s] held by Mr. Mo." The documents and circumstances surrounding the early redemption make clear the purpose behind *only* "redeeming the portion[s] held by Mr. Mo" at full par value plus interest was so that Defendant Mo could repay personal debt obligations. Moreover, while the early redemptions involving Defendant Mo were made at no discount to their par value of the notes, Fang had contemporaneously been involved in other transactions where other portions of the same convertible notes payable to third-parties had been sold at *20% less than par their value*. Subsequently, Defendant Mo's self-dealing through this note redemption was a contributing factor to the early acceleration of the remaining balance of over $168 million of convertible notes originally due in 2022 ("2022 Notes"), as discussed below.

93. Finally, in 2019, Defendant Mo had also caused Fang to transfer all equity interests in 42 different subsidiary entities to Shanghai Yuyue Electronic Technology Development Co., Ltd ("Shanghai Yuyue"), an entity controlled by Defendant Mo, for no consideration (other than Shanghai Yuye's assumption of net liabilities at the carrying amount). Thereafter, Fang continued to utilize the services of the entities transferred.

94. Against that backdrop, Fang's transfer of $51.2 million to Defendant Mo's affiliates to purchase CIH shares in June 2020 was just the most recent—albeit the most egregious—of several self-dealing transactions that Defendant Mo had foisted on Fang up to that time.

Case 1:25-mc-00235-KHP Document 17-1 Filed 08/08/25 Page 46 of 88

95. On August 24, 2020, Fang publicly announced that it planned to raise up to $30 million by issuing Fang Class A shares to members of management, presumably including Defendant Mo. Of course, Fang would have had no reason to raise capital had it not exercised its option early and spent $51.2 million to buy back CIH equity interests from Defendant Mo's affiliates on June 23, 2020, just two months before.

96. Regardless, Fang's announcement of the dilutive management share issuance, yet another related party transaction, was the last straw for some of Fang's disgruntled shareholders. On November 13, 2020, Evenstar Master Fund SPC for and on behalf of Evenstar Master Sub-Fund I Segregated Portfolio and Evenstar Special Situations Limited (collectively, "Evenstar") filed a winding-up petition in the Grand Court of the Cayman Islands to appoint provisional liquidators for Fang. The petition was predicated on Defendant Mo's history of self-dealing described above, including his actions in causing Fang to spin-off CIH and purchase CIH shares from his affiliates in 2019 and 2020.

97. Evenstar's filing of its winding-up provision constituted an event of default pursuant to the terms of Fang's outstanding 2022 Notes, triggering an acceleration of the maturity date for repayment of principal and outstanding interest to December 13, 2020.

98. Thus, Defendant Mo's history of abuse of Fang and self-dealing directly created challenges for Fang by leading to the winding-up petition and acceleration of Fang's debt under the 2022 Notes. Both of these issues were merely temporary crises, however.

99. First, on July 20, 2021, the Grand Court entered an order, by consent of the parties to the winding-up petition, appointing a new Fang director to be nominated by Evenstar. In conjunction with that order, Evenstar's application for appointment of provisional liquidators was effectively adjourned *sine die*. The winding-up petition is no longer being actively pursued, and

Fang has not faced any active risk of having liquidators appointed or of being wound up since the Grand Court entered its order on July 20, 2021.

100. Second, Fang and CIH—with Defendant Mo signing on behalf of both—entered into various settlement deeds with the holders of the 2022 Notes from June 25, 2021 to September 22, 2021. Pursuant to the settlement deeds, Fang and CIH each agreed to pay half of the amount due by December 31, 2021. CIH repaid the noteholders $42.4 million on September 24, 2021 and $41.8 million on November 10, 2021, and Fang repaid the noteholders $42.4 million on September 28, 2021 $41.8 million on November 15, 2021. Accordingly, by December 31, 2021, the 2022 Notes had been repaid in full and no longer posed any threat to Fang.

101. Thus, by no later than November 15, 2021 and certainly by the end of 2021, any temporary challenges associated with the winding-up petition and acceleration of the 2022 Notes—problems of Defendant Mo's own creation through his rampant prior self-dealing—had largely been resolved. But Defendant Mo did not let the crisis he caused go to waste. Instead, Defendant Mo utilized it as cover for an audacious new scheme to benefit himself (and later, his nephew, Defendant Dai) by further abusing Fang and acting against its best interests.

2. ***Defendant Mo and Defendant Dai Used the Winding-up petition—that Defendant Mo Caused—as an Excuse to Not File Fang's Securities Filings.***

102. Notwithstanding the winding-up petition and the acceleration of its 2022 Notes, Fang reported its fourth quarter 2020 and fiscal year 2020 unaudited financial results on March 26, 2021 without any delay or difficulty. Thereafter, however, Defendant Mo—and later his loyal nephew, Defendant Dai—caused Fang to fail to file its Form 20-F annual report for fiscal year 2020 and to cease all financial reporting for all future financial periods.

103. On May 3, 2021, Fang filed a Form 12b-25, signed by Defendant Mo, that indicated that Fang would not timely file its Form 20-F annual report for the year ending December 31,

2020. This filing stated that the delay was "primarily due to the pending winding-up petition," and the event of default on the 2022 Notes that the winding-up petition triggered. This filing further explained: "[Fang] is in the process of assessing the impact of the winding-up petition on the Company's financial statements, including the Company's ability to continue as a going concern, the outcome of which is dependent upon the outcome of the petition and the negotiation with the convertible note holders."

104. Fang subsequently failed to file that report by the May 17, 2021 deadline, prompting the NYSE to inform Fang on May 18, 2021 that Fang was not in compliance with NYSE's continued listing requirements under Section 802.01E of the NYSE Listed Company Manual.

105. On May 24, 2021, Fang publicly announced—in connection with a Form 6-K filing with the SEC signed by Defendant Mo—that Fang had contacted the NYSE on May 20, 2021 in response to the notice that Fang had received from NYSE. This announcement further acknowledged that Fang faced possible discretionary suspension and delisting if Fang did not timely file its annual report with the SEC.

106. On November 17, 2021, Fang announced that it had received notice from NYSE Regulation indicating that NYSE's Listings Operations Committee had agreed to an additional trading period through April 25, 2022 for Fang to complete and file its fiscal year 2020 Form 20-F and any subsequent delayed filings pursuant to the NYSE's late filer rules outlined in Section 802.01E of the NYSE Listed Company Manual. Fang further announced that it had "been in ongoing cooperation and correspondence with the NYSE on the late filing issue," and acknowledged that the NYSE would "move forward with the initiation of suspension and delisting

procedures" if Fang did not cure its delayed filings by May 17, 2022. Defendant Mo signed the associated Form 6-K filing with the SEC containing the November 17, 2021 announcement.

107. On April 25, 2022, Fang announced that it had received notice from NYSE Regulation indicating that NYSE's Listings Operations Committee had agreed to provide Fang with an additional trading period through May 17, 2022. Again, Fang emphasized that it "ha[d] been in ongoing cooperation and correspondence with the NYSE on the late filing issue," and noted that its ADSs would face suspension and delisting from the NYSE if Fang did not complete its late filings by May 17, 2022.

108. Fang filed this announcement with the SEC as an attachment to a Form 6-K dated April 25, 2022. Defendant Mo signed this Form 6-K purportedly as Fang's "Executive Chairman," notwithstanding that Fang had previously announced on February 28, 2022 that Defendant Mo's nephew, Defendant Dai, would replace Defendant Mo as Fang's chairman effective February 28, 2022. Thus, Defendant Mo continued to be aware of and actively involved in Fang's belated filing of its required annual reports and potential NYSE delisting.

109. On May 3, 2022, Fang filed a Form 12b-25 notification of late filing, indicating that it would not be timely filing its Form 20-F annual report for the year ended December 31, 2021 either. This filing, for the first time, disclosed that the 2022 Notes had been repaid in full. Once again, however, Fang stated that it needed more time "primarily due to the pending winding-up petition" and resulting questions over "the Company's ability to continue as a going concern." Defendant Dai signed this filing on Fang's behalf as its executive chairman.

110. Subsequently, after Fang failed to file its Form 20-F for the year ended December 31, 2020 by the May 17, 2022 deadline for curing the delay, the NYSE suspended trading on May 18, 2022. And on June 2, 2022, the NYSE delisted Fang's ADSs.

111. It was not in Fang's best interests to have its ADSs delisted from the NYSE as a result of its failure to timely file its annual reports with the SEC, nor for Fang to "go dark" and cease all financial reporting of its financial results. Defendant Mo's and Defendant Dai's actions in causing Fang to fail to file such reports directly violated Fang's code of conduct (incorporated by reference into Fang's registration statement with the SEC) providing that: "each employee, officer and director must take all reasonable steps to ensure that [Fang's securities filings] and other public communications furnish the marketplace with full, fair, accurate, timely and understandable disclosure regarding the financial and business condition" of Fang.

112. Moreover, there was no legitimate reason for Fang's failures to report its financial results and to timely file its required annual reports with the SEC. While securities filings signed by Defendant Mo or Defendant Dai blamed those failures on the winding-up petition, resulting default on the 2022 Notes, and a related question over whether Fang could continue as a going concern, those excuses made no sense for several reasons.

113. First, there is no reason why those issues would have precluded Fang from filing its annual reports for the fiscal year ending December 31, 2020 by the *May 17, 2022* deadline. That Fang was still operating in May 2022 would, by itself, negate any need for a retroactive going concern qualification or disclosures for a fiscal period that ended nearly eighteen months earlier. And given that the 2022 Notes were repaid during 2021, Fang could have simply moved the liability associated with the notes from long-term liabilities to short-term liabilities on its balance sheet as of December 31, 2020, with appropriate footnotes to its financial statements to explain the default and subsequent events.

114. Second, despite the pending winding-up petition (filed November 2020) and the acceleration of the 2022 Notes (in December 2020), Fang announced its fourth quarter and fiscal

year 2020 unaudited financial results on March 26, 2021. Thus, Fang was perfectly capable of releasing earnings reports despite the purported crisis it faced. Yet Fang failed to release *any* earnings reports after that or make any other securities filings disclosing its financial results. That Fang made financial disclosures on March 26, 2021—*before* repayment of the 2022 Notes or any resolution of the winding-up petition—yet failed to make similar financial disclosures *after* those issues were resolved reveals that neither the winding-up petition nor default was the real reason for Fang's failure to stay current on its securities filings.

115. Third, neither the winding up proceeding nor Fang's default on the 2022 Notes posed any threat to Fang's ability to continue as a going concern after 2021. The component of the winding-up petition that threatened appointment of provisional liquidators and jeopardized Fang's ongoing operations was resolved consensually by the parties via a July 20, 2021 court order adjourning those claims in the Cayman Islands proceedings. And the last of the holders of the 2022 Notes were repaid in full on November 15, 2021, more than *six months* prior to Fang's May 17, 2022 deadline to file its fiscal year 2020 annual report.

116. Fourth, Fang remained a highly solvent, successful operating business throughout the relevant time period. Indeed, in approving Fang's settlement and payment of one of the holders of the 2022 Notes in the Cayman Islands proceeding, the Cayman Court specifically found that Fang "is indeed solvent" on both a cash flow and balance sheet basis, noting that Fang had total assets of over $1.9 billion compared to total liabilities of $1.2 billion.

117. Fifth, around the same time as Fang's May 17, 2022 deadline for filing its fiscal year 2020 annual report, Defendant Mo and Defendant Dai caused Fang to purchase 233,140 CIH ADSs on the open market in New York in May and June 2022. Fang would not have purchased more CIH ADSs if there really had been a legitimate question over its ability to continue as a going

concern. (Notably, neither Defendant Mo nor Fang filed an amended Schedule 13D reporting those acquisitions.)

118. Sixth, Defendant Mo and Defendant Dai utilized Fang as a sponsor in a take private transaction involving CIH just two months after Fang's delisting, as discussed below. An August 23, 2022 letter outlining Fang's original proposal, signed by Defendant Dai on Fang's behalf, stated that the private proposal "would not be subject to any uncertainty or delay with respect to any debt financing" and "will not be subject to a financing condition." Fang filed an amended Schedule 13D filed with the SEC the next day—signed by Defendant Dai—that also indicated that Fang anticipated funding the transaction with "cash on hand." And in the final form of the take private transaction, Fang committed $14.8 million in equity financing and incurred a $2.2 million guaranty obligation, as described below. These actions were fundamentally inconsistent with Defendant Mo's and Defendant Dai's assertions in public filings that there was a question over whether Fang could continue as a going concern. Indeed, Defendant Mo and Defendant Dai would not have used Fang as the "sponsor" for their CIH take private transaction if Fang had still faced any active threat to its business in 2022.

119. Moreover, the Equity Commitment Letter obligating Fang to provide $14.8 million in equity financing for the take private transaction—signed by Defendant Dai—included the following representations and warranties:

- Fang "it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization" and "has (and will continue to have) the requisite capacity and authority to execute and deliver this Agreement and to fulfill, to perform its obligations hereunder and to consummate the transactions contemplated hereby;"
- Fang "has (and will continue to have) available funds not less than the sum of the Commitment plus the aggregate amount of all other commitments and obligations [Fang] currently has outstanding;" and

- "there is no Legal Proceeding pending against [Fang], or, to the knowledge of it, threatened against it … that restricts or prohibits the performance by it of its obligations under this Agreement."

Those representations and warranties were fundamentally inconsistent with Defendant Dai's assertions in connection with Fang's NYSE delisting that the winding-up petition raised a question over Fang's ability to continue as a going concern. And this further indicates that the proffered excuse for Fang's delayed securities filings and delisting was a sham.

120. Seventh, even if there had been some legitimate question over Fang's ability to continue as a going concern, that was not an excuse for failing to file its annual reports indefinitely. To the extent that Fang had concerns, it could have simply included appropriate disclosures in its filed Form 20-F annual reports. Fang's auditors could include an appropriate going concern qualification in their audit opinion to be included in that report, if necessary.

121. Accordingly, the reasons given in Fang securities filings—signed by Defendant Mo and Defendant Dai—for Fang's failure to timely file its annual reports were a pretextual sham. In reality, Defendant Mo and Defendant Dai caused Fang to "go dark" and stop making its securities filings for self-interested reasons and to benefit themselves (at Fang's expense).

122. Failing to file Fang's annual reports—or even announce quarterly financial results—benefitted Defendant Mo because it helped conceal Defendant Mo's past, present, and possible future self-dealing. For instance, unlike for fiscal year 2019 where Fang's Form 20-F annual report reflected that the "excess consideration" Fang paid for Defendant Mo's CIH interests was recorded as $13.6 million in executive compensation expense for Defendant Mo, Fang made no such disclosure of Defendant Mo's June 2020 self-dealing. Because Fang never filed its annual

report for fiscal year 2020, Fang never reported the tens of millions of dollars of excess consideration paid in Fang's June 2020 purchase from Defendant Mo's affiliates.[5]

123. In addition to concealing Defendant Mo's self-dealing, Fang's lack of financial disclosures also benefitted Defendant Mo and Defendant Dai because keeping Fang's investors in the dark necessarily reduced demand for—and hence the market price of—Fang ADSs. In turn, by causing Fang to "go dark" and then also causing Fang to miss its filing deadlines so that Fang would be delisted by the NYSE, Defendant Mo and Defendant Dai set themselves up to further benefit themselves by exploiting Fang. Specifically, Fang's lack of financial disclosures and the threat of Fang's NYSE delisting enabled Defendant Mo and Defendant Dai to facilitate sales of investors' Fang ADSs and shares and CIH ADSs and shares to Defendant Mo and Defendant Dai at a steep discount, as discussed below.

***3. Defendant Mo and Defendant Dai Used Fang's NYSE Delisting to Acquire Massive Positions in Fang and CIH at Steep Discounts.***

124. Defendant Mo's actions in causing Fang to "go dark" created an opportunity for self-enrichment through obtaining additional Fang holdings at a steep discount. Fang's continuous failures to disclose any financial results after March 26, 2021, to make its required securities filings, and its NYSE delisting predictably led to a precipitous drop in the price of Fang ADSs during that time period. On March 31, 2021, Fang's ADS closed at $12.50 per ADS. The price of Fang ADSs dropped throughout 2021 as Fang began to "go dark," and closed at $3.81 on December 31, 2021. The price fell further to close at $3.02 on May 16, 2022, the day before Fang's

[5] Fang's announcement of second quarter 2020 earnings results on August 14, 2020 did not disclose Fang's June 2020 purchases from Defendant Mo's affiliates. Fang reported a 177.2% increase in general and administrative expenses from $14.9 million in the second quarter of 2019 to $41.3 million for the second quarter of 2020, but misleadingly attributed the increase to "staff related costs" with no reference to Defendant Mo or Fang's purchases of CIH shares from his affiliates.

cure deadline with the NYSE. And Fang's ADS price fell to $1.90 on June 2, 2022, the day of Fang's NYSE delisting. Since then, mired on the OTC pink sheet, Fang ADSs have traded irregularly and sporadically for mostly far less.

125. By the same token, Defendant Mo could also obtain CIH shares at a significant discount to fair value or intrinsic value because of the substantial overlap between Fang shareholders and CIH shareholders. Due to Fang's spin-off of CIH in June 2019 (through which Fang shareholders received pro rata distributions of CIH shares or CIH ADSs), most of Fang's large, long-term investors in 2021 and 2022 were also CIH investors. This dynamic played into Defendant Mo's and Defendant Dai's hands because many investors exiting their Fang positions prior to Fang's delisting from the NYSE would seek to exit their CIH positions too (due to the interrelationship between Fang and CIH and Defendant Mo's control over both), either separately or as part of a package deal while unloading their Fang holdings.

126. In the time period between when Fang first indicated that it would not be timely filing its annual report and its ultimate delisting, Defendant Mo used his wholly-owned alter ego affiliate, ACE, to buy out eleven investors' interests in Fang ADSs or Fang Class A shares, as follows:[6]

[6] The dates reflected in this table are the dates on which ACE entered into purchase agreements for Fang securities. Notably, the purchases in May 2022 all closed on May 20, 2022 or May 24, 2022, during the window between when the NYSE suspended Fang ADSs and when the NYSE delisted them.

| Date | Counterparty | Fang ADSs | Fang Class A | Purchase Price |
|---|---|---|---|---|
| 7/16/2021 | Lupin Capital Fund I, L.P. | 109,608 | | $1,303,239.00 |
| 12/23/2021 | First Island Trustees (Guernsey) Limited | | 94,116 | $39,526.00 |
| 1/25/2022 | Chuang Xi Capital Holdings Limited | 47,788 | | $278,604.04 |
| 1/25/2022 | Clever Sight Limited | 340,736 | | $1,986,490.88 |
| 1/25/2022 | IDG Alternative Global Limited | 48,000 | | $279,840.00 |
| 1/25/2022 | IDG-Accel China Capital Investors L.P. | 9,769 | | $56,953.27 |
| 1/25/2022 | IDG-Accel China Capital L.P. | 211,606 | | $1,233,662.98 |
| 1/26/2022 | Safari | | 2,461,538 | $1,435,078.00 |
| 5/10/2022 | Fidelidade - Companhia de Seguros, S.A. | 277,734 | | $1,374,783.30 |
| 5/10/2022 | Peak Reinsurance Company Limited | 50,885 | | $251,880.75 |
| 5/16/2022 | HHLR Fund, L.P.; YHG Investment, L.P. | 886,443 | | $4,387,892.85 |
| | TOTAL | 1,982,569 | 2,555,654 | $12,627,951.07 |

The purchased Fang ADSs represented ten Class A shares each at the time, meaning that these acquisitions equated to 22,281,344 Fang Class A shares (representing 33.90% of outstanding Fang Class A shares and 24.77% of total outstanding Fang equity). By using ACE to make these acquisitions, Defendant Mo increased his and his affiliates' ownership of Fang Class A shares by *over 550%.*

127. Defendant Mo and his wholly owned affiliate alter ego, ACE, would have been forced to pay significantly more for those Fang interests had Fang been current with its financial reporting and not faced NYSE delisting. Defendant Mo's January 2022 and May 2022 purchases priced Fang ADSs at $5.83 and $4.95, respectively, which were at a premium to the artificially depressed trading prices of Fang ADSs at that time those purchases were made. But those purchase prices were still a significant discount from where Fang ADSs had traded earlier. Before Defendant Mo caused Fang to cease financial reporting and to fail to file its required annual reports, Fang ADSs traded at $12.50 on March 31, 2021. Similarly, from the date of Fang's reverse split in June 2020 through March 2021, Fang's ADS never closed below $9.90 per ADS, while typically trading in the $10 to $15 range and averaging around $12.20 per ADS. And even those prices were

artificially depressed relative to the intrinsic value of Fang's business because of Defendant Mo's systemic prior self-dealing.

128. Not only did Defendant Mo and his wholly-owned alter ego, ACE, benefit from scooping up Fang ADSs on the cheap, they further benefitted themselves by doing so outside of the permissible trading windows under Fang's insider trading policy. Defendant Mo's amended Schedule 13D filing with the SEC dated February 4, 2022, signed by Defendant Mo on behalf of himself and ACE, expressly admitted that ACE's purchases of Fang securities in December 2021 and January 2022 were "not made during a trading window as provided in [Fang's] Insider Trading Policy." Defendant Mo's amended Schedule 13D dated May 24, 2022, again signed by Defendant Mo on behalf of himself and ACE, likewise admitted that ACE's purchase of Fang securities in May 2022 were "not made during a trading window as provided in the Issuer's Insider Trading Policy." While both of those filings attempted to brush that aside by claiming that "a waiver from the Compliance Officer of [Fang] was obtained for the purchase[s]," that only goes to show that Defendant Mo was able to buy huge chunks of Fang securities outside of permissible trading windows due to his dominion and control over Fang and ability to procure purported "waivers" for his benefit at whim.

129. Moreover, Defendant Mo's actions specifically violated Fang's code of conduct (which was incorporated by reference into its registration statements and annual reports with the SEC). Specifically, Fang's code of conduct specifically prohibits officers and directors for using corporate information for personal gain, and further provides that:

> *Any* employee, *director* or officer *who has access to, or knowledge of, material non-public information from or about the Company is prohibited from buying, selling or otherwise trading in our stock or other securities of our Company.* "Material non-public" information includes any information, positive or negative, that has not yet been made available or disclosed to the public and that might be of

> significance to an investor, as part of the total mix of information, in deciding whether to buy or sell stock or other securities of the Company.
>
> *Such insiders also are prohibited from* giving "tips" on material non-public information, that is, *directly or indirectly disclosing such information to any other person, including family members*, other relatives and friends, so that they may trade in our stock or other securities. Furthermore, if, during the course of service with the Company, any employee, director or officer acquires material non-public information about another company, such as one of our customers or suppliers or our affiliates, or learns that the Company is planning a major transaction with another company (such as an acquisition), the employee, director or officer is restricted from trading in the securities of the other company.

(Emphasis added). Defendant Mo brazenly disregarded those prohibitions by buying huge tranches of Fang ADSs and shares when he knew material non-public information, such as Fang's financial condition and recent financial results, that Fang faced no legitimate questions over it is ability to continue as a going concern (notwithstanding misleading, contrary assertions in filings signed by Defendant Mo and his loyal nephew, Defendant Dai), and that Defendant Mo and Defendant Dai would soon be using Fang to take CIH private.

130. Relatedly, Defendant Mo (through his affiliate ACE) and Defendant Dai (through his affiliate True Knight) also procured over 20.47 million of CIH ADSs or CIH Class A shares from ten of those selling Fang investors. They did so both to capitalize on artificially deflated prices and thin trading volumes that were a direct result of their prior misconduct, and to position themselves to take CIH private shortly thereafter.

131. Defendant Mo, through his affiliate ACE, made the following purchases of CIH ADSs and CIH Class A shares from the exiting Fang shareholders:

| Date | Counterparty | CIH Class A | CIH ADS | Total Paid |
|---|---|---|---|---|
| 07/06/21 | Lupin Capital Fund I, L.P. | | 1,096,086 | $2,279,859.00 |
| 12/31/21 | First Island Trustees (Guernsey) Limited | 94,116 | | $93,175.00 |
| 05/24/22 | Fidelidade — Companhia de Seguros, S.A. | 1,613,208 | | $1,532,547.60 |
| 05/31/22 | HHLR Fund, L.P. and YHG Investment, L.P. | | 8,866,511 | $8,423,185.45 |
| **TOTAL** | | **1,707,324** | **9,962,597** | **$12,328,767.05** |

Each CIH ADS represents one CIH Class A share, and thus these acquisitions totaled 11,669,921 CIH Class A shares, or a 12.9% interest in CIH. The last three of these transactions fell outside of the permissible trading window under CIH's insider trading policy, but Defendant Mo purports to have obtained a waiver from CIH's compliance officer.

132. Defendant Dai, through his wholly owned affiliate True Knight, made the following purchases of CIH ADS and CIH Class A shares from exiting Fang shareholders:

| Date | Counterparty | CIH Class A | CIH ADS | Total Paid |
|---|---|---|---|---|
| 04/30/22 | Chuang Xi Capital Holdings Limited | - | 459,123 | $436,166.85 |
| 04/30/22 | Clever Sight Limited | - | 3,273,609 | $3,109,928.55 |
| 04/30/22 | IDG Alternative Global Limited | - | 480,000 | $456,000.00 |
| 04/30/22 | IDG-Accel China Capital Investors L.P. | - | 93,869 | $89,175.55 |
| 04/30/22 | IDG-Accel China Capital L.P. | - | 2,033,003 | $1,931,352.85 |
| 04/30/22 | Safari Group Holdings Limited | 2,461,538 | - | $2,338,461.00 |
| **TOTAL** | | **2,461,538** | **6,339,604** | **$8,361,084.80** |

The total purchased equates to 8,801,142 CIH Class A shares, or a 9.7% interest in CIH. Defendant Dai caused True Knight to make these purchases outside of the permissible trading window under CIH's insider trading policy, but Defendant Dai claimed to have received a waiver of that violation from CIH's compliance officer.

133. The (a) dark cloud over Fang from its failure to disclose its financial results and its delayed securities filings and potential NYSE delisting; (b) the Fang investors' exits from their Fang positions, and (c) Defendant Mo's and Defendant Dai's purchases of CIH interests from those Fang investors were inextricably linked and intertwined.

134. All of Defendant Mo's and Defendant Dai's affiliates' purchases of Fang and CIH CIH interests were made after Fang failed to timely file its annual report and announced on May 24, 2021 that it was in communication with the NYSE over the threat of delisting of Fang ADSs. Similarly, all such purchases were made after Fang's last public disclosure of any financial results on March 26, 2021.

135. Moreover, eight of the ten purchases of Fang interests occurred within three months of Fang's deadline of April 25, 2022 to cure its violation of the NYSE Rules (before the NYSE extended the deadline to May 17, 2022). ACE or True Knight purchased CIH ADSs and CIH Class A shares from all eight of the selling Fang investors on or after April 30, 2022, after Fang had announced on April 25, 2022 that is cure deadline had been extended to May 17, 2022. And two of those eight investors purchases of CIH interests by ACE were made after Fang's ADS was suspended by the NYSE in May 2022 (but before its delisting on June 2, 2022).

136. Finally, Defendant Mo's affiliate ACE purchased Fang ADSs or Fang Class A shares within days of when five of ten Fang investors also sold CIH ADSs or CIH Class A shares to ACE or True Knight (Defendant Dai's affiliate). And while there was a slight three-month time lag for five of the other investors, those investors were also holders or affiliates of holders of 2022 Notes, and they all sold their CIH interests on April 30, 2022, right after Fang had announced an extension of its cure deadline from April 25, 2022 to May 17, 2022.

137. Thus, the timing of these transactions was not merely coincidental. Rather, Defendant Mo and Defendant Dai were able to obtain large numbers of CIH securities representing 12.9% and 9.7% ownership in CIH, respectively, precisely because of their actions in causing Fang's failure to timely file its securities filings and Fang's resulting NYSE delisting. They made most of these acquisitions outside of the normal trading windows provided for in Fang's and CIH's respective insider trading policies. And all the purchases that ACE and True Knight made during 2022 were made for a price of just $0.95 per CIH ADS/CIH Class A share, far less than the fair value of those interests in CIH for the reasons discussed below.

138. Defendant Mo and Defendant Dai breached their duties of good faith and loyalty to Fang by causing its NYSE delisting without legitimate justification, but rather so that they could

scoop up huge stakes of Fang and CIH equity at steep discounts and while in possession of material non-public information regarding Fang's financial condition and performance and its ability to continue as a going concern (and indeed, serve as "sponsor" for a take private transaction involving CIH). And in addition to acquiring large stakes in Fang and CIH on the cheap, they further benefitted by consolidating their control over Fang and CIH, thereby facilitating the take private transaction they would pursue just a few short months later.

**C. Defendant Mo and Defendant Dai Cause Fang to Buy Out Minority Holders in CIH, Enabling Them to Take CIH Private Without Paying a Dime Themselves.**

139. On August 23, 2022, Defendants Mo and Dai caused Fang to submit a preliminary, non-binding proposal to take CIH private at a price of $0.84 per CIH share or CIH ADS, to be financed with Fang's cash on hand. Over the ensuing months, Fang, Defendant Mo, Defendant Mo's affiliates, Defendant Dai's affiliates, along with three additional collaborating large Fang and CIH shareholders, including Evenstar (collectively, the "Buyer Group") formed a "Consortium," or buyer group, to participate in the transaction along with Fang.

140. The Buyer Group eventually increased the purchase price to $1.00 per CIH share or CIH ADS, but refused to go any higher, rejecting requests from CIH's representatives in the transaction to offer a higher purchase price. On December 22, 2022, the terms of the take private transaction were finalized and CIH entered into an Agreement and Plan of Merger (the "Merger Agreement") with CIH Holdings Limited ("Merger Parent") and CIH Merger Sub Holdings Limited ("Merger Sub"). The transaction was structured so that Merger Sub would be merged with and into CIH through a statutory "short-form" merger in accordance with section 233(7) of the Cayman Islands Companies Act. Following completion of the merger, CIH would cease to be a public company and it would become a privately held, direct wholly owned subsidiary of Merger Parent. CIH ADS holder and shareholders other than those included in the buyer group were to

receive a distribution of $1.00 per CIH ADS or share, and CIH's ADSs and Deposit Agreement with JPMorgan in New York would then be cancelled and terminated.

141. Merger Parent, a Cayman Islands entity originally wholly owned by Fang, was a holding company formed for the purpose of holding the equity interest in Merger Sub and for implementing the merger as a means of taking CIH private. Prior to consummation of the merger of Merger Sub and CIH, each member of the buyer group (including Fang, Defendant Mo's affiliates, and Defendant Dai's affiliates) pre-committed to exchanging all their CIH securities to Merger Sub in exchange for newly issued shares of Merger Parent. As a result of these contributions, Merger Sub would have 95.0% voting power of CIH, enabling a "short-form" merger to go forward (with no shareholder vote).

142. The obligation of each member of the Buyer Group to exchange, or "roll over," their interests in CIH in exchange for a like number of Merger Parent shares in advance of the merger was memorialized in an Equity Contribution Agreement dated December 22, 2022. Defendant Dai signed this agreement on behalf of Fang, Merger Parent, Merger Sub, and True Knight, while Defendant Mo signed the agreement on behalf ACE and each of his other affiliates that held CIH shares or CIH ADSs.

143. The Equity Contribution Agreement was a pivotal piece of the overall deal structure. By exchanging their CIH shares and CIH ADSs to Merger Sub prior to the transaction, the Buyer Group effectively consolidated a 95% voting interest in a single entity (Merger Sub), thereby allowing a short-form merger structure with no general meeting of shareholders and no formal shareholder vote. Moreover, the agreement to "roll-over" CIH shares to Merger Sub in exchange for new shares in Merger Parent on a 1:1 basis was the only consideration paid by any of the Buyer Group members (with the exception of Fang).

144. In effect, therefore, the Equity Contribution Agreement enabled Defendant Mo and Defendant Dai to orchestrate a take private transaction for CIH without needing to pay a dime themselves. And it further benefitted them by enabling a "short-form" merger transaction structure, which reduced execution risk, allowed them to forego a general meeting of shareholders, and reduced their litigation risk in connection with disclosures surrounding the transaction. This would not have been possible but for Defendant Dai's and Defendant Mo's utilization of Fang because Fang held a 39.0% voting interest in CIH at the time, meaning that Merger Sub would have only had a 56.0% voting interest without Fang participating as well (meaning that a short-form merger would have been impermissible).

145. Defendant Dai and Defendant Mo also utilized Fang to facilitate the CIH take private transaction by causing Fang to provide $14.8 million in equity financing to Merger Parent to fund the buy-out of CIH's investors not participating in the transaction as members of the Buyer Group. Fang's obligation to provide this $14.8 million in equity financing was evidenced by an Equity Commitment Letter dated December 22, 2022 and signed by Defendant Dai on behalf of both Fang and Merger Parent.

146. Finally, Defendant Dai and Defendant Mo utilized Fang to back-stop the transaction by causing Fang to give a Limited Guaranty dated December 22, 2022 in favor of CIH, signed by Defendant Dai. Under the Guarantee, Fang irrevocably and unconditionally guaranteed up to $2.2 million of obligations of Merger Parent if the deal were terminated or if Merger Parent breached its other obligations under section 9.3 of the Merger Agreement.

147. Defendant Mo and Defendant Dai significantly benefited themselves and their affiliates by utilizing Fang as a vehicle and "sponsor" for the take private transaction of CIH. Had they not involved Fang in the transaction, then:

- Defendant Mo and Defendant Dai could not have used a short-form merger structure for the take private transaction, but instead would have been subject to a shareholder vote, faced increased execution risk, and faced additional litigation risk surrounding adequacy of disclosures;

- The total payable to non-participating CIH ADS holders and shareholders would have been much higher because Fang, as a holder of a 20.0% economic interest in CIH, would have received the distribution if it had not been included as a member of the Buyer Group;

- Defendant Mo and Defendant Dai, amongst other members of the Buyers Group, would themselves have needed to fund the buy-out of non-participating CIH ADS holders and shareholders; and

- Defendant Mo and Defendant Dai would have needed some other source than the Limited Guarantee provided by Fang to backstop the transaction.

Yet because of their utilization of Fang, Defendant Mo and Defendant Dai were able to procure those benefits for themselves, and the CIH take private transaction closed on April 17, 2023.

148. Despite those self-dealing benefits and Defendant Mo's and Defendant Dai's clear conflicts of interest, no steps were taken to protect Fang's interests in the transaction. Fang's board of directors never formed a special committee nor retained its own independent counsel or financial advisors in connection with the transaction. Moreover, CIH's Schedule 13E-3 for the transaction filed with the SEC (the "CIH Transaction Statement") specifically provides that Fang, as part of the Buyer Group, "did not consider [CIH's] net book value," "did not undertake an appraisal of the assets of [CIH]," and "did not seek to establish a pre-Merger going concern value for" CIH ADSs or shares.

149. Accordingly, Defendant Dai breached his fiduciary duties to Fang—and Defendant Mo dishonestly assisted those breaches—by utilizing Fang as a vehicle to take CIH private for the benefit of themselves and their affiliates without regard for Fang's best interests. Moreover, that misconduct was directly facilitated and enabled by their earlier breaches of fiduciary duty to Fang.

150. Specifically, the CIH take private transaction was the direct fruit of Defendant Mo's and Defendant Dai's earlier breaches of fiduciary duty in causing: (a) Fang to spin-off CIH and then shortly thereafter purchase CIH ADSs and CIH shares (including from Defendant Mo's affiliates); and (b) Fang's NYSE delisting to facilitate their affiliates' purchases of 20.47 million total CIH ADSs and CIH shares.

151. First, at the time the take private structure was finalized, the total holdings of Fang, Defendant Mo's affiliates, and Defendant Dai's affiliate (True Knight) were as follows:

| | **CIH Class A** | **(held as ADSs)** | **CIH Class B** | **Econ. Int.** | **Voting Int.** |
|---|---|---|---|---|---|
| Fang | 6,964,415 | (4,534,852) | 11,119,686 | 20.0% | 39.0% |
| ACE | 11,669,921 | (9,962,597) | - | 12.9% | 3.8% |
| Karistone | - | - | 926,461 | 1.0% | 3.1% |
| Open Land | 25,000 | (25,000) | - | 0.03% | 0.01% |
| Media Partner | - | - | 5,795,802 | 6.4% | 19.1% |
| Next Decade | 14,177 | (14,177) | 5,794,757 | 6.4% | 19.1% |
| True Knight | 8,801,142 | - | - | 9.7% | 2.9% |
| *TOTAL* | *27,474,655* | *(14,536,626)* | *23,636,706* | *56.5%* | *87.0%* |

Absent Defendant Mo's and Defendant Dai's control over Fang, therefore, Defendant Mo and Defendant Dai would have only been able to muster 48.0%[7] voting power over CIH. And excluding ACE's and True Knight's voting shares (all of which were acquired during Fang's delayed securities filings and delisting) from that, their combined CIH voting share would have only been 41.3%.[8] This means that even with the other participating members of the Buyer Group, Defendant Mo and Defendant Dai would not have been able to muster even a simple majority (as the Buyer Group would have only been at 49.3%).[9]

---

[7] 87% [total voting power] - 39% [Fang voting power] = 48%.

[8] 87% [total voting power] - 39% [Fang voting power] - 3.8% [ACE voting power] - 2.9% [True Knight voting power] = 41.3%.

[9] The other members of the Buyer Group collectively held 8.0% voting power, and 41.3% plus 8.0% equals 49.3%.

152. Second, Defendant Mo and Defendant Dai would not have been able to utilize a "short-form" merger transaction structure had it not been for: (a) their control over Fang and Fang's large purchases of CIH ADSs and CIH shares purchases and (b) their large CIH ADS and CIH share purchases through their affiliates, ACE and True Knight during the midst of Fang's NYSE delisting. They would have come nowhere close to the 90% threshold but for Defendant Mo's and Defendant Dai's control over Fang's 39.0% voting interest in CIH.

153. Moreover, even with the benefit of Fang's and other buyer group members' voting interests, Defendant Mo and Defendant Dai would have come up short of the 90% threshold if not for the 6.7% voting interest that ACE and True Knight obtained through purchases of CIH interests stemming from Fang's NYSE delisting. The voting total of the buyer group as a whole was 95.0%, including ACE and True Knight, and would have been 88.3% without them, falling short of the 90.0% threshold required for a "short-form" merger.

154. Third, Fang's, ACE's, and True Knight's huge contributions to the buyer group's voting power and overall holdings facilitated the transaction because they helped justify CIH's failure to conduct a pre-signing market check or post-signing "go-shop" procedures. The CIH Transaction Statement expressly states that the special committee CIH formed to evaluate the transaction "decided not to conduct a pre-signing market check or post-signing 'go-shop' taking into account facts including that the Buyer Group, after admitting Evenstar as a member, would own in the aggregate over 90% of the total voting power and over 80% of the total outstanding share capital" of CIH. Had it not been for Defendant Mo's and Defendant Dai's earlier breaches of fiduciary duty, the buyer group would have had nowhere close to 90% voting power or 80% of total equity ownership.

155. Fourth, CIH's special committee and its corrupt fairness opinion provider, Roth Capital,[10] utilized the $0.95 per CIH ADS or share price paid by ACE and True Knight in acquiring CIH interests from April 2022 and May 2022 (on the eve of Fang's delisting) as additional justification for the $1.00 per CIH ADS or share price paid in the take private transaction. Effectively, therefore, Defendant Mo's and Defendant Dai's actions in causing Fang's NYSE delisting (so that they could purchase CIH interests on the cheap) later benefitted them in a take private transaction that utilized the deflated CIH purchase prices as a reference point to justify a low-ball take private transaction.

**D. Defendants Have Been Unjustly Enriched Through Defendant Mo's and Defendant Dai's Interrelated Breaches of Fiduciary Duty to Fang and Systemic Abuses of New York's Capital Markets.**

156. In the aggregate, the combined effect of Fang spinning-off CIH in New York, buying back Defendant Mo's affiliates' CIH interests and other CIH ADSs on the open market in New York, failing to make its securities filings and suffering NYSE delisting, and sponsoring a New York-centered take private transaction to eliminate CIH ADSs and minority investors (including those located in New York) has been disastrous for Fang. Fang depleted over $130 million to go from controlling and owning 100% of CIH to holding a 35.8% minority non-

[10] Roth Capital's fairness opinion, which focused solely on fairness to CIH's minority investors, was not remotely credible for many other reasons, including, but not limited to, that: (a) Roth Capital's discounted cash flow analysis was a "garbage in, garbage out" analysis based on unrealistic discount rates and on reverse-engineered financial projections prepared by CIH management that were completely unrealistic and unverified by Roth Capital; (b) Roth Capital's comparable companies analysis improperly selected unprofitable companies as comparisons for CIH, a profitable business; (c) Roth Capital's calculations were based on incorrect assumptions for CIH share counts provided by CIH management; and (d) Roth Capital's different tests for estimating enterprise value, despite financial goal-seeking, nevertheless indicated a value far higher than $1.00 per CIH ADS (*e.g.,* Roth Capital's comparable companies analysis reported median EV/EBITDA multiples at least 3 times higher than the CIH implied transaction multiple, and its precedent transaction analysis reflected an EV/EBITDA multiple 10 times higher than the implied CIH transaction multiple).

controlling interest (in a now private CIH), while at the same time Fang ADSs were delisted from the NYSE and, in turn, Fang's ability to receive proper oversight and raise future capital have been significantly hampered.

157. Defendant Mo and his affiliates, in stark contrast, reaped huge windfalls from this interrelated series of events and Defendant Mo's consistent and repeated abuses of Fang to further his own interests at Fang's expense.

158. First, Defendant Mo, through his wholly owned alter ego affiliate ACE, massively increased his stake in Fang. ACE's purchases of Fang ADSs and shares, all made during the time period after Fang stopped reporting its financial results and making its securities filings under threat of NYSE delisting, amounted to a 24.8% equity interest in Fang. Defendant Mo made those purchases at a steep discount to the price where Fang ADSs traded before he caused Fang to "go dark," and an even steeper discount to the fair value or intrinsic value of Fang equity because Fang ADSs already traded at an artificially deflated price due to Defendant Mo's control over Fang and disturbing track record of self-dealing.

159. Second, Defendant Mo and his affiliates significantly increased their economic stake in CIH's business. According to the CIH Transaction Statement, Defendant Mo and his affiliates now collectively own a direct 26.7% economic interest in CIH's business through Merger Parent, as follows:

| **Mo Affiliate** | **Post-Merger Merger Parent Int.** |
|---|---|
| ACE | 12.7% |
| Karistone | 1.0% |
| Open Land | 0.0% |
| Media Partner | 6.5% |
| Next Decade | 6.5% |
| **TOTAL** | **26.7%** |

They hold an additional 21.1% indirect stake in Merger Parent through Fang (as Fang holds a 35.8% post-merger interest in Merger Parent and Defendant Mo and his affiliates now own a 59.09% interest in Fang). Combined, Defendant Mo's and his affiliates' stake in CIH's business through post-merger Merger Parent is 47.8% (of which 26.7% is a direct interest). This is a significantly higher interest in CIH's business than the 34.1% indirect interest that Defendant Mo and his affiliates collectively held in that business through Fang before Fang's spin-off of CIH.

160. Third, Defendant Mo and his affiliates pocketed tens of millions of dollars of cash. Fang paid $81.2 million to them in December 2019 and June 2020 to acquire 13.5 million CIH interests at $5.99 per share.

161. The windfalls that Defendants received are even worse when considering the fair value or intrinsic value of ownership interests in CIH's operating business at the time that ACE and Defendant Dai's affiliate, True Knight, gobbled up nearly 10% of CIH on the cheap due to Fang's NYSE delisting. Indeed, the fair value or intrinsic value of CIH interests at that time was at least 6 to 10 times higher than the $0.95 per CIH ADS or CIH share price paid by True Knight and ACE from April 30, 2022 to May 31, 2022.

162. At the time Defendant Mo and Defendant Dai used their wholly owned affiliates to obtain large stakes in CIH, CIH was operating a highly profitable business. Specifically, for the fiscal year ended December 31, 2021 and for the trailing twelve months ending March 31, 2022, CIH's profitability margins were as follows:

| **CIH PROFITABILITY MARGINS** | | |
|---|---|---|
| | *FYE 12/31/21* | *TTM Q1 2022* |
| Gross Margin | 82.3% | 82.4% |
| Operating Margin | 49.4% | 48.1% |
| EBITDA Margin | 49.6% | 48.3% |
| Net Profit Margin | 45.0% | 43.7% |

163. During those same periods, CIH's reported key financial metrics were robust. Specifically, CIH's securities filings reflect the following (when converting figures reported in RMB to U.S. dollars):[11]

| CIH FINANCIAL PERFORMANCE | | |
|---|---|---|
| *(000's $USD)* | *FYE 12/31/21* | *TTM Q1 2022* |
| Revenue | 96,242 | 95,317 |
| Gross Profit | 79,175 | 78,550 |
| Operating Income | 47,547 | 45,833 |
| EBITDA | 47,766 | 46,055 |
| Net Income CIH (reported) | 43,271 | 41,616 |
| Earnings per share (basic) | $0.48 | $0.46 |

164. Given that CIH's earnings per share had been in the $0.46 to $0.48 range, the $0.95 price that Defendant Mo and Defendant Dai caused their affiliates to pay for CIH ADSs and CIH shares was shockingly low at a mere two times earnings.

165. Moreover, the $0.95 per CIH ADS or CIH share price paid implies a meager total enterprise (EV) for CIH of *only $34.3 million*,[12] when accounting for the following:

- The $0.95 per CIH ADS or CIH share paid by Defendant Dai's affiliate True Knight in April 2022 and by Defendant Mo's affiliate ACE in May 2022 equates to a total implied equity value for CIH of $85.9 million (based on the total CIH shares and CIH ADSs outstanding of 90,425,368 as of March 31, 2022);

- As of March 31, 2022, CIH reported 252.84 million RMB in cash and cash equivalents, and 109.56 million RMB in short-term investments. The total of 362.5 million RMB equated to approximately $57.0 million in cash, cash equivalents, and short-term investments based on the 6.3549 spot exchange rate for U.S. dollars on March 31, 2022; and

[11] CIH reported its financial results in RMB. The figures set forth in the table herein were derived using the Internal Revenue Service average yearly exchange rate for 2021 of 6.452, and the spot exchange rate of 6.3549 on March 31, 2022.

[12] Enterprise Value (EV) = Market Capitalization + Debt – Cash and equivalents.

- CIH had no long-term term debt or notes payable, but it reported 34.71 million RMB in long-term lease liabilities as of March 31, 2022, equivalent to $5.5 million based on the spot exchange rate.

Accordingly, the enterprise value for CIH implied by Defendant Mo's and Defendant Dai's purchase price for CIH interests ($34.3 million) is *less than* CIH's EBITDA and net income over the trailing twelve-month period and as reported its most recent audited financial statements ($41.6 million to $47.8 million). Any reasonable estimate of the fair value or intrinsic value of a highly profitable operating business (with very little debt) like CIH would not be less than its operating cash flows or earnings over the preceding year.

166. Yet, Defendant Mo and Defendant Dai acquired CIH ADSs and CIH shares at price equivalent to an implied trailing twelve-month EV/EBITDA multiple of a miniscule *0.75x*. That multiple is *at least 6 - 10 times less* than a reasonable benchmark for an EV/EBITDA multiple based on comparable companies to CIH (especially when considering CIH's strong profit margins). In turn, the fair value or intrinsic value of the CIH equity interests that Defendant Mo and Defendant Dai obtained through their affiliates was many times higher than the $0.95 per CIH ADS or CIH share they paid.

167. Defendant Mo and Defendant Dai were only able to obtain CIH ADSs and CIH shares at such an extreme discount to the fair value and intrinsic value of equity interests in such a highly profitable business because of their egregious breaches of fiduciary duty. As described above, their breaches in causing Fang's NYSE delisting enabled them to obtain CIH interests from ten different Fang investors who also held CIH interests.

168. Moreover, CIH ADSs traded at a significant discount to fair value as a direct result of Defendant Mo's and Defendant Dai's misconduct for several reasons.

169. First, as a result of Defendant Mo's breaches of fiduciary duty in causing Fang to purchase his affiliates' CIH interests and to conceal that self-dealing through additional CIH ADS

purchases on the open market in New York, Fang was a large investor in CIH by 2022. Fang's large stake and financial entanglement with CIH meant that any purported uncertainty over Fang's ability to continue as a going concern cast a dark cloud of uncertainty over CIH's future prospects too. Defendant Dai directly and materially increased the extent of that risk and uncertainty by signing Fang securities filings in May 2022 that misleadingly cast doubt over whether Fang could continue as a going concern.

170. Second, and relatedly, Defendant Mo's prior breaches of fiduciary duty to Fang had previously caused CIH to incur significant losses. Dating back to its spin-off from Fang, CIH was a guarantor on Fang's 2022 Notes. As discussed above, Defendant Mo's history of breaches of his fiduciary duties (including his self-dealing with Fang involving CIH interests) led to the Evenstar winding-up petition that caused the acceleration of the 2022 Notes. That, in turn, triggered CIH's guaranty liability, and Defendant Mo forced CIH to pay nearly $84 million to the noteholders (which CIH never recouped and wrote off as a total loss).

171. Third, Defendant Mo and his subservient nephew, Defendant Dai, completely dominated and controlled CIH. Defendant Mo's long history of self-dealing and breaching his fiduciary duties to Fang, combined with his absolute control over CIH, created a significant risk of Defendant Mo harming CIH through future self-dealing. That risk significantly deflated the price that minority investors, who would be largely powerless to stop Defendant Mo, were willing to pay for CIH ADSs on the open market. The risk of self-dealing or diversion of CIH assets was particularly acute given that CIH and Fang shared office space, IT systems and servers, and certain members of management (such as Defendant Mo and later Defendant Dai as chairman).

172. Fourth, CIH had continuing obligations to indemnify Fang for claims arising out of the spin-off. Defendant Mo's self-dealing in causing Fang to purchase his CIH interests so close

to the spin-off and despite the stated rationale for the spin-off (as discussed above) created some risk that those indemnification obligations could be triggered.

173. In short, the market price of CIH ADSs and shares at the time Defendant Mo and Defendant Dai gobbled them up in April 2022 and May 2022 was artificially low and deflated—relative to fair value or intrinsic value—because Defendant Mo's and Defendant Dai's prior bad acts destroyed public investor appetite for those shares, and because Defendant Mo and Defendant Dai misleadingly made Fang's plight seem far worse than it really was. In effect, therefore, Defendant Do and Defendant Dai reaped compound benefits from their misconduct by exploiting their prior misdeeds to maximize the extent of windfalls they would receive through ongoing self-interested and bad faith breaches of fiduciary duty towards Fang. It was inequitable and unjust for Defendant Mo and Defendant Dai to compound the unjust enrichment they received from prior breaches of their fiduciary duties by engaging in further breaches, and they and their affiliates should be forced to disgorge all profits received from their dealings in Fang ADSs and shares and CIH ADSs or shares and/or to pay compensatory damages to Fang.

**PLAINTIFFS' DERIVATIVE STANDING**

174. Derivative standing in this action is related to Fang's internal affairs, as derivative standing involves the assertion of claims belonging to the company and it is an equitable right incident to ownership of Fang shares. Because derivative standing is an issue intertwined with Fang's internal affairs, derivative standing in this case is determined by Cayman Islands law, and not New York law. Cayman Islands law does not require a showing of contemporaneous ownership or demand futility, but even if it did, Plaintiffs would satisfy those requirements because Oasis obtained Fang ADSs in 2018 and has continuously owned those ADSs (before converting to registered shares), Lorelei obtained ADSs and continuously owned those ADSs (before converting to registered shares) prior to the CIH take private transaction, and Fang's directors—each of which

owe their positions to Defendants, can be removed by Defendants, and are loyal to Defendants—would not bring these claims against Defendants.

175. Plaintiffs Oasis and Lorelei have derivative standing under Cayman Islands law because Oasis and Lorelei are registered shareholders of record of Fang and the misconduct conduct alleged herein constitutes "fraud on the minority" within the meaning of Cayman Islands law. First, Defendant Mo's and Defendant Dai's misconduct both: (a) entailed deliberate and dishonest breaches of the fiduciary duties that they owed to Fang: (a) benefited Defendant Mo and Defendant Dai. Either suffices as equitable "fraud" within the meaning of the concept of "fraud on the minority" under Cayman Islands law. Second, Defendant Mo and Defendant Dai have sufficient control over Fang to enable them to block the company from bringing these claims against them, their alter egos, and their affiliates. Defendant Mo is Fang's controlling stockholder and has over 85.1% voting power of Fang. Moreover, Defendant Mo and Defendant Dai (Fang's chairman) have exercised *de facto* control over Fang and over Fang's other directors. Plaintiffs also have derivative standing to sue ACE, True Knight, Media Partner, and Next Decade because each of those affiliates of Defendant Mo and Defendant Dai were party to or accessory to or closely associated with Defendant Mo's and Defendant Dai's breaches of fiduciary duty.

## CAUSES OF ACTION

### Count I: Breach of Fiduciary Duty (Against Defendants Mo and Dai)

176. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

177. Defendant Mo served as a Fang director and chairman of Fang's board of directors from before the time of Fang's IPO until February 28, 2022. Defendant Dai, who previously served as a Fang officer and director, rejoined Fang's board on February 28, 2022 and has served as a

director and chairman of Fang's board of directors since then. During their tenures as Fang directors, Defendant Mo and Defendant Dai owed several fiduciary duties to Fang. Even after his supposed resignation on February 28, 2022, Defendant Mo continued to owe fiduciary duties as former director to not obtain a benefit from acts or omissions he had taken previously as a director.

178. First, Defendant Mo and Defendant Dai owed a duty to act loyally to Fang and to act in good faith in Fang's best interests and to promote the success of Fang.

179. Second, Defendant Mo and Defendant Dai owed a duty to use their powers as directors only for the proper purposes for which their powers were conferred.

180. Third, Defendant Mo and Defendant Dai owed a duty to not make a personal gain from use of their fiduciary positions as Fang directors.

181. Fourth, Defendant Mo and Defendant Dai owed a duty to avoid conflicts of interest. Relatedly, Fang's code of conduct, incorporated by reference into its registration statement with the SEC, expressly stated:

> *Business decisions must be made in the best interest of our Company, not motivated by personal interest or gain*. Therefore, as a matter of our Company policy, *all* employees, *directors* or officers *must avoid any actual or perceived conflict of interest*.
>
> A "conflict of interest" occurs when an individual's private interests interfere or conflict in any way (or even appear to interfere or conflict) with the interests of the Company as a whole. A conflict of interest situation can arise when an employee, officer or director takes actions or has interests (financial or other) that may make it difficult to perform his or her Company work objectively and effectively. Conflicts of interest also may arise when an employee, officer or director, or a member of his or her family receives improper personal benefits as a result of his or her position in the Company, regardless of whether such benefits are received from the Company or a third party. Loans to, or guarantees of obligations of, employees and their family members are of special concern. United States federal law currently prohibits the Company from making loans to directors and executive officers.
>
> It is difficult to identify exhaustively what constitutes a conflict of interest. For this reason, *every* employee, *director* or officer *must avoid any situation in which his/her independent business judgment might appear to be compromised*.

(Emphasis added).

182. Finally, related to their duties to avoid personal gains and to avoid conflicts of interest, Defendant Mo and Defendant Dai owed fiduciary duties to:

(a) not engage in self-dealing transactions with Fang;

(b) not obtain benefits, or kickbacks, from third parties for exercising their directorial functions in a particular way; and

(c) not exploit company information for personal gain or advantage.

The last of these duties was incorporated into the prohibition of trading on material non-public information set forth in Fang's code of conduct, as alleged above.

183. Defendant Mo breached his fiduciary duties in causing Fang to spin-off CIH, to then exercise its option to purchase back CIH shares from Defendant Mo's affiliates, and to purchase additional CIH ADSs on the open market in New York (to conceal the extent of his self-enrichment and partially offset the lost economic upside in the CIH interests his affiliates sold). Defendant Mo acted in bad faith against Fang's best interests in these transactions, as it was not in Fang's best interests to spend over $95.4 million to obtain an 18.5% non-controlling interest in an entity (CIH) that had been its wholly owned subsidiary just one year before (after Fang already had disposed of over $19.9 million in the spin-off itself). Moreover, Defendant Mo placed himself in a conflicted position, and reaped a substantial windfall and gain from self-dealing because Fang paid far more than the prevailing market price for his affiliates' CIH securities. And Defendant Mo orchestrated these transactions for an improper purpose of enabling him to raise cash while retaining full control over CIH's operating business (by virtue of his control over Fang).

184. Defendant Mo further breached his fiduciary duties in causing Fang to cease all financial reporting after March 2021, to fail to file its required Form 20-F annual reports from May 2021 onwards, and to obtain extensions of cure deadlines from the NYSE—so Defendant Mo could

buy Fang and CIH securities on the cheap—yet still have Fang's ADSs delisted. "Going dark," losing future access to New York's capital markets and financial reporting was not in Fang's best interest, but Defendant Mo caused Fang to do so anyway so for improper purposes and to benefit himself by concealing his prior self-dealing and to enable his and his nephew's affiliates to obtain Fang securities and CIH securities at artificially depressed prices. As a result of Defendant Mo's bad faith, acting for improper purposes, conflicts of interest, and self-dealing, his wholly owned affiliate ACE obtained a 24.8% stake in Fang and a 12.9% stake in CIH at artificially deflated prices resulting from Defendant Mo's own misconduct.

185. In obtaining a 24.8% stake in Fang for ACE, Defendant Mo breached his fiduciary duties further still by trading on material non-public information. When causing ACE to acquire Fang ADSs and shares at a steep discount, Defendant Mo was fully aware of Fang's recent and current financial condition and performance (which had not been disclosed in the marketplace since March 2021), knew that Fang faced no real threat from the winding-up petition (due to the July 2021 consent order), knew that the 2022 Notes had been repaid in full by November 2021, and knew that there were no legitimate questions over Fang's ability to continue as a going concern (despite contrary representations in securities filing signed by Defendant Mo and his nephew, Defendant Dai). Indeed, Defendant Mo was responsible for creating an informational vacuum in the marketplace that he later exploited. Defendant Mo's purchase of a massive 24.8% stake in Fang, through ACE, was motivated in whole or part by his knowledge of Fang's true financial performance and condition, and that Fang would continue as a going concern.

186. Defendant Dai likewise breached his fiduciary duties in causing Fang to fail to disclose its financial results, to fail to file its required Form 20-F annual reports, and to obtain extensions of cure deadlines from the NYSE—so Defendant Dai and his uncle, Defendant Mo,

could buy CIH securities on the cheap—yet still have Fang's ADSs delisted. "Going dark" and losing future access to New York's capital markets was not in Fang's best interest, but Defendant Dai caused Fang to do so anyway so for improper purposes and to benefit himself and his uncle by concealing Defendant Mo's prior self-dealing and facilitating his and his uncle Mo's scheme to obtain Fang and CIH securities at artificially depressed prices. As a result of Defendant Dai's bad faith, acting for improper purposes, conflicts of interest, and self-dealing, Defendant Dai's wholly owned affiliate True Knight obtained a 9.7% stake in CIH.

187. Defendant Dai further breached his fiduciary duties to Fang by exploiting Fang—with the assistance of Defendant Mo—as a vehicle for a take private transaction involving CIH. Despite having recently signed Fang securities filing suggesting that questions persisted over whether Fang could continue as a going concern, Defendant Dai, acting in concert with his uncle Mo, caused Fang to provide $14.8 million in equity financing, to commit to roll-over its CIH interests (which Fang held as a result of Defendant Mo's earlier breaches of fiduciary duty), and to incur a $2.2 million guaranty liability, all so Defendant Dai and Defendant Mo could take CIH private without needing to pay a dime themselves and while utilizing a beneficial, short-form merger structure. Defendant Dai acted in bad faith against Fang's best interests, acted for the improper purpose of benefitting himself and his uncle, and exploited his conflict of interest as Fang's chairman for personal gain—via True Knight—in orchestrating the take private transaction.

188. Defendant Mo and Defendant Dai obtained massive windfalls through their breaches of fiduciary duty. Defendant Mo procured $81.2 million in cash from Fang for his affiliates (Media Partner and Next Digital), obtained a 12.9% interest in CIH (via ACE) for a fraction of what that interest was worth, and likewise obtained a 24.8% in Fang (via ACE) at a steep discount, all while increasing his control over both Fang and CIH. Defendant Dai obtained a

9.7% interest in CIH (via True Knight) at a price that was a small fraction of the intrinsic value or fair value of those equity interests. Accordingly, Defendant Mo and Defendant Dai should be forced to account for all profits that they and their respective affiliates receive from the acquired CIH shares (and resulting Merger Parent shares) and to disgorge all such profits. Moreover, the Fang and CIH ADSs and shares obtained by ACE, and the CIH ADSs and shares obtained by True Knight, along with subsequently acquired Merger Parent shares obtained in connection with those CIH ADSs and shares, should be held in constructive trust.

189. Defendant Mo's and Defendant Dai's serial breaches of their fiduciary duties caused Fang to suffer tens of millions of dollars of damages in an amount to be proven at trial. In paying $5.99 per share for CIH interests acquired from Defendant Mo's affiliates and transferring $81.2 million to them, Fang paid far more than the prevailing market price at the time of those transactions. Fang lost $19.9 million in cash in connection with the CIH spin-off, spent $14.2 million in buying CIH ADSs to conceal purchases from Defendant Mo's affiliates (in addition to the $81.2 million transferred to Defendant Mo's affiliates), spent an additional $177,720 buying CIH ADSs in May and June 2022, advanced $14.8 million to fund the CIH take private, and incurred millions of dollars of professional fees in these CIH-related transactions, all to end up with a 35.8% minority interest in CIH compared to the 100% controlling interest it held in CIH before these transactions. As a direct, proximate, and foreseeable result of Defendant Mo's breaches of fiduciary, Fang was also forced to incur millions of dollars in professional fees in connection with the winding-up petition, resolution of the 2022 Notes, and correspondence with the NYSE (and associated securities filings) surrounding Fang's delisting.

**Count II: Dishonest Assistance**
**(Against Defendants Mo, ACE, and True Knight)**

190. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

191. Defendant Dai owed fiduciary duties to Fang.

192. Defendant Dai breached his fiduciary duties to Fang by causing Fang's NYSE delisting so that Defendant Dai and Defendant Mo could obtain CIH ADSs and shares at a massive discount to fair value, and by subsequently exploiting Fang in the CIH take private transaction to benefit himself and Defendant Mo.

193. Defendant Mo dishonestly assisted, or aided and abetted, in those breaches of fiduciary duty after Defendant Mo resigned as Fang's chairman of the board and was replaced by Defendant Dai in that role.

194. Defendant Mo induced and assisted in Defendant Dai's breaches of fiduciary duty by acting in concert with Defendant Dai in those transactions. Defendant Mo, as Fang's controlling stockholder, installed his loyal nephew (Defendant Dai) to help him carry out his plan to make Fang "go dark" and use Fang's impending NYSE delisting as a vehicle to pick up CIH ADSs and shares at a steep discount. In late January 2022, Defendant Mo, through ACE, bought out the Fang positions of six Fang investors. Just one month later, Defendant Mo stepped down and installed Defendant Dai, who then (via True Knight) bought all CIH positions from those same six investors in April 2022. Defendant Mo induced and worked in concert with his loyal nephew Defendant Dai in these transactions.

195. Defendant Mo, through his affiliates, also induced and assisted Defendant Dai's breaches of his fiduciary duties to Fang in connection with the CIH take private transaction. Defendant Mo acted in concert with Defendant Dai in developing the transaction structure, which

required Fang to provide all funding while neither Defendant Mo nor Defendant Dai needed to contribute any cash. Thereafter, Defendant Mo caused his affiliates to participate in the CIH take private transaction as members of the Buyer Group and as "roll-over shareholders" who pre-committed to the merger, enabling a short-form merger structure to be utilized.

196. Defendant Mo acted dishonestly in connection with Defendant Dai's breaches of fiduciary duty. Defendant Mo knew of—and had helped orchestrate—the corrupt scheme to cause Fang to "go dark" and suffer NYSE delisting so that Defendant Mo and Defendant Dai could benefit themselves by obtaining large stakes in CIH at undervalue. Defendant Mo similarly knew of—and helped orchestrate—the self-serving transaction structure for the CIH take private transaction.

197. As a result of his dishonest assistance of Defendant Dai's breaches of fiduciary duty (and of Defendant Mo's prior misconduct), Defendant Mo (via ACE) was able to procure additional Fang ADSs and CIH ADSs and shares, all at a steep discount, in May 2022. All profits that Defendant Mo receives in connection with those Fang ADSs and CIH ADSs and shares should be disgorged.

198. Moreover, Defendant Mo's dishonest assistance of Defendant Dai's breaches of fiduciary duty (and of Defendant Mo's prior misconduct) caused damages to Fang in an amount to be proven at trial related to Fang's NYSE delisting and costs associated with the CIH take private transaction.

199. Pleading in the alternative to the extent that ACE is not deemed Defendant Mo's alter ego (Count III), ACE also dishonestly assisted, or aided and abetted, Defendant Dai's breaches of his fiduciary duties. ACE assisted in those breaches because: (a) ACE was the entity that purchased Fang ADSs and shares from the six Fang investors who then relatedly sold CIH

ADSs and shares to Defendant Dai's entity, True Knight; and (b) ACE participated in the CIH take private transaction. ACE acted dishonestly in providing that assistance because ACE, as an entity that is wholly owned and controlled by Defendant Mo, is imputed with all of Defendant Mo's knowledge and intent. Accordingly, ACE should be forced to disgorge all profits it receives from the Fang ADSs and shares and CIH ADSs and shares that ACE obtained in connection with ACE's knowing and dishonest participation in Defendant Dai's breaches of his fiduciary duties, and ACE should be held jointly and severally liable for any damages Fang suffered in connection with the CIH take private transaction.

200. Pleading in the alternative to the extent that True Knight is not deemed Defendant Dai's alter ego (Count IV), True Knight also dishonestly assisted, or aided and abetted, Defendant Dai's breaches of his fiduciary duties. True Knight is wholly owned and controlled by Defendant Dai, and thus True Knight is imputed with Defendant Dai's knowledge and intent. True Knight participated in Defendant Dai's breaches of fiduciary duty as the entity that acquired CIH ADSs and shares from selling investors in April 2022 in connection with Fang's NYSE delisting, and as a participant in the CIH take private transaction. Accordingly, True Knight should be forced to disgorge all profits it receives from the CIH ADSs and shares it acquired in April 2022 in connection with Defendant Dai's breaches of his fiduciary duty, and it should be held jointly and severally liable for any damages Fang suffered in connection with the CIH take private transaction.

**Count III: Alter Ego**
**(Against Defendants Mo and ACE)**

201. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

202. Defendant Mo wholly owned ACE and exercised complete domination and control of ACE.

203. Defendant Mo, as ACE's sole owner, necessarily benefitted from ACE's dealings, and ACE is the tool that Defendant Mo utilized to help carry out his self-enrichment scheme surrounding Fang's NYSE delisting. Mo exercised his dominion and control of ACE to use it to purchase Fang and CIH ADSs and shares at grossly deflated prices resulting from Defendant Mo's breaches of fiduciary duty in causing Fang to "go dark," causing Fang's NYSE delisting, and exploiting material non-public information.

204. As a result of Defendant Mo's exercise of dominance and control of ACE and his utilization of ACE as a tool in his self-enrichment scheme, ACE procured large stakes in both Fang and CIH at steep discounts to fair value. All profits that ACE receives in connection with those Fang and CIH interests (and resulting Merger Parent interests) should be disgorged to Fang. Moreover, Fang was harmed as a result of "going dark" and its NYSE delisting and suffered damages in an amount to be proven at trial.

**Count IV: Alter Ego**
**(Against Defendants Dai and True Knight)**

205. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

206. Defendant Dai wholly owned True Knight and exercised complete domination and control of True Knight.

207. Defendant Dai, as True Knight's sole owner, necessarily benefited from True Knight's dealings, and True Knight is the tool that Defendant Dai utilized to help carry out his and his uncle Mo's self-enrichment scheme surrounding Fang's NYSE delisting. Dai exercised his domination and control of True Knight to use it to purchase CIH ADSs and shares at grossly deflated pricing resulting from Defendant Dai's breaches of fiduciary duty in causing Fang to "go dark" and causing Fang's NYSE delisting.

208. As a result of Defendant Dai's exercise of dominance and control of True Knight and his utilization of True Knight as a tool for self-enrichment, True Knight procured large stakes in CIH at steep discounts to fair value. All profits that True Knight receives on account of those shares and subsequently acquired Merger Parent shares should be disgorged to Fang. Moreover, Fang has been harmed as a result of "going dark" and its NYSE delisting and suffered damages in an amount to be proven at trial.

**Count V: Dishonest Assistance**
**(Against Defendants Media Partner and Next Decade)**

209. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

210. Defendant Mo owed fiduciary duties to Fang.

211. Defendant Mo breached his fiduciary duties to Fang by causing Fang to spin-off CIH and issue CIH shares to his affiliates, including Media Partner and Next Decade, and then buy those same CIH shares back from his affiliates at $5.99 per share.

212. Media Partner and Next Decade participated in and assisted, or aided and abetted, Defendant Mo's breaches of fiduciary duty to Fang because they are the entities that sold CIH shares to Fang at a price of $5.99 at a time when Fang could and did buy CIH interests on the open market in New York for much lower prices. In other words, Media Partner and Next Decade were the tools that Defendant Mo utilized in carrying out this scheme in breach of his fiduciary duties to Fang.

213. Media Partner and Next Decade acted dishonestly in participating in and assisting in Defendant Mo's breaches of fiduciary duty in these transactions. Defendant Mo's knowledge and intent are imputable to those entities, as Defendant Mo dominated and controlled them. Various securities filings signed by Defendant Mo expressly admit and acknowledge that

Defendant Mo controls Media Partner and Next Decade. And while several filings list Defendant Mo's wife, Jing Cao, as a director of those entities, Jing Cao has admitted in sworn declarations that she signed documents on behalf of Media Partner and Next Decade at Defendant Mo's instruction and while knowing little about the transactions.

214. Media Partner and Next Decade profited from participating in Defendant Mo's breaches of fiduciary duty in causing Fang to pay $5.99 per share for the CIH shares that Media Partner and Next Decade transferred to Fang as part of Defendant Mo's scheme. Moreover, those transactions harmed Fang and caused damages in an amount to be proven at trial.

**Count VI: Knowing Receipt**
**(Against Defendants Media Partner and Next Decade)**

215. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

216. Fang's assets, including its cash reserves, were subject to fiduciary duties owed by Fang's directors. In breach of those fiduciary duties, Defendant Mo caused Fang to transfer $81.2 million of cash to Media Partner and Next Decade.

217. Media Partner and Next Decade beneficially received $81.2 million from Fang.

218. Media Partner and Next Decade knew that the cash they received from Fang was transferred in breach of Defendant Mo's breach of fiduciary duties to Fang. Defendant Mo dominated and controlled Media Partner and Next Decade both directly, as he has admitted in securities filings with the SEC, and indirectly through his wife, Jing Cao, who has admitted that she blindly signed documents for Media Partner and Next Decade at the instruction of her husband, Defendant Mo. Defendant Mo was the directing mind and will of Media Partner and Next Decade, and his knowledge is imputable to them. Media Partner's and Next Decade's knowledge—and

participation in breaches of fiduciary duty—makes it unconscionable for them to retain the funds they received from Fang.

219. Accordingly, Media Partner's and Next Decade's transactions with Fang should be rescinded, and/or Media Partner and Next Decade should give restitution for the $81.2 million they received from Fang.

**NOTICE OF INTENT TO RAISE ISSUES UNDER FOREIGN LAW**

220. Pursuant to CPLR 3016 and CPLR 4511, Plaintiffs hereby give notice of their intent to raise issues under the laws of the Cayman Islands, including but not limited to, the law governing Plaintiffs' derivative standing, Defendant Mo's and Defendant Dai's duties to Fang and their breach of such duties, and Plaintiffs' claims for dishonest assistance and knowing receipt. Plaintiffs intend to offer expert testimony, documents, and other relevant material or sources to the Court to determine the foreign law at issue.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment in Fang's favor as follows:

a. Awarding compensatory damages against Defendants, jointly and severally, to Fang in an amount to be determined at trial;

b. Ordering the disgorgement of all profits Defendants have made or make as a result of their breaches of fiduciary duties, dishonest assistance of breaches of fiduciary duties, and/or knowing receipt of funds obtained as a result of breaches of fiduciary duties;

c. Rescinding Fang's purchases of CIH shares from Media Partner and Next Decade, and/or ordering Media Partner and Next Decade to make restitution of the funds they received;

d. Imposing a constructive trust over all Fang ADSs and shares obtained by ACE;

e. Imposing a constructive trust over all CIH ADSs and CIH shares obtained by ACE and assets traceable to those interests (including, but not limited to, shares in Merger Parent and any profits thereon);

f. Imposing a constructive trust over all CIH ADSs and CIH shares obtained by True Knight and assets traceable to those interests (including, but not limited to, shares in Merger Parent and any profits thereon);

g. Declaring that ACE and Defendant Mo are alter egos;

h. Declaring that True Knight and Defendant Dai are alter egos;

i. Awarding pre-judgment and post-judgment interest;

j. Awarding costs and attorneys' fees in an amount to be determined at the conclusion of this lawsuit; and

k. Ordering such other and further relief as the Court deems just.

Dated: New York, New York
May 29, 2023

Respectfully submitted,

REID COLLINS & TSAI LLP

William T. Reid, IV
Yonah Jaffe
Aaron A. Brown
420 Lexington Avenue, Suite 2731
New York, New York 10170
T: 212-344-5200
F: 212-344-5299
wreid@reidcollins.com
yjaffe@reidcollins.com
abrown@reidcollins.com

Nathaniel J. Palmer (*pro hac vice to be filed*)
Michael Yoder (*pro hac vice to be filed*)
1301 S. Capital of Texas Hwy, C-300
Austin, Texas 78746
T: 512-647-6100
F: 512-647-6129
npalmer@reidcollins.com
myoder@reidcollins.com

*Counsel for Plaintiffs Oasis Investments II Master Fund Ltd. and Lorelei NCC Inc.*

Gmail

**B. Robert Liu <robert.liu@balancelawfirm.com>**

---

## Activity in Case 1:25-mc-00235-GHW-KHP 507 Summit LLC and KOA CapitaL L.P. v. Balance Law PLLC Notice of Appearance

---

**B. Robert Liu, Esq.** <robert.liu@balancelawfirm.com> Wed, Jul 23, 2025 at 5:50 PM
To: Jeffrey Chubak <jchubak@aminillc.com>

Hi Jeffrey,

Here is my proposal for resolving this issue amicably.

Your client 507 Summit LLC produces the following documents concerning its investment in Fang ADS on August 8, 2022 and its conversion of Fang ADS into shares on March 2, 2023:

1. **Investment Thesis Memo, Risk Memo** and **Legal Memo** (including assessment of Related-Party Transactions, pending litigations and future litigation risks);
2. **Compliance Pre-Clearance Memo** and **Final Investment Committee Approval Notes;**
3. **All communications with Two Sea Capital** within 30 days of each respective transaction; and
4. **All communications with Oasis Capital** within 30 days of each respective transaction.

Under the condition that your client 507 Summit LLC produce the above four categories of documents, my firm is willing to produce the following documents to your client under appropriate confidentiality agreement:

1. Documents related to CIH's entering into the Merger Agreement on December 22, 2022;
2. Documents related to $1.00 per share Merger Consideration; and
3. Documents related to the filing of the Merger Agreement and the Plan of Merger with the Registrar on April 17, 2023.

Thank you and all the best,

B. Robert Liu, Esq.
Balance Law Firm
One World Trade Ctr, Ste 8500
New York, NY 10007
balancelawfirm.com
(212) 741-8080
(631) 490-4465 fax

CFA Institute
CFA®
CHARTERHOLDER
BEIXIAO LIU, CFA
Charter Awarded 2022

RATED BY Super Lawyers
Rising Stars
Beixiao Robert Liu
SuperLawyers.com

[Quoted text hidden]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| 507 SUMMIT LLC and KOA CAPITAL L.P.<br>Applicants<br>v.<br>BALANCE LAW PLLC dba Balance Law Firm<br>Respondent | Case 25-mc-235-KHP |

**REPLY DECLARATION OF JEFFREY CHUBAK**

I, Jeffrey Chubak, hereby declare:

1. I am a member of Amini LLC, counsel for the applicants 507 Summit LLC and KOA Capital L.P. in this 28 U.S.C. § 1782 proceeding.

2. Annexed hereto as exhibits are true and correct copies of the following-described documents:

| Exhibit # | Document Description |
|---|---|
| Cayman Court Orders in Underlying Appraisal Proceeding | |
| 1 | Directions Order, entered May 27, 2025 |
| Cayman Decisions in Companies Act § 238 Appraisal Proceedings | |
| 2 | Qunar Cayman Islands Limited v. Athos Asia Event Driven Master Fund et al |
| 3 | In re New Frontier Health Corporation |
| 4 | In re 51job, Inc. |
| 5 | Phoenix Meridian Equity Limited v. Lyxor Asset Managmeent, S.A. |
| Correspondence | |
| 6 | August 12, 2025 letter from applicants' counsel to CIH counsel re: default of discovery obligations under Directions Order |
| 7 | Emails between counsel for applicants and respondent herein |

I hereby declare under penalty of perjury that the foregoing is true and correct. Executed on this 22nd day of August, 2025.

/s/ Jeffrey Chubak

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO. FSD 201 OF 2023 (IKJ)**

**IN THE MATTER OF THE COMPANIES ACT (2023 REVISION)**

**AND IN THE MATTER OF CHINA INDEX HOLDINGS LIMITED**

---

**DIRECTIONS ORDER**

---

**UPON** the petition filed by China Index Holdings Limited (the **Company** or **CIH**) on 19 July 2023 pursuant to s.238(9) of the Companies Act (2023 Revision) (the **Proceedings**)

**AND UPON** the Company's Summons for Directions dated 19 July 2023 coming on for hearing on 23 May 2025

**AND UPON** hearing counsel for the Company and counsel for the dissenting shareholders listed in **Appendix 1** to this Order (together the **Dissenters** and each a **Dissenter**[1])

**IT IS HEREBY ORDERED THAT:**

---

[1] The Company and the Dissenters collectively the Parties; each a Party.

This Order was filed by Conyers Dill & Pearman LLP, Attorneys-at-Law for the Petitioner, whose address for service is SIX, 2nd Floor, PO Box 2681, Grand Cayman KY1-1111 Cayman Islands

1. The Dissenters be joined as respondents to the Petition.

**A. Appointment of Experts**

Valuation Experts

2. The Parties shall have leave to instruct and call as a witness at trial one expert witness each (the Dissenters jointly and severally to instruct one expert between them) in the field of valuation, in order to opine upon the fair value of the Dissenters' shares in the Company as a going concern as at 17 April 2023 (the **Valuation Date**) (the **Experts**).

3. The Experts shall be appointed no later than 42 days from the date of this Order, and on that date the Company and the Dissenters shall each advise the other in writing of the identities and contact details, including email addresses, of the respective Experts so appointed.

Additional Experts

4. The Parties shall have liberty to apply for leave to instruct and call as a witness at trial expert witnesses in such additional field(s) as they may be advised, provided that such application shall be made no later than 28 days after the deadline for filing and service of the Company's reply evidence pursuant to paragraph 39 below.

Interest Rate Experts

5. The Company and the Dissenters shall have leave to instruct and call, at a hearing following the Court's determination of fair value (the **Interest Hearing**), one expert witness each (the Dissenters jointly and severally to instruct one expert between them) to opine on the fair rate of interest for the purposes of section 238(11) of the

This Order was filed by Conyers Dill & Pearman LLP, Attorneys-at-Law for the Petitioner, whose address for service is SIX, 2nd Floor, PO Box 2681, Grand Cayman KY1-1111 Cayman Islands

Companies Act (2023 Revision) (together, the **Interest Experts**). For the avoidance of doubt, the same individual may be instructed and called as both an Expert and an Interest Expert.

6. Directions in respect of the Interest Hearing shall apply as follows:

6.1. If the Parties, or either of them individually, consider an Interest Hearing necessary, the Interest Experts shall be appointed within 28 days of the date of the Order made upon the Court's determination of fair value of the Dissenters' shares in the Company, and on that date the Company and the Dissenters shall each advise the other in writing of the identities and contact details, including email addresses, of the respective Interest Experts so appointed.

6.2. Absent agreement between the Parties at that time, and notwithstanding the provisions of any other direction herein, any Party shall have liberty to apply for further directions regarding the exchange of reports and supplemental reports from, and production of a joint memorandum by, the Interest Experts, and in relation to any other matters connected with determining the fair rate of interest.

**B. Confidentiality and Non-Disclosure Agreement**

7. No Expert, Interest Rate Expert or Expert's Appointee (being each person whom an Expert or Interest Rate Expert appoints to assist him/her in any work relating to the Proceedings, including the preparation of the Expert Reports and the Joint Memorandums (as defined in this Order) and any other preparations in relation to the Proceedings) (each an **Appointee** and collectively the **Appointees**), nor any Dissenters (including their agents, advisors, sub-advisors, representatives, affiliates and service providers and consultants, but excluding attorneys advising on Cayman Islands law) (collectively their **Representatives**), shall be given

This Order was filed by Conyers Dill & Pearman LLP, Attorneys-at-Law for the Petitioner, whose address for service is SIX, 2nd Floor, PO Box 2681, Grand Cayman KY1-1111 Cayman Islands

access to the Data Room (as defined below) or permitted to attend a management meeting (as defined below) until and unless each Dissenter, the Company and such Expert and Appointee enters into, and exchanges, a Confidentiality and Non-Disclosure Agreement in the same or substantially similar form attached to this Order as **Appendix 2**.

**C. Electronic Data Room and Company Disclosure Procedure**

8. Within 14 days from the date of this Order, the Company shall open an electronic data room (the **Data Room**) and, subject to paragraph 7 above, provide access to the Experts, the Appointees, the Dissenters, and their respective Representatives and legal advisors.

9. The Data Room shall be accessible to each of the parties and the parties' respective advisors, consultants and any Experts defined and appointed pursuant to paragraphs 2 to 5 above, together with the Experts' team members for inspection of the documents contained therein, subject to the entry into a binding non-disclosure agreement in the form set out at Appendix 2 which must remain in effect until the conclusion of these proceedings.

10. Within 60 days of the Data Room being opened, the Company shall upload to the Data Room all Documents (as defined in **Appendix 3**) that were made available by the Company to members of the Buyer Group (as defined in the Company's proxy statement dated 24 February 2023) for the purposes of the merger transaction, and shall also upload the index for such documents (the **Buyer Group Due Diligence Documents**).

11. Within 90 days of the Data Room being opened, the Company shall upload to the Data Room all Documents, Communications (as defined in **Appendix 3**) and other materials which are in its possession, custody or power comprising the categories of documents set out in **Appendix 3** of this Order which were prepared or created

This Order was filed by Conyers Dill & Pearman LLP, Attorneys-at-Law for the Petitioner, whose address for service is SIX, 2nd Floor, PO Box 2681, Grand Cayman KY1-1111 Cayman Islands

in the 5 year period ending on the Valuation Date, 17 April 2023 and which are relevant to the determination of fair value.

12. In addition to giving disclosure of the non-exhaustive categories of documents required by paragraphs 10 and 11 above, within a further 60 days following the end of the period set out at paragraph 11 above, the Company shall upload to the Data Room all additional Documents, Communications (as defined in **Appendix 3**) and other materials which are in its possession, custody or power prepared or created in the 5 year period ending on the Valuation Date which are relevant to the determination of the fair value of the Dissenters' shares in the Company as at the Valuation Date.

13. The Company shall comply with the disclosure protocol at **Appendix 5** hereto when conducting searches for potentially relevant documents and uploading documents to the Data Room. In relation to documents that have been redacted pursuant to **Appendix 5**, upon request, documents shall be provided in their native format manually amended by way of deletion of redacted information.

14. All Parties who have been given access to the Data Room shall be given full access rights to the documents therein, save that no Party will have the ability to modify documents in-situ within the Data Room; however, all such documents shall be in a form which the Dissenters can download to their own systems either individually or (upon request to, and facilitated by, the Data Room service provider) as a bulk download and, in turn, modify outside of the Data Room.

15. The costs of and associated with the establishment and maintenance of the Data Room, including the Data Room provider's costs of (i) uploading, processing and hosting the documents added to the Data Room, (ii) producing the Data Room Index (as defined below) and any updated versions thereof, (iii) technical support, including the costs of facilitating any bulk export or download of documents and (iv) Experts, Appointees, Dissenters and Representatives seeking access to the

Data Room, shall be borne initially by the Company on an ongoing basis but shall ultimately be costs in the Proceedings.

16. The Company shall, on an ongoing basis whilst the Proceedings are extant, bear the costs of a reasonable number of access codes per Dissenter and per Expert, to facilitate access to the Data Room (such costs ultimately to be costs in the Proceedings). Should any Dissenter require additional access to the Data Room, such Dissenter shall bear the specific costs of such access, and the Company will arrange for such costs to be charged by the Data Room provider to the Dissenter directly.

17. No Data Room usage report, or any other analysis of any Party's usage of the Data Room, shall be run by any Party on the usage of another Party, its Representatives, legal advisers or its appointed Expert and his/her Appointees without that Party's express written consent or order of the Court.

**D. Lists of Documents; Translations**

18. The Company will ensure that the documents it uploads to the Data Room will be appropriately indexed in an electronically searchable form (the **Data Room Index**). The Data Room Index shall be compiled in a manner which complies with the requirements for lists in O.24, r.5(1) of the Grand Court Rules (**GCR**). This index shall be updated contemporaneously with any documents being added to the Data Room by the Company. Any changes in the content of the Data Room shall be clearly identified to the Dissenters at the same time they are made.

19. In relation to the documents which are to be disclosed pursuant to this Order, the Company shall, on or before each of the respective dates for compliance with paragraphs 10, 11 and 12 above (and from time to time thereafter as may be necessary) file and serve on the Dissenters a list of documents complying with GCR O.24, r.5 (each such list a **List of Documents**). So long as the Data Room Index has been provided in a manner which complies with the requirements for

lists in GCR O.24, r.5(1), the Data Room Index shall be treated as the Company's index of documents in accordance with GCR O.24, r.5(1) and any documents that may fall within GCR O.24, rr.5(2) and 5(3) shall be listed separately in accordance with Form No. 16 of **Appendix 1** to the GCR. Nothing in this Order or in **Appendix 2** hereto shall derogate from each Party's implied obligation not to use the documents obtained thereby for any improper or collateral purpose.

20. In the event that any Party wishes to rely on a document which is not in the English language and a certified English translation is not available, that Party shall procure and provide a certified English translation of the document relied on at its own initial cost. An electronic copy of the certified English translation shall be uploaded to the Data Room as soon as practicable. The costs of any such translations shall ultimately be costs in the proceedings.

**E. Experts' Information Requests of the Company**

21. Unless the Court otherwise orders, the Company shall upload to the Data Room any additional information, Documents or Communications (as defined in **Appendix 3**), or other materials which are or have been in its possession, custody or power that are requested by any Expert for the purpose of preparing his/her own opinion (**Information Requests**). For the avoidance of doubt, if an Expert so requests, this may include Documents, Communications, materials or information produced after the Valuation Date. Such requests may be made from the date of the upload of documents to the Data Room pursuant to paragraph 10 above. Any Information Requests from an Expert and any responses from the Company thereto shall be in writing and in English and shall be copied simultaneously by email to the Expert for the other party or parties to the email addresses notified in accordance with paragraph 3 above.

22. The Experts' Information Requests may be made periodically but the Experts shall use their best endeavours to submit only non-repetitive, concise and clear

questions.

23. The Company shall provide written answers in English to each batch of Information Requests and shall upload the written answers and any responsive Documents or Communications (as defined in **Appendix 3**) or other materials to the Data Room as soon as practicable, and in any event (unless otherwise agreed) within 21 days of receipt of that Information Request. For the avoidance of doubt, should the Information Request be received by the Company after 5.30pm (Cayman Islands time), this timeframe shall begin to run from 8.30am (Cayman Islands time) the following Cayman Islands business day.

24. Submitted questions and information requests will be answered and responded to in the order of their request.

25. Unless otherwise agreed, the cut-off date for the submission of the final Information Request to the Company is 28 days before the date fixed for the relevant exchange of Expert Reports (as provided for at paragraph 41 below) and the cut-off date for the submission of written answers by the Company is 20 days before the date fixed for the relevant exchange of Expert Reports.

**F. Management Meetings**

26. Within 28 days of a request by any of the Experts, unless otherwise agreed or directed by the Court, the Company shall procure that appropriate members of its management team be available to meet with all Experts simultaneously, in person (and if in person, additionally by way of video link) or by way of video link as may be agreed between the Parties, such meeting to be scheduled to take place at a mutually convenient place and time, for the purpose of providing information and answering queries which are relevant to the preparation of the Experts' respective Expert Reports (a **Management Meeting**).

This Order was filed by Conyers Dill & Pearman LLP, Attorneys-at-Law for the Petitioner, whose address for service is SIX, 2nd Floor, PO Box 2681, Grand Cayman KY1-1111 Cayman Islands

27. The number of Management Meetings requested by the Experts shall not be restricted, save that no Management Meetings may be requested by any of the Experts within 42 days of the relevant Experts' Reports being due to be exchanged, no Management Meeting shall take place within 28 days of any prior Management Meeting, unless otherwise agreed between the Parties or directed by order of the Court.

28. The Parties shall agree on the time and date, attendees, format (video conference or in person), and (if applicable) location for a Management Meeting.

29. If agreement cannot be reached as to the time or date, attendees, format and/or location of a Management Meeting, any Party may apply to the Court for directions on not less than 10 working days' notice to the other Parties, such matter to be resolved by the Court on the papers unless the Court otherwise orders.

30. Management Meetings shall be conducted in English. If necessary to facilitate efficient and effective participation by any member of the Company's management team, the Company shall arrange for independent interpreters to be present at Management Meetings and the Dissenters may, in the alternative, instruct their own interpreter(s) for a Management Meeting. The costs of any interpreter shall be borne equally by the Company and the Dissenters. The costs of all interpreters shall nonetheless be costs in the Proceedings.

31. Only members of the Company's management team, the Parties' legal advisers, the Experts (together with the Experts' team members), Dissenters or representatives of the Dissenters, any interpreters (if applicable) and any transcription service providers shall attend Management Meeting save that any Management Meeting held by video-link or held in person but for which it is possible to provide video-link may be attended by Dissenters or representatives of the Dissenters (who do not attend in person). Each Party shall be responsible for the travel, visa, accommodation and other logistical arrangements of its Expert(s)

and legal advisors in relation to Management Meetings and the costs thereof shall be costs in the Proceedings.

32. Each Expert shall provide a list of questions and/or topics (a **List of Questions and Topics**) to the Company not less than 21 days prior to the agreed date for a Management Meeting. The List of Questions and Topics shall be copied by email to the Expert for the other Party or Parties at such time as it is sent to the Company. Any Expert may ask reasonable follow-up questions at such Management Meeting to the extent that they consider it necessary. If an Expert reasonably wishes to raise a new question or topic not included in the List of Questions and Topics, reasonable accommodation shall be made by the Company and agreement to provide a response shall not be unreasonably withheld.

33. The Company shall arrange for Management Meetings to be recorded and a transcript prepared in English (the **Management Meeting Transcript**). Both the recording and the transcript shall be circulated by the Company and uploaded to the Data Room by the Company as soon as reasonably practicable thereafter and in any case within 14 days of the relevant Management Meeting. The cost of such recording and transcript shall be borne equally by the Company and the Dissenters and such costs shall be costs in the Proceedings.

34. Within 21 days of uploading the transcript of a particular Management Meeting, the Company and Dissenters shall be permitted to consider whether there are any errors in the transcript and, if so, explain any such errors to the other party and produce (or, if already produced and uploaded to the Data Room, identify) the supporting documents which demonstrate any such error.

35. Within 14 days of receiving notice of any purported errors and supporting documents, the party that received notice of purported errors shall confirm their agreement or otherwise to the purported errors that have been identified, and within 7 days thereafter the Company shall circulate to the Dissenters, and if not

This Order was filed by Conyers Dill & Pearman LLP, Attorneys-at-Law for the Petitioner, whose address for service is SIX, 2nd Floor, PO Box 2681, Grand Cayman KY1-1111 Cayman Islands

provided, the Dissenters may circulate to the Company a new draft. In addition, a copy of the transcript shall be uploaded to the Data Room which identifies (a) any amendments agreed between the parties, and (b) any statements which either party maintain are erroneous but which the parties have not agreed should be noted (the "**Reviewed Transcript**") with documentation included in support of each side's respective position.

36. To the extent they consider it appropriate to do so, an Expert may refer to the Reviewed Transcript in their Report, the Joint Memorandum and/or Supplemental Report.

**G. Dissenter Disclosure**

37. Subject to the Company entering into, and exchanging, a non-disclosure agreement in the same or substantially similar form as that contained in **Appendix 2**, with the Dissenter as a disclosing Party and the Company as the recipient, each Dissenter shall upload to the Data Room (or, at the Dissenter's election, by way of an alternative data room) within the period specified in paragraph 12 of this Order, documents in its possession, custody or power falling within the categories of documents identified at **Appendix 4** of this Order which were prepared and created in the 5 year period ending on the Valuation Date and which are relevant to the determination of the fair value of the shares in the Company as at the Valuation Date. Each Dissenter's disclosure in the Data Room (or any alternative data room) shall be available to the Company and the Experts but not to the other Dissenter.

38. The costs of hosting such documents in the Data Room (but not in an alternative data room, which costs shall be borne initially by the Dissenters on an ongoing basis, but shall ultimately be costs in the Proceedings) shall be borne initially by the Company on an ongoing basis but shall ultimately be costs in the Proceedings, and paragraphs 13 to 20 above shall apply in the same manner, and with the

necessary modifications to give effect to those paragraphs, to the Dissenters' upload of documents to the Data Room (or any alternative data room).

**H. Factual Affidavits**

39. The Company shall file and serve any factual evidence by no later than a date 105 days from the date of this Order with English translations. The Dissenters shall file any evidence in response by no later than 60 days of service of the Company's factual evidence upon them. The Company shall file any evidence in reply with English translations by no later than 21 days of service of the Dissenters' evidence upon it.

40. Any factual evidence to be relied upon at the hearing of the Petition shall be given by affidavit or affirmation and leave is hereby granted to the Parties to cross-examine any deponent of any factual affidavit or affirmation and the deponent(s) of any such affidavit(s) or affirmation(s) shall attend for cross-examination on the condition that notice requiring their attendance is given 14 days before the CMC (as defined below) or, if the CMC is dispensed with or the date of the CMC is fixed less than 14 days prior to the hearing of the CMC then the deadline shall be 30 days prior to trial.

**I. Expert Reports and Joint Memorandum**

41. Signed reports of each of the Valuation Experts (the **Expert Reports**):

41.1 Shall be confined respectively to the issue of the fair value of the Dissenters' shares as a going concern in the Company as at the Valuation Date;

41.2 Shall be in accordance with the Rules for Expert Witnesses in the FSD

Guide; and

41.3 Shall be exchanged simultaneously 21 weeks after the deadline for the Company's evidence in reply pursuant to paragraph 39 above.

42. The Experts shall each meet at a mutually convenient time, whether in person, by telephone, conference call or video link or howsoever they shall decide and so often as they jointly consider necessary (the **Experts' Meeting**), but no later than 21 days after the exchange of the respective Expert Reports, to discuss the differences between their respective Expert Reports with a view to narrowing the issues between them and producing the Joint Expert Memorandums required by paragraph 43 below.

43. A joint memorandum of the Experts (the **Joint Expert Memorandum**) recording:

43.1. the fact that they have met;

43.2. when and where they met, and that they discussed the Expert issues;

43.3. the issues on which they agree;

43.4. the issues on which they disagree; and

43.5. a brief summary of the reason for any such disagreement,

shall be completed and issued to the Parties by the Experts by no later than 28 days following the respective Experts' Meeting.

44. Any supplemental Expert Reports (**Supplemental Expert Reports**) shall be exchanged simultaneously by no later than 56 days following the issuance of the Joint Expert Memorandums.

This Order was filed by Conyers Dill & Pearman LLP, Attorneys-at-Law for the Petitioner, whose address for service is SIX, 2nd Floor, PO Box 2681, Grand Cayman KY1-1111 Cayman Islands

45. The Company and the Dissenters shall each be at liberty to call as expert witnesses at trial their own appointed Experts whose report(s) have been exchanged pursuant to the provisions of this Order.

46. The Company shall be at liberty to cross-examine the Dissenters' appointed Experts on their report(s) at trial, and the Dissenters shall be at liberty to cross-examine the Company's appointed Experts on their report(s) at trial.

**J. Case Management, Case Management Conference and Trial Dates**

47. Any Party that seeks foreign ancillary relief in aid of these Proceedings, whether by way of third party discovery applications, applications in the United States of America under 28 U.S.C. s.1782, or otherwise, shall, as soon as practicable after serving any such application (and in any event within 7 days' of service), notify this Court, and the other Parties to the Proceedings.

48. Each party will disclose promptly to the other parties any and all documents received from any third-party or non-party as a result of any ancillary relief in aid of these proceedings obtained by the party (whether by way of an order of this Court, an order of any foreign Court or voluntary assistance by the third party). Disclosure shall be made in accordance with paragraphs 19 and 20 (as applicable).

49. Unless the Parties otherwise agree, a Case Management Conference (**CMC**) shall be held on the earliest date convenient to the Court and the Parties' Cayman Islands legal advisors and counsel after the deadline for exchange of any Supplemental Reports, or in the event that no Supplemental Reports are exchanged, on the earliest date convenient to the Court and the Parties' Cayman Islands legal advisors and counsel once it is confirmed that no Supplemental Reports will be exchanged. The Parties may agree that the CMC be dispensed

with provided that the Court does not indicate a CMC is necessary.

50. The Company and the Dissenters shall, on an ongoing basis while the Proceedings are extant, each pay 50% of the cost of the recording and transcription of any hearings in the Proceedings, and these costs shall ultimately be costs in the Proceedings. The Parties shall agree on the supplier and fee quote prior to each hearing.

51. For convenience only, the deadlines set out in the various paragraphs in this Order are tabulated in a schedule attached to this Order as **Appendix 6**. To the extent there is any inconsistency between the terms of this Order and **Appendix 6**, this Order shall prevail.

52. Save as varied by this Order or further order, the practice and procedures set out in the FSD Guide are to be followed.

53. Liberty for any Party to apply for further directions in respect of the matters addressed in this Order and any other matters prior to the CMC.

54. The trial of the Petition shall be listed on the first available date after 15 September 2026, with a time estimate of 4 weeks.

55. Within 15 days of the filing of this Order, the Company shall inform the Dissenters of the total number of shares that shall be the subject of the trial of the Petition, and shall inform the Dissenters of any change within 3 days of such change.

Holiday blackout periods

56. The following periods are dedicated holiday periods to enable the Parties and the legal and Expert teams to take leave should they desire to do so. Time shall not run during these periods for any purpose in relation to this Proceeding, including

any task provided for under this Order and in respect of any correspondence exchanged in relation to this Proceeding:

56.1. 24 December to 2 January;

56.2. Chinese New Year, being seven calendar days from the first Bank Holiday in Beijing for Chinese New Year; and

56.3. National Day Golden Week, being seven calendar days from the first Bank Holiday in Beijing for the Golden Week.

57. Costs be costs in the proceedings.

Dated this 27 day of May 2025

Filed this 27 day of May 2025

**THE HONOURABLE JUSTICE KAWALEY**
**JUDGE OF THE GRAND COURT**

This Order was filed by Conyers Dill & Pearman LLP, Attorneys-at-Law for the Petitioner, whose address for service is SIX, 2nd Floor, PO Box 2681, Grand Cayman KY1-1111 Cayman Islands

**APPROVED AS TO FORM AND CONTENT**

Conyers Dill & Pearman LLP

______________________________

**CONYERS DILL & PEARMAN LLP**
Attorneys for the Company

Carey Olsen

______________________________

**Carey Olsen**
Attorneys for the Dissenters

This Order was filed by Conyers Dill & Pearman LLP, Attorneys-at-Law for the Petitioner, whose address for service is SIX, 2nd Floor, PO Box 2681, Grand Cayman KY1-1111 Cayman Islands

**Appendix 1**

**List of Dissenters**

| | Dissenter | Address |
|---|---|---|
| 1 | Koa Capital L.P. | 99 Wall St., New York, NY 10005, U.S.A. |
| 2 | 507 Summit LLC | 853 Broadway, Suite 1109, New York, NY 10003, U.S.A. |

This Order was filed by Conyers Dill & Pearman LLP, Attorneys-at-Law for the Petitioner, whose address for service is SIX, 2nd Floor, PO Box 2681, Grand Cayman KY1-1111 Cayman Islands

**Appendix 2**

**Confidentiality and Non-Disclosure Agreement**

**[*NB: Where the Company is the Recipient, references to the "Company" shall be amended accordingly*]**

This Confidentiality and Non-Disclosure Agreement (the **"Agreement"**), effective [Date] (the **"Effective Date"),** is entered into

BETWEEN

**China Index Holdings Limited**, a company incorporated under the laws of the Cayman Islands and having its registered office address at c/o Maples Corporate Services Limited, PO Box 309, Ugland House, George Town, Grand Cayman KY1-1104, Cayman Islands (the **"Company"**)

AND

[NAME], a company incorporated under the laws of [jurisdiction] and having its registered office address at [address] (the **"Recipient"**),

(each herein referred to individually as a **"Party",** and collectively as the

**"Parties"**).

**WHEREAS:**

A. On 22 December 2022, the Company entered into an agreement (**"Merger Agreement"**) and plan of merger (**"Plan of Merger"**) with CIH Holdings Limited (**"Parent"**) and CIH Merger Sub Holdings Limited (**"Merger Sub"**). Pursuant to the terms of the Merger Agreement, the Merger Sub merged with and into the Company, with the Company continuing as the surviving company and a wholly-owned subsidiary of the Parent and ceasing to be a publicly traded company (the **"Merger"**).

This Order was filed by Conyers Dill & Pearman LLP, Attorneys-at-Law for the Petitioner, whose address for service is SIX, 2nd Floor, PO Box 2681, Grand Cayman KY1-1111 Cayman Islands

B. The shareholders of the Company and the Merger Sub were not required to approve or authorize the Merger, pursuant to section 233(7) of the Cayman Islands Companies Act (2023 Revision) (**"Act"**), given that the Merger Sub held shares in the Company which represented at least 90% of the votes at a general meeting of the Company and a copy of the Plan of Merger was given to every member of the Company.

C. The dissenting shareholders of the Company identified in **Appendix 1** of the Directions Order (as defined herein) (each a **"Dissenter",** and collectively the **"Dissenters"**) have dissented from the Merger pursuant to Section 238(5) of the Act.

D. On 19 July 2023, the Company filed a petition in the Grand Court of the Cayman Islands to determine the fair value of the Dissenters' shares (Cause No. FSD 201 of 2023 ([ ]), the "**Proceedings**").

D. Pursuant to an order for directions in the Proceedings dated [date] (the **"Directions Order"**), the Company is to establish an electronic data room (the **"Data Room"**) to which discovered documents are to be uploaded for the purposes of the Proceedings.

E. Pursuant to the Directions Order, meeting(s) may be convened at which members of the Company's management team will provide information and answer queries relevant to the preparation of the Parties' Experts' respective Expert Reports (the "**Management Meeting**").

F. The Company is engaged in proprietary and confidential business activities, and could be prejudiced if Confidential Information (as defined herein) pertaining to the Company or its business is disclosed publicly or to third parties, or used by the Recipient, its Representatives and/or Appointees (as defined herein) for purposes not reasonably related to the purposes of the Proceedings.

This Order was filed by Conyers Dill & Pearman LLP, Attorneys-at-Law for the Petitioner, whose address for service is SIX, 2nd Floor, PO Box 2681, Grand Cayman KY1-1111 Cayman Islands

**NOW, THEREFORE,** in consideration of the promises and the mutual agreements and covenants hereinafter set forth, and intending to be legally bound, the Company and the Recipient hereby agree as follows:

**1 DEFINITIONS AND INTERPRETATION**

1.1 In this Agreement the following words and expressions shall have the following meanings:

(a) **"Affiliates"** means a corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent or sibling corporation.

(b) **"Appointee"** means each person whom an Expert appoints to assist him/her in any work relating to the Proceedings, including the preparation of the Expert Reports and the Joint Memorandum (such other terms as defined in the Directions Order).

(c) **"Representatives"** means, with respect to a Recipient, its Affiliates, agents, advisers, sub-advisers, representatives, legal advisors, service providers and consultants.

1.2 References to recitals and clauses are references to the recitals to and clauses of this Agreement.

1.3 Headings to clauses and the use of bold type are for convenience only and shall not affect the interpretation or construction of this Agreement.

1.4 Words in the singular include the plural and vice versa.

**2 CONFIDENTIAL INFORMATION**

2.1 "Confidential Information" means:

This Order was filed by Conyers Dill & Pearman LLP, Attorneys-at-Law for the Petitioner, whose address for service is SIX, 2nd Floor, PO Box 2681, Grand Cayman KY1-1111 Cayman Islands

(a) Any information disclosed by the Company to the Recipient, its Representatives and/or Appointees either directly or indirectly, in writing or orally, related to: trade secrets; business, commercial, or financial information; financial statements; financial or business plans and strategies; projections or analyses for future or prior periods; tax data; business and marketing plans and strategies; assets and liabilities; proposed strategic transactions or acquisitions, strategic alternatives, or business combinations; or other personally or commercially sensitive or proprietary information of the Company and its subsidiaries; and

(b) Any notes, analyses, compilations, studies, interpretations, documents or records containing, referring to, relating to, based upon or derived from, such Confidential Information, in whole or in part, created by the Recipient, its Representatives and/or Appointees.

2.2 Confidential Information shall not, however, include any information that:

(a) Was publicly known or made generally available to the public without a duty of confidentiality prior to the time of disclosure to the Recipient by the Company;

(b) Has become publicly known or made generally available to the public without a duty of confidentiality after disclosure to the Recipient by the Company through no action or inaction of the Recipient in breach of this Agreement; or

(c) Is in the rightful possession of the Recipient without confidentiality obligations at the time of disclosure by the Company to the Recipient as shown by the Recipient's then contemporaneous written files and records kept in the ordinary course of business.

2.3 If the Recipient or its Representative becomes compelled by applicable law, rule or regulation or request of governmental or regulatory authority to disclose any Confidential Information, the Recipient will, insofar as it is permitted to do so by

applicable law, rule or regulation and other than in the case of routine regulatory investigations, provide the Company with a written notice in advance of such disclosure, where practicable, and will provide such reasonable assistance to the Company as the Company may require at the Company's sole expense, in seeking a protective order or other appropriate remedy.

2.4 If the Company waives the Recipient's compliance with this Agreement or fails to obtain a protective order or other appropriate remedy, the Recipient will furnish only that portion of the Confidential Information that it is required to disclose by applicable law, rule or regulation provided that any Confidential Information so disclosed shall maintain its confidentiality protection for all purposes other than such disclosure compelled by applicable law, rule or regulation.

**3 MAINTENANCE OF CONFIDENTIALITY**

3.1 Except as may otherwise be agreed in writing by the Company or permitted by the courts of the Cayman Islands by way of relief from the implied undertaking or pursuant to this Agreement or otherwise, all Confidential Information and its contents received by the Recipient, its Representatives and/or Appointees shall be:

(a) Maintained as set forth in this Agreement;

(b) Disclosed only to such persons and in such manner as permitted by this Agreement; and

(c) Used solely for the purposes of, or related to, the Proceedings.

3.2 Prior to its Representatives and/or Appointees being granted access to the Data Room, and/or receiving the Confidential Information, the Recipient shall:

This Order was filed by Conyers Dill & Pearman LLP, Attorneys-at-Law for the Petitioner, whose address for service is SIX, 2nd Floor, PO Box 2681, Grand Cayman KY1-1111 Cayman Islands

(a) Ensure that its Representatives and Appointees expressly agree in writing to comply with the confidentiality terms imposed by this Agreement or are otherwise bound by confidentiality obligations no less restrictive than those contained herein; and

(b) Confirm in writing to the Company that the agreements in clause 3.2(a) above have been obtained or obligation of confidentiality (as contemplated by clause 3.2(a) above) are otherwise in place.

3.3 The Recipient, its Representatives and its Appointees shall keep the Confidential Information confidential and shall not, unless for the purposes of, or related to, these Proceedings:

(a) Disclose any Confidential Information or permit any Confidential Information to be disclosed, either directly or indirectly, to any third party (other than other Representatives or Appointees or Recipients who have signed a confidentiality agreement in this form and their Representatives or Appointees) without the Company's prior written consent; or

(b) Use the Confidential Information for any purpose other than as set out at Clause 3.1 above or exploit the Confidential information in any way:

(i) In communications with any competitor or competitors of the Company or its subsidiaries or affiliates; and/or

(ii) As a basis for trading in the securities of the Company or its subsidiaries or affiliates.

3.4 The Recipient shall take necessary measures to protect the confidentiality, and to avoid disclosure and unauthorised use, of Confidential Information. Without limiting the foregoing, the Recipient shall take at least those same measures it employs to protect its own confidential information.

3.5 The Recipient shall reproduce the Company's proprietary rights notices on any copies of documents, in the same manner in which such notices were set forth in or on the original.

**4 BREACH OF CONFIDENTIALITY**

4.1 The Recipient shall notify the Company of:

(a) Any unauthorized use or disclosure, or suspected unauthorized use or disclosure, of Confidential Information by the Recipient, its Representatives and/or Appointees as soon as practicable upon becoming aware of such use or disclosure; and

(b) Any actions by the Recipient, its Representatives and/or Appointees which are in breach of their respective obligations under this Agreement as soon as practicable upon becoming aware of such use or disclosure.

4.2 In the event of a breach of 4.1(a) and/or 4.1(b) of this Agreement, the Recipient shall reasonably cooperate with any and all efforts of the Company to help the Company regain possession of Confidential Information and/or prevent its further unauthorized use or dissemination.

4.3 The Recipient agrees to be responsible for any breach of this Agreement by any of its Representatives and/or Appointees that have received or obtained Confidential Information.

4.4 Nothing in this Agreement shall prejudice in any way the rights of the Company to file an application with the Cayman Islands court for a protective order relating to any Confidential Information. For the avoidance of doubt, any failure by the Company to obtain such an order or other protection after having a reasonable opportunity to do so shall not preclude the Recipient from making use of the Confidential Information in the Proceedings.

## 5 DESTRUCTION OF MATERIALS

5.1 Upon the earlier of (i) the final determination of the Proceedings (including all appeals therefrom), or (ii) a legally binding agreement having been executed between the Company and the Recipient as to the amount payable to it as a result of the Merger, and payment having been duly received by the Recipient (the "**Final Determination**") the Recipient shall, upon request by the Company following the Final Determination, take all reasonable and proportionate steps to:

(a) subject to clause 5.2, destroy any materials that are in writing or other tangible medium or permanently erase any materials that are in an electronic or other non-tangible medium (to the extent technologically feasible) that constitute Confidential Information obtained or possessed by the Recipient; and

(b) procure that any of its Representatives and/or Appointees destroy any materials that are in writing or other tangible medium or permanently erase any materials that are in an electronic or other non-tangible medium (to the extent technologically feasible) that constitute Confidential Information obtained or possessed by the Recipient's Representatives and/or Appointees.

5.2 Notwithstanding the foregoing, one copy of the Confidential Information may be retained by the Recipient or its attorneys to comply with applicable law or regulation, provided that copies so retained shall continue to be treated as confidential in accordance with the provisions of this Agreement.

5.3 Notwithstanding the destruction or erasure of Confidential Information pursuant to this Clause 5, the Recipient and its Representatives shall continue to be bound by their confidentiality obligations and other obligations under this Agreement.

## 6 INDEMNITY

The Recipient shall indemnify the Company against all liabilities, costs, expenses, damages and losses suffered or reasonably incurred by the Company arising out of or in connection with any breach of this Agreement by the Recipient, its Representatives and/or Appointees.

**7 INADEQUACY OF DAMAGES**

The Recipient agrees that any violation of this Agreement may cause irreparable injury to the Company which cannot be adequately remedied in monetary terms or other damages, and accordingly the Company may be entitled to obtain injunctive relief, specific performance and/or any other equitable relief in addition to all other legal remedies concerning any threatened or actual breach of any of the provisions of this Agreement.

**8 TERM**

8.1 The obligations of the Recipient under this Agreement shall survive until 12 months following compliance with Clause 5 above. Notwithstanding the foregoing, the Recipient's duty to hold in confidence any Confidential Information that was disclosed by the Company during the term of this Agreement shall remain in effect for five years.

8.2 The termination of this Agreement shall not affect any accrued rights or remedies to which the Company is entitled.

**9 NO WARRANTY**

The Company makes no warranties, express, implied or otherwise, with respect to non-infringement or other violation of any intellectual property rights of a third party or of the recipient.

**10 NO LICENSE**

This Agreement shall not be construed as creating, conveying, transferring, granting or conferring upon the Recipient any rights, license or authority in or to the Confidential Information except as expressly set forth in this Agreement. Title to the Confidential Information will vest solely with the Company.

**11 MISCELLANEOUS**

11.1. This Agreement shall bind and inure to the benefit of the Parties and their respective successors and permitted assigns; except that the Recipient may not assign or otherwise transfer this Agreement, by operation of law or otherwise, without written consent of the Company. Any assignment or transfer of this Agreement in violation of the foregoing shall be null and void. The Recipient hereby represents and warrants that the person executing this Agreement on its behalf has express authority to do so, and, in so doing, to bind the Party thereto.

11.2. This Agreement contains the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior written and oral agreements between the Parties regarding such subject matter.

11.3. If any provision herein shall be determined to be void or unenforceable in whole or in part for any reason whatsoever such invalidity or unenforceability shall not affect the remaining provisions or any part thereof contained within this Agreement and such void or unenforceable provisions shall be deemed to be severable from any other provision or part thereof herein contained.

11.4. No provision of this Agreement may be waived except by a written instrument executed by the Party against whom the waiver is to be effective. A Party's failure to enforce any provision of this Agreement shall neither be construed as a waiver of the provision nor prevent the Party from enforcing any other provisions of this Agreement. No provision of this Agreement may be amended or otherwise modified except by a written instrument signed by the Parties to this Agreement.

11.5. The Parties may execute this Agreement in one or more counterparts, each of which is deemed an original, but all of which together constitute one and the same agreement. This Agreement may be delivered by email or facsimile transmission, and email or facsimile copies of executed signature pages shall be binding as originals.

**12 GOVERNING LAW AND JURISDICTION**

12.1. This Agreement and any dispute, claim, suit, action or proceeding of whatever nature (including non-contractual disputes or claims) arising out of or in connection with it or its subject matter or formation shall be governed by and construed in accordance with the laws of the Cayman Islands.

12.2. Each Party irrevocably agrees to submit to the exclusive jurisdiction of the courts of the Cayman Islands over any claim or matter arising under or in connection with this Agreement or the legal relationship established by this Agreement; provided that nothing in this Clause 12 shall prevent a Party from seeking interlocutory or interim injunctive relief in other jurisdictions.

12.3. Each Party irrevocably agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.

[*Signature page follows immediately.*]

**IN WITNESS WHEREOF,** the Parties acknowledge that they have read and understood this Agreement and have executed this Agreement as of the Effective Date.

| | | |
|---|---|---|
| Signed for and on behalf of | ) | |
| China Index Holdings Limited | ) | |
| by its duly authorised agent | ) | |
| | ) | Name: |
| | ) | Designation: |
| | ) | Date: |
| In the presence of: | ) | |
| | ) | |
| | ) | |
| | ) | |

Name:

Date:

| | | |
|---|---|---|
| Signed for and on behalf of | ) | |
| [NAME OF RECIPIENT] | ) | |
| | ) | |
| | ) | Name: |
| | ) | Designation: |
| | ) | Date: |
| In the presence of: | ) | |
| | ) | |
| | ) | |

Name:

**Appendix 3**

**Categories of documents to be disclosed pursuant to paragraph 11 and 12 of the Order**

This Order was filed by Conyers Dill & Pearman LLP, Attorneys-at-Law for the Petitioner, whose address for service is SIX, 2nd Floor, PO Box 2681, Grand Cayman KY1-1111 Cayman Islands

In this Appendix 3, headings are for convenience only and shall not affect the interpretation or construction of this Appendix, and the following definitions apply:

"Document" includes, without limitation, original, draft and all non-identical copies of all hard copy and electronically or digitally stored information, including all forms of correspondence, agreements, instant messages (including text messages, WeChat messages, Signal messages, WeCom messages, QQ messages, WhatsApp messages and all other data stored on any form of messaging application), memoranda, calendars and other planners, records of telephone conversations, notebooks and all other forms of work papers, presentations, spreadsheets, graphs, charts, and any and all other forms of analyses.

"Communication" means any written, or electronic transmission of information (in the form of facts, ideas, inquiries, or otherwise), including all meetings, discussions, dialogues, conversations, telephone calls, interviews, negotiations, cablegrams, mailgrams, telegrams, telexes, cables, correspondence, facsimiles, emails, text messages, chat messages (including Bloomberg messages, Instant Bloomberg chats, WeChat messages, Signal messages, WeCom messages, QQ messages, and WhatsApp messages), or other forms of written interchange, however transmitted, including reports, notes, memoranda, lists, agenda, proposals, opinions, messages, video tapes, and other documents or records of communication.

Unless otherwise stated, the definitions in the Company's proxy statement dated 24 February 2023 (the "**Proxy**") are adopted herein below.

The Company shall be responsible for producing any of the following documents if held within their, and including their officers, board members or employees, possession and power to produce.

**The Company, the Special Committee and their advisors**

(a) Communications and Documents produced by, provided to or received from Roth Capital or its representatives or affiliates (collectively the **"Financial Advisor"**) in relation to the 2020 Proposed Transaction, Proposed Transaction and the Merger, which includes all matters set out in the Proxy (including but not limited to the Financial Advisor's fairness opinions dated 22 December 2022 (the **"Fairness Opinion"**) including Communications

and Documents passing between the Financial Advisor and:

i. The independent directors or Special Committee of the Company;

ii. The Company's other directors, management, employees, counsel or advisors; and

iii. The Buyer Group and/or any of their respective advisors and/or representatives (the **"Buyer Group Team"**); and

iv. Any other potential purchasers or interested parties.

(b) Communications and Documents in respect of the Company's decision to form the Special Committee, including the Company's choice of the members of the Special Committee, and any Communications and Documents in relation to the appointment of Mr. Jianping Ye and Mr. Jason Chenyang Wei as members of the Special Committee (including Communications and Documents made and produced prior to their appointment) and any internal or external analysis conducted in respect of their suitability and independence.

(c) Communications and Documents relating to the Special Committee's decision to engage Gibson, Dunn & Crutcher LLP as its legal counsel and Roth Capital as its financial advisor in connection with the Proposed Transaction and the Merger, including Communications and Documents relating to any other legal or financial advisor considered but not appointed.

(d) Communications and Documents produced by, provided to, received from or passing between any of (i) the Company and any of its representatives, agents, employees or advisors, (ii) the members of the Special Committee, (iii) the Financial Advisor, (iv) any member of the Buyer Group, (v) any other potential purchaser or interested party, (vi) any other advisors or consultants to the Company or the Special Committee and/or (vii) any shareholders of the Company, in relation to the 2020 Proposed Transaction, Proposed Transaction and the Merger, including for the avoidance of doubt any minutes or agendas of meetings and any supporting documentation, notes, records and any other reports prepared for such meetings.

(e) Communications and Documents relating to the negotiation of, process related to, and terms and conditions of the 2020 Proposed Transaction, Proposed Transaction and the Merger, including any and all proposals considered but not implemented.

(f) Communications and Documents produced by, provided to, received from or communicated between employees, directors, management or consultants of the Company in the production and calculation of any projections sent to the Financial Advisor and/or Special Committee and any other sets of projections in existence (including, for the avoidance of doubt, in respect of the Opinions as well as any other proposal).

(g) Communications and Documents concerning the downward business performance of the Company and its purported or potential impact on the Proposed Transaction, including all Communications and Documents produced by, provided to and any advice received by the Company and / or Special Committee relating to these issues.

(h) Communications and Documents relating to the Special Committee's discussion with Gibson Dunn regarding the general market practice of a pre-signing market check and a post-signing "go-shop" procedure where a buyer group owns more than 50% of the aggregate voting power, and the Special Committee's decision to not conduct a pre-signing market check or post-signing "go-shop".

(i) Communications and Documents involving the Company's auditors, KPMG Huazhen LLP and MaloneBailey, LLP, including the creation and write-down of assets or liabilities between related parties, including between the Company and Fang Holdings for the period 17 April 2018 – 17 April 2023 which are relevant to the determination of the fair value of the Dissenters' shares in the Company as at the Valuation Date.

**Buyer group and potential purchasers**

(j) Communications and Documents produced by, provided to or received from any member of the Buyer Group in relation to the Proposed Transaction or the Merger (including, but not limited to, for the purposes of undertaking due diligence on the Company, all management forecasts or other budgets, models or reports provided to the same, all prior

versions and drafts of the Proposed Transaction and Merger Documents and all Communications and Documents relevant to the negotiation of same).

(k) Communications and Documents produced by, provided to or received from the Buyer Group or any other potential purchaser's or interested party's financiers or prospective financiers for the purposes of securing finance for the Proposed Transaction or the Merger or any potential or actual proposal (by way of debt finance or equity capital contributions), undertaking due diligence on the Company and/or for negotiating the terms of the Proposed Transaction, Merger or related proposals (including those concerning price, structure or conditions).

**Corporate and financial documents**

(l) Minutes and agendas of Board meetings and any supporting documentation and any other reports prepared for Board Meetings of the Company relevant to the determination of fair value.

(m) Monthly management accounts for the Company.

(n) Consolidated quarterly accounts for the Company from 17 April 2018 to 30 September 2023.

(o) Monthly and/or quarterly financials for the Company including, where available, budgets, profit and loss statements, balance sheets, cash flow statements and any accompanying notes, commentary, reports or business plans.

(p) Communications and Documents relating to the value of the Company's investments.

(q) Communications and Documents supporting the values of loans and other receivables and liabilities of the Company.

(r) Communications and Documents relating to the value of any real estate holdings of the Company including but not limited to, valuations, lease agreements with tenants, investment plans or proposals.

This Order was filed by Conyers Dill & Pearman LLP, Attorneys-at-Law for the Petitioner, whose address for service is SIX, 2nd Floor, PO Box 2681, Grand Cayman KY1-1111 Cayman Islands

(s) Documentation of any off-balance sheet or non-operating assets and liabilities of the Company, including pension and foreign exchange liabilities.

(t) Advice or analysis relating to corporation tax, withholding tax or other tax prepared by or for the Company's management.

(u) Gross revenue before and after splits that are done in accordance with any intercompany agreements between the Company and any other entity for the period 17 April 2018 – 17 April 2023.

(v) All intercompany agreements related to the split of revenues between Fang Holdings and related entities and the Company for all business segments which are relevant to the determination of the fair value of the Dissenters' shares in the Company as at the Valuation Date.

(w) All communications with regards to changes in the agreement between Fang Holdings and the Company related to intercompany revenues splits which are relevant to the determination of the fair value of the Dissenters' shares in the Company as at the Valuation Date.

(x) Segment level disclosure of the Company and Fang Holdings for each quarter of the period 17 April 2018 – 17 April 2023 including segment revenues, count of customers by segment, accounting assumptions for amortizing contracts and recognizing revenue by segment, count of new customers by segment, sum of new customers segment revenues, count of cancelled customers by segment, and sum of cancelled customers segment revenues, which are relevant to the determination of the fair value of the Dissenters' shares in the Company as at the Valuation Date.

(y) Any communications or documentation relating to Fang Holding's purchase of the Company's shares, including the purchase of the Company's shares by Fang Holding for $5.99 in the years 2019 and 2020, or any other periods and the purchase of the Company's shares by any member of the Buyer's group (collectively "**Buyer Group Purchases of CIH**").

This Order was filed by Conyers Dill & Pearman LLP, Attorneys-at-Law for the Petitioner, whose address for service is SIX, 2nd Floor, PO Box 2681, Grand Cayman KY1-1111 Cayman Islands

(z) Communications and Documents including accounting values related to the provision of any liabilities from 17 April 2018 – 30 September 2023.

**Projections and valuations**

(aa) Financial projections, forecasts, valuations, budgets, reports and models and supporting documentation for the Company including:

(i) Internal long-term forecasts, budgets, projections, reports and models including source data and any supporting documentation;

(ii) External forecasts, budgets, projections, reports and models relating to the Company's long-term plans including any supporting documentation;

(iii) Any Communications, board minutes or other Documents relating to the Company's projections (for the avoidance of doubt including but not limited to those Documents and Communications previously produced by, provided to, or communicated between employees of the Company in the production and calculation of the projections sent to the Financial Adviser and any other sets of projections in existence); and

(iv) Valuations or models of the Company (or any part of it, and whether for financial reporting, tax or investment appraisal purposes or otherwise) prepared by or for the Company, including any accompanying or supporting documentation and Documents provided to or obtained from any financial adviser in relation to any such valuation.

(bb) Analyst, third party market and industry reports relevant to the Company and/or the markets in which the Company operates, including any Communications with and Documents produced by, provided to or received from any such analyst, third party and/or industry member.

**Operations and strategy**

(cc) Internal Documents relating to market share and commission broken down by business

segment.

(dd) Subscription contracts and agreements for the Company's top 50 customers during the period 17 April 2018 – 17 April 2023 organized by reporting segment.

(ee) Service cancelation requests by any customer during the period 17 April 2018 – 17 April 2023.

(ff) Internal Documents relating to any other potential acquisition of the Company or any part of it considered by the Company's management or Board.

(gg) Agreements with the Company's major suppliers and any related Communications and Documentation.

(hh) Communications and Documents relating to any significant changes to the business of the Company or industry related events that either had, or were perceived as having, a significant effect on the Company and/or its long term projections, including all Communications and Documents relating to regulatory issues in the Peoples Republic of China, market conditions relating to Chinese real estate companies, the impact of COVID-19 on the Company, and any foreign exchange issues including the potential depreciation of the Renminbi.

(ii) Any Communications and Documents relating to the Company's post-Merger plans, including all valuation and analysis, relevant to any potential relisting or IPO of the Company, whether in the People’s Republic of China or elsewhere, and whether or not the potential relisting or IPO was or may ultimately not be pursued.

(jj) Communications and Documents relating to any (greater than 5% of assets) purchase or sale transactions of company assets that have occurred after the last reported period ending 30 September 2022.

(kk) Communications and Documents relating to any material (greater than 5% of assets) debt or liability incurrences that have taken place after the last reported period ending 30 September 2022.

This Order was filed by Conyers Dill & Pearman LLP, Attorneys-at-Law for the Petitioner, whose address for service is SIX, 2nd Floor, PO Box 2681, Grand Cayman KY1-1111 Cayman Islands

(ll) Communications and Documents relating to any with regards to any borrowing, lending, buying or selling transactions to or from related parties or to or from shareholders with ownership or control positions in excess of 5%.

(mm) Communications and Documents relating to the status, operations and quarterly accounting entries for the Company's acquisition of Shouzheng Credit Rating Ltd. and China Index Credit Rating Ltd.

(nn) Communications and Documents relating to any business that ceased operations and/or operation that was transferred to Fang from 17 April 2018 – 17 April 2023 which are relevant to the determination of the fair value of the Dissenters' shares in the Company as at the Valuation Date.

**Shares and shareholders**

(oo) The number, terms and class of shares issued by the Company and any changes thereto, and the terms and conditions of any outstanding share options and any Documents or Communications relating to any potential stock buybacks.

(pp) Any Communications produced by, provided to or received from the Company and/or any of its shareholders in relation to shareholders' interests and incentives and exercise of shareholders' voting rights or voting agreements, including all written objections to the 2020 Proposed Transaction, Proposed Transaction or the Merger received by the Company and any documents responding to, discussing, analysing or commenting on the objections received from shareholders.

(qq) Communications and Documents relating to any actual or potential significant transactions of the Company's shares, including shares accumulated by the members of the Buyer Group prior to and/or in anticipation of the 2020 Proposed Transaction, Proposed Transaction or the Merger.

(rr) Any Communications or Documents produced by, provided to, received from or communicated between directors, management or consultants of the Company in relation to the market price of the shares of the Company including, but not limited to, Documents

and Communications relating to the change in the market price of the shares of the Company between the listing of the Company's shares and the execution of the Merger Agreement, as well as whether the Company's market price was believed to have reflected the Company's intrinsic value.

(ss) Any internal Communications or Documents in relation to the market price of the Company's shares by the Company's directors and senior officers.

(tt) Communications and documents between the Company and its shareholders in relation to any purchase of the Company's shares by Fang Holdings or any member of the Buyer's Group, the 2020 Proposed Transaction, the Proposed Transaction or the Merger, including in relation to the shareholders' interests and incentives, including, without limitation, any Communications in relation to the exercise of shareholders' voting rights or voting agreements.

**The Buyer Group Purchases of CIH, 2020 Proposed Transaction, Proposed Transaction and the Merger**

(uu) Any Communications and Documents in relation to the engagement of, and provision of advisory services in relation to the Buyer Group Purchases of CIH, 2020 Proposed Transaction, Proposed Transaction or the Merger.

(vv) Any and all other Communications and Documents relating to the Buyer Group Purchases of CIH 2020 Proposed Transaction, Proposed Transaction and the Merger, to the extent not otherwise captured above.

**Appendix 4**

**Categories of documents to be disclosed pursuant to paragraph 37 of the Order**

Documents which exist and are within the Dissenters' possession, custody or power and which were created or received between 17 April 2018 and 17 April 2023 which are relevant to the question of the fair value of the Dissenters' shares in the Company as at the Valuation Date and which fall within the categories set out below:

1. All documents reflecting or relating to any valuations or similar analyses of the Company that the Dissenters prepared, reviewed, or considered, including but not limited to:

    (a) All written documents, including Excel files, that set forth, summarise, or otherwise reflect valuation analyses of the Company or Company's shares;

    (b) Any internal valuations of the Company or the Company's shares; and

    (c) Any valuations of the Company or Company stock reviewed or considered by the Dissenters in connection with the above.

2. A list of any communications that the Dissenters had, whether in writing, electronically or verbally, with any representative of the Company prior to the date of the merger in relation to the value of the Company or its shares.

3. Confirmation of the date the Dissenters purchased any or all of their shares in the Company, including the method of purchase.

4. A schedule setting out the history of the Dissenters 'trades in the shares of the Company.

5. All documents, information and material issued or shared between the Dissenters ' investment manager and/or investment advisor and the Dissenters 'investment committee

for their consideration of the Company's go-private transaction including file notes of meetings, meeting agendas and all forms of written communications.

6. All documents, communications, information and materials issued or shared between the Dissenters 'investment manager and/or investment advisor and the Dissenters' investment committee with other shareholders and their investment managers, investment advisors, investment committees of the Company and Fang Holdings on the Company and Fang Holdings

This Order was filed by Conyers Dill & Pearman LLP, Attorneys-at-Law for the Petitioner, whose address for service is SIX, 2nd Floor, PO Box 2681, Grand Cayman KY1-1111 Cayman Islands

**Appendix 5**

**Disclosure Protocol pursuant to paragraph 13 of this Order**

**A. Definitions**

1. **Metadata** means data about data. In the case of an electronic Document, metadata is typically embedded information about the Document that is not readily accessible once the native electronic Document has been converted into an electronic image or paper Document, for example, the date on which the Document was last printed or amended. Metadata may be created automatically by a computer system (system metadata) or may be created manually by a user (application metadata).

2. **MD5 Hash Value** means the Message Digest algorithm 5 which is used to provide a 128-bit hash or "digital signature" for electronic Documents and is generated upon the basis of

the binary data of a file; where 2 or more items have the same MD5 Hash Value they are deemed to be duplicates.

3. **Native File Format** means an electronic Document stored in the original form in which it was created by a computer software program.

4. **Parent Document** means a Document with one or more attachment. For example, an email is a parent Document and any Documents attached to the email are its attachments.

**B. Preservation of Documents**

5. The parties will take steps to preserve all potentially discoverable Documents, including the metadata of such Documents, and to ensure no metadata is altered during the preservation, collection, review of Documents or the disclosure process generally.

**C. De-duplication**

6. Stand-alone electronic Documents or entire Document families with the same MD5 Hash Value will be identified and any duplicates removed, except:

6.1 where duplicates are added to a party's List of Documents (as defined by paragraph 19) because they are family members of other Documents which are also disclosed. Duplicates which are part of a family are not to be removed; and

6.2 scanned hard copy Documents.

7. A deNIST filter will be applied to the Documents during processing to identify and remove files that are generally created by operating systems or applications and contain no user-generated information or data. The deNIST culling process identifies files found on the National Institute of Standards and Technology (NIST) list of Documents that hold no value for litigation purposes.

**D. Format**

8. Electronic Documents are to be provided in their Native File Format with all functionality, such as formulae and computations intact and enabled, and without watermarking, subject to:

8.1. Documents, other than excel spreadsheets, that have been redacted in accordance with this protocol, which Documents will be produced in Tagged Image File Format (**TIFF**) with the relevant .opt file and Document ID coding;

8.2. Excel spreadsheets, that have been redacted in accordance with this protocol, which Documents will be produced in a Native Format or near Native Format by using a software solution that retains the full functionality of the excel spreadsheet while applying redactions, such as Milyli, Evolver, or Redact Assistant.

9. All PDF and TIFF Documents will be provided with corresponding Document level OCR text files where possible or shall otherwise be uploaded to the Data Room in a searchable format using optical character recognition.

10. Each party will ensure Documents are decrypted, or that passwords are supplied. To the extent encryption for Documents cannot be successfully processed despite reasonable efforts, a slip sheet stating that the Documents cannot be decrypted shall be inserted in its place, including the metadata required, to the extent it can be reasonably extracted from the file in its encrypted form.

11. Unless otherwise agreed or ordered by the Court, parties should not place any restrictions on Documents that prevent opposing parties from accessing them.

12. Family-inclusive Documents will be uploaded to the Data Room with metadata load files containing the family attachment range to allow linking of Documents from the same family. Subject to any claim to privilege, or confidentiality and irrelevance, all family Documents are to be disclosed where only one member of a family Document is identified as relevant.

13. The following applies in relation to attachments to emails:

13.1. Any Document that is attached to or embedded within another Document is to be classed as an attachment (unless an excluded Document);

13.2. Attachments must be listed as separate Documents; and

13.3. In general, attachments will appear immediately after the Parent Document in the parties' Lists of Documents.

14. All parties who have been given access to the Data Room shall have full access rights to the Documents therein, save that no party will have the ability to modify Documents in-situ within the Data Room; however, Documents shall be in a form in which the Dissenters can download any versions of the Documents (e.g. TIFF or native) either individually or (upon request to, and facilitated by, the Data Room service provider) as a bulk download and, in turn, modify outside of the Data Room.

**E. Document Coding**

15. Parties are required to code Documents in the Data Room by providing the following metadata detail for each Document, where such detail is reasonably available:

15.1. Document ID: The document ID must be a unique reference and begin with "*CIHL*" for the Petitioner and *"D01-"*, *"D02-"*, etcetera for the Dissenters based on the order in which they appear in Appendix 1. The document ID should be 8 digits in length following the party indicator, utilising zeros if necessary, e.g. CIHL-00001234

15.2. Parent document ID: If there is no Parent Document, leave this field blank.

15.3. Last Modified Date: This should be the date and time last modified, or the manually coded date in the format DD/MM/YYYY, 00:00:00.

15.4. Date Created: This should be the original date and time a file was created and may be the same as the Last Modified Date.

15.5. Sent date: The date and time that the Document was sent in the case of an email and may be the same as the Date Created.

15.6. File name/subject/description: This may be the file name or subject line of an email or other descriptor.

15.7. Document title: The extracted title of the Document.

15.8. Document type: (ie. .pdf, .xls, .msg etc).

15.9. Sender/Author: The name of the author of a Document or sender of an email.

15.10. CC: The name of the recipient(s) of the Document in a CC. Use a semi-colon (;) symbol as the multi-value separator.

15.11. BCC: The name of the recipient(s) of the Document in a BCC. Use a semi-colon (;) symbol as the multi-value separator.

15.12. Recipient: The name of the recipient(s) of the Document. Use a semi-colon (;) symbol as the multi-value separator.

15.13. Custodian and Duplicate Custodian: The name of the custodian from whom the Document was drawn, and the names of any other custodians who had duplicate copies of the Document.

15.14. MD5 Hash Value: as defined.

15.15. Contains Redactions: This will be a binary "Yes/No" code applying where the whole or part of a Document has been redacted.

15.16. Reason for Redaction: This will identify the reason for the redaction using the following labels, as applicable:

Litigation privilege;

Legal professional privilege;

Without prejudice privilege; and

Irrelevant and confidential.

This Order was filed by Conyers Dill & Pearman LLP, Attorneys-at-Law for the Petitioner, whose address for service is SIX, 2nd Floor, PO Box 2681, Grand Cayman KY1-1111 Cayman Islands

16. When a Document is uploaded to the Data Room it shall contain the above information and such information should be visible to users of the Data Room.

**F. Excluded Documents**

17. Temporary internet files, cookies and irrelevant gif files (ie. company logos) are to be excluded from searches and discovery (to the extent possible).

**G. Withholding Disclosure - Privilege and Confidentiality**

18. Nothing in this Protocol will prevent a party from withholding Documents from production on the basis of any applicable Cayman Islands law.

19. If a claim of Cayman Islands law privilege, or confidentiality and irrelevance, is asserted over a portion of a Document only, that portion will be redacted and the Document produced.

20. The redacted sections of a Document are to be identified as such either by being blacked out or by otherwise being marked as having been redacted and stating the reason for the redaction in the List of Documents.

**H. List of Documents**

21. In their List of Documents, the parties shall provide the following information to the extent that this information is reasonably available:

21.1. Document ID;

21.2. Parent document ID;

21.3. Last Modified Date;

21.4. Date Created;

21.5. Email sent date;

21.6. Conversion ID;

21.7. Title/subject/description;

21.8. Document type: (ie. .pdf, .xls, .msg etc);

21.9. Sender/Author;

21.10. Recipient;

21.11. Contains Redactions;

21.12. Reason for Redaction.

22. Each party reserves the right to reasonably request further information from the disclosing party in relation to specific Document(s), other than those fields listed above.

23. Each party's List of Documents will be ordered by family group, with attachments listed below Parent Documents.

24. The parties' List of Documents will be provided in an excel spreadsheet format (.xls).

**I. Variation**

25. This protocol may be varied by agreement of the parties in writing or by order of the Grand Court of the Cayman Islands.

This Order was filed by Conyers Dill & Pearman LLP, Attorneys-at-Law for the Petitioner, whose address for service is SIX, 2nd Floor, PO Box 2681, Grand Cayman KY1-1111 Cayman Islands

**Appendix 6**

**Schedule of Dates**

| | Description | Order | Reference | Dates |
|---|---|---|---|---|
| 1 | Directions Order (the "**Order**") issued | | - | 23 May 2025 |
| 2 | Company to inform Dissenters of total number of shares subject to the trial of the Petition | 55 | 15 days from filing of Order | 09Jun 2025 |
| 3 | Company to open an electronic Data Room and provide access to the Experts, the Appointees and the Dissenters, and their respective Representatives | 8, 10 | 14 days from date of Order | 06 Jun 2025 |
| 4 | Experts may start issuing information Requests to the Company | 21 | From the date of the upload of documents to the Data Room | 22 Jul 2025 |
| 5 | Company to upload Buyer Group documents pursuant to Appendix 3 | 11 | 90 days from date of Order | 21 Aug 2025 |
| 6 | Each party to appoint their respective Experts and to advise the other parties of the identities and contact details including email addresses of the respective Experts appointed | 3 | 42 days from date of Order | 04 Jul 2025 |
| 7 | Company to upload all additional documents pursuant to Appendix 3 | 12 | 60 days from date of Order | 22 Jul 2025 |

This Order was filed by Conyers Dill & Pearman LLP, Attorneys-at-Law for the Petitioner, whose address for service is SIX, 2nd Floor, PO Box 2681, Grand Cayman KY1-1111 Cayman Islands

| | Description | Order | Reference | Dates |
|---|---|---|---|---|
| 8 | Company to upload all other materials not already covered in Appendix 3 | 12 | 60 days from the deadline date set in para 11 for Appendix 3 document uploads | 22 Sep 2025 |
| 9 | Dissenters to upload Appendix 4 and other documents to Data Room | 37 | In accordance to the deadline date specified in para 12 | 22 Sep 2025 |
| 10 | Company to upload written answers to the first Information Request batch | 23 | Within 21 days of the receipt of the first Information Request | - |
| 11 | Company to upload written answers to any further Information Request batches | 23 | Within 21 days of receipt of the Information Request | - |
| 12 | List of Questions and Topics to be provided to the Company | 32 | Not less than 21 days prior to the agreed date for the Management Meeting | - |
| 13 | Management Meeting | 26 | Within 28 days of a request by any of the Experts | 10 Mar 2026 |
| 14 | Cut-off date for final Management Meeting | 27 | 42 days prior to the exchange of Expert Reports | - |
| 15 | Recording and transcript of Management Meeting to be circulated by the Company and uploaded to the Data Room | 33 | Within 14 days of the relevant Management Meeting | - |
| 16 | Cut-off date for either party to provide comments on any errors in the transcript from a Management Meeting | 34 | Within 21 days of uploading the transcript to the Data Room | - |
| 17 | Notified party to confirm if they agree or disagree with errors in Management Meeting transcript identified. | 35 | Within 14 days of being notified of the purported errors | - |
| 18 | Cut-off date for Company, and if the Company fails to, the Dissenters, to circulate and | 35 | Within 7 days of the Dissenters confirming if they agree or | 05 Sep 2025 |

| | Description | Order | Reference | Dates |
|---|---|---|---|---|
| | upload an updated transcript to the Data Room | | disagree with the errors identified by the Company | |
| 19 | Service of Company's factual evidence with English translations | 39 | 105 days from date of Order | 04 Nov 2025 |
| 20 | Service of Dissenter's factual evidence in response | 39 | No later than 60 days of service of the Company's factual evidence upon them | 25 Nov 2025 |
| 21 | Service of Company's factual evidence in reply with English translations | 39 | No later than 21 days of service of the Dissenters' evidence upon it | 24 Mar 2026 |
| 22 | Cut-off date for final Information Request from Experts to the Company | 25 | 28 days prior to the exchange of Industry Expert Reports | 21 Apr 2026 |
| 23 | Experts to exchange their respective Expert Reports | 41.3 | Within 21 weeks from the date of the Company's reply factual evidence pursuant to paragraph 39 | 12 May 2026 |
| 24 | Experts discuss differences | 42 | Within 21 days of the exchange of Expert Reports | 09 Jun 2026 |
| 25 | Experts to issue their Joint Memorandum | 43 | Within 28 days of the Experts' Meeting | 04 Aug 2026 |
| 26 | Experts to exchange their respective Supplemental Reports (if any) | 44 | Within 56 days of the Joint Experts' Memorandum | - |
| 27 | Cut-off date for providing notice to any deponent of factual evidence for cross-examination at trial | 40 | 14 days before the CMC or, if the CMC is dispensed with or the date of the CMC is fixed less than 14 days prior to the hearing of the CMC then the deadline shall be 30 days prior to trial | - |
| 28 | Case Management Conference | 49 | Earliest convenient date after the deadline for exchange of any Supplemental Reports, or on the earliest convenient date once it is | First Available Date After 15 September 2026 |

This Order was filed by Conyers Dill & Pearman LLP, Attorneys-at-Law for the Petitioner, whose address for service is SIX, 2nd Floor, PO Box 2681, Grand Cayman KY1-1111 Cayman Islands

| | Description | Order | Reference | Dates |
|---|---|---|---|---|
| | | | confirmed that no Supplemental Reports will be exchanged | |
| 29 | Trial | 54 | First available date after 15 September 2026 subject to the availability of counsel, for 4 weeks | |
| 30 | Each party to appoint their respective Interest Experts (if necessary) and to advise the other parties of the identities and email addresses of the respective Interest Experts appointed | 5, 6 | Within 28 days of the date of the Order made upon the Court's determination of the fair value of the Dissenters' shares in the Company | |

This Order was filed by Conyers Dill & Pearman LLP, Attorneys-at-Law for the Petitioner, whose address for service is SIX, 2nd Floor, PO Box 2681, Grand Cayman KY1-1111 Cayman Islands

**IN THE COURT OF APPEAL OF THE CAYMAN ISLANDS**
**ON APPEAL FROM THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CICA NO 24 OF 2017**
**FSD CAUSE NO 76 OF 2017 (RPJ)**

**IN THE MATTER OF THE COMPANIES LAW (2016) REVISION**
**AND IN THE MATTER OF QUNAR CAYMAN ISLANDS LIMITED**

**BETWEEN**

**QUNAR CAYMAN ISLANDS LIMITED**

***Appellant***

**and**

1. **ATHOS ASIA EVENT DRIVEN MASTER FUND**
2. **FMAP ACL LIMITED**
3. **BLACKWELL PARTNERS LLC – SERIES A**
4. **MASO CAPITAL INVESTMENTS LIMITED**
5. **SENRIGAN MASTER FUND**
6. **PAG ASIA ALPHA LP**
7. **PAG QUANTITATIVE STRATEGIES TRADING LIMITED**
8. **PAG-P ASIA FUND LP**

***Respondents***

**Appearances:** Petitioner/Appellant: represented by Thomas Lowe QC, Paul Madden and Lachlan Greig instructed by Harney Westwood & Riegels
1st, 2nd and 5th Respondents: represented by Paul Girolami QC and Andrew Jackson, instructed by Appleby
3rd and 4th Respondents: represented by Robert Levy QC and Rocco Cecere and Jessica Bush, instructed by Mourant Ozannes
6th, 7th and 8th Respondents: represented by Nigel Meeson QC and Erik Bodden, instructed by Conyers Dill & Pearman

**Before:**

**THE RT HON SIR JOHN GOLDRING *President***
**THE RT HON SIR BERNARD RIX, JA**
**THE HON SIR RICHARD FIELD, JA**

**Date of Hearing:** **13 November 2017**

**Date of Delivery:** **10 April 2018**

## DISCLOSURE JUDGMENT

**Sir Bernard Rix, JA**

1. This appeal concerns three aspects of disclosure which formed part of a Judgment dated 20 July 2017 and an Order dated 31 August 2017, both of the Hon Mr Justice Parker.

2. The appeal arises in the context of proceedings pursuant to section 238 of the Companies Law (2016 Revision) by which dissenting shareholders (the Respondents) challenge the price offered for their shares in a merger by which Qunar Cayman Islands Limited, the Appellant, a NASDAQ quoted company, was taken private by Ocean Management Merger Sub Limited, a wholly owned subsidiary of Ocean Management Holdings Limited. The Appellant (the "**Company**") continues as the surviving company.

3. The Respondents (the "**Dissenting Shareholders**") between them owned 5.2% of the issued share capital of the Company. The Dissenting Shareholders fall into three groups (the judge below said there were four) each of which has been separately represented. As a result there was a certain unevenness in the quantity of the submissions made on behalf of the Company and the Dissenting Shareholders respectively.

4. The merger was proposed on 23 June 2016, a finalised merger agreement was executed on 19 October 2016, and the merger was approved on 24 February 2017 by a special resolution of the Company's shareholders at an AGM called for that purpose. The Dissenting Shareholders had already given notice in writing of their objection prior to the AGM (pursuant to section 238(2)). As of 28 February 2017 the merger was certified as effective by the Assistant Registrar of Companies.

5. The value of the Company according to the merger price was some US$4.6 billion. This reflected a price per share of US$10.13 (or US$30.39 for American Depository Shares, each representing three ordinary shares). Despite their dissent, the Dissenting Shareholders' shares were cancelled, pursuant to section 238, in exchange for the right to receive the "*fair value*" of their shares.

6. On 24 April 2017 two petitions were filed pursuant to section 238(9) seeking a determination of the fair value of the Company's shares. It was agreed that the proceedings should be consolidated.

7. Directions Summonses were heard on 23 June 2017 before Mr Justice Parker. The Company's appeals concern three aspects of the outcome of those summonses, two of which relate to the disclosure to be given by the Company and the third of which relates to the disclosure to be given by the Dissenting Shareholders. In brief, the Company complains that the Company is being required to give too much disclosure, and that the Dissenting Shareholders are being required to give no disclosure at all.

*Section 238*

8. For present purposes the critical parts of section 238 are as follows:

> *"(7) Upon the giving of a notice of dissent under subsection (5), the member to whom the notice relates shall cease to have any of the rights of a member except the right to be paid the fair value of his shares and the rights referred to in subsections (12) and (16)...*
>
> *(11) At the hearing of a petition, the Court shall determine the fair value of the shares of such dissenting members as it finds are involved, together with a fair rate of interest, if any, to be paid by the company upon the amount determined to be fair value."*

*The experts*

9. For the purposes of assisting the parties in relation to disclosure, the Company and the Dissenting Shareholders each appointed experts. My understanding is that these will not be the experts who will ultimately give respective opinions on fair value.

10. The Company appointed Mr Timothy James Reid, of Singapore, and the Dissenting Shareholders appointed Mr Bruno Arboit, of Hong Kong. For the purposes of the Directions Summons, each expert produced two affidavits.

11. In his first affidavit sworn 23 May 2017, Mr Reid spoke to a schedule of documents to be disclosed by the Company. This schedule came to be called Schedule A (because it was so-called as attached to the Company's Summons for Directions). Mr Reid said of this Schedule:

> "*The Schedule is intended to be equally relevant and applicable to both the company and the dissenting shareholders in any given section 238 action. That is, the categories of documents listed are sufficient for either side's expert to produce a robust valuation analysis. In preparing this, I have been careful to acknowledge and take into account the inherent imbalance between the information available to the company and that available to the dissenting shareholders.*"

12. Mr Reid went on to say this about the process of valuation:

> "*...there are five widely recognised and accepted valuation methodologies used to value the total assets of a company or the equity in that company. A decision of which methodology or methodologies to use will be influenced by the purpose of the valuation, the nature of the assets being valued and the relevant available information. In theory all valuations are based on cash flows that are then discounted to reflect the time value of money. Valuations methodologies which do not use the discounted cash flow methodology are, in theory, surrogates for cash flow based valuations. The other four basis recognised methodologies are:*
>
> *(a) Capitalisation of future maintainable profits;*
> *(b) Notional realisation of assets;*
> *(c) Value of net tangible assets;*

*(d) Capitalisation of future maintainable dividends."*

13. In his first affidavit sworn 9 June 2017, Mr Arboit acknowledged Appendix A as broadly following the categories of documents ordered in other section 238 cases in the Cayman Islands, but he emphasised that such categories should not be regarded as closed. It was "*a good starting point*". He also said this:

> "*28. In my opinion, it is an essential and critical requirement that the Experts be allowed the opportunity to request further documents/information and to have reasonable access to Company management, particularly those involved in the production and finalisation of any management projections or heavily involved in the strategic planning of the business...*
>
> *29. Additionally, companies in different sectors may require different documents in order to produce a report. It is only after an expert has done extensive research on the company, its business model, and competitors within the sector, that the relevance of certain documents might become clear to him/her...*
>
> *36. Additionally, it is unclear why Appendix A limits information to those from within the last three years prior to the date of valuation. I consider that information from a longer time period (usually five years) will be required to clearly demonstrate historical patterns of growth...*
>
> *45. ...The experts may also reference fair value by way of comparison with peers (where appropriate) but often directly comparable companies do not exist.*
>
> *46. In my professional opinion, a review of documents is required in order to determine the appropriate methodology/ies..."*

14. Mr Arboit also referred extensively to Cayman Island jurisprudence on section 238 valuations, inter alia to Mangatal J in *Homeinns Hotel Group*, from whose judgment he quoted this:

> "*I am of the view that the additional requirements should relate not only to documents, but also to information…experts are the best judge of what is relevant when it comes to disclosure…*"

15. Mr Arboit next turned to a so-called Schedule B, also attached to the Company's Summons for Directions, in which documents sought from *the Dissenting Shareholders* were set out. As to Schedule B he said this:

> "*53. I do not consider that the documents listed in Qunar's Request for Information – Appendix B, that is documents and information relating to the Dissenters' investment in the Company and internal analysis, are relevant to the determination of fair value of a publicly listed company's shares. The rationale and motivations of each dissenting shareholder in making investment in the Company are not factors that I would take into account in forming my own independent determination of fair value and would have no bearing on my opinion thereof.*
>
> *54. To this end I would not consider any analysis produced by dissenting shareholders to be relevant to a valuation and would not factor their analysis into my valuation (in order to ensure that my valuation was wholly my own). Analyses produced by dissenting are no doubt produced for a variety of purposes, and are likely to be informed by their own methodologies.*"

16. In sum, Mr Arboit, as the expert appointed by the Dissenting Shareholders, was anxious to get the widest possible disclosure from the Company, but repeatedly asserted the irrelevance of the Dissenting Shareholders' documents relating to their investment in

the Company. For this he gave no reason other than his personal anxiety to distance his own opinion from anything revealed from such documentation. He said, no doubt plausibly, that dissenters' analyses are likely to be informed by their own methodologies – but given his own evidence that at this stage methodology remains open and that "*a review of documents is required in order to determine the appropriate methodology/ies*", the fact that dissenters may adopt methodologies of their own can hardly be a factor negative to the relevance of their analyses. It may be noted moreover that among the categories of documents Mr Arboit sought from the *Company* were third-party market and industry reports relevant to the markets in which the Company operates which were included in the order made by the judge in Appendix 2 to his Order as item (l). It is not immediately clear why such third party and industry reports in the possession of the Company are relevant for disclosure by the Company, and not if in the possession of Dissenting Shareholders, even though they may be incorporated in and/or relevant to their own analyses of the Company and its operations.

17. Mr Arboit's first affidavit elicited a response from Mr Reid in his second affidavit, sworn 16 June 2017. He there stated as follows:

> "*14. As an expert valuer it is helpful to consider all forms of valuations of the Company and especially those conducted at or around the time of merger and particularly those that were participating in the market at that time as willing buyers and sellers.*
>
> *15. I understand that all of the Dissenters are hedge funds or private equity firms who specialise in investing in companies prior to a merger or management buy-out. The strategy of these firms is to identify companies where the merger or buy-out has been 'mis-priced', allowing them to make a profit for their investors and clients. Such firms will usually employ experienced securities analysts to identify suitable companies for this type of event-driven investment.*

> 16. *Securities analysts are finance professionals who gather and interpret data about companies, industries and financial markets in order to express opinions on the investment potential of stocks and securities. They employ a wide range of techniques, from conducting comparisons of similar companies to modifying the figures in a company's annual statements where the analyst spots items in those statements that can be questioned. A securities analyst will typically produce detailed research and valuation reports to justify his or her recommendations in relation to a particular investment opportunity.*
>
> 17. *In my opinion, the views of securities analysts employed by the Dissenters are potentially highly relevant to the issue of the fair value of the Company. While the analysts do not have access to all of a company's internal information, they are able to rely on the large quantity of information that is available generally...It is highly likely that the Dissenters have produced their own sophisticated and informed valuations and analyses of the Company, and in my opinion these are potentially highly relevant due to the experience and expertise of the securities analysts."*

18. Appendix A also includes "*External projections and reports relating to the Company's long-term plans*" and "*Third-party market and industry reports relevant to the markets in which the Company operates*". While such documents would not have been prepared internally by the Company, they can still be relevant for many reasons, including as a cross-check and to compare any inputs and/or assumptions employed. I note again that Arboit 1 does not dispute the relevance of these documents. In my opinion any valuations relied on by the Dissenters would be just as relevant for an expert valuer's purposes as third-party valuations or reports in the Company's possession. As with third-party reports used by the Company, the fact that the reports or valuations originate

outside the Company itself does not prevent them from being useful or relevant for valuation purposes.

19. Mr Arboit also made a second affidavit, sworn 20 June 2017. On the subject of disclosure by the Dissenting Shareholders, he had this further to say:

> "*5. I re-iterate that "the valuers should be valuing as if they are 'inside the company', rather than outsiders" (Arboit 1, paragraph 30). Relevant information for these purposes entails the universe of both public information and private information available to the Company...*
>
> *6. ...to the extent that third-party market reports have been relied upon by the Company (and may have informed the views of the Company's management on the question of valuation), I would consider these reports relevant because in valuing from "inside the company", the Experts will necessarily require full access to the information that may have influenced Company management in its business planning or may underpin the assumptions in any projections.*
>
> *7. That is not to say that in a determination of fair value I would not seek access to publicly available information beyond that which is known to be (or have been) in the possession of the Company, however this information is available, as it is in the public domain, and can (and should) be sourced independently. Whilst the public documents themselves may be relevant, the opinions of specific investors derived from these public sources are of no relevance and would not inform my valuation. The Experts should develop their own deeper understanding of the true drivers of the intrinsic value of the Company...*

8. *...They* [the Dissenters] *will have necessarily performed their analysis disclosure on the basis of publicly available information. That is, they have no more information than the experts would already have access to in the public domain. I consider the request for disclosure in Appendix B to be irrelevant for the purposes of determining fair value because the valuation opinion of the Dissenting Shareholders is precisely that – simply an opinion. That is, an opinion based on less relevant and complete information than the Experts would already have access to by way of the information supplied by the Company..."*

20. I add to these extracts the observation that both Mr Arboit and Mr Reid, beginning with Mr Arboit, cited some jurisprudence, both in the Cayman Islands and elsewhere. However, I will consider that jurisprudence below. The experts may be experts in valuation, but they are not lawyers.

*Schedules A and B*

21. Reference has been made above to Schedules A and B. Schedule A became a document agreed between the experts listing disclosure to be made by the Company: it was annexed to the judge's Order as Appendix 2 thereto. Schedule B, however, was not annexed because the judge determined that anything in the possession of the Dissenting Shareholders was irrelevant. I will refer to the judge's judgment below. It is relevant, however, to set out Schedule B, as proposed by the Company and supported by Mr Reid's evidence:

1. All documents reflecting or relating to any valuations or similar analyses of the Company that the Respondents prepared, reviewed, or considered, including but not limited to:

1.1 all written documents, including Excel files, that set forth, summarise, or otherwise reflect valuation analyses of the Company or Company shares;

1.2 any internal valuations of the Company or the Company's shares; and

1.3 any valuations of the Company or Company stock reviewed or considered by the Respondents in connection with this action.

2. A list of any communications that the Respondents had, whether in writing, electronically or verbally, with any representative of the Company prior to the date of the merger;

3. Confirmation of the date the Respondents purchased any or all of their shares in the Company, including the method of purchase;

4. A history of the Respondent's trades in the shares of the Company;

5. Confirmation as to whether the Respondents have ever taken a short position in the Company's shares; and

6. All documents, information and material issued or shared between the Respondents' investment manager and/or investment advisor and the Respondents' Investment Committee for their consideration of the Company's go-private action including file notes of meetings, meeting agendas and all forms of written communications.

22. In effect Mr Arboit was saying that because, in his opinion, Company documents would be *more* relevant or more persuasive than Dissenting Shareholders' documents, therefore the latter had no relevance at all. That is not, to my mind, a sound argument.

*The three issues on appeal*

23. There are three issues raised on this appeal by the Company concerning the judge's Judgment and Order. The first two relate to the extent of the Company's disclosure.

The second relates to the complete absence of any disclosure required from the Dissenting Shareholders.

24. Thus the Company complains about the terms of paragraphs 6 and 11 of the judge's Order. Under paragraph 6, the Company is required to give general disclosure of all relevant documents, beyond that required by Schedule A or Appendix 2 which is the separate subject-matter of paragraph 5. The Company complains that there is no case for such general disclosure. And under paragraph 11, the Company is required to provide such further disclosure and/or information as the experts might require after they have assimilated the first rounds of disclosure. The Company complains that there is no call for such further disclosure, nor, separately, for the right to obtain further information from the Company. The Company submits that this is, inappropriately, to delegate powers to the experts, and to do so on a flimsy basis.

25. I shall set out the terms of paragraphs 6 and 11 below. These are the basis of the Company's first two issues on appeal, which it is convenient to call the "*paragraph 6 issue*" and the "*paragraph 11*" issue respectively.

26. As for disclosure from the Dissenting Shareholders, the Company submits that the judge was wrong to rule that any such disclosure was irrelevant and on that ground to decline to order it.

*The Order and the judgment*

27. The relevant paragraphs of the Order made by the judge are as follows:

> "*5. By 4.00 pm on 4 September 2017 (Cayman Islands time), the Company shall upload to the Data Room all documents (of whatsoever description, whether electronic, hard copy or in any other format) and communications (whether by email or otherwise) and other materials which are in its possession, custody or power comprising the categories of documents*

*prepared or created in the five year period ending with 24 February 2017 (the **"Valuation date"**) set out in **Appendix 2** together with an index of the same.*

*6. In addition to paragraph 5 above, by 4pm (Cayman Islands time) on 18 September 2017, the Company shall upload any additional documents (of whatsoever description, whether electronic, hard copy or in any other format) and communications (whether by email or otherwise) and other materials which are in its possession, custody or power which are relevant to the determination of the fair value of the shares in the Company as at the Valuation Date and shall include any such documents in the index.*

...

*11. The Company shall upload to the Data Room any additional documents, materials, communications (whether by email or otherwise) or information requested by any Expert for the purpose of preparing his/her own opinion within 14 days of receipt of such a request, unless otherwise agreed or directed by order of the Court, and such requests for information of any Expert shall be made prior to the date 21 days before the exchange of expert reports, or any such other date as mutually agreed by the parties. For the avoidance of doubt, if the Experts so request, this may include documents, materials or information produced after the Valuation Date, and such requests may be made from the date of the upload of documents to the Data Room pursuant to paragraph 5 above. Any such request from or response to an Expert shall be copied by email to the Expert for the other party or parties to the email addresses notified in paragraph 10.*

> 12. *The Company by consent agrees to procure that appropriate members of its management team shall be available to meet both Experts, in person or by telephone or by way of video link, such meetings to be scheduled to take place at a mutually convenient place and time for the purpose of providing information and answering queries which are relevant to the preparation of the Experts' respective opinions..."*

28. Thus it will be seen that the judge provided for disclosure by the Company (i) pursuant to Appendix 2 (by para 5), (ii) 2 weeks later in respect to "*any additional documents...relevant to the determination of the fair value*" (by para 6), and (iii) by subsequent request "*by any Expert for the purpose of preparing his/her own opinion*", albeit "*unless otherwise agreed or directed by order of the Court*" (by para 11). Any expert could also (by para 11) request "*information*", and para 12 "*by consent*" of the Company provides for the manner in which such information might be provided, in addition to the documentary form in which it was to be given or copied to an opposing party's expert under para 11.

29. The judgment explained these orders for production of documents and information as follows.

30. The judge referred to prior cases under section 238, such as *In the matter of Homeinns Hotel Group* (FSD 75 of 2016, unreported 12 August 2016: "*I accept that the experts are to have regard to all relevant documents and information, not just publicly available information*" *per* Mangatal J at para 20); and *In the matter of Integra Group* (FSD 92 of 2014, unreported 28 August 2015, Jones J), from which the judge derived a number of propositions including that "*The experts are the best judges of what information is or is not relevant for their purposes and so a Company should not control what information should be made available to the experts, based upon its own assessment of relevance*" (*per* Parker J at para 17); and *In the matter of Shanda Games Limited* (FSD 14 of 2016, unreported 25 April 2017: where, albeit by consent, the disclosure order "*also provided that all additional documents or information needed*

*and requested by the parties' experts would be made available within fourteen days of receipt of a request*" at para 55 *per* Segal J).

31. The judge also spoke (at para 20 of his judgment) of a submission made by Mr Terence Mowschenson QC on behalf of the Company that there was no power to order general discovery (under Order 24 rule 1) in actions begun by petition (as distinct from actions begun by writ) and that disclosure should therefore be confined to disclosure by request for specific categories of documents under rules 3 and 8 – such as the requests made in Schedule A, which were agreed, and which were all that was necessary, and that "*Further documents would only be provided on request by an expert*" (at para 21).

32. The judge decided otherwise, however (at paras 22ff). He said that disclosure of "*all documents that are relevant to fair value*", on a "*catch-all basis*", after production of specific classes of document agreed, "*is the usual order*" (as indeed the authorities he had cited demonstrate). He rejected the submission that there was no power under the GCR to order general discovery in actions begun by petition. That was in respect of the paragraph 6 issue.

33. The judge then turned (at para 32 of his judgment) to the paragraph 11 issue, which he described as the issue "*whether in response to a request for documents and/or information the requesting expert should be required, if so asked by the Company, to state (and if necessary verify) why the information and documents were relevant.*" Mr Mowschenson had submitted that this requirement was necessary, in the interests of proportionality and to prevent abusive requests.

34. The judge answered this issue, however, in the negative. He said:

> "*36. I approach this case on the basis that all parties will comply with the orders of the Court. They will in their conduct ultimately be regulated by the Court, in the sense that the Court will rule, as it must when asked to do so, on all matters relating to the law and procedure leading up to the trial...*

> 37. *I do not believe that any additional check or balance needs to be specifically built into the discovery order as Mr Mowschenson QC has suggested, in order to give the Company some added protection. Since the question of fair value is a matter for the Court's judgment to be reached in the light of all the factual evidence put before it and on the basis of expert assistance from valuation experts from both sides, it is not for the Company or its expert to seek to limit in advance the expert's line of enquiry. Of course, if the requests are oppressive or disproportionate or calculated to harass the Company, the Court will step in if asked to do so…"*

35. Thirdly, the judge addressed the disputed question of whether the Dissenting Shareholders should give disclosure of their documents (at paras 55ff). Mr Mowschenson submitted that they should, and pointed to the fact that, in a similar situation of the assessment of fair value in Delaware, dissenters were required to give disclosure: *In re Appraisal of Dole Foods Company, Inc*, CA No 9079 (December 9, 2014). On the other side, however, Mr Robert Levy QC said that the decision of Mangatal J in *Homeinns*, to the effect that "*it is not in keeping with the purposes of section 238 for the dissenting shareholders to be ordered to provide discovery"* (*Homeinns* at para 20), was an end to the matter, and that judges of one division should speak with the same voice.

36. On this issue too, the judge decided in favour of the Dissenting Shareholders. He said that he preferred the evidence on this subject of Mr Arboit over that of Mr Reid. It will be recalled that Mr Arboit said that the Dissenting Shareholders' documents were "*not…relevant*". The judge agreed. He said (at para 69) that "*I am not persuaded by Mr Reid's second affidavit that valuations of third parties based on public information are relevant to a determination of fair value*". He said (at para 70) that he preferred the evidence of Mr Arboit that the Dissenting Shareholders' internal analyses "*are not relevant*". He said (at para 73) that "*Section 238 cases should not be treated like ordinary civil litigation as it pertains to discovery*". As for the Delaware case of *Dole*,

he said (at para 75) that he would pay close attention to the decisions of the Courts in Delaware on matters of substantive law "*given the similarity of the jurisprudence and the actual words used in section 238*". But not on matters of procedure, where care had to be taken that Delaware law was consistent with Cayman law and practice. He concluded (at para 76):

> "*Whilst I take the view that the possibility of discovery from dissenters should not be ruled out, in an exceptional case, I take some comfort from the fact that I do not consider it to be very likely that discovery would be ordered to be given by dissenters in a section 238 case. This is in keeping with the approach both in* ***Integra*** *and* ***Homeinns****. It follows that in my respectful opinion that Mangatal J was clearly right in her decision that it was not appropriate for dissenting shareholders to be ordered to provide discovery in the usual way...*"

*The first issue, concerning paragraph 6 of the Order: submissions*

37. On this appeal, Mr Mowschenson QC, although present in court to present a different appeal on behalf of the Company, was replaced by Mr Thomas Lowe QC. It was suggested that this was because Mr Mowschenson had conceded the paragraph 6 and paragraph 11 issues below, before the judge.

38. Be that as it may, Mr Lowe submitted on behalf of the Company that there should not be automatic or "*blanket*" disclosure of all relevant documents in an action begun by petition; that discovery should be by requested categories under Order 24 rules 3, 8 and 14, not rule 1, and that such requests had to be justified as necessary and proportionate; and that in any event production should not be ordered unless so justified.

39. On behalf of the Dissenting Shareholders, Messrs Girolami QC, Mr Levy QC and Mr Meeson QC all submitted that the judge was right, inter alia because paragraph 6 had been agreed below between the parties. It was true that in para 20 of his judgment, Parker J had mistakenly suggested that paragraph 6 was in issue: but that reflected an earlier stage of skeleton argument, whereas by the time of the court hearing the parties

had agreed on the terms of a "*catch-all*" provision in paragraph 6 of the draft order, in addition to the Schedule A categories for disclosure which had been agreed pursuant to paragraph 5 of the draft order. In any event counsel submitted that the judge had been right, for the reason he proposed, to conclude that a catch-all provision was necessary, as had previous judges before him in section 238 cases.

*The first issue: discussion and decision*

40. To some extent, in their oral submissions the three counsel appearing for one or another of the Dissenting Shareholders, sought to divide up their fire-power so as not to overlap on the three issues. But there was no complete success in this endeavour. In any event, all three had filed full written skeleton arguments. This had the effect of somewhat overwhelming the advocacy.

41. Be that as it may, this first ground of the Company's appeal was wholly undermined by clear evidence that the Company had conceded the catch-all provision of paragraph 6 below. Such agreement was not altogether surprising in the light of previous orders possibly agreed but in any event sanctioned in earlier section 238 cases.

42. Thus, a travelling draft of what was ultimately agreed as paragraph 6 demonstrated that the Company had accepted paragraph 6 and had made some (albeit relatively small) changes to it.

43. In any event, it is clear that rule 3 applies in any proceedings ("*whether begun by writ, originating summons or otherwise*") and allows the court to make an order for general discovery. It is unlike rule 7 which is concerned with discovery of particular documents. Whereas rule 7 requires an affidavit from the requesting party, rule 3 does not. And although it is true that production goes beyond discovery and inspection, and that production will only be ordered where necessary, it is likely to be an unusual case where the documents discovered as being relevant go beyond what is necessary for production – even if that can of course happen where disclosure is vast and goes well beyond what is necessary for a fair trial of the proceedings, especially on matters of only tangential interest. Because of discovery by list, it will be open to the parties to anticipate how

much actual production will be necessary. Where there is a dispute, rule 14 makes it clear that the burden is on the party seeking production.

44. In the present case, however, it was agreed that the relevant documents, whether under paragraph 5 (Appendix 2 documents) or under paragraph 6 (the catch-all provision) were not merely to be discovered by list but "*uploaded*" ie produced.

45. In a section 238 fair value proceeding, moreover, such an attitude to the Company's disclosure obligations is entirely understandable. It is the Company itself which has put forward a price for the merger buy-out of its shares, and it has done that on the basis of its own internal assessment of its business and its prospects. For these purposes it knows better than anyone else the documentary material which is relevant to its assessment. Although independent experts may make a good start at categorising likely documents for disclosure, as has been done in Schedule A/Appendix 2, and, subject to the second issue concerning paragraph 11 of the Order discussed below, those experts may usefully be able to follow through with further requests for documentation, it makes good sense for the standard obligation on a party, to make disclosure of its relevant documents, to stand behind such initiatives. The judge said (at para 25 of his judgment):

> "*This seems to me to be in keeping with the Court's approach in these types of cases. I do not think the Company should be made to do so only if an expert requires further documents and asks for them, rather it should be a general obligation of the Company to search for and produce all documents relevant to fair value.*"

46. In these circumstances, the appeal with respect to paragraph 6 of the Order is dismissed.

*The second issue, concerning paragraph 11 of the Order: submissions*

47. Mr Lowe submitted on behalf of the Company that the process contemplated in paragraph 11 of the judge's Order was "*wholly outside Order 24*". The judge had no power to delegate his powers under Order 24. Rule 7 was the regular process for seeking further specific documents, and that process required support in the form of an affidavit

and was subject to well recognised limitations. In the present case, the Dissenting Shareholders' (new) expert had produced two long lists of additional materials which had every appearance of being an unrestrained catch-all. Moreover, the reference to "*information*" in paragraph 11 was an additional error: it effectively allowed an expert to administer interrogatories, which usually required the specific permission of the court. By delegating its functions to the experts, the court had put it out of its power to control the process of disclosure and interrogatories in a way that circumvented recognised safeguards.

48. On behalf of the Dissenting Shareholders, however, it was again submitted that the Company had agreed to the essential terms of paragraph 11 in the run-up to the hearing before the judge below. This was demonstrated by the travelling drafts of the draft order prior to the hearing, from which it was clear that the Company had agreed both to the concept of further experts' requests for documents and to their requests for information, and had only disagreed on how such requests might be policed. Thus the Company sought protection in the form below (with emphasis added by me):

> "*11. Each expert personally and not through parties' attorneys, can make a request for such additional documents or information as he/she reasonably believes to be relevant to the determination of the fair value of the shares in the Company at the Valuation date and for the purposes of preparing his/her own opinion…*
>
> *12. The Company or Respondent shall respond to the expert request…within 21 days of receipt of such a request unless otherwise agreed. In responding to such request the Company or Respondent may, if they consider appropriate, request further clarification of the request from the expert if the Company or the Respondent is concerned that the request is too broad, disproportionate or not relevant to the determination of fair value…and for the purposes of the expert preparing their own report…*

> 13. *<u>The expert shall respond to any request for clarification...within 7 days of such request providing the clarification requested...</u>*
>
> 15. *<u>The Company may, on 5 days' notice, apply to the Court for an order that the Dissenters' Expert certify by affidavit that the documents sought are both relevant and necessary for him/her to prepare his/her report.</u>*"

49. Ultimately, however, the judge decided in effect, with the aid of prior cases, that the experts were less likely to abuse their position than the Company was. He also inserted into his Order at para 11 the words "*unless...directed by order of the Court*" and made specific reference in his judgment (at para 41) to a liberty to apply, in these terms: "*All parties have liberty to apply to the Court at any stage if the process is not being followed or is being circumvented in some way.*"

50. During submissions, Mr Lowe accepted that the words inserted into paragraph 11, understood as the Court made clear it understood them, namely as a further protection on the part of the Court against any abuse on the part of the experts and maintaining the ultimate control of the Court over the paragraph 11 process, went far and perhaps the whole way to meet the Company's objection to that process.

*The second issue: discussion and decision*

51. In the circumstances, there is little that needs to be said under this heading. Mr Lowe effectively withdrew the Company's appeal against paragraph 11 during the course of submissions. In my judgment, the Company cannot in any event successfully appeal against the concept of expert engagement in the process of disclosure which had been sanctioned by the Parties and the Court not only in paragraph 11 of the Order, but also in paragraph 6 (dealt with above) and in paragraph 12 (against which there has been no appeal).

52. In sum, I would dismiss the Company's appeal on the paragraph 11 issue.

*The third issue, concerning disclosure by the Dissenting Shareholders: submissions*

53. In the event, this was the issue which most divided the Parties on this appeal.

54. On behalf of the Company, Mr Lowe submitted that the Dissenting Shareholders' own documents concerning the valuation of the Company were relevant and it was for the Dissenting Shareholders to show why they should not be disclosed. The Company's expert had asked for these documents, as set out in Appendix B, on the basis they were relevant for the purposes of a report on fair value. There was no logic in the judge's rejection of the Company's expert's views in favour of relevance. The judge was wrong to say that the requested documents were irrelevant.

55. On behalf of the Dissenting Shareholders, Counsel supported the judge's decision refusing any disclosure from the Dissenting Shareholders for the reasons he had given. In essence: it was a matter of precedent in the Cayman Islands where in all previous section 238 cases "*disclosure has been a one-way process*"; a conflicting view from Delaware in the *Dole* case could be explained on the basis of a different and broader view about disclosure there, inter alia because disclosure was allowed simply on the basis that it was relevant to credit in cross-examination, which was not the case in the Cayman Islands, and reference was also made to what Segal J had to say about Delaware authorities in *Shanda* at paras 73-80, and in any event it was the law of the forum which prevailed; the question of fair value was a matter for independent experts examining objective data; the views of the Dissenting Shareholders were subjective, based on merely public and incomplete information, and in any event irrelevant as mere opinion, and what was worse opinion from non-experts and non-independent sources; there was no need for any "*reality check*" since experts could be trusted; any documents were likely to be privileged; the judge's decision was a case management decision within his discretion and could not be faulted on any of the limited grounds on which an exercise of discretion could be attacked.

*The third issue: discussion and decision*

56. It was somewhat anomalous that the Dissenting Shareholders devoted much more energy to responding to this branch of the Company's appeal than the Company itself devoted to advancing it. That was not only due to the fact that the Dissenting Shareholders had three separate skeleton arguments and three separate leading counsel duplicating their submissions. However, the point is of substantial importance in section 238 proceedings generally, and arises in the Court of Appeal substantially for the first time.

57. I approach this issue from the point of view that one sided disclosure on the central issue of a case (a fortiori where that issue is one of fair value and the Dissenting Shareholders are only shareholders in the first place because, as professional and sophisticated investors, they have taken a decision to invest in the Company whose value is in issue), is anomalous, unprecedented outside section 238 cases in the Cayman Islands, and prima facie counter-intuitive, and therefore the argument in favour of such one-sided disclosure has to be considered with the greatest of care.

58. I ask myself first what can be learned from previous cases in the Cayman Islands. It appears that, whatever may have been done in practice, the *issue* has only risen in two cases, one of which is cited by the judge and the other of which emerges from one of the skeleton arguments before the Court. The case cited by the judge is *Homeinns*, a decision of Mangatal J which he cited at para 12 of his judgment and referred to again at paras 61 and 75. I repeat the relevant part of her judgment (at para 20 thereof):

> "*Further in my judgment it is not appropriate to make a standard order under order 24 of the GCR for disclosure by both parties. In my judgment, it is not in keeping with the purposes of section 238 for the dissenting shareholders to be ordered to provide discovery.*"

59. The case relied on in Mr Levy's skeleton is *Trina*. The court does not have a judgment in that case, but Mr Levy has annexed to his skeleton an email dated 25 July 2017 (5 days after the judgment of Parker J in the present case) sent by Segal J to the parities in that case, in which the following appears:

> *"As regards the Petitioner's application for a direction that the Dissenting Shareholders upload to the Data Room and provide discovery of the documents listed in paragraph 7 of the draft directions order dated 4 July, I am not persuaded by the evidence relied on by the Petitioner that valuations of third parties based on public information are relevant to a determination of fair value. It seems to me that once an expert has the Petitioner's full records he does not need to see and nothing helpful could be gained by reviewing such third-party valuations. Nor do I consider that the other documents referred to in paragraph 7 (being information relating to the Dissenting Shareholders' investment in the Petitioner and the Dissenting Shareholders' internal analyses) are relevant to the determination of fair value of a publicly listed company's shares."*

60. The trouble with these views, as it seems to me, are as follows. Mangatal J's only reason for her conclusion is that discovery from dissenters "*is not in keeping with the purposes of section 238*". However, she does not explain, and I can find nothing within section 238 to explain, why any discovery from dissenters is inappropriate or not in keeping with the purposes of section 238. As for Segal J's views, he is equally against disclosure of "*valuations by third parties*" and dissenters' "*internal analyses*". As for the former, he says that the experts do not need them; as for the latter he says simply that they are "*not relevant*". Nevertheless, both experts in this case are agreed that third party valuations are relevant and helpful, and, where in the possession of the Company, should be disclosed; and at any rate Mr Reid is of the opinion that Schedule B documents, which include the Dissenting Shareholders' analyses, are also relevant and will assist him for the purposes of a report. Segal J gives no reason for his statement that such documents are irrelevant. In my judgment, if third party valuations in the possession of the Company are relevant, so are third party valuations not in the possession of the Company, but, for instance in the possession of the Dissenting Shareholders. After all, the question of fair value is closely related to the question of what a willing buyer and a willing seller would exchange for the shares of the Company (or for the Company as a whole): and that question is closely related to valuations

conducted within the market generally. And if that is the case, then analyses and valuations conducted by the Dissenting Shareholders, which may well in any event be based in part on "*third party*" valuations, assessments and analyses, are as relevant as any such valuations, assessments and analyses, or even more so for the very reason that the Dissenting Shareholders are not merely potential investors, but actual investors in the Company. They are active members of the market who are willing to put their money where their analysis is.

61. I conclude therefore that prior decisions in the Cayman Islands are of very little assistance to this Court.

62. I also remind myself that the Dissenting Shareholders' counsel, when asked, could cite no other jurisprudence, in the Cayman Islands or in the United Kingdom, in which wholly one-sided discovery has been tolerated or practised, outside section 238 in the Cayman Islands.

63. Next I go to the jurisprudence of Delaware, which has had long familiarity with the concept of fair value in the context of dissenting shareholders and a statute with similar wording to section 238. Reference was made to the case of *Dole* before the judge, and in the Dissenting Shareholders' skeleton arguments before this Court. A significant part of the judge's judgment below consisted in setting *Dole* aside as throwing any light on the issue before this Court. Mr Lowe did not refer to it in his submissions, but that as it seems to me does not relieve this Court of the need to consider whether the judge was justified in what amounts to his disparagement of that case for present purposes. I do not, however, take any account of *Dole* as constituting any authority or precedent. In any event it comes from a separate jurisdiction. However, I cannot ignore considerations which are addressed in *Dole* as though such matters did not exist in the world. That would be to shut my eyes to the realities of life.

64. What I find in *Dole* is a sophisticated, well-informed, modern, judgment (delivered in 2014), with extensive citation of jurisprudence. The current issue, of disclosure by dissenting shareholders, is considered in real depth, unlike the brief assertions made in the Cayman Islands jurisprudence cited above. I assume that the Delaware law of

discovery is broader than the law in the Cayman Islands, and that it also allows discovery going to credit, which is not the law in the Cayman Islands or in English law. I therefore fully understand that in these respects Delaware jurisprudence will be an unsafe guide. I will also assume, for the sake of argument, that experts in Delaware may be less conscious of the need to assist the Court as distinct from promoting the interests of the party appointing them, than will be the case in the Cayman Islands (or from wherever the experts in Cayman Islands cases may be brought). Nevertheless, a reading of *Dole* demonstrates that its reasons for requiring normal cross-party disclosure go much deeper than could be explained by those factors. I cite passages in Vice Chancellor Laster's Opinion to exemplify the power of its reasoning (but omitting the extensive footnotes):

> "*Several Court of Chancery decisions have ordered production of pre-suit valuation material prepared by appraisal petitioners. These decisions recognize that the pre-litigation valuations are relevant to the central issue in the proceeding, which is the value of the subject company. They are also relevant to issues of such as the appropriate inputs and considerations for valuation methodologies...*
>
> *The petitioners argue that their valuations are opinions, not facts, and that the question of valuation in an appraisal is purely a matter for the experts...In my view, the valuation-related information that Dole seeks easily satisfies the potential admissibility requirement. A statutory appraisal proceeding is not a fault-based case in which one side has the burden of proof and loses if it fails to meet its burden...*
>
> *...In making its determination, this court can consider a wide range of factual evidence, including, but not limited to, the market price, the merger price, other offers for the company or its assets, prices at which knowledgeable insiders sold their shares, internal corporate documents from the respondent, and valuation work prepared for non-litigation purposes. Even when the parties have retained valuation experts and the court relies on their opinions when determining fair value, the court*

*has considered factual evidence relating to valuation as a cross-check, or reality-check, on the litigation-driven figures generated by the experts. The fact that a party has retained an expert does not enable the party to shield factual material relating to valuation that otherwise would be discoverable and admissible...*

*...Nor, in this case, are the petitioners' witnesses unqualified to express views on value. In my view, their testimony and their pre-litigation valuations will be "helpful to...the determination of a fact in issue," namely the determination of the fair value of Dole..."*

*Experts on valuation in this court often consider other valuation work when rendering their opinions. For example, when developing a weighted average cost of capital for the subject company, an expert may prepare her own calculation and then demonstrate the reasonableness of the selected inputs by showing that other valuations have used the identical or similar inputs, or that the inputs that the expert selected were more conservative than the inputs used by others. The expert may employ similar reasoning to attack the opposing expert's work by showing that other valuations have not used comparable inputs or that the approach selected by the other side's expert was particularly aggressive. Comparisons are made frequently to reports from securities analysts, presentations by the investment bankers who worked on the deal, or internal materials prepared by corporate personnel...*

*The petitioners' internal, contemporaneous valuations are real-world assessments by "astute investors" who must "back their beliefs with their purses". Their views may prove to be as or even more credible than the litigation-crafted opinions of valuation experts...*

*Experts can act strategically when selecting comparable companies or precedent transactions, when picking multiples, or when choosing inputs for their cost-of-capital calculations. Perhaps more importantly,*

*academic studies have shown that experts unconsciously reach higher or lower results depending on whether they represent the plaintiff or the defendant due to cognitive phenomena like attachment bias. It is helpful to check an expert's litigation-driven work or a party's litigation-inspired arguments against other valuations, particularly pre-litigation analyses…*

*Discovery into the petitioners' analyses also should help promote settlement…Access to both sides' pre-litigation valuations should help de-bias the litigation positions, constrain the range, and promote settlement…"*

65. Irrespective of the foreign source of these remarks, I consider there is wisdom in them. It has been my experience in cases in which experts, and share valuation experts, play a significant or dominant role, that such experts, however professional and loyal to Court or tribunal rather than party, always tend to diverge from each other in favour of their appointing party. It has also been my experience in share valuation cases that there can be much room for issues on the facts of a company's history, its financial performance, the validity of its predictions, projections as to the state of an industry, or markets, or products, or technological developments, and so on. However important a company's own documents may be on such matters, the company and its personnel and advisors have no monopoly on understanding of or insight into the world in which the company operates. The company's own documents, however important to the issue of fair value (and no one would doubt that) must be exposed to the arguments which can flow from the findings, analyses, evaluations and factual selections which other sophisticated entrepreneurs, investors and analysts in the market have made or performed. Moreover, it must be remembered that the documents of investors prior to litigation are not driven by the litigation itself but by their willingness to put their own cash to work in support of those findings and evaluations. There is a reality to that which must not go unrecognised.

66. I turn next to the evidence of the experts involved in the current stage of these proceedings, Mr Reid and Mr Arboit. In a nutshell, Mr Arboit says that the Dissenting Shareholders' documents cannot be relevant, Mr Reid says that they are likely to be highly relevant. Mr Arboit says that he would prefer to distance himself from them (because as I understand it, they are the documents of his appointing party), whereas Mr Reid says that he would use them as being relevant for the purposes of his report. The judge accepted the evidence of Mr Arboit and rejected the evidence of Mr Reid. Why? In my respectful opinion, there is something unbecoming about an expert appointed by one party opining that its appointing party's documents *cannot* be relevant; and there is something unfortunate in a judge at a merely interlocutory stage choosing between the differing views of the experts, when it will only ultimately be at trial, and in the light of adequate disclosure and of experts' reports that an objective position is capable of satisfactory evaluation.

67. It is often the case that at the *procedural and interlocutory* stage of disclosure, one or other party to a dispute seeks to take up an extreme position about the irrelevance of some category of documents, when what it is really doing is making an unwarranted assumption about the final outcome of the *substantive* arguments raised in the parties' dispute. Courts have to be wary of that approach, for otherwise they may find themselves taking up a final position about some aspect of the argument before they are in a position to do so. Something of that kind seems to me to be going on in this case. The Dissenting Shareholders, who want to focus on the Company's own internal documents, almost to the exclusion of any other documents (I will revert to that "*almost*"), does so because that approach best suits their case that the Company is the most knowledgeable judge of its own affairs. No one else can be privy to as much of its own information as itself. Public information is all very well, but that is only half the story. Because only the Company is privy to all the information, both public and internal, the Dissenting Shareholders point to the Company's own submission (even if that is not accepted) that its view of its own value has a precedence which cannot be challenged by anyone with only a partial view. Therefore the views of others are irrelevant. And saying that the views of others are irrelevant, involves also saying, albeit implicitly, that their views of everything which goes to make up a business's value is irrelevant: not only their ultimate view of value, but every ingredient which goes to

make up that ultimate view, such as the state of the industry, the state of the market, the position of competitors, the state of the Company's products and competing products, the ability to predict the future, the discount which has to be made for that uncertainty, the cost of capital, both loan and equity, and so on and so on. But the implicit theory of the Company's submissions, supported by Mr Arboit, is that everyone's views on all these matters are irrelevant.

68. Except, (and I now come to that "*almost*"), that Mr Arboit, although he seeks to make that case of total irrelevance, inter alia by talking about valuers valuing "*as if they are 'inside the company'*" (see above at para 18) – in itself an arguably controversial concept, unless all it means is that the Company's internal documents have to be considered as of significant importance, but I doubt that that is all it means – nevertheless still has to accept that he would take into consideration as potentially relevant both (a) "*third-party market reports…relied upon by the Company*", and (b) "*publicly available information beyond that which is known to be (or have been) in the possession of the Company*": but even so *not*, he says, (c) the reports of specific investors, which "*are of no relevance*" (*ibid*). This does not make sense to me: if the reports of third parties should be taken into account, I do not understand why the reports of specific investors should not also be taken into account. They are part of the market, they are third parties so far as the Company is concerned and were in every sense third parties immediately before their investment, and their reports are likely to be all the more pertinent in that they are likely to be highly contemporaneous and professional reports of sophisticated members of the market who are not only observers but ready to act on their own research and scholarship (see Mr Reid's second affidavit cited at para 17 above). In these circumstances, I do not understand Mr Arboit's view that only these reports are irrelevant, or, with respect, why the judge was willing to act on that view. I respectfully consider that the judge was wrong to do so, and wrong in principle to find any support in Mr Arboit's view for a totally exceptional exclusion of any obligation of disclosure from one party.

69. Mr Arboit, of course, had to accept that third party reports were relevant, because he had put his agreement to asking the Company to produce inter alia "*third party and*

*industry reports relevant to the markets in which the Company operates*" (ex Schedule A/Appendix 2).

70. Moreover, I find it inconsistent that the judge was willing to accept, under the regime provided for in paragraph 11 of his Order, that the view of *either* expert as to further documents or information to be provided by the Company was sufficient, subject to the order of the Court, for the Company to have an obligation to provide such material, whereas he was not willing to accept Mr Reid's well-reasoned evidence that *he* would require the documents of the Dissenting Shareholders on value to assist him in the preparation of a report on fair value, even if Mr Arboit would choose to ignore them. It is a strong thing indeed, in the face of a general regime for mutual disclosure, or even in the absence of such a regime, to rule at an interlocutory hearing that documents that an expert says that he would find useful in the preparation of his report would not be permitted to him.

71. I would next refer to the oddity of the contrast between the Dissenting Shareholders', Mr Arboit's and the judge's views that *all* factors are relevant to the Court's finding of fair value, and the selection of the Dissenting Shareholders' documents as alone being excluded from that totality. The judge's judgment is replete with references to the width of the investigation leading to the Court's determination of fair value (section 238(11): "*the Court shall determine the value of the shares*"). Thus the judge cites (i) Mangatal J in *Homeinns* that "*In particular I accept that the experts and the Court are to have regard to all relevant documents and information, not just publicly available information*" (at para 12 of his judgment); (ii) Mr Levy's submission that the section 238 cases of *Perfect World; Shanda; Mindray; Bona;* and *Qihoo* demonstrated that "*the Court should not limit in advance the types of documents which the expert should be entitled to see and to call for*" (at para 13); (iii) the proposition which (inter alia) the judge derived from the judgment of Jones J in *Integra* to the effect that "*Section 238 does not dictate any particular valuation methodology...fair value should be proved by any techniques or methods which are generally considered acceptable in the financial community*" (at para 17); (iv) his own view that "*it should be a general obligation of the Company to search for and produce all documents relevant to fair value*" (at para 25); (v) Jones J in *Integra* that "*The one true rule is to consider all the evidence that*

*might be helpful, and to consider the particular factors in the particular case, and to exercise the best judgement that can be brought to bear on <u>all the evidence and all the factors</u>. I emphasise: it is a question of judgment. No apology need be offered for that. Parliament has decreed that fair value be determined by the Courts not by a formula that can be stated in the legislation"* (at para 30); (vi) his own view that "*Since the question of fair value is a matter for the Court's judgement to be reached in the light of <u>all the factual evidence</u> put before it and on the basis of expert assistance from valuation experts from both sides, <u>it is not for the Company or its expert to limit in advance the expert's line of enquiry</u>*" (at para 37: and I would add that what applies to the Company or its expert applies equally to the Dissenting Shareholders or their expert); and (vii) his own view that "*<u>I accept that there may be different approaches and what one expert considers necessary and relevant another expert may not</u>*" (at para 39) (emphasis added).

72. What is then striking is the contrasting approach that the judge takes to (a much smaller number of) documents identified by an expert as relevant documents in the hands of Dissenting Shareholders, a contrasting approach which the judge asserts on the a priori conception that *all* the relevant documents will be held by the *Company* (a proposition which not even Mr Arboit accepts), and that dissenters' documents relating to fair value are irrelevant. Thus the judge repeatedly assumes the conclusion at which he arrives, for he states: (i) "*Since the Company will likely hold all the relevant information which will go to a determination of fair value...*" (at para 31); (ii) "*The Court would require very clear grounds upon which to make such an order [discovery from dissenters]*" (at paras 64/65); "*material which might give an indication of value which the dissenters themselves may have thought the company or their shares to have had prior to or for the purposes of the merger, is irrelevant...*" (at para 67); (iii) "*although I do not rule out the possibility of dissenters being ordered to give specific discovery in an exceptional case, such a case would be very rare indeed and would require clear grounds"* (at para 68); (iv) "*I am not persuaded by Mr Reid's second affidavit that valuations of third parties based on public information are relevant*" (at para 69: but he ordered the disclosure by the Company of such third party valuations on the basis that they were relevant, as they were agreed to be by both experts); (v) "*I prefer the evidence of Mr Arboit that* [the requested documents] *are not relevant..."* (at para 70).

(vi) "*Section 238 cases should not be treated like ordinary civil litigation as it pertains to discovery…*" (at para 73); (vii) "*Mangatal J was clearly right in her decision that it was not appropriate for dissenting shareholders to be ordered to provide discovery in the usual way… "*(at para 76).

73. It seems to me that all these statements are at root the same simple assertion of irrelevance. Rather inconsistently, the judge allowed that in exceptional cases some (unidentified) documents might have a special case made for their disclosure from dissenters. But that perhaps merely reflects the judicial caution of "*Never say never*". On the judge's assertion of irrelevance, however, no case could be made, and even if in theory it could be, no one could ever know of what documents to ask for.

74. I have stated my reasons above for respectfully disagreeing with the judge's a priori assertion of irrelevance. In sum, dissenters live in the same world as companies whose fair value has to be assessed. Such companies may have internal information and projections which are not in the public domain, albeit in the case of a listed company like Qunar the room for such private information may be more limited than in the case of unlisted companies. In any event, no one disputes the relevance and potential importance of such companies' documents. It remains true, nevertheless, that value, and the market, is for the world, not only the companies concerned, and that often such companies may not understand the world in which they operate as well as outsiders understand it. But whether that is true or not, value depends on a multiplicity of factors, and methodologies, about which sophisticated analysts have different insights, and no one is more relevantly concerned with getting the research and analysis and those insights right than those who are thinking of investing in or have invested in a company. However, "*getting it right*" is not the point at this stage of the proceedings. What is needed is for the Court, at the end of the day, to get it right, having been exposed to all the material and all the arguments.

75. In my judgment, it is unhealthy in such a context, and in litigation especially, to form a priori assumptions about relevance. The normal rule is that disclosure is a mutual obligation. Mutuality in this respect is equity and fairness. Of course some litigants may have more of what needs to be disclosed than other litigants. And it is always possible

that the documents of one party will turn out to be of greater influence than those of the other side. But I would need to be clearly persuaded that section 238 litigation is the unique field in which one-sided disclosure ought to be practised, and I would in principle regard that as a heavy task. Counsel have not suggested that there is one-sided disclosure in any other field. I am not persuaded of that extreme and unique position by repeated assertions that only the companies concerned, and not its sophisticated investors, have disclosure relevant to fair value. It seems to me that if dissenters have in their possession, as they are likely to do, documents, reports, analyses, projections and so on about companies in which they invest, their products, their industries, their markets, their competitors, in other words documentary material which relates to the value of such companies, then this material is as much a matter for disclosure as any such documents in the hands of the companies: and it matters not whether such material is possessed by the one side or the other, or is simply available as a matter of efficient research. In this context I find the evidence contained in Mr Reid's second affidavit, which merits repeated re-reading (see at para 18 above) highly persuasive. At any rate it is arguably highly persuasive, and that is all that is needed at this stage of the proceedings.

76. It is submitted for the Dissenting Shareholders that the judge's decision is an exercise of discretion and not readily amenable to appeal, subject to the usual limited grounds on which the exercise of discretion can be attacked. There are three answers. First, the ruling is not so much an exercise of discretion (for instance in relation to particular documents) as a decision of law (as to relevance) and/or principle. The fact that the judge allowed the remote possibility that in some (unexplained) case a dissenter could be made to disclose a document in exceptional circumstances does not change the reality of the judge's rationale. Secondly, however, even if his decision were a matter of discretion, the judge has erred fundamentally and in principle, by creating a unique field for one-sided disclosure. Thirdly, the judge wrongly considered himself to be following in the line of established precedent, in the form of Mangatal J in *Homeinns*, and even if not strictly binding on him: but it is clear to me that her assumption, that section 238 somehow makes disclosure by dissenters inappropriate, cannot carry weight.

77. Finally, I refer briefly to two judgments of this Court of Appeal on the subject of disclosure in section 238 proceedings, albeit judgments only at the permission to appeal stage. The first is *Qihoo 360 Technology Co Ltd v. Maso Capital Investments Limited & Ors* (CICA no 20 of 2017, 9 October 2017), where permission to appeal against disclosure by the company concerned was refused, but this Court (Martin JA, Newman JA and Morrison JA) ended by warning of the possibility of abuse by dissenters conducting "*a 'drains up' inspection of the entire business regardless of the relevance to fair value*" (at para 27). The second is to the permission to appeal judgment of Martin JA in this very case, where he repeated his concern about possible abuse by dissenters in their disclosure demands of companies, and was also clearly concerned in general that, in the light of a series of section 238 petitions coming before the Grand Court, the Court of Appeal should have an opportunity to consider the proper parameters of the interlocutory stages of a section 238 petition. It seems to me that in the present case there is as yet no sign of danger of abuse in respect of potential further requests of the experts from the Company, provided that they are properly held subject to the control of the Court, which will wish to prevent anything abusive or disproportionate. However, there would to my mind be a danger of abuse in a situation where one sided disclosure is demanded of a company, on matters of relevance to fair value, but dissenters are given carte blanche to address any arguments on fair value they wish or can, free of any discipline that would be imposed by having, where necessary, to present to the experts and ultimately to the Court their own documents on matters of relevance to fair value, which must inevitably exist.

78. Thus Dissenting Shareholders in this case have not submitted that they do not possess the documents which they have been requested to disclose pursuant to Schedule B. The list of documents within Schedule B is a short list, and certainly not a difficult list to answer, and there is nothing disproportionate about that list. It has not been suggested that there is. The list has been sanctioned by the Company's expert.

79. Even so, item 5 is not so much a request for documentation as a request for information, and I would not allow that. Item 4 could be reflected in documentation, but it is much simpler if the position is simply scheduled, as requested. If the schedule is challenged, the Dissenting Shareholders should stand ready to confirm it by documents.

(Incidentally, the idea that Dissenting Shareholders should not be required to disclose their dealings in the shares of a section 238 company seems to me to be inexplicable.) Item 4 may incidentally answer the question in item 5. Item 2 should be confined to communications regarding the value of the Company or its shares. Item 1.3 should be amended to read "*in connection with the above*" rather than "*in connection with this action*".

80. Subject to the above paragraph, I would therefore allow the Company's appeal under this third issue.

*Conclusion*

81. In sum, I would dismiss the Company's appeal on the first two issues, against paragraphs 6 and 11 of the Order, but allow the Company's appeal on the third issue, concerning discovery from the Dissenting Shareholders, so as to grant discovery as set out in Schedule B to the draft order, subject to the detailed comments at para 79 above.

**Sir Richard Field JA**

82. I agree.

**Sir John Goldring P**

83. I also agree

COURT OF APPEAL • CAYMAN ISLANDS • 11/17

Digitally signed by Advance Performance Exponents
Date: 2024.04.24 11:21:36 -05:00
Reason: Apex Certified
Location: Apex


**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 72 OF 2022 (DDJ)**
**CAUSE NO: FSD 74 OF 2022 (DDJ)**

**IN THE MATTER OF THE COMPANIES ACT (2022 REVISION)**
**AND IN THE MATTER OF NEW FRONTIER HEALTH CORPORATION**

| | |
|---|---|
| **Before:** | The Hon. Justice David Doyle |
| **Appearances:** | Mr Tom Lowe KC instructed by Grainne King, Aline Mooney and Catie Wang of Harney, Westwood & Riegels for New Frontier Health Corporation<br><br>Ms Blair Leahy KC instructed by Nigel Smith and Kalyani Dixit of Carey Olsen for Hildene Opportunities Master Fund II, Ltd, Invictus Special Situations Master I, LP, Oasis Investments II Master Fund Ltd and Alpine Partners (BVI) LP and Katie Logan of Campbells for Blackwell Partners LLC – Series A, Maso Capital Investments Limited and Star V Partners LLC |
| **Heard:** | 26 and 27 March 2024 |
| **Draft Judgment circulated:** | 15 April 2024 |
| **Judgment delivered:** | 24 April 2024 |

**HEADNOTE**

*Company's application to extend time period within which to comply with discovery obligations in a Section 238 case on the grounds that there was a risk of prosecution under the law of the People's Republic of China if it complied without approval from the PRC authorities – no approval mechanism presently in place and unlikely to be in place in the near future – the relevant law and procedure – GCR's overriding objective – Section 7 of the Bill of Rights requiring a fair trial within a reasonable time – the importance of complying with court orders and local rules – a consideration of the relevant authorities including Bank Mellat and some American authorities – the approach – whether the relevant PRC law provisions apply – whether there is an actual risk of prosecution – the balancing exercise and the relevant factors to consider*

**INDEX**


| Heading | Page |
|---|---|
| **Introduction** | 3-4 |
| **Background** | 4-5 |
| **The Application** | 5 |
| **Summary** | 5-6 |
| **The August 2022 Order** | 6-7 |
| **The main issue** | 7 |
| **Law** | 7 |
| - *Grand Court Rules* | 7-10 |
| - *The Constitution of the Cayman Islands – Section 7 of the Bill of Rights* | 10-11 |
| - *The importance of complying with court orders and the local rules* | 11-12 |
| - *Authorities* | 12 |
| - *Brannigan v Davison* | 12-15 |
| - *Bank Mellat* | 15-17 |
| - *Re Sina* | 17-19 |
| - *The submissions on the authorities* | 20-24 |
| - *Some American authorities* | 24 |
| - *Rogers* | 24-25 |
| - *Aerospatiale* | 25-26 |
| - *Richmark* | 26-27 |
| **Determination of the Application** | 27 |
| - *The approach* | 28-29 |
| - *Do the relevant PRC law provisions apply in the present context?* | 29-32 |
| - *Conclusion as to whether the relevant PRC law provisions apply in the present context* | 32 |
| - *Is there an actual risk of prosecution?* | 33 |

| | |
|---|---|
| - *Lingjun (Judy) Wang's evidence on actual risk of prosecution* | 33-34 |
| - *Professor Liu's evidence on actual risk of prosecution* | 34 |
| - *Mr Duan's evidence on actual risk of prosecution* | 34-35 |
| - *Conclusion on actual risk of prosecution* | 35-38 |
| - *The balancing exercise* | 39-40 |
| - *The actual risk of prosecution and the degree and extent of such risk* | 40 |
| - *The need for and importance of the documents* | 40-42 |
| - *Minimisation of the concerns under the foreign law* | 42 |
| - *The location of the documents and the parties* | 42 |
| - *Comity considerations* | 43-45 |
| - *The availability of alternative means of securing the documents* | 45 |
| - *(a) Generally* | 45-46 |
| - *(b) Letters rogatory* | 46-49 |
| - *(c) CAC self-assessment* | 49-51 |
| - *The conduct of the party seeking the extension* | 51-56 |
| - *Whether the delay causes any prejudice to the parties and the legal system generally* | 56-57 |
| - *The extent to which non-compliance would undermine important interests of the Cayman Islands or compliance would undermine the important interests of the foreign state* | 58 |
| - *Whether there is an acceptable explanation and good excuse for the delay* | 58 |
| - *What the justice of the case requires* | 59 |
| - *Conclusion on the balancing exercise* | 59 |
| **Ancillaries** | 59-60 |
| **The Order** | 60 |


## JUDGMENT

### Introduction

1. Put simply and stripped of its detail and complications this case concerns the legal position when a company which has voluntarily chosen to be incorporated under and subject to the laws of the Cayman Islands, with management and operations on the ground in the People's Republic of China, seeks more time to disclose documentation relevant to a dispute with dissenting shareholders as to the fair value of shares in the company. The company says that it cannot disclose such documentation without the approval of the Chinese authorities but there has been no approval mechanism in place for over a year now and it is unlikely to be in place in the near future. The company is concerned that if it discloses the documentation without the approval of the Chinese authorities a real risk of prosecution will arise. Should yet more time be granted to the company

or not? On the facts and in the circumstances of this case, balancing the relevant factors and competing interests, and applying well established and internationally recognised principles of the common law and comity, I have decided that the requirements of the laws and interests of the Cayman Islands override the requirements of the laws and interests of the People's Republic of China and no more time should be granted to the company.

**Background**

2. A new low in cases brought under section 238 of the Companies Act ("Section 238") was about to be reached on 9 November 2023 until the point was conceded by New Frontier Health Corporation ("the Company"). The Company had been asking the court to determine at the case management conference on 9 November 2023 what "test" would be applied at the hearing of its summons dated 18 August 2023 (the "Application"). In effect an argument as to what law we would be arguing about at a subsequent hearing. Harneys, the attorneys acting for the Company, by letter dated 4 October 2023 had unhelpfully initially maintained the following stance:

> "We repeat that the issue of whether or not there is a real risk of criminal prosecution is irrelevant. Our client genuinely fears recrimination for breach of the relevant PRC laws, but is not seeking to avoid discovery, simply time to comply. *Bank Mellat* is simply not engaged."

By letter dated 5 November 2023 Harneys belatedly conceded that the court could deal with what was described as the *Bank Mellat* point at the hearing of the Application. In my judgment delivered on 9 November 2023 I decided the point as follows:

> "16. In respect of Issue 1, my conclusion is that the Court should not determine at this CMC "the test" which should be applied on the hearing of the Application. It will be for counsel for the parties to address the relevant law in their written and oral submissions at the hearing of the Application. It would be premature and inappropriate at this CMC, almost in the abstract and certainly without the benefit of full argument, for the Court to determine the test which should be applied in respect of the Application."



FSD2022-0072 Page 4 of 60 2024-04-24

3. On 9 November 2023 I made an order setting down the hearing of the Application for 1.5 days commencing at 10am on 13 February 2024. The parties by agreement applied to vacate that hearing and by order made on 4 December 2023 the hearing was re-listed to commence at 10am on 26 March 2024. The Application was duly heard over two long but intensely interesting days and I reserved judgment, which I now deliver.

4. There was some considerable force in the submission of Blair Leahy KC, who appeared on behalf of Hildene Opportunities Master Fund II, Ltd, Invictus Special Situations Master I, L.P., Blackwell Partners LLC – Series A, Maso Capital Investments Limited, Star V Partners LLC, Oasis Investments II Master Fund Ltd and Alpine Partners (BVI) LP (the "Dissenters") that the Company, in failing to file the Application earlier and the way in which it sought to progress the Application including its approach to the case management conference in November 2023, has in effect already obtained through the back door a further extension of six months.

**The Application**

5. By the Application correctly described by Tom Lowe KC, who appeared on behalf of the Company, as a "very unusual" one as it sought an open-ended extension, the Company applied for an order that it be granted yet another extension of time in respect of the period provided for in paragraph 10a of the Order for Directions dated 12 August 2022 (the "August 2022 Order"), as extended by Order of the Court dated 31 March 2023 as regards its obligation to give discovery in these proceedings until the later of 7 days following:

(a) the grant of regulatory approval by the government authorities of the People's Republic of China ("PRC")

(b) the conclusion of the discovery processes pursuant to the applications ongoing in the United States under section 1782 of Title 28 of the United States Code related to the Company ("the Section 1782 Applications").

**Summary**

6. In this case there is a clash of the local laws of the Cayman Islands and the foreign laws of the PRC.

7. Pursuant to the August 2022 Order the Company was required to give discovery of the relevant documentation in this case by 19 December 2022. By application dated 19 December 2022 the Company initially sought an extension of time to 28 April 2023 and subsequently to 29 September 2023. By order made on 31 March 2023 it was given until 29 September 2023 to complete its discovery. On 18 August 2023 the Company filed the Application seeking an open-ended extension of time in view of issues arising under the law of the PRC.

8. For reasons which follow, I have dismissed the Application and have declined to extend the deadline for the Company's discovery beyond 29 September 2023.

9. I have held that the relevant provisions of the laws of the PRC do apply to *inter partes* discovery and that there is an actual risk of prosecution but such risk is low to moderate. I have balanced the relevant factors. I have concluded that the requirement that the Company comply with the August 2022 Order as varied and the interests of the Cayman Islands in the fair and expeditious determination of civil proceedings in effect trump the PRC's legitimate interests in data protection and security.

**The August 2022 Order**

10. Paragraph 10a of the August 2022 Order required the Company within 120 days from 12 August 2022 to upload to the Data Room all documents (of whatever description, whether electronic or in any other format) and communications (whether by email or otherwise) comprising the categories of documents set out in Appendix 3 of the Order which are (i) in its possession, custody or power, (ii) prepared or created in the 5 year period ending on the Valuation Date (6 January 2022, 9pm Cayman Islands time), and (iii) relevant to the determination of the fair value of the Dissenters' shares in the Company as at the Valuation Date. The categories of documents in Appendix 3 were specified under the following headings: Financial Advisor, Special Committee, Buyer Group and potential purchasers, Corporate and financial documents, Projections and valuations, Operations and strategy, Shares and Shareholders and the Merger.

11. Heading C of the August 2022 Order was headed Confidentiality and Non-Disclosure Agreement and required experts and the Dissenters to enter into such agreements in the same or substantially similar form as set out in Appendix 2 which ran to 13 pages, before they would be given access to