# 26-1325

# United States Court of Appeals
# for the Second Circuit

507 SUMMIT LLC and KOA CAPITAL L.P.,

*Applicant-Appellants,*

-against-

BALANCE LAW PLLC, D/B/A BALANCE LAW FIRM,

*Respondent-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
Volume II of II (Pages JA-213-JA-417)

AMINI LLC
*Attorneys for Applicant-Appellants*
131 West 35th Street, 12th Floor
New York, New York 10001
(212) 490-4700
jchubak@aminillc.com
jbrewer@aminillc.com

BALANCE LAW FIRM
*Attorneys for Respondent-Appellee*
One World Trade Center, Suite 8500
New York, New York 10007
(212) 741-8080
robert.liu@balancelawfirm.com

5494

ELECTRONIC PARALEGAL

# TABLE OF CONTENTS

Docket Entries ....................................................................................JA-1

Respondent's Opposing Memorandum of Law
(ECF No. 16).......................................................................................JA-6

Respondent's Opposing Declaration of B. Robert Liu,
Dated August 8, 2025 (ECF No. 17).............................................................JA-19

Exhibit A to Liu Declaration -
Subpoena *Duces Tecum* in *Oasis Investment II Master Fund Ltd. v. Vincent Tianquan Mo, et al.*, Index No. 652607/2023,
Dated May 7, 2025, with Exhibit (ECF No. 17-1) .............................JA-29

Exhibit B to Liu Declaration -
E-Mail from B. Robert Liu to Jeffrey Chubak,
Dated July 23, 2025 (ECF No. 17-1) ...............................................JA-117

Applicants' Reply Declaration of Jeffrey Chubak,
Dated August 22, 2025 (ECF No. 18).......................................................JA-118

Exhibit 1 to Chubak Reply Declaration -
Directions Order of The Grand Court of The Cayman Islands *in the Matter of the Companies Act (2023 Revision) and in the Matter of China Index Holdings Limited*, Case No.
FSD 201 OF 2023 (IKJ), Dated May 27, 2025
(ECF No. 18-1) .......................................................................JA-119

Exhibit 2 to Chubak Reply Declaration -
Decision of The Court of Appeals of The Cayman Islands in *Qunar Cayman Islands Limited v. Athos Asia Event Driven Master Fund, et al.*, CICA No. 24 of 2017, Dated November 13, 2017
(ECF No. 18-2) .......................................................................JA-171

Exhibit 3 to Chubak Reply Declaration -
Decision of The Grand Court of The Cayman Islands *In re New Frontier Health Corporation*, Case No. FSD2022-0072,
Dated April 24, 2024 (ECF No. 18-3)...............................................JA-207

Exhibit 4 to Chubak Reply Declaration -
Decision of The Grand Court of The Cayman Islands *In re 51Job, Inc.*, Cause Nos. FSD 155 & 156 of 2022 (DDJ), Dated November 29, 2022 (ECF No. 18-4) ....................................JA-267

Exhibit 5 to Chubak Reply Declaration -
Decision of The Grand Court of The Cayman Islands in *Phoenix Meridian Equity Limited v. Lyxor Asset Management, S.A., et al.*, Cause No. 311 of 2007, Dated May 22, 2009 (ECF No. 18-5) ....................................JA-281

Exhibit 6 to Chubak Reply Declaration -
Letter from Carey Olsen to Alecia Johns and Tonicia Williams, Dated August 12, 2025 (ECF No. 18-6) ....................................JA-296

Exhibit 7 to Chubak Reply Declaration -
E-Mail from Jeffrey Chubak to B. Robert Liu, Dated July 31, 2025 (ECF No. 18-7) ....................................JA-302

Opinion and Order of Hon. Katharine H. Parker on Application for Discovery for Use in A Foreign Proceeding, Dated January 26, 2026 (ECF No. 21)....................................JA-305

Respondent's Notice of Motion to Quash Petitioners' Subpoena, Dated February 25, 2026 (ECF No. 22)....................................JA-325

Respondent's Supporting Declaration of B. Robert Liu, Dated February 25, 2026 (ECF No. 23)....................................JA- 327

Exhibit 1 to Liu Declaration -
Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action, Dated January 27, 2026 (ECF No. 23-1) ....................................JA-330

Exhibit 2 to Liu Declaration -
Stipulation and Order of Hon. Andrew Brrok for the Production and Exchange of Confidential Information in *Oasis Investment II Master Fund Ltd. v. Vincent Tianquan Mo, et al.*, Index No. 652607/2023, Dated November 19, 2024 (ECF No. 23-2) ..............JA-343

Respondent's Supporting Memorandum of Law, Dated February 25, 2026 (ECF No. 24)....................................JA-354

Applicants' Opposing Memorandum of Law, Dated March 1, 2026
(ECF No. 25)....................JA-370

Respondent's Supplemental Declaration of B. Robert Liu,
Dated March 3, 2026 (ECF No. 26)....................JA-380

Exhibit A to Liu Supplemental Declaration -
Certificate of Incorporation of Lorelei NCC Inc.,
Dated March 03, 2026 (ECF No. 26-1)....................JA-382

Exhibit B to Liu Supplemental Declaration -
Stipulation in *Oasis Investment II Master Fund Ltd. v. Vincent Tianquan Mo, et al.*, Index No. 652607/2023,
Dated March 31, 2025 (ECF No. 26-2)....................JA-388

Respondent's Reply Memorandum of Law, Dated March 3, 2026
(ECF No. 27)....................JA-392

Letter from Jeffrey Chubak to Hon. Katherine H. Parker,
Dated March 5, 2026 (ECF No. 28)....................JA-407

Letter from Jeffrey Chubak to Hon. Katherine H. Parker,
Dated March 9, 2026 (ECF No. 29)....................JA-408

Exhibit 1 to Letter -
Applicants' Sur Reply of Jeffrey Chubak, Dated March 9, 2026
(ECF No. 29-1) ....................JA-409

Letter from Beixiao Robert Liuto Hon. Katherine H. Parker,
Dated March 12, 2026 (ECF No. 30)....................JA-412

Order of Hon. Katherine H. Parker, Dated March 12, 2026
(ECF No. 31)....................JA-414

Letter from Jeffrey Chubak to Hon. Katherine H. Parker,
Dated April 16, 2026 (ECF No. 33)....................JA-415

Letter from Jeffrey Chubak to Hon. Katherine H. Parker,
Dated April 16, 2026
(ECF No. 34)....................JA-416

Applicants' Notice of Appeal, Dated May 11, 2026 (ECF No. 35) ....................JA-417

the Data Room. Under heading D Electronic Data Room and Company Disclosure Procedure at paragraph 12 it was provided that where documents in the Company's possession, custody or power "are required to be redacted in order to comply with the laws of the People's Republic of China the protocol set out at Appendix 6 shall apply". Appendix 6 contained a detailed 8-page protocol in respect of the redaction of documents, their review, production and inspection. It can be seen therefore that there were stringent provisions in respect of confidentiality and redaction.

12. By order made on 31 March 2023 the August 2022 Order was in effect varied and the Company was granted an extension of time until 29 September 2023.

**The main issue**

13. The main issue for the court's determination is whether a further extension should be granted to the Company as regards its obligations to give discovery, pursuant to the August 2022 Order as varied. In essence the court is involved in a discretionary case management decision. Issues as to the laws of the PRC also arise.

**Law**

14. I now turn to the relevant local law. It is well established that this court has a jurisdiction to extend the time period for compliance with an order requiring discovery and inspection to be provided within a certain time frame.

*Grand Court Rules*

15. Under Order 3 rule 5(1) of the Grand Court Rules ("GCR") the court may, on such terms as it thinks just, by order extend the period within a person is required by any order to do any act in the proceedings.

16. In my judgment delivered on 31 March 2023 in these proceedings I stated at paragraph 27 that "When considering an application to extend time the court is exercising a judicial discretion". At page 29 I referred to English authorities to the effect that the court will normally grant a reasonable extension of time if it does not impact on hearing dates or otherwise disrupt proceedings but the

need to comply with court orders was of paramount importance. At paragraph 30 I noted that the court should take careful account of the overriding objective and consider the impact on the administration of justice and other court users.

17. Practice Direction 2 of 2024 encourages, in addition to reference to the English White Book 1999, reference to the Hong Kong Civil Procedure as an aid to the interpretation and application of the GCR.

18. The commentary in the English White Book 1999 on the then equivalent English rule indicates that the object of the rule was to give the court a discretion to extend time with a view to the avoidance of injustice to the parties. The absence of good reason for the delay is not sufficient for the court to refuse to exercise its discretion to extend time. Once a party is in default it is for the party to satisfy the court that the discretion should nonetheless be exercised in his favour and for such purpose he may rely on any relevant circumstances. The court would however normally need to be satisfied that there was an acceptable explanation for the delay. If there was none the question of prejudice was unlikely to arise. If there was an acceptable explanation, the court might still refuse to extend time if the delay was substantial or if to do so would cause significant prejudice to the other side. It is important that the court's resources should be used as effectively as possible and that the proper and regular administration of business in general before the courts should not be disrupted as a result of breaches which occurred without any justification whatsoever and notwithstanding the absence of any prejudice to the other party involved. Time requirements must be observed. The overriding principle is that justice must be done. Litigants are entitled to have their cases resolved with reasonable expedition. There is a very wide inherent jurisdiction to enlarge any time which the court has ordered.

19. The commentary in the Hong Kong Civil Procedure 2024 indicates that the substantially similar Hong Kong rule explicitly confers the widest measure of discretion. Its object is to avoid injustice to the parties. A clear statement in the application for the extension of time of the reasons for the inability to comply with the stipulated time limit should normally be provided. An adequate explanation for the delay will normally be required but all matters (including the adequacy of any reasons for the delay) must be considered and weighed in the balance together with the overall justice of the application.

20. In this case, commenced by petition filed as long ago as 28 March 2022, discovery was required to be completed within a particular time frame (long since passed) imposed by a court order rather than pursuant to Order 24 rule 2 of the GRC which requires parties to an action to make discovery by exchanging lists within 14 days after pleadings in the action are deemed to be closed. Order 24 rule 3 gives the court power to order any party to a cause or matter (whether begun by writ, originating summons or otherwise) to serve a list of documents.

21. In exercising its discretion as to whether or not to grant an extension of time the court should have regard to the overriding objective. The preamble to the GCR provides as follows:

> "1. The Overriding objective
>
> 1.1 The overriding objective of these Rules is to enable the Court to deal with every cause or matter in a just, expeditious and economical way.
>
> 1.2 Dealing with a cause or matter justly includes, as far as is practicable —
>
> (a) ensuring that the substantive law is rendered effective and that it is carried out;
>
> (b) ensuring that the normal advancement of the proceeding is facilitated rather than delayed;
>
> (c) saving expense;
>
> (d) dealing with the cause or matter in ways which are proportionate
>
> (i) to the amount of money involved;
>
> (ii) to the importance of the case; and
>
> (iii) to the complexity of the issues;
>
> (e) allotting to it an appropriate share of the Court's resources, while taking into account the need to allot resources to other proceedings.
>
> 2. Application by the Court of the overriding objective
>
> 2.1 The Court must seek to give effect to the overriding objective when it
>
> (a) applies, or exercises any discretion given to it by these Rules; or
>
> (b) interprets the meaning of any Rule.
>
> 2.2 These Rules shall be liberally construed to give effect to the overriding objective and, in particular, to secure the just, most expeditious and least expensive determination of every cause or matter on its merits.
>
> 3. Duty of the parties
>
> The parties are obliged to help the Court to further the overriding objective. In applying the Rules to give effect to the overriding objective the Court may take into account a party's failure to help in this respect.



FSD2022-0072 Page 9 of 60 2024-04-24

4. Court's duty to manage proceedings

4.1 The Court must further the overriding objective by actively managing proceedings.

4.2 This may include —

(a) identifying the issues at an early stage;

(b) deciding promptly which issues need full investigation and trial and accordingly disposing summarily of the others;

(c) encouraging the parties to co-operate with each other in the conduct of the proceedings;

(d) helping the parties to settle the whole or part of the proceeding;

(e) deciding the order in which issues are to be resolved;

(f) fixing timetables or otherwise controlling the progress of the proceeding;

(g) considering whether the likely benefits of taking a particular step will justify the cost of taking it;

(h) dealing with as many aspects of the proceeding as is practicable on the same occasion;

(i) dealing with the proceeding without the parties needing to attend at court;

(j) conducting procedural hearings by means of telephone conference calls;

(k) making appropriate use of technology; and

(l) giving directions to ensure that the trial proceeds quickly and efficiently.

4.3 Whenever a proceeding comes before the Court, whether on a summons for directions or otherwise, the Court will consider making orders on its own motion for the purpose of giving effect to the overriding objectives of the rules."

*The Constitution of the Cayman Islands – Section 7 of the Bill of Rights*

22. In dealing with an application to extend time the court should take into account Section 7 of the Bill of Rights scheduled to the Cayman Islands Constitution ("Section 7") which provides that everyone has the right to a fair and public hearing in the determination of his or her legal rights and obligations by an independent and impartial court within a reasonable time. It is in similar terms to Article 6 of the European Convention on Human Rights and Fundamental Freedoms. There is a lot of European case law (see for example *Kudla v Poland* (30210/96) 10 WLUK 740; (2002) 35



FSD2022-0072 Page 10 of 60 2024-04-24

E.H.R.R 11 (ECtHR) referred to in the latest English White Book) which places the duty to administer justice expeditiously on the courts.

*The importance of complying with court orders and the local rules*

23. The court should also take into account the importance of complying with court orders (see *Arnage v Walkers* FSD unreported judgment 25 January 2022 at paragraphs 78-103, presently subject to an appeal).

24. In *Richmark Corp v Timber Falling Consultants* 959 F.2d 1468 (9th Cir. 1992) the United States Court of Appeals, Ninth Circuit stated at page 1479:

> "Just as United States companies doing business in the PRC must expect to abide by PRC law, when Beijing [the company] availed itself of business opportunities in this country, it undertook an obligation to comply with the lawful orders of the United States courts…".

25. In a similar vein Hoffmann J (as he then was) succinctly stated in *MacKinnon v Donaldson, Lufkin and Jenrette* [1986] 1 Ch 482 at 494-495:

> "If you join the game you must play according to the local rules … a party may be excused from having to produce a document on the grounds that this would violate the law of the place where the document is kept … But, in principle, there is no reason why he should not have to produce all discoverable documents wherever they are."

26. The court may have regard to the fact that the relevant entity chose to be incorporated under the laws of the Cayman Islands and to be subject to its laws. The procedure in this court is governed by the *lex fori* – the law of the Cayman Islands. That is the norm internationally, as a matter of the conflict of laws. Discovery and inspection of documents form a part of the law of procedure governed by the *lex fori*. I hope it is not adopting too parochial a view but in the case presently before the court I think it important not to lose sight of the fact that the chosen place of incorporation of the Company was the Cayman Islands. The court should also not be blind to the fact that the location of the Company's operations and its management is the PRC. Carl Wu ("Mr Wu"), the Chief Executive Officer and a director of the Company, says at paragraph 16 of his first affirmation

of 21 July 2022, that he is ordinarily resident in Shanghai and is based in the Company's Shanghai office as is the Company's Chief Operating Officer.

*Authorities*

27. Counsel referred to various authorities including *Brannigan v Davison* [1997] AC 238, *Bank Mellat v Her Majesty's Treasury* [2019] EWCA Civ 449, *Byers v Samba Financial Group* [2020] EWHC 853 (Ch), *Tugushev v Orlov* [2021] EWHC 1514 (Comm), *The Public Institution for Social Security v Al Wazzan* [2023] EWHC 1065 (Comm), and *Re Sina Corporation* (FSD, RPJ unreported judgment 6 February 2024).

*Brannigan v Davison*

28. Mr Lowe relied heavily on *Brannigan* which he said informed the relevant law as subsequently referred to in *Bank Mellat*. In *Brannigan* it was held by the Judicial Committee of the Privy Council (on appeal from the Court of Appeal of New Zealand) that the common law privilege against self-incrimination did not apply where the witness was at risk under a law of a different country of criminal or penal sanctions and even if the secrecy legislation of the Cook Islands rendered the plaintiffs liable to prosecution if they gave the evidence in New Zealand required by a commission of inquiry, they were not privileged against giving such evidence. Lord Nicholls, delivering the judgment of their Lordships, at pages 249-251 stated:

> "Seen from the point of view of the witness, the right may be as much needed where foreign law is involved as where it is not. The difficulty confronting the individual may be just as acute when the feared prosecution is under the law of another country. There is, however, a real problem in letting this lead to the conclusion that the privilege should apply in such a case. The privilege is rigid and absolute. The witness has an unqualified right. Where the privilege applies the witness need not answer. Unless the case falls within a statutory exception, that is the end of the matter. There is no scope for the court to exercise any discretion.
>
> It is the unqualified nature of the right, so valuable as a protection for the witness, which gives rise to the problem when a foreign law element is present. If the privilege were



FSD2022-0072 Page 12 of 60 2024-04-24

applicable when the risk of prosecution is under the law of another country, the privilege would have the effect of according primacy to foreign law in all cases. Another country's decisions on what conduct does or does not attract criminal or penal sanctions would rebound on the domestic court. The foreign law would override the domestic court's ability to conduct its proceedings in accordance with its own procedures and law. If an answer would tend to expose the witness to a real risk of prosecution under a foreign law then, whatever the nature of the activity proscribed by the foreign law, the witness would have an absolute right to refuse to answer the question, however important that answer might be for the purposes of the domestic court's proceedings.

This surely cannot be right. Different countries have their own interests to pursue. At times national interests conflict. In its simple, absolute, unqualified form the privilege, established in a domestic law setting, cannot be extended to include foreign law without encroaching unacceptably upon the domestic country's legitimate interest in the conduct of its proceedings … Their Lordships' conclusion is that the common law privilege does not run where the criminal or penal sanctions arise under a foreign law …

If the unqualified application of the privilege to foreign law is unsatisfactory, so also is the opposite extreme. The opposite extreme is that the prospect of prosecution under a foreign law is neither here nor there. Since the privilege does not apply to prosecution under the foreign law, the witness must always answer a relevant question in the domestic proceedings, regardless of the nature of the crime under the foreign law and regardless of the likely practical consequences for the witness under that law.

This would be a harsh attitude. It would be a reproach to any legal system. One would expect that a trial judge would have a measure of discretion …This important question need not be answered in the present case, and their Lordships consider it better to leave the answer to be supplied on another occasion. The reason why the question need not be answered is that in the present case the statutory "sufficient cause" and "just excuse" exceptions provide ample scope for all the circumstances to be taken into account …".



FSD2022-0072 Page 13 of 60 2024-04-24

29. Lord Nicholls declined to answer the following "important question": "where the self-incrimination privilege does not apply because the feared prosecution is under foreign law, does the domestic court, under its inherent power to conduct its process in a fair and reasonable manner, nevertheless have a discretion to excuse a witness from giving self-incriminating evidence?"

30. Lord Nicholls at page 251 also referred to "the concept of weighing all the consequences of the refusal to give evidence: the adverse consequences to the inquiry if the questions are not answered and the adverse consequences to the witness if he is compelled to answer."

31. Lord Nicholls at page 253 added:

> "... their Lordships recognise that the contradictory commands of different states can give rise to acute problems for individuals. The resolution, or alleviation, of these problems is one object of the principles of foreign state compulsion, which have been developed particularly in the United States. For its part New Zealand has observed these principles."

32. It is interesting and informative to note that in the New Zealand Court of Appeal [1996] 2 NZLR 278 Cooke P at page 292 referred to issues "such as the likely ambit of the knowledge of witnesses, the degree of help likely to be obtained from their evidence, and the possibility of reasonably obtaining the required information from other sources ...".

33. Richardson J at page 330 listed various considerations which should be weighed including:

(a) the vital national interests of New Zealand;
(b) the importance of the information sought;
(c) the alternative means of accessing that information from other sources;
(d) the nationality and ordinary residence of the prospective witnesses and the location of the documents;
(e) the nature and extent of the witnesses' commercial and personal connections with the foreign state; and
(f) the nature and extent of the risk to the witnesses and any others immediately affected that requiring testimony would impose and the professional and personal consequences for them.

34. *Brannigan* was followed by the Federal Court of Australia in *Bank of Valletta Plc v National Crime Authority* [1999] FCA 1099 and the court accepted that proper matters for consideration included the sovereignty of the foreign state, the absence of any evidence to indicate the importance, urgency or necessity of production of the documents, the seriousness of any contravention of the foreign legislation and the foreigner's good faith and aspects of the history of the matter. There was also reference to the lack of any alternative method of obtaining the necessary information (paragraphs [15] and [16]).

*Bank Mellat*

35. In *Bank Mellat* Gross LJ, sitting in the Court of Appeal of England and Wales, referred at paragraph 2 to on occasions a tension arising between local law requirements "for the inspection of documents and the provisions of foreign law in the home country of the litigant." At paragraph 3 he added:

> "Where such a tension arises, it is for the Court to balance the conflicting considerations: the constraints of foreign law on the one hand, and the need for the documents to ensure a fair disposal of the action in this jurisdiction, on the other. The balance is struck by a Judge sitting at first instance, making discretionary case management decisions. As is well-established, this Court will only interfere if the Judge has erred in law or principle or has (in effect) reached a wholly untenable factual conclusion."

36. From paragraph 52 onwards Gross LJ covered the legal framework including the law in respect of (1) evidence of foreign law and (2) production, inspection and contravening foreign criminal law.

37. At paragraph 63 Gross LJ pulled the threads together in respect of a local disclosure obligation and a foreign regulatory law clash and, in an oft quoted passage which is worth quoting in full, summarised the position as follows:

> "i) In respect of litigation in this jurisdiction, this Court (i.e., the English Court) has jurisdiction to order production and inspection of documents, regardless of the fact that compliance with the order would or might entail a breach of foreign criminal law in the "home" country of the party the subject of the order.

ii) Orders for production and inspection are matters of procedural law, governed by the *lex fori*, here English law. Local rules apply; foreign law cannot be permitted to override this Court's ability to conduct proceedings here in accordance with English procedures and law.

iii) Whether or not to make such an order is a matter for the discretion of this Court. An order will not lightly be made where compliance would entail a party to English litigation breaching its own (i.e., foreign) criminal law, not least with considerations of comity in mind (discussed in *Dicey, Morris and Collins, op cit*, at paras. 1-008 and following). This Court is not, however, in any sense precluded from doing so.

iv) When exercising its discretion, this Court will take account of the real – in the sense of the actual – risk of prosecution in the foreign state. A balancing exercise must be conducted, on the one hand weighing the actual risk of prosecution in the foreign state and, on the other hand, the importance of the documents of which inspection is ordered to the fair disposal of the English proceedings. The existence of an actual risk of prosecution in the foreign state is not determinative of the balancing exercise but is a factor of which this Court would be very mindful.

v) Should inspection be ordered, this Court can fashion the order to reduce or minimise the concerns under the foreign law, for example, by imposing confidentiality restrictions in respect of the documents inspected.

vi) Where an order for inspection is made by this Court in such circumstances, considerations of comity may not unreasonably be expected to influence the foreign state in deciding whether or not to prosecute the foreign national for compliance with the order of this Court. Comity cuts both ways."

38. At paragraph 64 Gross LJ felt it important, in the context of an actual risk of prosecution, to highlight that "it is concerned with the risk of *prosecution*, rather than the risk of subsequent sanction, if prosecuted and convicted…the question focuses on the *actual* risk of prosecution- not

on whether the conduct in question discloses a breach of Iranian criminal law, without more." (italics inserted by Gross LJ). Jackson LJ and Coulson LJ agreed with Gross LJ.

39. *Bank Mellat* was followed by Fancourt J in *Byers*, by Butcher J in *Tugushev* and by Henshaw J in *The Public Institution for Social Security*. *Bank Mellat* has also recently been followed in the Cayman Islands by Parker J in *Re Sina*.

*Re Sina*

40. In *Re Sina* Parker J helpfully dealt with the relevant law from paragraph 112 onwards and at paragraph 116 accepted that the relevant principles to be applied under Cayman Islands law were those as set out in the *Bank Mellat* case and subsequent English authorities including *Byers*, *Tugushev*, and *The Public Institution for Social Security*. Like Parker J, I too follow those English authorities.

41. At paragraph 155 Parker J accepted Professor Liu's evidence that the documents caught by a disclosure order constitute data for the purposes of the DSL and his interpretation that "foreign judicial or law enforcement" includes court ordered *inter partes* disclosure. At paragraph 169 Parker J noted that "the Court has concluded that Article 36 of the DSL applies to *inter partes* disclosure, approval should be sought, and if the data is transferred without approval, there is a breach of PRC law." In *Re Sina* it appears that disclosure of what was defined as the Remaining Documents had been refused by the PRC authority and the company had been formally warned to strictly comply with that decision or be subject to penalties (see paragraphs 30 and 32). It is also clear from paragraph 28 of the judgment that the Remaining Documents consisted of just 666 discoverable documents. From paragraph 45 of the judgment it appears that all parties had access to "45,199 PRC approved documents" and the total of documents uploaded to the data room was approximately 58,000. It appears that a further 6,000 documents had been omitted (see paragraph 51 of the judgment) but the company had wisely taken steps to ascertain whether any of the requested documents could be located overseas to obviate the need to seek regulatory approval. In particular the company had asked a legal entity in America whether it would provide it with the necessary material located overseas on a voluntary basis.



FSD2022-0072 Page 17 of 60 2024-04-24

42. At paragraph 183 Parker J stated:

> "Considering the direction from the Chinese authority where there is no appeal, it seems to the Court that there is a real risk that enforcement action would be taken against the Company and its officers were it to nevertheless disclose the Remaining Documents."

43. At paragraph 185 Parker J added:

> "The Court is persuaded in all the circumstances … there is, as a matter of fact, a real risk that the disclosure in these circumstances would trigger a prosecution and serious sanction."

44. At paragraph 187 Parker J stated:

> "The Company has persuaded the Court that serious sanctions, such as revocation of its business licence would be applicable as a result of it performing its discovery obligations in breach of the PRC authorities approach to their jurisdiction and warning. The Court is not of the view on the evidence that the only sanction that would be available in this case would be the imposition on the Company of a modest fine in circumstances where the Company would be disobeying a specific instruction and warning. The Court accepts Professor Liu's evidence that given the importance of the Company's place in the internet information sector in China and the nature of its data involved in the case it is at least likely that its violation of Article 36 of the DSL will have serious consequences."

45. From paragraph 188 Parker J conducted the balancing exercise and stated:

(1) "One of the factors is the conduct of the party giving disclosure" (paragraph 189) and

(2) "Other factors are delay and prejudice" (paragraph 191)

46. From paragraph 218 onwards Parker J dealt with his conclusions and his reasons for the same. At paragraph 220 Parker J concluded that the fairest and most appropriate course, on the facts and in



FSD2022-0072 Page 18 of 60 2024-04-24

the circumstances of the case before him, was "to approve the orders contained in the proposals made by the company on December 13 (as further directed by the Court – see below) and also to proceed with the letters rogatory process in order that the best possible chance of finding out more about the outstanding categories of material and obtaining it is facilitated."

47. At paragraph 227 Parker J pragmatically stated:

> "The concept of an independent suitably qualified expert in China expressing a view as to the importance of the Remaining Documents seems to the Court to be a sensible proposal. It is not ideal but provides a way forward as to the 'need' question."

48. At paragraph 232 Parker J added:

> "Once the China Independent Expert has opined on the Remaining Documents the 'need' question in relation to the importance of the documents to the issues in the case will become clearer and if necessary, the Court can make further decisions in relation to the Remaining Documents."

49. The Dissenters seek to distinguish *Re Sina* on various grounds including: (1) in *Re Sina* the company had already disclosed over 97% of the documents. In the case presently before this court, the Company has disclosed less than 10% of the relevant documents; (2) in *Re Sina* the PRC authority had denied its application to transfer the 666 documents as they were "highly sensitive". In the case presently before this court there is no evidence of any highly sensitive material and the Company has previously received approval in respect of its applications; (3) in *Re Sina* the company's primary business was to operate a high profile "Twitter-like" social media platform in the PRC called "Weibo". In the case presently before this court the Company is in the private healthcare business; (4) in *Re Sina* there was no criticism of the company's approach to the discovery process whereas in this case there has been; (5) in *Re Sina* there appears to have been no or only limited discussion about the possibility of redaction of sensitive documents whereas in this case a redaction process has taken place; and (6) in *Re Sina* there had been a formal warning issued by the relevant PRC authority, whereas in this case there has been no such warning. I agree that the facts and circumstances in *Re Sina* are very different to the facts and circumstances presently before this court. It is trite that each case must be decided on its own facts and circumstances.

*The submissions on the authorities*

50. Ms Leahy took a straightforward and easily understandable approach in respect of the relevant authorities. Ms Leahy referred to Order 3 rule 5(1) of the GCR and submitted that the court should follow what she referred to as the *Bank Mellat* test. Ms Leahy also referred to the subsequent authorities (including *Byers*, *Tugushev* and *Re Sina*) in which *Bank Mellat* had been followed and applied.

51. Mr Lowe, at times during his submissions, appeared to be subtly hinting that the Company had a less onerous test to pass than the *Bank Mellat* test.

52. Mr Lowe attempted to pray in aid the principles of foreign state compulsion, referred to in the American cases and the New Zealand case of *Brannigan*, and submitted in effect that Neuberger J, as he then was, in *Morris v Bank Arabe et International d'Investissement SA* [2001] I.L.Pr 37, 568 at page 578 had been wrong to attempt to pour cold water on this hot American topic. It is interesting to note in that case, although it was not necessary for his decision, Neuberger J at page 582 stated "the Court should normally lean in favour (probably heavily in favour) of ordering inspection, especially where a substantial number of important documents are involved."

53. Mr Lowe eloquently, and with much intellectual force, attempted to persuade the court that in certain respects (in particular sub-paragraph iv) the reference to the "actual" risk test and sub-paragraph vi), the emphasis on comity cutting both ways) the Court of Appeal of England and Wales in *Bank Mellat* "got it wrong" or did not properly take into account previous authorities and that the subsequent first instance decisions simply repeated the mistakes or misunderstood *Bank Mellat* and should not be followed. At paragraph 7 of his skeleton argument dated 26 February 2024 Mr Lowe submitted that on proof that compliance with a court order for discovery contravenes a foreign law the court must engage in a balancing exercise to determine whether as a matter of comity and fairness, it should modify the discovery obligation and added "The Company does not accept that this Court is bound to follow certain English decisions which may suggest that the Court should only exceptionally exercise such a discretion, even where foreign unlawfulness is proved." Mr Lowe was bold enough to add at paragraph 8 that:

"… when the balance falls in favour of modifying the obligation of discovery, the Court should ordinarily do no more than require the party to make its best efforts to obtain the foreign documents for discovery but ought not to require the impossible. This is in essence the order that Parker J recently made in *Re Sina Corporation*."

54. I had to make great efforts not to be seduced into error by the attractive eloquence of Mr Lowe's submissions. Coming back down to earth I reminded myself that I was not sitting in the Supreme Court of the United Kiugdom reviewing an appellate decision from the court below. I am just a mere first instance puisne judge in the Cayman Islands. Parker J, a fellow judge at first instance, with much experience in Section 238 cases and discovery and foreign law issues in *Re Sina* at paragraph 116 accepted that the relevant principles set out in *Bank Mellat*, *Secretary of State for Health v Servier Laboratories Ltd* [2014] 1 WLR 4383 and the subsequent English first instance authorities (*Byers*, *Tugushev* and *The Public Institution for Social Security)* were "to be applied under Cayman Islands law". Parker J from paragraph 131 also referred to some US authorities but did not find them to be "of great assistance because the facts and circumstances of each case and the approach of the US courts to the determination of the expert evideuce is different. It is also clear that this is a developing area of jurisprudence in the US and the way in which the Chinese authorities approach the data security laws and euforce them is also recognised by them to be developing." I am far from persuaded that Parker J was wrong to find that the principles outlined in *Bank Mellat* were good Cayman law and I take into account the helpful guidance provided by the English authorities in this area of the common law. None of the factors listed at paragraph 70(3) of my judgment in *HQP Corporation Limited (in official liquidation)* (FSD unreported judgment delivered on 7 July 2023 and presently subject to an appeal) would justify this court declining to follow such English authorities.

55. Mr Lowe skilfully tried to move the court away from the words "actual risk" referred to in *Bank Mellat* and more towards the language used in the earlier English cases on domestic self-incrimination. By way of example, he went back to the 1930s and the legal battle between two glass companies and referred me to the language used in *Triplex Safety Glass Company v Lancegaye Safety Glass* [1939] 2 KB 395. Du Parcq LJ read the judgment of the court and at page 404 stated that, in the context of domestic self-incrimination the relevant danger was the existence, of which the court must be satisfied of the peril and possibility of being convicted as a criminal. A mere "remote and naked possibility" out "of the ordinary course of the law and such as no reasonable

man would be affected by" was not enough. In somewhat nuanced submissions, Mr Lowe seemed to be suggesting that when Gross LJ in *Bank Mellat* referred to the real – in the sense of actual – risk of prosecution all that was necessary was, relying on the privilege against self-incrimination authorities, a risk that was not fanciful. That is not my reading of *Bank Mellat*.

56. In his opening oral submissions Mr Lowe referred to the English authorities which required "a sliding scale of risk" but submitted that once the court is satisfied that there is a real risk of prosecution there is no basis for "grading the risk down" and invited the court not to follow the English cases insofar as they suggest the court should deal with "the magnitude of risk". Ms Leahy submitted that the court should assess the degree of the actual risk of prosecution when conducting the balancing exercise. That makes sense to me and is supported by authority. When questioned further on this topic during his reply submissions Mr Lowe submitted that once a party has got over the threshold of establishing a real risk the court should not subject it to even more stringent tests such as "grading the seriousness of the risk, because that violates the principles of privilege." Mr Lowe suggested that there was no basis for "grading the risk" and I note that in *Rio Tinto Zinc Corp v Westinghouse Electric Corp* [1978] AC 547, in the context of the privilege against self-incrimination and witnesses, Roskill LJ in the English Court of Appeal commented at page 579 that it was not for the court "to resolve problems of this kind by calculating odds." In subsequent authorities, in the present context, the courts have stated that an assessment of the degree and extent of the actual risk is a relevant factor to have regard to in the balancing exercise. Fancourt J in *Byers* at paragraph 107 v) referred to "the extent of the risk". Henshaw J in *The Public Institution for Social Security* at paragraph 156 stated that "a component of that assessment must be the court's view as to how likely it is that the disclosure and inspection would infringe Swiss law." Butcher J in *Tugushev* at paragraph 34, stated: "I consider that in [the balancing] exercise the smaller or less significant the risk which the court considers that there is, even if it surmounts the threshold of being a "real risk", the less weight it will be given in the balance." That makes good common sense to me. Insofar as Mr Lowe attempted to persuade the court that the grading of the risk was not appropriate I reject such attempts.

57. Mr Lowe took me to various extracts from the well-known House of Lords case of *Westinghouse*. Mr Lowe referred to the comments of Lord Denning MR in the Court of Appeal at page 574 where it was stated that once it appears that a witness is at risk then "great latitude should be allowed to him in judging for himself the effect of any particular question" adding "It is not necessary for him

to show that proceedings are likely to be taken against him, or would probably be taken against him. It may be improbable that they will be taken, but nevertheless, if there is some risk of them being taken- a real and appreciable risk- as distinct from a remote of insubstantial risk, then he should not be made to answer or disclose the documents."

58. In a transparent attempt to persuade me be a timorous soul, Mr Lowe also prayed in aid the cautionary words of Roskill LJ who at page 579 referred to "the degree of risk of penalty proceedings following", in the context of section 14 of the Civil Evidence Act 1968 and the privilege against self-incrimination which the common law had provided for three centuries, and gave the courts a stark warning as follows "In the absence of bad faith, to say that there is no risk of proceedings may in all but the plainest cases involve a court claiming to itself a degree of prescient foresight to which it would not be wise to pretend for if its forecast were wrong and if proceedings and penalties were to follow, damage will or at least may be done by an erroneous decision of the court which it would not be easy thereafter to undo or redress." It is interesting to note that at page 579 Roskill LJ, in the context of the privilege of self-incrimination in respect of a witness where once established the court has no discretion to exercise as the privilege is "rigid and absolute", stated:

> "It cannot, I think, be right in these cases for the court to attempt a quantitative assessment of the probability one way or the other of the risk of proceedings ultimately being taken, and then to seek to draw the line, one way where the probabilities in the view of the court are thought to be more or less evenly balanced and the other where the balance is more disparate. It is not for the court to resolve problems of this kind by calculating the odds. I think the right question to ask is that posed by Shaw L.J. on Friday afternoon. Can exposure to the risk of penalties (or in other cases to the risk of prosecution for a criminal offence) be regarded as so far beyond the bounds of reason as to be no more than a fanciful possibility?"

59. Mr Lowe also referred to the words in the House of Lords of Viscount Dilhorne at page 627. Viscount Dilhorne agreed with Lord Denning's "great latitude" comments and at page 628 added "Lord Denning contrasted a real and appreciable risk with a remote or insubstantial one, and once it appears that the risk is not fanciful, then it follows it is real. If it is real, then there must be a reasonable ground to appreheud danger, and, if there is, great latitude is to be allowed to the witness

and to a person required to produce documents." Finally on *Westinghouse*, Mr Lowe took me to the comments of Lord Fraser at page 647 who stated that "The test is not a rigorous one. All that is necessary is that it should be reasonable to believe that production would "tend to expose" (not "would expose") the possessor of the documents to proceedings. I agree with the Court of Appeal that that test is satisfied in the present case."

60. In my judgment the position of a Cayman company seeking not to provide discovery pursuant to a Cayman court order unless and until it obtains foreign regulatory approval cannot be fully equated to the position of an individual refusing to answer a question in local proceedings on the grounds that it would subject him to the peril and possibility of being convicted as a criminal in that local jurisdiction. Insofar as Mr Lowe's submissions on the law and the relevant test in the present context invited me to disregard any grading of the risk and appeared to invite me not to follow "the real- in the sense of actual- risk of prosecution in the foreign state" wording as referred to at the oft cited paragraph 53 iv) of *Bank Mellat*, and instead to follow the words used in earlier English cases (referred to above) on self-incrimination, I decline to accept such invitation. Instead I, like many English first instance judges (for example Fancourt J in *Byers*, Butcher J in *Tugashev*, and Henshaw J *in The Public Institution for Social Security)* and as Parker J did in *Re Sina*, follow *Bank Mellat* in the present context. Despite Mr Lowe's best efforts, I was not persuaded that Gross LJ in *Bank Mellat* or the various English judges at first instance who followed him placed insufficient attention to the earlier cases and "got it wrong".

*Some American authorities*

61. Mr Lowe, in his persistent and imaginative attempts to water down the *Bank Mellat* principles, also treated me to a lengthy but interesting excursion into several American authorities and I acknowledge that some of them were helpful insofar as they put some meat on the bones of the balancing exercise where local law requirements potentially collide with foreign law requirements, so I make brief reference to them.

*Rogers*

62. In *Societe Internationale v Rogers* (1958) US 113, 78 S Ct. 1087 Justice Harlan, delivered the opinion of the US Supreme Court, and at page 1095 referred to the petitioner's "extensive efforts

at compliance" and felt compelled to conclude "that the petitioner's failure to satisfy fully the requirements of this production order was due to inability fostered neither by its own conduct nor by circumstances within its control." And, displaying a sensitive international approach not always associated with subsequent American judges such as Scalia J, added "It is hardly debatable that fear of prosecution constitutes a weighty excuse for nonproduction, and this excuse is not weakened because the laws preventing compliance are those of a foreign sovereign." The court felt that the petitioner's failure to comply with the pretrial production order was due to "inability, and not to wilfulness, bad faith, or any fault of petitioner."

*Aerospatiale*

63. *In Societe Nationale Industrielle Aerospatiale v United States District Court for the Southern* District of Iowa 482 US 522 (1987) Justice Stevens, writing for the majority, considered principles of comity and at footnote 28 referred to the Restatement of Foreign Relations Law of the United States (Revised 1986) which suggested that in the context of the scope of the district court's power to order foreign discovery in the face of objections from foreign states these factors are relevant to any comity analysis: "(1) the importance to the …litigation of the documents or other information requested; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means of securing the information; and (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located." At 2557 the court, in the context of the wide-ranging pretrial discovery process in the US, emphasised that American courts "should exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position." And after referring to the oft cited *Hilton v Guyot*, 159 US 113 (1895) on comity concerns the court added "American courts should therefore take care to demonstrate due respect for any special problem confronted by the foreign litigant on account of its nationality or the location of its operations for any sovereign interest expressed by a foreign state. We do not articulate specific rules to guide this delicate task of adjudication." In respectful dissent Justice Blackmun at page 2568 stated "I can only hope that courts faced with discovery requests for materials in foreign countries will avoid the parochial views that too often have characterized the decisions to date."

64. The Restatement (Fourth) of Foreign Relations Law 442 (2018) under the heading Foreign-State Compulsion provides "To the extent permitted by statute, regulation, or procedural rule, courts in the United States have discretion to excuse violations of law, or moderate the sanctions imposed for such violations, on the ground that the violations are compelled by another state's law, if: (a) the person in question appears likely to suffer severe sanctions for failing to comply with foreign law; and (b) the person in question has acted in good faith to avoid the conflict." Under the commentary the following appears: "The foreign-state-compulsion defense requires the likelihood of severe criminal or civil sanctions under the foreign law. The risk of punishment must not be purely hypothetical…A failure to raise the defense in a timely fashion will…bar reliance on it. Conversely, a person who identifies the contradictory foreign law at the outset and makes serious efforts to secure a release from or waiver of a foreign prohibition may be excused from compliance with federal law, if that law permits such discretion." Under the Reporters' Notes it is stressed that there must be a direct conflict and "the likely foreign sanctions must be severe" and this could include revocation of a business licence. In assessing the likelihood of sanctions, the courts have also considered whether the person in qnestion has taken reasonable steps to avoid or mitigate the consequences under foreign law. The person in question must act in good faith. The courts must balance multiple factors to reach equitable outcomes. The location of the documents may be relevant but "In the contemporary world, where documents often exist in virtual form and may be accessed from many locations, territorial location may become less relevant…the question is not the physical location of the documents but rather the likelihood that the person will suffer severe sanctions for failing to comply with foreign law and the person's good faith in seeking to comply with the order." It is also indicated that "There is no established practice outside the United States of requiring the use of a foreign-state-compulsion defense." The defence "reflects the practice of states in the interests of comity".

*Richmark*

65. *In Richmark Corp v Timber Falling Consultants* 959 F.2d 1468 (9th Cir. 1992) the United States Court of Appeals, Ninth Circuit, applied *Rogers* and *Aerospatiale* and considered at pages 1475-1476 the importance of the documents ("the evidence is directly relevant…we have found this factor to weigh in favor of disclosure…it is crucial…The importance of the documents to the litigation weighs in favor of compelling disclosure"), the specificity of the request, the location of infonnation and parties ("The fact that all the information to be disclosed (and the people who will

be deposed or who will produce the documents) are located in a foreign country weighs against disclosure , since those people and documents are subject to the law of that country in the ordinary course of business"), any alternative means of obtaining information and the balancing of national interests which the court felt was "the most important factor" and added "We must assess the interest of each nation in requiring or prohibiting disclosure, and determine whether the disclosure would "affect important substantive policies or interests" of either the United States or the PRC".

66. At 1477 the court made reference to the PRC's interest in the confidentiality of the information in question and added "This interest must be weighed against the United States' interests in vindicating rights of American plaintiffs and in enforcing the judgments of its courts. The former interest has been described as "substantial"…and the later as "vital"…To be sure , these interest are not so strong that they would compel disclosure in all cases…In this case, however, because Beijing [ the company] and the PRC have been unable to identify any way in which the PRC's interests will be hurt by the disclosure, the interests of the United States must prevail. The balancing of the national interests is therefore a factor which weighs in favor of disclosure." The court stated that the effect that a discovery order is likely to have on the foreign company is another factor to be considered. If the foreign company "is likely to face criminal prosecution in the PRC for complying with the United States court order that fact constitutes a "weighty excuse" for nonproduction…In this case, Beijing has in fact been ordered by the Chinese government to withhold the information, and has been told that it will bear the "legal consequences" of disclosing the information. Beijing therefore seems to be placed in a difficult position, between the Scylla of contempt sanctions and the Charybdis of possible criminal prosecution."

67. The court at page 1478 concluded that "The United States has a strong interest in enforcing its judgments which outweighs the PRC's interest in confidentiality in this case."

**Determination of the Application**

68. I now turn to my determination of the Application.



FSD2022-0072 Page 27 of 60 2024-04-24

*The approach*

69. In reaching my determination of the Application I must consider and have considered the law in respect of extensions of time and when there is a potential clash between local obligations such as discovery pursuant to a court order and foreign laws potentially impacting upon the same. I must also consider and have considered the relevant evidence and submissions. I note that each case must depend on its own facts and circumstances and that I should not construe previous authorities as statutory provisions. I have a discretion to exercise, and such is helpfully informed by principles referred to in previous authorities dealing with similar issues. That is the beauty and fascination of the common law.

70. This is not a case, like some of the others, where one side is objecting to a discovery or disclosure order being made. In August 2022 the Company was not objecting to giving discovery of documents located in the PRC, it simply wanted 180 days to do so rather than the 120 days contended for by the Dissenters. It said it needed this time to complete the redaction process. I gave it 120 days and criticised it for dragging its feet. Later it applied for an extension to 28 April 2023 and then to 29 September 2023. I granted an extension to 23 September 2023 "somewhat reluctantly". At no stage has the Company appealed against the August 2022 Order. I am now requested to grant yet a further extension of time with no end date presently in clear sight.

71. I think it also relevant to note that this case concerns not a foreign company facing difficulties in its "home" jurisdiction, like some of the other previous cases. The Company is incorporated under the laws of the Cayman Islands. Its "home" jurisdiction is the Cayman Islands, although I note that it has operations and management within the PRC. The initial presumption should be that it must, absent lawful and good excuse, comply with our local laws, rules and court orders. I do not however adopt a harsh, inflexible stance and I have considered the Company's connections to the PRC and the position it is in.

72. The Company's explanation for the delay in complying with the August 2022 Order as varied and the reason for its request for further time to comply is that if it does comply, without the approval of the PRC authorities, it will face a real risk of prosecution in the PRC. It says it needs further time to obtain those approvals as no approval mechanism is presently in place. To test whether that is an adequate explanation and a valid reason I need to consider issues of PRC law and I must also

consider the guidance provided in *Bank Mellat* and the subsequent English cases as applied by Parker J in *Re Sina* and exercise my discretion in the particular circumstances of this case.

*Do the relevant PRC law provisions apply in the present context?*

73. The first question is whether the relevant provisions of the law of the PRC apply in the present context. The Company relies on the expert evidence of Professor Han Liu ("Professor Liu") and the Dissenters rely on the expert evidence of Zhichao Duan ("Mr Duan"). The experts are unhelpfully at polar opposites on this issue but at least they refer to the same provisions of law of the PRC.

74. The agreed English translation of Article 36 of the Data Security Law of the PRC ("DSL"), which came into effect on 1 September 2021, provides:

> "Article 36 The competent authorities of the People's Republic of China shall handle requests for data made by foreign judicial or law enforcement authorities, in accordance with the relevant laws aud international treaties or agreements concluded or acceded to by the People's Republic of China, or in accordance with the principles of equality and reciprocity. Without the approval of the competent authorities of the People's Republic of China, organizations or individuals in the People's Republic of China shall not provide data stored within the territory of the People's Republic of China to any overseas judicial or law enforcement body."

75. Counsel also referred me to Article 48 of the DSL which insofar as is relevant provides:

> "Whoever, in violation of Article 36 of this Law, provides data to an overseas judicial or law enforcement body without the approval of the competent authorities, shall be given a warning by the competent department, and may be concurrently fined not less than RMB 100,000 yuan but not more than RMB 1 million yuan, and the directly liable persons in charge and other directly liable persons may be fined not less than RMP 10,000 yuan but not more than RMB 100,000 yuan. If serious consequences are caused, the violator shall be fined not less than RMB 1 million yuan but not more than RMB 5 million yuan, and may be ordered to suspend the relevant business or suspend operations for rectification, or

have relevant business permits or the business license revoked. The directly liable persons in charge and other directly liable persons shall be fined not less than RMB 50,000 yuan but not more than RMB 500,000 yuan."

76. Article 1 of the DSL provides that the law is enacted for "the purpose of regulating data processing, ensuring data security, promoting development and utilization of data, protecting the lawful rights and interests of individuals and organizations, and safeguarding the sovereignty, security and development interests of the state."

77. The agreed English translation of Article 41 of the Personal Information Protection Law of the PRC ("PIPL"), which under Article 74 came into operation on 1 November 2021, provides:

> "Article 41 The competent authorities of the People's Republic of China shall handle foreign judicial or law enforcement authorities' requests for personal information stored within China in accordance with relevant laws and the international treaties and agreements concluded or acceded to by the People's Republic of China, or under the principle of equality and reciprocity. Without the approval of the competent authorities of the People's Republic of China, no organization or individual shall provide data stored in the territory of the People's Republic of China for any foreign judicial or law enforcement authority."

78. Counsel referred me to Article 66 of the PIPL which provides:

> "Where personal information is processed in violation of the provisions of this Law or without fulfilling the personal information protection obligations provided in this Law, the departments with personal information protection duties shall order the violator to make corrections, give a warning, confiscate the illegal gains, and order the suspension or termination of provision of services by the applications that illegally process personal information; where the violator refuses to make corrections, a fine of not more than RMB one million yuan shall be imposed thereupon; and the directly liable persons in charge and other directly liable persons shall each be fined not less than RMB 10,000 yuan nor more than RMB 100,000 yuan.



FSD2022-0072 Page 30 of 60 2024-04-24

In the case of an illegal act as prescribed in the preceding paragraph and the circumstances are serious, the departments with personal information protection duties at or above the provincial level shall order the violator to make corrections, confiscate the illegal gains, impose a fine of not more than RMB 50 million yuan or not more than five percent of the previous year's turnover; may also order the suspension of relevant businesses, or order the suspension of all the business operations for an overhaul, and notify the competent authorities to revoke relevant business permits or license; shall impose a fine of not less than RMB 100,000 yuan but not more than RMB 1 million yuan upon each of the directly liable persons in charge and other directly liable persons, and may decide to prohibit the abovementioned persons from serving as directors, supervisors, senior managers, or the persons in charge of relevant companies within a specific period of time."

79. Article 1 of the PIPL provides that the law is enacted for "the purposes of protecting the rights and interests on personal information, regulating personal information processing activities, and promoting reasonable use of personal information."

80. Counsel also referred me to Article 253 (1) of the Criminal Law of the PRC (2020 Amendment) which provides:

> "Whoever sells or provides any citizen's personal information in violation of the relevant provisions of the state shall, if the circumstances are serious, be sentenced to imprisonment of not more than three years or limited incarceration in addition to a fine or be sentenced to a fine only; or be sentenced to imprisonment or not less than three years but not more than seven years in addition to a fine if the circumstances are really serious."

81. Looking at these provisions simply on the plain wording on their face through Cayman common law as opposed to Chinese civil law eyes, and focusing on the opening wording "requests for data made by foreign judicial or law enforcement authorities" and "foreign judicial or law enforcement authorities'", "requests for personal information stored within China" and closing words "any overseas judicial or law enforcement body" and "any foreign judicial or law enforcement authority" I can see how it may be difficult for some to see how the Company's compliance with its discovery obligations is a request for data to be provided "to any overseas judicial or law enforcement body" or a request "for personal information stored in China" to be provided to "any foreign or law

enforcement authority." There is no direct request from "foreign judicial or law enforcement authorities". There is no direct provision of data including personal information "to any overseas judicial or law enforcement body" or "any foreign or law enforcement authority." This court however must look at more than simply the words of the provisions in isolation. I must also consider the expert evidence on the provisions and apply my own common sense.

*Conclusion as to whether the relevant PRC law provisions apply in the present context*

82. I accept Professor Liu's opinion that Article 36 of the DSL and Article 41 of the PIPL are likely to be applicable because providing relevant documents, pursuant to the August 2022 Order, is highly likely to be viewed by the Chinese authorities as equating to a court in a civil jurisdiction summoning evidence (paragraph 20 of the joint memorandnm of experts). That opinion makes sense to me in the present context.

83. I have concluded that it is likely that disclosure and inspection of data and/or personal information stored within the PRC could infringe PRC law namely Article 36 of the DSL and Article 41 of the PIPL. I am persuaded by Professor Liu's experience and knowledge and his view that, despite the wording of the provision, DSL Article 36 will be construed as regulating the cross-border transfer of evidence for *inter-partes* discovery compelled by a foreign court. In this case the August 2022 Order required the Company to give discovery by way of uploading documents to the Data Room and some of these documents may be adduced into evidence and placed before the court. Birt JA in *Trina Solar Limited* (CICA unreported judgment delivered on 4 May 2023) at paragraph 256 referred to the reality of Section 238 cases and the "duty of the company to provide the court with all the information so that the court can fulfil the duty imposed on it under Section 238." It is easy to see why documents produced via the August 2022 Order could be regarded as being provided to an "overseas judicial body" namely the Grand Court of the Cayman Islands. Although Mr Duan's narrow view is under the literal wording of the provisions certainly arguable, I prefer Professor Liu's views as to the applicability of Article 36 of the DSL and Article 41 of the PIPL.

*Is there an actual risk of prosecution?*

84. The next question is whether the Company has established an actual risk of prosecution. As Beatson LJ stated in *Servier* at page 4424 "In the exercise of its jurisdiction, it is legitimate for the court to take account of the real risk of prosecution." In the subsequent *Bank Mellat* appeal Gross LJ stated at paragraph 63 iv) that "When exercising its discretion, this Court will take account of the real – in the sense of the actual – risk of prosecution in the foreign state." The burden is placed squarely on the Company to establish the relevant risk of prosecution (if any authority is required for that trite proposition see paragraph 70 ii) of *Bank Mellat*). The Company seeks to discharge this burden by placing primary reliance on the expert evidence of Professor Liu and the Dissenters attempt to counter with the expert evidence of Mr Duan. I have also considered all the other evidence before the court on this "mundane and, essentially, factual question" (paragraph 70 i) of *Bank Mellat*).

85. As Butcher J said in *Tugushev* at paragraph 32, applying *Bank Mellat*, "the relevant question is as to the risk of prosecution. It is not as to the risk of a sanction being imposed, but the question is one as to the actual risk of prosecution and not merely the question of whether the conduct which is relevant discloses a breach of the foreign criminal law."

86. Henshaw J in *The Public Institution for Social Security* at paragraph 156 stated that "It is for the applicant to establish a real risk of prosecution or (arguably) other prejudice …". In *Bank Mellat* (at paragraphs 63(iv) and 64) the reference is to a real – in the sense of the actual – risk of prosecution in the foreign state. It appears from paragraph 69 of *Bank Mellat* that a risk of prosecution without the risk of subsequent sanctions is sufficient to weigh in the court's discretion.

*Lingjun (Judy) Wang's evidence on actual risk of prosecution*

87. Lingjun (Judy) Wang, the Company's general counsel, in her first affirmation of 16 November 2023 at paragraph 6 says "we genuinely fear prosecution and genuine prejudice" and at paragraph 7 grades this as "a very high risk" stating "I and those members of staff and management working for the Company and its group genuinely fear that if we transfer the data identified for discovery and inspection, across the border, without regulatory approval then we, as individuals and the Company are at serious risk of prosecution or other forms of serious prejudice." She gives details

at sub paragraph a.-h., at a. referring to the Company operating, in what she describes as the "highly regulated sector" of healthcare services through a network of private hospitals and affiliated ambulatory clinics over 27 sites in the PRC.

*Professor Liu's evidence on actual risk of prosecution*

88. What does Professor Liu say about the actual risk of prosecution?

89. In his first affirmation of 13 March 2023, he says little about risk of prosecution but refers from paragraph 36 onwards to penalties for non-compliance under the DSL. In his second affirmation of 24 August 2023 again he says little about risk but from paragraph 20 onwards refers to penalties for non-compliance with the DSL. Finally in his third affirmation of 16 November 2023 at paragraph 9 he offers his opinion that "the Company, its management team and its employees are all at high risk of criminal prosecution as well as other forms of serious prejudice by way of administrative sanction were the Company to be caught transferring data cross-border without PRC regulatory approval." (my underlining). At paragraph 10 he refers to "criminal prosecution under the PRC Code". At paragraph 26 he refers to his understanding that "the risk of prosecution and enforcement" is not "fanciful but a real and present danger for companies operating in the PRC". At paragraph 28 he concludes that the risk of the Company and its management and staff having penalties imposed through "an administrative or criminal prosecution for breaches of Article 36 of the DSL or the PIPL" is "highly likely" and adds at paragraph 29 a reference "high risk" exposure to "prosecution or other forms of serious prejudice." In his fourth affirmation of 9 January 2024 Professor Liu at paragraph 7 provides what he describes as his "high-level summary" and at paragraph 7 (g) does not use the words "high risk" or indeed refer to a criminal prosecution but summarises his evidence as "The risk of sanction for the company (sic) upon breach by the Company of the DSL and/or PIPL is considerable…" (my underlining). Nowhere in his high-level summary does he refer to a high risk of prosecution, although in fairness there is a cross reference to paragraphs 44-62 but they do not refer to a high risk of prosecution.

*Mr Duan's evidence on actual risk of prosecution*

90. Mr Duan in his affirmation of 20 December 2023 refers to prior evidence from his colleague Zhihua Taug ("Mr Tang"). Mr Tang in his affirmation of 2 March 2023 did not refer to risk of prosecution

but did at paragraph 37 state that even if giving discovery without prior approval would result in non-compliance with Article 36 of the DSL (which he denied) "I consider that the risk of the Company being sanctioned by the PRC authorities for such a breach would be very low." (my underlining). Mr Duan at paragraph 13.7 of his affirmation says that even if the transfer of data was in breach of PRC law (which he denies) "the risk of the Company being prosecuted by the PRC authorities, and the risk of serious consequences (such as imprisonment of its officers) from any such prosecution, if it gave discovery in these proceedings, without first seeking approval to do so would be low." (my underlining). At paragraph 59 Mr Duan says that he does not consider that there is a risk of infringement of PRC laws but "even if there was a risk of infringement, it is my opinion that the risk of the Company being prosecuted (or suffering some other form of serious prejudice) is extremely low." (my underlining). At paragraph 60 Mr Duan adds that if a PRC law firm attended to the redaction process it is "extremely unlikely the Company would be punished…". At paragraph 77 Mr Duan says that if personal information and other important data is redacted the risk of "an imposition of penalties is extremely low; the likelihood that extreme punishment at the highest scale would be imposed is even lower". At paragraph 80 Mr Duan says that provided personal information is redacted (as required by the August 2022 Order) "the Company should not be at risk of failure to comply with the PIPL and hence any risk of punishment under Article 66 of the PIPL."

*Conclusion on actual risk of prosecution*

91. I must consider the issue presently before me on the evidence presented. As a matter of comity I should assume that the prosecution authorities in the PRC will act reasonably and fairly, there being no evidence to the contrary before me.

92. Ms Leahy accepted that there was not a lot of evidence before the court on the issue as to whether PRC law is the same as Cayman law on the issue of a prosecuting authority having a discretion whether to prosecute or not but submitted that the court was entitled to assume that PRC law is the same as Cayman law, in the absence of any evidence to the contrary. Mr Lowe submitted that there was no evidence in respect of PRC prosecutors having a discretion and to assume such would take the presumption of similarity of law to a whole new level.

93. In my judgment, the PRC authorities should reasonably and fairly take into account all relevant circumstances when they are considering whether to instigate a prosecution or impose a penalty. I note that Article 10 of a document entitled "Interpretation of the Supreme People's Court and the Supreme People's Procuratorate on Several Issues Concerning the Application of the Law in the Handling of Criminal Cases of Infringing on Citizens' Personal Information" dated 8 May 2017 provides that if "there are no "especially serious circumstances" where the offender is a first-time offender, the restitution is made in full and the offender truly expresses repentance about the crime, it can be held that the circumstances are minor, with prosecution dismissed or criminal punishment waived. If the criminal punishment is truly necessary, the offender shall be leniently punished." These appear to be fair considerations familiar to common law eyes. I also note a draft document dated 13 November 2023 whereby public comments are sought by the Chinese Ministry of Industry and Information Technology on the administrative penalty discretion guidelines for data security in industrial and information technology fields. There is reference to the DSL and the discretion in administrative penalties in respect of data security violations. It is clear from such document that the PRC authorities have a discretion and are directed to pay "equal attention" to "correcting the violation and educating the parties involved, so as to guide the parties to consciously abide by the law." Article 18 (1) provides that "where the violation is minor and is corrected in a timely manner, without causing any harmful consequences; or where the violation is committed for the first time with minor harm, is corrected in a timely manner, no penalty may be imposed." Under Article 19 (1) "lighter or mitigated administrative penalty shall be imposed" "when the party takes proactive action to eliminate or reduce the harmful consequences of the data security violation." Although review and redaction by PRC lawyers is not specifically mentioned such could reasonably fall within the phrase "proactive action to eliminate or reduce the harmful consequences" and such should be taken into account when the PRC authorities are making a decision whether to prosecute or not. The "Benchmarks for Discretion" documents refer to administrative penalties as including fines and suspension or revocation of licenses and to prior warnings and orders to make rectifications. Fair and reasonable prosecutors will have regard to various factors when considering whether or not to prosecute.

94. I also take into account Roskill LJ's stark warning in the *Westinghouse* case at page 579, albeit in a different context, flagged by Mr Lowe on a number of occasions during the hearing.



FSD2022-0072 Page 36 of 60 2024-04-24

95. For present purposes erring on the side of caution and in favour of the Company, I am content to conclude that there is, in the circumstances of this case, an actual risk of prosecution. For the purposes of the balancing exercise that now follows I do not assess the risk of prosecution as "high" (Professor Liu) or "low" or "extremely low" (Mr Duan). I assess it as low to moderate. I state the reasons for such assessment below:

(1) despite my conclusion on the applicability of the DSL and the PIPL, from their plain wording there is some uncertainty as to their applicability and different experts take different views. Henshaw J in *The Public Institution for Social Security* went so far as to say at paragraph 156 that "there is force in the view that prosecution is relatively unlikely if there is a real doubt about the law";

(2) the provisions of the DSL and the PIPL refer to warnings or fines or "if serious consequences are caused" or if "the circumstances are serious" bigger fines and possible suspension or revocation of business licences rather than prosecutions and terms of imprisonment. The PIPL also refers to the position "Where the violator refuses to make corrections …". No warning has been given in this case;

(3) the DSL has been in force since 1 September 2021 and the PIPL since 1 November 2021 and there have been no prosecutions. Butcher J in *Tugushev* at paragraph 32 stated that the court should consider whether the foreign law "is regularly enforced". The experts are agreed that no entity "has been penalised or prosecuted (including the penalty of license revocation) for infringing DSL 36 or PIPL 41 or for the disclosure of data in discovery in foreign litigation proceedings." (paragraph 65 of the undated joint memorandum of experts);

(4) when an approval mechanism was in place the Company was given approval in respect of the applications it made;

(5) the PRC prosecution authorities should note that there has been no approval mechanism in place for over a year and no such mechanism is in clear sight for the future;

(6) the PRC prosecution authorities should consider comity issues including the fact that the Company's disclosure of the documents was to comply with an order of a court made in the place of the Company's incorporation to further the overriding objective and to enable that court to conduct a fair trial within a reasonable time;



FSD2022-0072 Page 37 of 60 2024-04-24

(7) the PRC prosecution authorities should be conscious of the need for expedition and compliance with the overriding objective as the rules of one of the PRC's Special Administrative Regions refers to one of the main "underlying objectives" being "to ensure that a case is dealt with as expeditiously as is reasonably practicable." (Order 1A rule 1(b) of the Hong Kong Civil Procedure 2024. See also the judgment of Justice Geoffrey Ma, a former Chief Justice of Hong Kong, delivered in *Wing Fai Construction Company Limited (in compulsory liquidation) v Yip Kwong Robert* [2011] HKCFA 85 especially at paragraphs 31-34 and 64 where that internationally well-respected jurist stresses the need for expedition);

(8) the PRC prosecuting authorities should note that the August 2022 Order contains stringent provisions in respect of confidentiality and redactions to ensure the protection of the data;

(9) the PRC authorities should also take note of the considerable efforts the Company has gone to in respect of redactions. Indeed I note that Xiaomeng (Melody) Wang at paragraph 24 of her first affirmation of 12 October 2022 in *51Job, Inc* (FSD 155 of 2022 (DDJ)) and included in the bundles before the court in this matter stated: "redacting personal information contained in these documents is the only practical way to allow these documents to be transferred out of the PRC and provided to the Dissenters and the Experts without exposing the Company and its employees and officers to the risk of violating the Cybersecurity Law and/or the PIPL and facing the corresponding sanctions". I do not lose sight of Mr Lowe's point that Harneys in their letter dated 14 April 2023 indicated that the PRC authorities had referred to the need for authorisations by relevant personal information subjects and that "redaction only" may not suffice; and

(10) the PRC prosecuting authorities should note that the Cayman court took into account the important interests of the PRC in respect of the regulation of data processing, data security, the lawful rights and interests of relevant legal entities and the protection of personal information and safeguarding the sovereignty and security of the state.

96. Having concluded that there is a risk of prosecution, albeit a low to moderate one, I now go on to conduct the balancing exercise.



FSD2022-0072 Page 38 of 60 2024-04-24

*The balancing exercise*

97. At the core of the balancing exercise is weighing on the one hand the risk of prosecution and on the other the need for and importance of the documents to ensure the fair determination of the Section 238 proceedings within a reasonable time. Various relevant factors need to be weighed in the balance and a just and fair conclusion arrived at.

98. In considering whether or not to grant a further extension of time for a party to comply with an order requiring it to provide discovery within a specified period of time, where there is a real – in the sense of actual – risk of prosecution in a foreign state, the court may take into account the following factors when undertaking the balancing exercise:

(1) the overriding objective of dealing with cases in a just, expeditious and economical way;

(2) Section 7 and the need for a fair trial within a reasonable time;

(3) the importance of complying with court orders and local rules;

(all of which are covered above)

and the following factors which I consider in further detail below:

(4) the actual risk of prosecution and the degree and extent of such risk;

(5) the need for and the importance of the documents;

(6) minimisation of the concerns under the foreign law;

(7) the location of the documents and the parties;

(8) comity considerations;

(9) the availability of alternative means of securing the documents;

(10) the conduct of the party seeking the extension;

(11) whether the delay causes any prejudice to the parties and the legal system generally;

(12) the extent to which non-compliance would undermine important interests of the Cayman Islands or compliance would undermine important interests of the foreign state;

(13) whether there is an acceptable explanation and good excuse for the delay; and

(14) what the justice of the case requires.

*The actual risk of prosecution and the degree and extent of such risk*

99. I have set out above my assessment of the "mundane, and essentially factual question" (Gross LJ in *Bank Mellat* at paragraph 70 i)) of the actual risk of prosecution in this case. I have concluded that there is a risk of prosecution and I assess it as low to moderate. I have full regard to that important factor in the balancing exercise, but as the prior authorities make plain it is not determinative of the balancing exercise.

*The need for and importance of the documents*

100. In respect of the need for and importance of the documents to the fair disposal of these proceedings I have been given very little help by the Company. I do not even have a list of the 444,000 outstanding documents in the PRC or a summary of the nature of them. Mr Lowe suggested that providing a list outside the PRC would run the risk of prosecution. The 440,000 documents are plainly relevant documents otherwise they would not be discoverable. Whether they are necessary to a fair determination of the proceedings is difficult to assess. I do not even have sight or a summary of the 36,000 documents discovered to date to enable me to assess the relative importance of the outstanding documents which are yet to be uploaded to the Data Room by way of discovery. The August 2022 Order specified the various categories of documents to be discovered and it is a reasonable inference that at least some of the outstanding 440,000 documents may be of some importance and some of them may prove to be very important.

101. In my judgment delivered on 31 March 2023 in these proceedings at paragraph 32 I referred to Parker J's judgment delivered on 20 January 2023 in *Re Sina* and his justifiable comments that:

> "Disclosure by the Company is fundamental to a fair trial of this section 238 proceeding. Disclosure by companies, as experience shows, is of central significance in the context of fair value cases and is central to the analysis of the experts."

102. At paragraph 33 I added "It is common ground between the Company and the Dissenters that the Company's discovery in this case will be fundamental to a fair trial." The Company in its skeleton argument dated 23 March 2023 at paragraph 14 acknowledged that "vital materials concerning the petitioner's fortunes over the lookback period, and the deliberations of the special committee in the lead up to the statutory merger, are all in the company's control." And at paragraph 23 "… the Court cannot discharge its statutory duty without the relevant materials."

103. Catie Wang in her first affirmation of 2 November 2023 at paragraph 7 acknowledged "the urgency and necessity of providing the Documents in the Proceedings."

104. Martin JA delivering the judgment of the Court of Appeal in *In Re Qihoo 360 Technology* 2017 (2) CILR 585 at paragraph 3 stated:

> "… all or nearly all of the financial information necessary to enable the court to determine the value of a company's business, and hence of its shares, will inevitably be held by the company itself. The proper conduct of the valuation exercise will accordingly require that the company make adequate disclosure of that information … the experts will often have to be given a substantial degree of autonomy in determining what information is needed for their valuations … care must be taken to ensure that this autonomy is not abused … in general we agree with the statement … that "the experts are the best judge of what information is or is not relevant for their purposes"."

105. I have also considered paragraphs 250-261 of *Trina Solar Limited* (CICA unreported judgment delivered on 4 May 2023) where Birt JA emphasised the importance of the Company's discovery and evidence in Section 238 cases. Birt JA at paragraph 256 commented that the relevant "information will primarily be in the hands of the company and its financial advisers; dissenting shareholders are unlikely to have much information other than that in the public domain. It is

therefore the duty of the company to provide the court with all the information so that the court can fulfil the duty imposed on it under section 238." At paragraph 257 Birt JA added:

> "It follows that the court should make wide ranging orders for discovery as was done in this case. The company must comply fully with such an order …".

106. In view of the lack of evidence before the court as to the documents discovered to date and the outstanding 440,000 documents to be discovered it is difficult to assess the probative value of the outstanding documents but I take judicial notice of the necessity and importance of a company's discovery in Section 238 cases.

107. It would appear that some necessary and important documents have not yet been disclosed. Travis Taylor, the Dissenters' valuation expert, put forward an Information Request under the heading "Questions for Management" dated 23 February 2024 which included a request for items as basic as the Company's audited financial statements for the year ended 31 December 2021. There were also general requests in respect of financial results for each hospital and specific requests in respect of an increase in the offer price, and the total number of options outstanding at the Valuation Date and questions in respect of cash flows. Travis Taylor stated that as work continues on the report "I expect to have further requests."

*Minimisation of the concerns under the foreign law*

108. In this case there are already stringent confidentiality and redaction provisions in the August 2022 Order which should minimise any concerns under PRC law.

*The location of the documents and the parties*

109. The 440,000 documents appear to have originated in the PRC and are still located in the PRC. The Company is incorporated under the laws of the Cayman Islands and its registered office is within the Cayman Islands, although it has operations and personnel on the ground in the PRC. The Dissenters appear to be located outside the PRC, with addresses in the Cayman Islands, the British Virgin Islands and the United States of America.

*Comity considerations*

110. Dicey, Morris & Collins in *The Conflict of Laws* (Sixteenth Edition) at paragraph 7-002 referred to comity stating that "Comity is a term of very elastic content. Sometimes it connotes courtesy or the need for reciprocity." At paragraph 7-017 still in the section dealing with comity, it is stated that:

> "... the English court may order the disclosure of documents held abroad or the provision of information, even if the object of the order might be subject to the criminal sanctions in the country in which the documents are held ...".

111. In 1895 the Supreme Court of the United States of America in *Hilton v Guyot* 159 U.S. 113 (1895) conducted, in the context of the recognition of foreign judgments and comity, an impressive review of the judgments and laws of many countries including England, Jamaica, Tobago, Australia, France, Holland, Belgium, Denmark, Germany, Switzerland, Russia, Poland, Romania, Bulgaria, Austria, Italy, Monaco, Spain, Portugal, Greece, Egypt, Cuba, Porto Rico, Mexico, Peru and Chile and at page 143 Justice Gray, delivering the opinion of the court, uttered on 3 June 1895 his now famous words, which still hold good in April 2024:

> ""Comity" in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will upon the other. But it is the recognition which one nation allows within its territory to the legislature, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws."

Chief Justice Fuller dissented and Justices Harlan, Brewer and Jackson concurred in the dissent.

112. The expression "comity" is used in many senses (see paragraph 69 of *Shandong Chenming Paper Holdings Limited v Arjowiggins HKK2 Limited* [2022] HKCFA 11 at paragraph 69) but in the present context it is used to cover this court's respect for the laws and interests of the PRC and the PRC's respect for the laws and interests of the Cayman Islands.

113. In *GTI Holdings Limited* (FSD unreported judgment 15 March 2022) at paragraph 68, in respect of comity between the Cayman Islands and Hong Kong, a Special Administrative Region of the PRC, I commented as follows:

> "...The judges in the Cayman Islands take great care to avoid potential conflict with courts in friendly foreign jurisdictions, especially Hong Kong in view of the very strong connections between the two countries and the importance of the legitimate financial business conducted in and from them. It is plainly in the best interests of the Cayman Islands and Hong Kong that such business continues to flourish and that both jurisdictions have a mutual respect for each other."

114. Gross LJ in *Bank Mellat* at paragraph 63 vi) stated that "considerations of comity may not unreasonably be expected to influence the foreign state in deciding whether or not to prosecute the foreign national for compliance with the order of this Court. Comity cuts both ways." Butcher J in *Tugushev* at paragraph 36 stressed that "the English courts can expect foreign states to take into account the fact that if disclosure is given in contravention of their domestic law it was in compliance with an English court order." Fancourt J in *Byers* at paragraph 107 xi) stated:

> "The public prosecutor and SAMA can be expected to recognise, as a matter of international comity between friendly states, that the Bank's compliance with its disclosure duty is in response to a lawful order of a foreign Court that has jurisdiction over the Bank, and which was done so that the Bank can proceed to defend itself against a very substantial claim."

115. Furthermore, I am encouraged by Professor Liu's comment at paragraph 51 of his third affirmation of 16 November 2023 to the effect that the judicial trend in the PRC "has been, in recent years, to uphold" the "principles of comity".

116. I have carefully considered the comity concerns, but comity should be a two-way street. If a Cayman court refuses to give a Cayman company further time to comply with a Cayman court order this entails no disrespect to the relevant interests of the PRC or its laws. In this case, the PRC authorities, as a matter of comity, should take into account the fact that the documents are required to be disclosed pursuant to order of the Grand Court of the Cayman Islands (which includes express



FSD2022-0072 Page 44 of 60 2024-04-24

and stringent provisions for confidentiality and redaction to deal with PRC law concerns), made in the place of incorporation of the Company, and that this court is constitutionally obliged to give the parties a fair hearing within a reasonable time. The PRC authorities should respect the need for the Company, incorporated under the laws of the Cayman Islands, to comply with the August 2022 Order.

*The availability of alternative means of securing the documents*

117. It is also relevant to consider the availability of alternative means of securing the documents and the Company's efforts in that respect.

*(a) Generally*

118. The Company has failed to comply with the August 2022 Order in a timely fashion. 440,000 relevant documents still remain outstanding. The Company, in essence, now says that if it provides them even in their redacted form it would run a real risk of prosecution in the PRC. The Company at paragraph 70 of its skeleton argument dated 26 February 2024 acknowledges that "A great deal of the financial information sought would be available from parties in the US ...". In such circumstances, I would have expected to see evidence from the Company that it has taken all reasonable steps to secure access to any duplicates of the documents located outside the PRC. No such evidence has been provided. Mr Lowe took the court to an American case from 1987 (*Aerospatiale*) where there was reference to the availability of alternative means of securing the information. It is trne that some of the Dissenters (namely those represented by Carey Olsen), as seems the norm in Section 238 cases, have filed numerous Section 1782 applications in America but I have seen no evidence that the Company has supported those applications or done its best to encourage voluntary production of outstanding documents outside the PRC. Indeed, in the correspondence between the Dissenters and the Company on the question of the disclosure of outstanding documents the Company seems to take an unduly combative stance and has not given an inch. By letter dated 16 October 2023 the Dissenters (via their attorneys) requested the Company (via its attorneys) to produce an affidavit verifying the categories of undisclosed documents by reference to the August 2022 Order which the Company says falls within the relevant PRC legislation. The Company has produced no such affidavit. Harneys unhelpfully responded on 25 October 2023 simply denying that the Company had "withheld documents from discovery pending



FSD2022-0072 Page 45 of 60 2024-04-24

PRC regulatory approval which it should properly have disclosed" and added: "We do not believe additional evidence is required for the Court to deal with the Further Extension Summons." That is not an attractive position for the Company to adopt especially where it has failed to comply with the August 2022 Order.

119. In an endeavour to lead the court to conclude that the Company was doing all it reasonably could to enable it to transfer the outstanding redacted documents from the PRC to the Cayman Islands, and to persuade the court yet again to exercise its discretion in its favour and give the Company a further extension of time, Mr Lowe referred to the actions the Company had taken in respect of letters rogatory and the Cyberspace Administration of China ("CAC") self-assessment and it is to those belated attempts that I now turn.

*(b) Letters rogatory*

120. In the Company's written submissions dated 2 November 2023 for the case management conference on 8 November 2023 at paragraph 7 it stated that the process of review of the Company's documents collected within the PRC had been completed on 31 July 2023 and since the last hearing to the date of the skeleton 31,649 of the Company's discoverable documents had been approved by the PRC regulatory authorities for cross-border transfer and disclosed to the Dissenters. At paragraph 9 it was stated that on or around 31 March 2023 the Company's PRC legal counsel was informed by the Judicial Assistance Exchange Centre (the "JAEC") that it was no longer accepting applications for approval and that the Ministry of Justice was discussing with the relevant authorities in the PRC a new mechanism to handle such applications. At paragraph 19 (c) (vi) it was stated that "The Company is doing everything possible to identify means by which approval may be obtained in the absence of any new mechanism including Letters Rogatory and preparation of a self-assessment to facilitate an application to the Cyberspace Administration of China (CAC) for a security assessment in relation to the cross-border transfer of the Documents: both methods being uncertain." Catie Wang of Harneys in her first affirmation of 2 November 2023 at paragraph 7 stated: "the Company intends to apply shortly to the Ministry of Foreign Affairs for Letters Rogatory ...".

121. The Company (via Harneys) wrote to the court by letter dated 29 December 2023 and stated:

> "… the Company will seek shortly to have the Letters Rogatory Application listed such that it may be determined, and matters progressed as soon as possible."

122. In a subsequent letter of 19 January 2024 "the Company will proceed to list the Letter Rogatory Application before this Court." Harneys in a letter dated 22 February 2024 to Campbells and Carey Olsen stated that the Company "will shortly issue its application".

123. As it transpires the application for a letter rogatory to be issued to the Ministry of Foreign Affairs of the PRC was not filed until 20 March 2024, shortly before the hearing was due to commence on 26 March 2024.

124. Catie Wang in her affirmation of 20 March 2024 filed on behalf of the Company at paragraph 17 states that the Company seeks the "issuance of the Request through diplomatic channels on principles of comity" and adds that:

> "(a) it is uncertain whether the PRC authorities will accede to the Request;
> (b) I understand that letters of request under the Hague Convention in the PRC usually only concern a handful of documents as opposed to thousands as is the case in this matter;
> (c) it is (at least in common law jurisdictions) unusual for a litigant to seek its own documents through such a request; and
> (d) the timeline within which the PRC authorities will deal with the Request, if made, is difficult to predict."

125. Professor Liu does not see a "legal barrier to the Company attempting this potential route to obtain approval, albeit I am unaware of any successful application having been made from the Cayman Islands to the PRC for such judicial assistance. It would be a novel approach to the present impasse and may in fact be better received by the JAEC and Ministry of Justice, since this is arguably a collection of evidence under the principle of comity, in respect of which the judicial trend has been, in recent years, to uphold" (paragraph 51 of his third affirmation of 16 November 2023).

126. Mr Duan, in his affirmation of 20 December 2023 at paragraph 91, is of the view that a letters rogatory approach will not be effective: "Whilst the letters rogatory application is theoretically possible, it is time-consuming and has not been successful in the past."

127. In *Byers* Fancourt J at paragraph 68 decided that the court should not issue a letter of request to the Ministry of Foreign Affairs of the Kingdom of Saudi Arabia essentially for the following reasons:

(i) such an order is "wrong in principle" adding "attempting to engage the support of a foreign government to remove an obstacle to a foreign litigant's compliance with an order for disclosure is not a request for assistance from a foreign court to secure material evidence. This court does not have diplomatic relations with foreign governments.";

(ii) there was no credible evidence that such an approach was likely to bear fruit;

(iii) even if there was a positive response, it would almost certainly be too late for a fair and effective trial to take place in October 2020.

128. Fancourt J is not alone in his reservations in respect of letters of request in such circumstances. Neuberger J at paragraph 80 in *Morris* rejected an argument that disclosure should be sought by a letter of request under the Hague Convention as such would have created unjust delay and it was not clear that it would succeed. Rimer LJ in *Secretary of State for Health v Servier Laboratories Ltd* [2013] EWCA Civ 1234; [2014] 1 WLR 4383 at paragraph 104 stated: "It is obvious that, as between obtaining disclosure (i) by a direct order against the parties, and (ii) by a "court to court" request … the former is plainly the more appropriate course. The latter is likely to be a slow, cumbersome and inadequate alternative, which may well … spawn follow-up applications …". Beatson LJ and Laws LJ agreed and the Supreme Court dismissed applications for permission to appeal. Henshaw J in *The Public Institution for Social Security* at paragraph 45 noted and applied these English appellate comments.

129. The concerns of the English courts over the effectiveness of letters rogatory in a discovery process are also echoed in the American courts. In *Milliken & Company v Bank of China et al* 758 F. Supp. 2d 238 (2010) at pages 239-243 the court said that requests via a letter rogatory "have not been particularly successful in the past. Requests may take more than a year to execute. It is not unusual

for no reply to be received or after considerable time has elapsed, for Chinese authorities to request clarification from the American court with no indication that the request will eventually be executed." In *Nidec Motor Corporation v Broad Ocean Motor LLC et al* 4.13-cv-01895 Sept (20 January 2022), sitting at the coal face, United States District Judge Sarah E Pitlyk at page 3 referred to Hague Evidence Convention procedures being often unduly time-consuming and expensive and less likely to produce needed evidence than the direct use of the Federal Rules of Civil Procedure "and courts have found such concerns especially acute with respect to China." In *Aerospatiale* Justice Stevens, delivering the opinion of the court, at page 2555 stated "In many situations the Letter of Request procedure authorized by the Convention would be unduly time consuming and expensive, as well as less certain to produce needed evidence than direct use of the Federal Rules. A rule of first resort in all cases would therefore be inconsistent with the overriding interest in the "just, speedy, and inexpensive determination" of litigation in our courts …".

130. Although I take into account the Company's belated efforts to proceed by way of a letter rogatory I do not attach any significant weight to them in the balancing exercise.

*(c) CAC self-assessment*

131. The Company (via Harneys) in a letter dated 14 July 2023 stated that its PRC counsel had approached local CACs in both Beijing and Shanghai on 14 July 2023 but to no avail and the central CAC stated that they were not the competent authority to deal with applications if no important data was involved.

132. Catie Wang in her first affirmation of 2 November 2023 at paragraph 7 indicated that the Company was in the process of preparing its self-assessment to facilitate an application to the CAC for a security assessment in relation to the cross-border transfer of documents.

133. The Company (via Harneys) wrote to the court by letter dated 29 December 2023 and stated:

> "The Company is in the process of finalising its CAC self-assessment application …"

134. By letter dated 19 January 2024 the Company (via Harneys) informed the court that "The Beijing CAC considers that the MOJ administers cross-border transfer of evidence for *inter partes*

discovery under foreign proceedings and it would not be able to provide any guidance if the MOJ does not take any applications." The Company stated that it "is in the process of preparing the self-assessment report and will submit the same to the CAC once it is completed."

135. The Company at paragraph 69 of its skeleton argument dated 26 February 2024 says that in order to avoid further delay the Company has continued to finalise the CAC self-assessment papers and "It is anticipated that the CAC Self-Assessment will be filed in the week commencing 26 February 2024." At paragraph 55 (vi) of its skeleton argument it is stated:

> "On 4 August 2023 Ms Liu was advised by the JAEC that no update was available. Ms Liu also tried again to approach the local CACs in both Beijing and Shanghai, as well as the central CAC, but was told once again that the CAC is not the appropriate authority to contact in relation to the cross-border transfer of the Company's PRC data."

136. Professor Liu in his third affirmation of 16 November 2023 at paragraph 50 refers to CAC self-assessment and says that he sees "no legal barrier to the Company attempting this course" and "there seems to me to be little to be lost in attempting this approach." In his second affirmation of 24 August 2023 Professor Liu at paragraph 14 had stated that it was unclear to him whether "any of the CACs will continue to have a role in approvals for materials sought for cross-border transfer where this concerns litigation...".

137. Mr Duan in his affirmation of 20 December 2023 at paragraph 92 raises, in a balanced and common-sense way, the possibility that "the CAC may not consider the application, as the CAC does not consider itself the competent authority for handling cross-border evidence transfer." He adds "even if the Company completes the self-assessment report, the CAC is unlikely to accept the Company's application."

138. In her fifth affirmation of 20 March 2024 Catie Wang at paragraph 13 (a) says that the Company is mindful of its discovery obligations and at paragraph 14 adds that "on 20 March 2024, the Company submitted a self-assessment to facilitate an application to the Cyberspace Administration of China (CAC) for a security assessment in relation to the cross-border transfer of Documents (the CAC Application), however, it is difficult to predict with any certainty whether the CAC

Application will be accepted by the CAC and if it is, the timeline within which the Company might receive a response."

139. It is difficult to see what will realistically be achieved by the CAC self-assessment route, other than further delay. Although I take into account the Company's references to CAC self-assessment I do not attach any significant weight to them in the balancing exercise.

*The conduct of the party seeking the extension*

140. The Company presented its petition dated 28 March 2022 seeking pursuant to Section 238 the court's determination of the fair value of certain shares. There was a heavy burden on the Company to provide discovery and to conduct itself accordingly.

141. In my judgment delivered on 12 August 2022 I recorded on page 7 that the Company was seeking an order that it provide the bulk of its discovery within 180 days rather than the 120 days as contended for by the Dissenters. My ruling was that a period of 120 days should be allowed. My reasons included the following:

> "I am not persuaded that the impact of the COVID 19 pandemic and the PRC Data Protection Laws mean that a longer period than 120 days should be allowed. 120 days should be adequate and realistic. The discovery process cannot be permitted to unduly delay the determination of the issues in this case within a reasonable time. The Dissenters have referred to authorities where a "customary" 70 days has been ordered in the past. The evidence before the Court goes nowhere near justifying 180 days. I noted with concern Mr. Wu's statement at paragraph 24 that "the company is yet to begin the process of collecting documents from custodians." The Company seems to have dragged its feet in starting the discovery process earlier than it did and must now get on with the process and devote sufficient resource to it. The Company has already had significant time to progress discovery. The Company must now focus on complying with its discovery obligations."

142. In my judgment delivered on 31 March 2023 I criticised (at paragraphs 2 and 3) the loose language the Company had used in its skeleton argument dated 23 March 2023. At paragraph 4, I referred to the August 2022 Order and stated that according to the Dissenters, the Company's discovery

should have been completed by 19 December 2022. I also referred to Appendix 6 to the August 2022 Order as containing "a very detailed protocol regarding documents required to be redacted in order to comply with the laws of the" PRC. I noted at paragraph 6 that the Company had failed to comply with the August 2022 Order. I referred to the evidence of Mr Wu in his affirmation dated 21 July 2022 and at paragraph 11 noted Mr Wu's reference to the Data Protection Laws of the PRC and his statement that "based on discussions with its advisers the Company anticipates being able to provide the Discovery Documents within 180 days of the Court's directions order, but not earlier than that". At paragraph 13 I noted:

> "At no stage did Mr Wu even hint that government approval was required in the PRC before documents could be released for discovery purposes."

143. At paragraph 17 I summarised the position of the Company. It initially applied for an extension to 28 April 2023 but at the hearing was seeking an extension to 29 September 2023. The Company referred to data security and protection regulations being introduced in the PRC "in c. late 2021", and that the "release [of the balance of the Company's data] must await the grant of government approval" and "On 17 December 2022 a first tranche of documents was sent to the Judicial Assistance Exchange Centre in Beijing for approval to make a cross-border transfer to the Cayman Islands." The Company's position was that the relevant legislation only came into force in late 2021 and the penalties for breach are serious including the revocation of licence, supervision of business and fines for corporate and individuals responsible for unapproved transfers.

144. At paragraph 19 I stated:

> "There is no evidence that the substantive Data Protection Law of the PRC has changed. On behalf of the Company there is evidence that on 1 September 2022 the Measures on Security Assessment for Cross-Border Data Transfer came into effect. There is evidence that the DSL came into force on 1 September 2021 and the PIPL on 1 November 2021, well before the August hearing."

145. At paragraph 28 I stated:

> "It is unfortunate that despite the comments I made in my judgment delivered on 12 August 2022 the Company has not progressed compliance with its discovery obligations in a timely fashion."

146. I added:

> "34. It is unsatisfactory, to say the least, that the Company has not complied with the August Order. The Company's changing positions in respect of PRC law is also of considerable concern. Frankly the Company's attitude to discovery at times was verging on an inappropriate mindset of "it will take as long as it takes in view of PRC requirements."
>
> 35. The Company in the evidence presented to the Court in August did not even hint that approval would be required from the authorities in the PRC before it could comply with its discovery obligations in this jurisdiction, the place of its incorporation. The clear message provided by the Company to the Court in August was to the effect that a further level of review by the Company and its agents was required and this would take some time. There was no reference whatsoever to any external State approvals being required in the PRC."

147. At paragraph 40 I stated:

> "The Company needs to inject a real and continually pressing sense of urgency into its processes for complying with its discovery obligations."

148. At paragraph 41 I added:

> "Valid criticism can be levied against the Company in respect of the way in which it dealt with the discovery issue both prior to and subsequent to the August hearing. It has dragged its heels. It has not acted expeditiously … It has given different messages to the Court in respect of PRC law. All in all a very unsatisfactory position."

149. At paragraph 43 I "somewhat reluctantly" gave the Company "one further extension to 29 September 2023 to comply with its discovery obligations. It is important that the Dissenters and the Court are provided with all the relevant documentation to enable a fair trial to take place. It is also important that such trial takes place within a reasonable time."

150. At paragraph 45 I stated "The Company should not underestimate the importance of complying with Court orders and the adverse consequences that may follow if orders are not strictly complied with. The Company needs to comply with its discovery obligations within the extended time period."

151. At paragraph 46 I endeavoured to underline to the Company the seriousness of the position and the need for the Company to comply with the August 2022 Order by stating:

> "Without fettering the Court's discretion I should add that it is unlikely that any further extensions will be granted even if the approval of the Chinese authorities is not obtained on a timely basis prior to 29 September 2023 … No further delays will be tolerated. The Company should not expect any further indulgence from the Court in respect of compliance with its discovery obligations."

152. I have covered some other aspects of the Company's conduct in the previous section headed *The availability of alternative means of securing the documents.* Suffice to say I have not been impressed with the Company's conduct in respect of its discovery obligations. It has dragged its feet in starting the initial discovery process blaming Covid and the redaction process and it then changed course to insist that approval of PRC authorities was essential. More recently in respect of the Application it initially sought to argue at a case management conference that *Bank Mellat* was not engaged but abandoned that unhelpful stance shortly before the case management conference. Neither have I been impressed with the Company's conduct in respect of seeking access to the documents outside the PRC. Its efforts and lack of expedition in respect of letters rogatory and CAC self-assessment do not instil confidence either. It mentioned letters rogatory on 2 November 2023 but did not file the application until 20 March 2024. The pretence for its delay was that it did not want to derail the March 2024 hearing. I do not find that excuse compelling.

The efforts in respect of what the Company refers to as the CAC self-assessment are equally unimpressive.

153. I take into account Mr Lowe's submission that when an approval mechanism was in place the Company actively engaged with the PRC regulatory authority and obtained approval for two tranches of about 30,000 documents and there is no approval mechanism presently in place for the outstanding 440,000 documents.

154. In fairness to the Company I do acknowledge that it has no doubt spent time and money in gathering together the relevant documents in the PRC and going through a comprehensive review and onerous redaction process and when there was an approval mechanism in place applying for and obtaining approval for two tranches of documentation. As Mr Lowe realistically recognised however the Company's "big problem" is that it has only disclosed 8% of the relevant documents to date. Standing back and looking at the Company's efforts to secure alternative access to the outstanding documents in accordance with the August 2022 Order I think they can fairly be described as inadequate and simply not good enough. There is no evidence that the Company has sought to gain access to any of the outstanding 440,000 documents from locations outside the PRC. There is no evidence that the Company has sensibly co-operated with the Dissenters in their Section 1782 Applications or made other efforts to secure documentation outside the PRC on a voluntary basis. Indeed, there is evidence, in the form of the voluminous correspondence placed before the court, that the Company appears to have adopted a hostile and unhelpful stance in response to any requests from the Dissenters for documents and information.

155. I am not presently convinced that the Company has been doing and is doing all it reasonably can to secure alternative access to the outstanding 440,000 documents or any of them, especially where they also exist in hard copy or electronic format outside the PRC.

156. Ms Leahy complained that the Company had dragged its feet and was playing tactical delaying games. I should make it clear, however, that Ms Leahy did not allege bad faith or lack of good faith on the part of the Company. Moreover, Mr Lowe was at pains to stress that the Company's difficulties in providing the remaining 440,000 documents were not of its own making and were outside its control, praying in aid the comments in *Rogers* at page 1095. In my judgment the Company has not taken a thorough or expeditious approach to complying with its discovery

obligations and seeking to obtain the outstanding documents from sources outside the PRC. I have considered all the submissions placed before the court in respect of the Company's conduct and it should be clear from the contents of this judgment that I have not been impressed with the Company's conduct.

157. I take into account the Company's conduct in respect of its discovery obligations and alternative steps to gain access to the documents and weigh it in the balance.

*Whether the delay causes any prejudice to the parties and the legal system generally*

158. There has already been a long delay in the Company complying with its discovery obligations. The Company was originally required to provide its discovery by 19 December 2022 and an extension was provided "somewhat reluctantly" to 29 September 2023. The Company maintains it cannot provide the outstanding 440,000 documents without approval of the PRC authorities. The experts are agreed that there is no current mechanism for the cross-border transfer of data. There is no public information or documentation indicating that government departments are in discussions or are initiating the establishment of a mechanism for reviewing data exports relating to overseas discovery proceedings. Professor Liu holds the view that a relevant mechanism and regulation is "forthcoming" (paragraph 18 of the joint memorandum of experts). Mr Duan does not consider that there are likely to be developments or new mechanisms introduced in the near future that would be applicable to the discovery in this matter. Professor Liu now says that a mechanism is "expected to be introduced in the first half of 2024" (paragraph 36 of the joint memorandum of experts). Professor Liu at paragraph 18 of his second affirmation of 24 August 2023 had predicted that a new mechanism would be "put in place by the end of 2023 or the beginning of 2024". By the time of his third affirmation of 16 November 2023 this had already slipped to "Q1 2024" but in fairness to him, he added that the "estimate may be subject to change depending on how efforts to set up the New Mechanism progress and other policy decisions including the publication of the Draft Regulation" (paragraph 44). We are now out of "Q1 2024" and no new mechanism is in sight. No firm timelines can confidently be predicted. No approval mechanism has been in place for over a year. On the evidence I have been provided with there is, in my judgment, no realistic hope of a new mechanism being put in place any time soon or approvals being granted before the end of the year. We simply cannot wait that length of time in addition to the two years that have already elapsed since the commencement of these proceedings, which are fast becoming stale.



FSD2022-0072 Page 56 of 60 2024-04-24

159. The Company rightly acknowledged at paragraph 25 of its skeleton argument dated 23 March 2023 that "it may be said that *all* delay is prejudicial" (Company's italics). I have noted that the delay in producing the documents in the near future will not, so long as some of the Section 1782 Applications lodged by some of the Dissenters await determination, be unduly prejudicial to the Dissenters. Moreover, no trial dates have yet been set so an extension of time would not involve the vacation of existing trial dates. However more than a reasonable delay in progressing towards and completing the trial will risk breaching Section 7 and would be seriously prejudicial to the legal system and the constitutional obligations of the courts to secure a fair trial within a reasonable time.

160. I note also that the Dissenters wish to consider the Company's disclosure before deciding whether to forego certain aspects of discovery from the Section 1782 Applications or withdraw them altogether. The Company seeks to counter with a submission that it is common practice in Section 238 cases for the parties to agree that the conclusion of discovery will not take place until after the dissenting shareholders have given notice that the document productions in any Section 1782 proceedings have been concluded and refers to directions orders in *Re Sina* and *58.com*. In the case presently before me the Company should focus on its compliance with the August 2022 Order rather than trying to pray in aid the Dissenters Section 1782 Applications and which are no substitute for the Company giving proper and timely discovery.

161. It is trite that justice delayed can be justice denied. Delay can adversely affect not just the parties to these proceedings but also other court users and the administration of justice generally. Companies and their advisers must move away from the inappropriate and outdated mindset that Section 238 cases will take as long as they take. They must move much closer to the need for expedition and promptly taking all necessary steps to enable the courts to undertake fair determinations of disputed issues within a reasonable time. Parties and their advisers are obliged to help the court to further the overriding objective of dealing with cases in "a just, expeditious and economical way" and to comply with Section 7. Delay will normally add significantly to costs and is the enemy of justice and expedition. The parties, their advisers, and the courts must constantly be on their guard to confront and seek to minimise delays, wherever possible. In that way we will all contribute to the fair, just, expeditious and economical determination of legal disputes within a reasonable time.

*The extent to which non-compliance would undermine important interests of the Cayman Islands or compliance would undermine the important interests of the foreign state*

162. I take into account that non-compliance with the August 2022 Order as varied would undermine important interests of the Cayman Islands in respect of Section 7, the overriding objective and compliance with court orders and local rules. Non-compliance would undermine those important interests of the Cayman Islands. Mr Lowe was keen to stress that there were no other Cayman pnblic interests engaged. In some of the cases national interests other than the interest in a fair trial within a reasonable time are engaged. I also take into account the fact that in many Cayman group corporate structures that come before the Grand Court at the top is a holding company incorporated under the laws of the Cayman Islands and subsidiaries and other affiliated companies below it incorporated in various foreign jurisdictions including the PRC. It is right and, I venture to suggest, in the best interests of the Cayman Islands that the Grand Court pays due respect to the laws and interests of those foreign jurisdictions and I have borne that firmly in mind when conducting the requisite balancing exercise in this case. I have taken into account the important interests of the PRC in respect of the regulation of data processing, data security, the lawful rights and interests of relevant legal entities and the protection of personal information and safeguarding the sovereignty and security of the state. At paragraph 76 of his affirmation of 20 December 2023 Mr Duan agrees with Professor Liu's observation that the PRC is strengthening its data regulation but adds that it has "simultaneously showed a growing interest in maintaining a free flow of data to and from China in facilitation of international trade ...". Ms Leahy submitted countries across the globe are mindful of trying to balance data security with economic growth and ensuring that the former does not thwart the latter. Compliance with the August 2022 Order as varied may be seen by the PRC authorities to potentially undermine some of the important interests of the PRC, but the strict confidentiality provisions and the comprehensive review and thorough redaction process should significantly reduce, if not eliminate such concerns.

*Whether there is an acceptable explanation and good excuse for the delay*

163. The Company has not produced an acceptable explanation and good excuse for the delay.

*What the justice of the case requires*

164. The justice of the case requires the Company to comply with the August 2022 Order as varied.

*Conclusion on the balancing exercise*

165. Weighing all the relevant factors, the balance clearly and firmly comes down in favour of declining to grant yet a further extension of time for the Company to comply with the August 2022 Order, as already varied. I therefore dismiss the Application.

166. I do not refuse the further extension of time lightly. I have considered the degree and extent of the risk of prosecution and the need for and importance of the outstanding documents to ensure the fair determination of the Section 238 proceedings within a reasonable time. I recognise the PRC's legitimate interest in data protection and security but in my judgment such is overridden by this court's constitutional obligation to secure a fair trial within a reasonable time, the overriding objective and the importance of Cayman companies complying with orders of Cayman courts in this jurisdiction. In my judgment the requirement that the Company comply with the August 2022 Order as varied trumps any remaining concerns the Company may have in respect of the laws of the PRC.

167. The 440,000 outstanding documents have been duly reviewed by the Company's PRC legal counsel and redacted. They are "ready for production" (see paragraph 40 of the Company's skeleton argument dated 26 February 2024). The Company should now press the button and upload them to the Data Room forthwith, without any further delay and these proceedings should be expeditiously progressed towards trial.

**Ancillaries**

168. In respect of any ancillary applications such as costs or leave to appeal any such applications should be filed and served within the next 14 days with concise written submissions in support (no more than 5 pages) and any concise written submissions in opposition (no more than 5 pages) to be filed and served within 14 days thereafter. I am minded to deal with any such applications on the papers.



FSD2022-0072 Page 59 of 60 2024-04-24

Subject to any contrary submissions I am also minded to order that the Company pay the Dissenters' costs of the Application and such costs to be taxed on the standard basis in default of agreement.

**The Order**

169. Counsel should let me have within the next 7 days for my approval a draft order, agreed as to format and content, in respect of the determinations contained in this judgment.

David Doyle

---

**The Honourable Justice David Doyle**
**Judge of the Grand Court**



FSD2022-0072 Page 60 of 60 2024-04-24

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NOs. FSD 155 & 156 OF 2022 (DDJ)**

**IN THE MATTER OF SECTION 238 OF THE COMPANIES ACT (2022 REVISION)**

**AND**

**IN THE MATTER OF 51JOB, INC.**

| | |
|---|---|
| **Appearances:** | **Mr Mac Imrie KC, instructed by Mr Luke Stockdale, Mr Malachi Sweetman and Mr Adrian Davey of Maples and Calder (Cayman) LLP, for the Company** |
| | **Mr Jonathan Adkin KC, instructed by Mr Rocco Cecere, Mr Zach Hoskin and Mr Ronan O'Doherty of Collas Crill; Mr Rupert Bell and Mr Patrick McConvey of Walkers; Mr James Eggleton of Carey Olsen; and Mr Christopher Easdon of Campbells for the Dissenters** |
| **Before:** | **The Hon. Justice David Doyle** |
| **Heard:** | **21 and 22 November 2022** |
| **Draft Judgment Circulated:** | **29 November 2022** |
| **Judgment Delivered:** | **2 December 2022** |

**HEADNOTE**

*Directions in respect of petitions filed pursuant to section 238 of the Companies Act (2022 Revision)*

**JUDGMENT**

**Introduction**

1. At the end of the directions hearing on 22 November 2022 I reserved judgment. I now deliver judgment.

2. In this case the Court will, in due course, be called upon to make a determination of the fair value of the shares held by various dissenters in 51job, Inc. (the "Company") together with a fair rate of interest if any, on the amount payable by the Company to various dissenters.

3. The Company and the dissenters had sensibly agreed some of the terms of a draft directions order leading to the trial of this case but there were a number of issues which were not agreed and which required the determination of the Court. I again stress the duty of the parties and their attorneys to help the Court to further the overriding objective of dealing with cases justly.

4. I have to say that during the hearing there appeared to be a somewhat hostile atmosphere between the attorneys. The exchanges between counsel appeared a bit too tetchy at times. I suspected a lot of that was generated by those who instructed the attorneys and the amounts at stake. The position may not have been helped by the Court having to sit until 7pm on the first day as concern had been expressed as to whether there was going to be sufficient time available to deal with all the remaining disputed issues. As it transpired we finished on the morning of the second day.

5. I express the wish that going forward the attorneys adopt a more helpful and cooperative approach. This will further the overriding objective. I think it is important to stress that pursuant to the overriding objective and the duties of attorneys as officers of this Court that there should be more positive cooperation and less negative confrontation between litigants and their attorneys. Litigants, as they are duty bound to do, need to try a lot harder to help the Court to further the overriding objective of dealing with matters justly and attorneys also need to try a little harder to assist the Court in the proper and efficient administration of justice. Litigants and their attorneys

must openly and sensibly cooperate and assist the Court in respect of the overriding objective. As Segal J put it in *Great Simplicity Investment Corporation v Bitman Technologies Holding Company* (FSD 247 of 2019 (NSJ) unreported judgment 3 August 2020) at paragraph 8(i):

> "*I recognise that these proceedings arise out of a hotly contested and deeply felt dispute where the battle lines have been firmly drawn for some time but in my view both parties would benefit from increased cooperation between their legal advisers.*"

6. I am grateful for the continuing assistance of the parties and counsel in this respect.

7. It would have been helpful in this case and may perhaps be helpful in future cases, as discussed with counsel, if prior to the skeleton arguments being filed the attorneys agreed on the issues in dispute and that these were all covered in the skeleton arguments. In this case the numbering and description of the disputed issues of both the Company and the dissenters were different, making cross-referencing difficult. Moreover it appears that the privilege issue was not on the agenda and did not appear in the skeleton argument of one of the parties and therefore had to be adjourned by agreement. Furthermore, issue 11 "Schedule of Trades" was a new issue and I did not have the benefit of it being dealt with in the skeleton arguments. A full list of numbered disputed issues should be filed well in advance of the hearing and it would be helpful, again well in advance of the hearing, to have a summary table of the numbered list of issues in dispute with the issue being concisely identified, a summary of the respective positions adopted in respect of such issues and cross references to the paragraphs in the skeleton arguments and the evidence dealing with such issues. It would also be helpful if an agreed bundle of joint authorities could be provided rather than separate bundles on behalf of the company and the dissenters with duplicated authorities, as unfortunately occurred in this case.

8. I was keen to get these determinations on the disputed issues (with brief reasons) out to the parties as soon as possible after the hearing and before the Christmas and New Year break in order that the parties would know where they stood in respect of the future case management of these

proceedings. This judgment does not therefore set the submissions or the law out in great detail but I have full regard to the submissions put before the Court and the relevant law, which is already well established in respect of the issues arising for determination in this case. Moreover, I do not refer to chunks of the evidence presented to the Court but have full regard to it in arriving at my determination of the disputed issues.

**Determination of the issues**

9. Before I turn to the determination of the issues that have not been agreed, I should emphasise that the agreements arrived at between the parties in respect of some of the issues in the particular circumstances of this case were no doubt arrived at as a result of pragmatic compromises on both sides and should not be regarded as "standard precedents", especially as such issues were not the subject of detailed judicial consideration and determination.

*Issue 1 – How long should the Company have to complete its discovery?*

10. The Company suggests rolling discovery with a maximum of 196 days. The dissenters suggest 60 days.

11. I have considered the evidence provided and in particular note what are described as the "complicated factors" in respect of the Company's discovery. I do not think that the Company has dragged its heels in respect of discovery. I am content to accept the timescales requested by the Company. This should ensure that proper and full discovery is provided. This will assist the dissenters and ultimately the Court. The timescales are generous but it may be that out of an abundance of caution the Company should put a couple of additional people into their discovery team to ensure that they are met. The Company should not expect any extensions and should put sufficient resources into the discovery process to ensure that these generous timescales are met.

*Issue 2 – foreign discovery applications*

12. I accept that that the time period for the determination of any foreign discovery applications is not entirely in the control of the applicant for such orders or indeed this Court. I do however want to encourage applicants to make such applications at an early stage and to progress them expeditiously. They cannot be allowed to unduly delay the determination of the Cayman Islands proceedings which under section 7 of the Bill of Rights scheduled to the Cayman Islands Constitution must be determined "within a reasonable time".

13. I am content to grant directions in accordance with the dissenters' modified proposals in this respect which appear consistent with the approach adopted and orders made in previous cases. The letter "a" requires to be inserted in paragraph 49 before "foreign" and after "seeks".

14. I am content with the Company's suggested paragraphs 50 and 51 which is in similar terms to the provisions in the Consent Order dated 28 September 2022 in *Re 58.com Inc.* (FSD 275 of 2020 (MRHJ)). I agree that it strikes the right balance between not unduly restricting the dissenters' ability to use Company documents where their use would not prejudice the Company (because the documents being used would already have been seen by the target of the application) while at the same time ensuring that for other documents, the Company has a right to object in respect of their proposed use. I have considered the dissenters' submissions in respect of the implied undertaking but think it sensible and fair to include the protections and restrictions as were included in *Re 58.com Inc.,* albeit by way of agreement. If such restrictions do in practice turn out to severely hamper the dissenters' ability to gather evidence and unfairly disadvantages them then they can come back to Court, if absolutely necessary, under the general liberty to apply provision. I should stress that, in any event, under paragraph 51 the Company shall not unreasonably withhold its consent to any request by the dissenters to use additional relevant documents discovered by the Company in the proceedings for the purposes of any application for a foreign discovery order.

15. I am not persuaded that the additional provisions requested by the Company as to additional prior notice, completion of proceedings, issues of privilege, and issues relating to transcripts of depositions are necessary or appropriate or fair to the dissenters and do not make such directions.

*Issue 3 – deal process experts?*

16. I note all that is written and said on this hotly disputed issue of deal process experts but think I can deal with this topic fairly shortly.

17. The dissenters represented by Mr Adkin submitted that in "the very unusual circumstances of the present case" permission should be granted at this stage for each of the Company and the represented dissenters to engage experts in "the separate field of deal process". Despite Mr Adkin's protestations that they were not trying to import Delaware law and practice into Cayman law and practice in respect of separate deal process experts, the affidavits filed on behalf of the dissenters had, as I think Mr Adkin fairly recognised, that flavour. At times when reading some of the affidavit evidence I wondered whether I was sitting in the Cayman Islands or Delaware.

18. Mr Adkin submitted that this case is the only section 238 case where the agreement arrived at between the company and the purchasers was comprehensively and radically renegotiated and the deal price so significantly reduced as a consequence of such renegotiation.

19. Mr Adkin referred to cases where experts other than valuation experts (such as industry experts) had been used. Mr Imrie countered by referring to Segal J's criticisms in *Re Trina Solar Limited* (FSD 92 of 2017 (NSJ), unreported judgment, 23 September 2020) of the "unfortunate failure to coordinate the expert evidence to be given by the industry experts and the valuers" (paragraph 8(e) of the judgment). Mr Adkin submitted that each case must be dealt with on its own facts and circumstances.

20. Mr Adkin reminded me of comments in *Re JA Solar Holdings Co., Ltd.* (FSD 153 of 2018 (ASCJ), unreported judgment, 18 July 2019) in respect of relatively "standard form" directions. The former Chief Justice Smellie stated at paragraph 16 (vi):

> *"each of the company and the dissenting shareholder(s) instruct a valuation expert (with the potential that the Court may also grant leave to the parties to instruct another type of expert, such as an industry expert or interest rate expert, if the Court believes this would be of assistance)."*

21. A great deal of the evidence put before the Court on this issue number 3 referred to the position in Delaware. Based on the submissions from counsel it does not appear that Delaware benefits from the overriding objective or the restrictions on adducing expert evidence that we have in the Cayman Islands. The evidence presented to me in respect of Delaware law and procedure on testimony by expert witnesses included references to Rule 702 of "Delaware Rule of Evidence" which provides in effect that a witness who is qualified as an expert may testify if the opinion "will help the trier of fact to understand the evidence or to determine a fact on issue." The expert evidence therefore must be helpful, which makes good sense.

22. In Cayman Islands law and procedure we have the overriding objective and restrictions on the production of expert evidence. The overriding objective requires this Court to deal with every case in "a just, expeditious and economical way". The FSD Users Guide at B5 pages 41-45 refers to the topic of expert evidence in the Cayman Islands. Parties are directed to bear in mind that expert evidence may lead to unnecessary expense. In the Cayman Islands the parties need to apply for the Court's leave to call an expert witness. The Court may limit the length of an expert report. The use of a single joint expert in appropriate cases is encouraged. Strict duties are imposed on experts and parties instructing experts. In the Cayman Islands the expert must provide independent assistance to the Court by way of an objective unbiased opinion in relation to relevant matters within his expertise. An expert witness should never assume the role of an advocate or seek to promote a client's case. In the Cayman Islands expert evidence presented to the Court should be,

and should be seen to be, the independent product of the expert uninfluenced by the pressures of litigation or any party. It is incumbent on the parties to choose an appropriate expert who can deal with the relevant issues. If such issues can be dealt with by one expert rather than a number of experts then such is to be encouraged in accordance with the Cayman Islands overriding objective. Cayman Islands law and procedures seems to differ from Delaware law and procedure in this area. There appears to be a different litigation culture in the different jurisdictions.

23. I have considered *Re Nord Anglia Education, Inc* [2018 (1) CILR 164] and Kawaley J's refusal, in the particular circumstances of that case, to permit "an extra expert" to deal with "the sales process issue" as he did not feel that the issue was "likely to be so central to the valuation exercise as to justify incurring the costs of an additional layer of expert evidence" (at paragraph 46). It appears in that case that both the company's and the dissenters' valuation experts considered themselves competent to opine on the deal process issues in the proceedings (FSD 235 of 2017 (IKJ) unreported judgment 17 March 2020 at paragraphs 41, 53 and 114 to 134 and neither expert nor the Court suggested there was any deficit in this respect). I think Kawaley J, known, as accepted and reinforced by Mr Adkin, for his openness and transparency, would have commented in his subsequent judgment had he felt that the lack of additional deal process experts had caused a particular difficulty in that case.

24. Each case, of course, must be considered on its own facts and circumstances but I note that Ramsey-Hale J, as she then was, in *Re 58.com Inc.* (FSD 275 of 2020 (MRHJ) unreported judgment, 8 March 2022) was not persuaded that the Court required a deal process expert to determine the fair value of the shares in that case (paragraph 126 of the judgment).

25. On this disputed issue a lot of the evidence focused on the law and practice in Delaware although Mr Adkin was wise to distance his submissions from such, preferring tactically to rest his submissions on the particular facts and circumstances of this case. Although I take into account any helpful guidance from foreign law jurisdictions (such as Delaware), as a judge sitting in the

Grand Court of the Cayman Islands it is, of course, to Cayman Islands law and procedure to which I should turn to first in accordance with my judicial oath.

26. In *Shanda Games Ltd v Maso Capital Investments Ltd* [2020] UKPC 2 Lady Arden, a good friend of the Cayman Islands, referred at paragraph 13 to Segal J's judgment at first instance (FSD 14 of 2016 (NSJ), unreported judgment, 25 April 2017) drawing guidance from Delaware law. Segal J (at paragraph 79) recognised however that "it will also be necessary always to take care and be satisfied that the law and practice developed by such other courts fits and is consistent with other relevant parts of Cayman law and practice." *Shanda* regarded, amongst other issues, fair value and the minority discount point. At paragraph 49 Lady Arden commented to the effect that Cayman Islands courts are able to use the jurisprudence of the Delaware and other courts "if placed before them as a source of guidance on some particular issue. It goes without saying that the jurisprudence of Delaware is of great value in this field. However, it should be borne in mind that there may be different rules in related contexts … In addition there may be different economic and social policy considerations affecting legislation in Delaware." At paragraph 50 it was stated that "The Board takes the view that comparative law whose subject matter is similar to section 238 may provide to varying degrees a useful comparison …". On the disputed issue presently before this Court I have regard to the law and procedure in Delaware but of paramount importance in my mind is the law and procedure of the Cayman Islands.

27. Order 38 rule 4 of the Grand Court Rules ("GCR") refers to the limitation of the number of experts that may be called at trial. Order 38 rule 36 of the GCR refers to restrictions on adducing expert evidence. These rules do not appear to be replicated in Delaware. Mr Imrie refers to the US attorneys engaged by the dissenters in this case and submits that there is scope for the proceedings to become unwieldy and cautions the Court to guard against "an unchecked US legal influence in the directions to be made". Mr Imrie warned the Court in effect against creeping Americanism in these type of cases. As I stated during my exchanges with counsel, the American tail, whether in respect of applications for foreign discovery orders or in respect of expert evidence, should not be allowed to wag the Cayman Islands dog in this case.

28. I am not persuaded that it is necessary or appropriate or in accordance with the overriding objective for there to be deal process experts in this case in addition to valuation experts. It is difficult to see what issue this proposed deal process expert evidence would go to that could not be covered by a competent and properly chosen valuation expert. I am simply not persuaded in this case that there are any issues over and above or alongside valuation issues that can be dealt with by valuation experts that require, in addition to valuation experts, to be dealt with by deal process experts. The parties should carefully choose their valuation experts and ensure that they are in a position to give relevant and helpful opinions to the Court and that they deal with the relevant issues in a simple and straightforward way and in accordance with their onerous duties to the Court.

*Issue 4 – supplemental factual evidence?*

29. Mr Imrie submitted that supplemental affidavits were appropriate because experience in recent cases suggests that it would be helpful to allow for the possibility that one or both experts misapprehended a key factual issue in their first reports, which can and should be clarified in a short supplemental factual affidavit and taken into account in the experts' supplemental reports. For the mistake only to be highlighted in correspondence and become apparent during cross-examination will not assist the Court.

30. Mr Adkin submitted that the Company's proposed direction departs from the standard approach in section 238 cases and makes little sense as all the factual evidence should be finalised before the experts express a concluded view on fair value. Mr Adkin referred to Parker J's judgment in *Re eHi Car Services Limited* (FSD 115 of 2019 (RPJ) unreported judgment, 24 February 2020) at paragraph 58, Mangatal J's judgment in *Re Homeinns Hotel Group* (FSD 75 of 2016 (IMJ), unreported judgment, 7 February 2017) at paragraphs 23 and 24, and the comments of Smellie CJ (as he then was) in *Re JA Solar Holdings Co., Ltd.* (FSD 153 of 2018 (ASCJ), unreported judgment, 18 July 2019) at paragraph 78 (c).

31. In my judgment it is not appropriate to permit supplemental factual evidence. It would be a departure from the spirit of the standard approach to section 238 cases and I am not persuaded that such proposed departure has been justified.

32. There was some general force in Mr Imrie's well considered submission that this Court in effect should feel able to depart from "standard" previous directions or at least to tweak or improve them in furtherance of the overriding objective when such is justified. In my experience the parties at these directions hearings sometimes, when it suits them, try to place too much emphasis on what they describe as "standard" orders made in previous cases. On occasions these are orders which have been agreed in previous cases by the parties by way of compromise and have not been the subject of considered judicial determination. On this disputed issue however the Court has previously made it plain that the factual evidence should be finalised before the experts finalise their reports. I do not think that what the Company proposes would be in accordance with the overriding objective or the approach rightly adopted in previous cases. It would in effect be a second bite at the evidential cherry and despite the restrictions placed in the Company's proposed paragraph 45 it would be open to abuse. If there are clear and obvious factual errors in the reports of experts these can be raised by way of correspondence and the experts can, if appropriate, deal with same. I do not think it is necessary or appropriate to include the Company's proposed paragraph 45 in the directions order.

*Issue 5 – specified disclosure categories*

33. Now agreed.

*Issue 6 – dissenters liberty to apply*

34. Now agreed.

*Issue 7 – information requests and timings*

35. I am content with the Company's suggested time periods of 28 days in paragraph 22 and 21 days in paragraph 23 rather than 21 and 14 as contended for by the dissenters. Reasonable time must be provided, in fairness.

*Issue 8 – management meetings transcript costs*

36. Now agreed.

*Issue 9 – management meetings' transcript mechanics and timing*

37. I am content with the Company's suggested paragraphs which are similar to the formulation used in previous cases (see for example paragraphs 32A and 33 of the Directions Order made on 8 November 2021 in *Re 58.com Inc.*).

38. I accept that the purpose of management meetings is to enable the valuers to get, from the horse's mouth so to speak, a better idea of the company's business. I am influenced by the Company's submission that to allow company management to clarify, correct or comment on the relevant passages to be relied upon enables management to speak freely and prevents the management meeting process from being turned into a formal type of deposition or examination. I am content to include paragraphs 33 and 34 of the Company's proposed directions order.

*Issue 10 – "important data" issue*

39. Now agreed.

*Issue 11 – Schedule of Trades*

40. This was a new issue raised during the course of the hearing. I did not benefit from skeleton arguments on this new issue but I did benefit from the clear, concise and focused oral submissions of Mr Imrie and Mr Adkin. I am content with the Company's suggested wording and Schedule.

41. Mr Adkin referred to the judgment of Margaret Ramsay-Hale J as she then was, in *Re 58.com Inc.* (FSD 275 of 2020 (MRHJ), unreported judgment, 8 March 2022) at paragraphs 85-94 and the reasons of Martin JA (18 August 2022) for refusing leave to appeal which I have considered. Mr Adkin referred to the well-known distinction between materials held by the dissenters which are capable of demonstrating value, and materials which do no more than reveal thoughts or motivation of the dissenters. As Martin JA put it at paragraph 2 "the former should be disclosed, the latter not".

42. Mr Imrie referred to the leading authority of *Re Qunar Cayman Islands Limited* [2018 (1) CILR 199] and in particular paragraph 21 and the comments of Rix JA at paragraphs 78 and 79. In that case, item 4 referred to "A history of the Respondent's trades in the shares of the Company" and item 5 "Confirmation as to whether the Respondents have ever taken a short position in the Company's shares". Rix JA at paragraph 79 stated that "the idea that dissenting shareholders should not be required to disclose their dealings in the shares of a s.238 company seems to me to be inexplicable" and in the circumstances of that case added, "Item 4 may incidentally answer the question in item 5". Rix JA does not appear to have felt that the dissenters should not be required to provide details of any "short" positions in respect of the relevant Company's shares.

43. I am content to adopt the Company's proposed directions and Schedule on this issue. How the Company will be permitted to deploy such documentation will be a matter for determination at trial. Such a direction does not, however, fall foul of the rule against evidence of motivation of the dissenters.

*Issue 12 – privilege question*

44. Adjourned by agreement. Hopefully the parties will be able to agree upon this issue. If not it should properly be brought back before the Court, with concise skeleton arguments setting out the respective positions of the parties.

*Issue 13 – redaction issues*

45. Now agreed.

*Issue 14 – Dissenter's discovery issue*

46. Now agreed.

**Conclusion**

47. I have set out above my determinations on the various issues. The attorneys should provide a draft Order reflecting these determinations. I am minded to order costs in the cause. If any party objects to that they should file and serve concise (no more than 5 pages) written submissions within 14 days and any concise responsive written submissions should be filed within 14 days thereafter and I will decide costs on the papers without a further hearing.

**THE HON. JUSTICE DAVID DOYLE**
**JUDGE OF THE GRAND COURT**

GRAND COURT – CAYMAN ISLANDS

22-5-09

IN THE GRAND COURT OF THE CAYMAN ISLANDS

CAUSE NO. 311 OF 2007

BETWEEN PHOENIX MERIDIAN EQUITY LIMITED
[A company incorporated under the laws of the Cayman Islands]

PLAINTIFF

AND LYXOR ASSET MANAGEMENT S.A.
(a wholly owned subsidiary of SOCIÉTÉ GÉNÉRALE)
[A company incorporated under the laws of France]

1ST DEFENDANT

AND SCOTIABANK & TRUST (CAYMAN) LIMTED
[A company incorporated under the laws of the Cayman Islands]

2ND DEFENDANT

IN CHAMBERS
BEFORE THE HON. CHIEF JUSTICE
The 3RD AND 6TH APRIL AND 22ND MAY 2009

APPEARANCES: Mr. Colin McKie and Mr. Pennay of Maples and Calder for the 1st defendant

Mr. Graeme Halkerston and Ms. Hudson of Appleby for the plaintiff

## RULING

1. This is an application by the first defendant ("Lyxor") for injunctive relief restraining the plaintiff ("Phoenix") from continuing proceedings in the United States instituted by Phoenix and in which certain persons resident in the United States would be compelled to give depositions.

2. Those persons are Samuel Rosenberg and Anthony Phlipponneau or any other officer, director, managing agent or employee of SG Americas Securities LLC ("SGAS"), resident in the United States. SGAS is an affiliate entity of Société Générale ("Soc. Gen") and is incorporated in and operating in the United States.

3. The background is as follows.

4. Phoenix sues Lyxor in these proceedings before this Court in respect of what Phoenix claims is the full value of its investment in a group of Phoenix Investment Funds administered by Lyxor.

5. The dispute is over the sum of approximately $100 million which Lyxor claims it is entitled to withhold on behalf of its parent Soc. Gen. This large sum is in respect of what Soc. Gen now claims as an "undisclosed margin" or profit to which it is entitled for its part as investment advisor and leverage financier to the Phoenix Funds.

6. Lyxor's claim on behalf of Soc. Gen has only recently been clarified in the pleadings. Until then, it was rather differently pleaded in terms of a penalty or levy which Soc. Gen was entitled to impose because of Phoenix's early redemption of its investments.

7. Not surprisingly, Phoenix seeks to examine every aspect of Soc. Gen's claim and has required, through the discovery process, full and frank disclosure of any information in Lyxor's possession or control relating to Soc. Gen's claim. Lyxor has provided extensive witness statements and/or affidavits from Mr. Rosenberg in particular, in support of its discovery.

8. A complicating feature of the case is that while Lyxor asserts the claim on behalf of its principal Soc. Gen, the relevant institutional information is held by Soc. Gen

which is itself not a party to this action. And, while Lyxor claims to have made full and frank disclosure, the issues which Phoenix seeks to explore by way of the depositions in the United States, are matters within the knowledge of Messrs. Rosenberg and Phlipponneau (and perhaps others) who are officers of SGAS (and in the case at least of Mr. Rosenberg), of Soc. Gen itself; but not of Lyxor.

9. That being the nature of the inter-relationships, the witnesses Rosenberg and Phlipponneau are not immediately amenable to the process by which this Court can compel officers of companies, which are parties to proceedings before it, to submit to oral interrogation by way of discovery; that is: Grand Court Rules Order 24 Rule 16.

10. Phoenix has therefore resorted to the discovery process available by way of notice under Section 1782 of Title 28 of the United States Civil Procedure Code. By that process Phoenix seeks to depose Messrs. Rosenberg and Phlipponneau on a wide range of 11 separate topics relating to Soc. Gen's business as investment adviser and financier, not just of Phoenix Funds, but also – to the extent relevant to Soc. Gen's claims – relating also to Soc. Gen's dealing with other clients.

11. Phoenix argues that it should be allowed to pursue the depositions of Messrs. Rosenberg and Phlipponneau because Lyxor has significantly changed its case in a manner which is inconsistent with the earlier sworn affidavit of its chief witness Mr. Rosenberg and that the deposition of Mr. Rosenberg and his colleague Mr. Phlipponneau, will provide significant "litigation benefits" to Phoenix (and it is hoped this Court) in the trial to take place here in this action.

12. Lyxor objects to the Title 28 depositions on the grounds of oppression and prejudice. On its behalf, Mr. McKie argues that as Messrs Rosenberg and

Phlipponneau have both given witness statements in these proceedings and will be attending to testify at the trial, the proposed depositions are unconscionable for three main reasons:

(i) They will subject Mr. Rosenberg and Mr. Phlipponneau to unwarranted double cross-examination and the trial in this Court will suffer from that unwarranted duplication. Such interrogation of the proposed witnesses would be oppressive and could discourage them from attending for trial out of concern for being submitted to the same process again.

(ii) The parties are working flat out to prepare for this complex trial, albeit now postponed from May 2009 to September 2009. It is unnecessary and undesirable for there to be the distraction of depositions.

(iii) The area of enquiry defined by the 11 topics is far too broad and intrusive.

13. Phoenix's summons now before me, by which it seeks to restrain Lyxor from pursuing the Title 28 depositions, raises an important issue of Cayman Islands Civil procedure. This is whether the Cayman Courts should intervene to prevent depositions in the United States ordered by the United States court to be given by deponents who are residents there and where the deponents are potential witnesses in a Cayman action in respect of which it is clear that the Cayman Court is the only appropriate forum for the ultimate trial of the action.

14. While the case law on this point has developed in other places in the Commonwealth, it is a point of first impression for this Court; the question whether an anti-suit injunction should be issued to restrain foreign proceedings

having been reported to have arisen before only in the context of cases where there were disputes over the forum conveniens. See ***In Re Cotorro Trust** 1997 CILR 1;* ***Lemos v Coutts and Co. (Cayman) Ltd.**1992-93 CILR 460* and ***Unilever PLC v ABC International** 2008 CILR 87.* (In the first two of those cases, the foreign proceedings were restrained on the basis that Cayman was the proper forum. In the ***Unilever case***, arbitration proceedings in Paris were restrained on the basis that the defendant, ABC International, a Cayman Islands company, was seeking vexatiously to compel the plaintiff to submit to those arbitration proceedings).

15. In the context of this application there are competing discernible issues of principle involved. Unlike the position in many other Commonwealth jurisdictions including England; Cayman civil procedure does allow – pursuant to GCR O. 24 R. 16 – oral discovery by way of depositions prior to trial. This is however, as already noted limited to officers of companies which are parties to proceedings before the Court. So while it may not be said that Cayman law is hostile to witnesses being cross-examined prior to trial, such a procedure remains unusual. No case concerning this procedure has been reported since O. 24 R. 16 was amended in September 2003 to allow it.

16. O. 24. R.16 apart, there is, generally, no power by which the Cayman courts on behalf of parties to actions before it, can compel persons who are not parties to give a full measure of pre-trial discovery. That is: where discovery includes both the disclosure and production for inspection and copying of documents, as well as the giving of oral or written testimony. In this regard, Cayman law and procedure

differs essentially from that of several foreign jurisdictions, including the United States.

17. This Court must therefore be alive to natural concerns of practitioners about the possibility of such pitfalls as duplication of effort and oppression arising from the use of pre-trial depositions. These are considerations which are identified by Lyxor here as militating against the Title 28 proceeding from the perspective of the Court in ways which, perhaps, would not trouble the United States or other foreign courts where such pre-trial depositions are routine.

18. But the further issue of principle is the other side of the coin: it raises the question to what extent is it desirable or appropriate, that a party to litigation before our Courts, should be prevented from availing itself of a statutory right which it may have under foreign law (here United States Federal law), to apply for an order that persons resident in the foreign jurisdiction who are themselves not parties to the action before this Court, and so not amenable to its process, should give pre-trial discovery by way of deposition evidence relevant to the issues in dispute before this Court.

19. Framing the competing issues of principle in this way brings into stark relief the competing and equally important concerns which must be considered. It is plain from the outset, that where a party has a right to avail itself of a legitimate foreign process, there must be a very compelling reason to prevent it from doing so – something more than just the philosophical differences of approach to litigation existing between jurisdictions.

20. The way in which the English courts have come to terms with the problem is, as ever, of high persuasive value.

21. Dicta from the leading case of ***South Carolina Insurance Co. v Assurantie Maatshappij "De Zeven Provincia" N.V.*** *[1987] AC 24 H.L.* sets the now classical framework for the consideration of the principles (per Lord Brandon at p 40 C-E):

> ***"...the power of the High Court to grant injunctions is, subject to two exceptions to which I shall refer shortly, limited to two situations. Situation (1) is when one party to an action can show that the other party has either invaded, or threatens to invade, a legal or equitable right of the former for the enforcement of which the latter is amenable to the jurisdiction of the court. Situation (2) is where one party to an action has behaved, or threatens to behave, in a manner which is unconscionable."***

22. And at p 41 letter D:

> ***"It is difficult, and would probably be unwise, to seek to define the expression "unconscionable conduct" in anything like an exhaustive manner. In my opinion, however, it includes, at any rate, conduct which is oppressive or vexatious or which interfered with the due process of the Court."***

23. Here Lyxor, for the reasons already summarized above, does not rely on what Lord Brandon describes as situation (1) but rather on situation (2).

24. I will come below to more fully examine the arguments, but before so doing there are further points of principle relevant to this application which may be gleaned from Lord Brandon's speech from pages 41-43. They are conveniently

summarized also in ***Nokia Corporation v Interdigital Technology Corporation*** as adopted and applied by Pumfrey J (at para. 25 [2004] EWHC 2920):

"*(a)* *The English courts do not, in general, exercise any control over the way in which a party obtains the evidence which it needs to present to support its case...*"

[(and directly from Lord Brandon at p 41-42:

*"Subject, however, to the help of the court in these various ways* [*e.g.* **pursuant to Orders 24 and 38**], *the basic principle underlying the preparation and presentation of a party's case in the High Court is that it is for that party to obtain and present the evidence which he needs by his own means, provided always that such means are lawful in the country in which they are used."*]

"*(b)* *If a third party voluntarily assists a party by providing evidence, there can be no objection to that evidence being gfused by the party. The provision of material in this way does not interfere with the court's control of its own process.*

*(c)* *Consequently, by exercising a right potentially available to it under US law to obtain documents or evidence from a third party, a party to litigation is not departing from or interfering with the procedure of the English* [(**Cayman**)] *court. ...*

> *(e) It is for the US court hearing the 1782 application to decide upon the merits of the application under US law and to determine the nature and scope of the relief to be granted. The fact that a party is enabled by exercising those rights to obtain documents and evidence which would not otherwise be available to it is not a ground for interference by the English court."*

25. With those ground rules in mind, the main question arising in the present application is the question whether to allow the Title 28 deposition to proceed would be "unconscionable" within the meaning identified by Lord Brandon's situation (2).

26. Mr. Halkerston on behalf of Phoenix refutes the suggestion of unconsionableness. He emphasizes the fact that as neither Messrs. Rosenberg nor Phlipponneau is an officer of Lyxor, Order 24 Rule 16 cannot be invoked by this Court in aid of Phoenix's quest for information. He argues that there are several significant and legitimate litigation reasons why Phoenix wishes to seek depositions from those witnesses as officers of SGAS/Soc. Gen. These include:

    (a) Identifying how Lyxor's/Soc. Gen's valuation process of the Phoenix Funds operated for the purpose of assisting Phoenix' expert witnesses to complete their reports for the trial. As Lyxor's witnesses have had access to Soc. Gen's witnesses and processes in compiling their evidence, Phoenix should have the mutual benefit of access for the preparation of its expert evidence. This access is said to be confined only to certain levels of seniority of internal control at Soc. Gen.

(b) Given the degree of urgency which attended the preparation for this trial when the Title 28 proceedings was first instituted, exacerbated by the recent and important amendment to Lyxor's defence; the taking of depositions would be less prone to delay than the alternative means of written interrogatories available through this Court's process. The taking of depositions would allow for the "drilling down" several levels of questions in one day which would take several weeks, if not months, in the interrogatories process pursuant to GCR Order 26 and would also save the additional costs and Court time likely to be taken by the interrogatories process.

(c) Identification of the witnesses and documentation which would assist the case. For example, the identification of other clients of SGAS/Lyxor who may be expected to have had similar issues with this type of product because Lyxor and Soc. Gen rely on market practice for the implication of the right to charge the undisclosed margin. Finding this information out at the trial in live evidence will not allow Phoenix the chance effectively to marshall this further evidence before the Court.

(d) Identifying the interaction between SGAS/Soc. Gen and third parties involved in the Phoenix deal, particularly in relation to certain "kickbacks" which were allegedly paid.

(e) Identifying how the SGAS/Soc. Gen/Lyxor audit process was conducted and the information which was or which was not available to PWC, the auditors of the Funds.

27. Lyxor's complaint, that the Title 28 depositions would be merely duplicative of the testimony to be given at the trial, must be viewed in the context of what it is that Phoenix hopes to achieve by the depositions.

28. It is acknowledged by Lyxor that Messrs. Rosenberg and Phlipponneau are indeed the officers who are privy to the kind of information to be elicited. While the scope of the 11 issues is criticized for being too wide, there is no denial of their general relevance to the trial.

29. As the depositions are to be regarded as part of the discovery process – a concept not yet readily embraced by Cayman lawyers – they may not be restrained simply for being duplicative in and of themselves.

30. Moreover, on the basis of the ***South Carolina*** principles, and bearing in mind that GCR Order 24 Rule 16 provides for pre-trial discovery by way of depositions, I may not proceed on the basis that Cayman law regards double-cross-examination as being, in and of itself, an abuse. Indeed, it is worth noting here again, that it is well established that for the purposes of eliciting full answers to written interrogatories, witnesses can be submitted to pre-trial cross-examinations, limited though that may be. See GCR O 26 R 5(2).

31. While it has been intimated that Messrs. Rosenberg and Phlipponneau may be daunted or discouraged by the Title 28 process from coming to testify again at the trial, Mr. McKie did not positively assert that that would be so. Such an assertion – given their seniority within SGAS and their importance as witnesses to Lyxor's case – would be surprising to say the least.

32. The fact that they remain amenable to giving evidence before this court does not, however, diminish the concerns about unconsionableness.

33. There are proper concerns over the proportionality of what is sought by Phoenix when compared to the obvious inconvenience, costs and potential oppressiveness of the Title 28 deposition especially if framed as widely as proposed.

34. Messrs. Rosenberg and Phlipponneau have both given extensive witness statements (and/or affidavits) in this case and are required to attend the trial which is now postponed from this month to September 2009.

35. Between now and then, there is, arguably, time enough for Phoenix to be able, by the written interrogatories process available through this Court, to elicit the sworn information which it may properly require to complete the discovery process before the trial.

36. Accordingly, while I am sympathetic to Phoenix' concern at having been met with what it describes as the *volte face* of Lyxor's change of defence, that circumstance must be weighed against allowing Phoenix to unleash the full brunt of the Title 28 process against key witnesses upon whom Lyxor must rely for its defence. The Title 28 process, if allowed to go unchecked, could result in the kind of real forensic unfairness which was perceived by the English courts in comparable circumstances in ***Omega Group Holdings Ltd. v Kozeny and Benfield*** ***[2002] CLC 132 and*** ***Benfield Holdings Ltd. v Aon Ltd.*** ***[2007] EWHC 171.***

37. I have particularly in mind, as did Justice Langley in ***Benfield Holdings*** (at para. 23) that English (Cayman) procedures provide for proofs of witness statements or affidavits which must contain the truthful account of evidence which witnesses may give orally. Evidence to be relied upon must be disclosed beforehand in statements or affidavits. Thus, Phoenix must be told just what evidence it is that

Lyxor relies upon for its (and Soc. Gen's) defence. Like any other litigant, Phoenix should be able to prepare for cross-examination by reference also to the documentary disclosure which has been given. If gaps in the evidence appear, Phoenix should be able to put specific interrogatories to Lyxor requiring binding responses or may put requests for specific further disclosure of documentary evidence.

38. In other words, it seems to me that I am obliged to consider whether a comparable forensic objective to that sought by the Title 28 process, can be achieved by means of the ordinary process of this Court without exposing the witnesses to what is perceived to be the potential inconvenience, costs and oppression of the Title 28 process. The mere fact that witnesses have committed their positions to witness statements is not in and of itself a bar to Title 28 depositions. The question is whether there are proper concerns about vexatiousness and oppression.

39. However, the United States courts are shown to be alive to such concerns. They have the power to control the scope. They have determined that it must ordinarily be a matter for them to control their own process. See ***Intel Corp. v Advanced Micro Devices Inc.*** ***542 U.S. 241 (2004).*** In the same vein, the United States court will also be able to determine the extent, if at all, to which the application should be curtailed for being "fishing" – another objection raised by Lyxor .

40. And while the United States courts have no separate direct interest in the application itself or the outcome of the proceedings in the Court to be assisted by them, I may not proceed on the basis that they might fail to protect the witnesses from oppression. The evidence on United States law indicates that very similar

objections to those raised by Messrs. Rosenberg and Phlipponneau before this Court as to oppressiveness can be raised before the United States court.

41. Mr. McKie, in his usual careful arguments, also points out – as was observed in ***Intel*** – that where the parties to a Title 28 proceeding are the same as those in the foreign proceedings, the need for assistance is not as apparent as it is when evidence is sought from a non-participant in the matter arising abroad, when the foreign tribunal can itself decide whether to order the parties to produce evidence.

42. This view of the approach likely to be taken by the United States Court has been recognised as a factor to be considered by the English courts when deciding whether to injunct deposition proceedings: see **Nokia** (above, at para 22(i)).

43. However, the involvement of Messrs. Rosenberg and Phlipponneau in these proceedings as key witnesses on behalf of Lyxor seeking to advance what is ultimately Soc. Gen's case, but being themselves not amenable to the process of this court as officers of Soc. Gen, is a circumstance of a different kind. Treating them as parties who are fully amenable as contemplated by the ***Intel*** case would not be a realistic approach to take. Yet this is a premise upon which Lyxor bases its objection to Phoenix's Title 28 application. It is, I conclude, a false premise.

44. It was also proposed in the arguments that without Lyxor having the reciprocal ability to examine Phoenix' witnesses, the Title 28 procedure must be inherently unfair. While there is no case law authoritatively to that effect, one may accept that, in broad terms, "equality is equity".

45. In accepting this, Mr. Halkerston did offer that Phoenix' main factual witness – its principal and director Mr. Al-Ibrahim – would make himself amenable, pursuant to our local Order 24. R. 16.

46. As Title 28 would not apply to him because he is not a resident of the United States, that offer of reciprocity under Order 24. R. 16 can hardly be described as unreasonable.

47. In conclusion, I am not satisfied that Lyxor has established the threshold test of unconscionability for the grant of the injunction so as to override Phoenix' legitimate right to invoke the Title 28 procedure. On balance, in the exercise of discretion, I therefore refuse the order for the injunction.

Hon. Anthony Smellie
Chief Justice

GRAND COURT — CAYMAN ISLANDS

May 22 2009

CAREY OLSEN

Carey Olsen Cayman Limited
PO Box 10008
Pavilion East
Cricket Square
Grand Cayman KY1-1001
Cayman Islands

T +1 345 749 2000
F +1 345 749 2100
E cayman@careyolsen.com

Our ref DO/HW/MFD/1084026/0002/Z4370285v1
Your ref Matter No.: 837352

Conyers Dill & Pearman
Six, 2nd Floor, Cricket Square, PO Box 2681
Grand Cayman, KY1-1111, Cayman Islands

12 August 2025

**Attention: Dr Alecia Johns, Ms Tonicia Williams**

Dear Sirs/Madams

**In the matter of China Index Holdings Limited Cause No. FSD 201 of 2023 (IKJ) (the "Proceedings")**

1. We refer your letter of 4 August 2025.

2. Your letter (received the day before the deadline to upload Buyers Group Data to the Data Room) seeks numerous extensions of time to the Directions Order. As of today, the Company is past due on the following deadlines set in the Directions Order:

   2a. **Appointment of Expert.** The 04 July 2025 deadline to appoint a Valuation Expert

   2b. **Upload Buyer Group Data.** The 05 August 2025 deadline to upload Buyer Group Data to the digital Data Room

3. The Directions Order is not an expression of wishes. It is an order of the Grand Court that the Company is required to comply with. The Company has thus far demonstrated casual disregard for the Directions Order, availing itself of extensions without the consent of Dissenters and without leave of the court.

4. Moreover, the explanations offered for the delay by the Company are either absent or unconvincing.

   4a. **Appointment of Expert.** By your letter, the cause for failing to meet the deadline in the Directions Order and the self-imposed deadline promised in communications is "*primarily due to the prolonged onboarding and due diligence process required from the intended expert and the additional time for finalising the fee structure and scope of work*".

"Carey Olsen" in the Cayman Islands is the business name of Carey Olsen Cayman Limited, a body corporate recognised under the Legal Practitioners (Incorporated Practice) Regulations (as revised). The use of the title "Partner" is merely to denote seniority. Services are provided on the basis of our current terms of business, which can be viewed at: www.careyolsen.com/terms-of-business. CO Services Cayman Limited is regulated by the Cayman Islands Monetary Authority as the holder of a corporate services licence (No. 624643) under the Companies Management Act (as revised).

These proceedings have been afoot since 2023. The Company had 42 days from the date of the Directions order to the deadline for Appointing a Valuation Expert and as of today has had an additional 35 days to complete this obligation but still has not done so. Further, the Company has not asked the court for leave to extend its deadline.

4b. **Upload Buyer Group Data.** With regards to the requested extension of the deadline for uploading the Buyer Group Due Diligence Documents into the Data Room and other deadlines due to bad weather and flooding in Beijing, the Dissenters extend their sympathies for those affect by flooding, but do not consider the arguments for the various deadline extensions convincing. For instance, there is no credible argument that bad weather in Beijing is cause for extending a deadline that predates the weather event. And for reasons further explained below, there is no reason for deadline extensions for uploading documents that were already produced by the Company as part of the transaction. Further points for consideration are included below.

4.b.1 The Buyer Group Due Diligence Documents are defined at paragraph 10 of the Directions Order as documents "*that were made available by the Company to members of the Buyer Group.... For the purposes of the merger*". Therefore, the Company's obligation is to upload into the Data Room a package of documents that came into existence two years ago in 2023.

4.b.2 The Directions Order allotted 74 days to upload these documents. The request for extension arrived on day 73 on the eleventh hour. The bad weather in Beijing occurred within a week of the deadline for submission so approximately 95% of the allotted time was in no way affected by the weather.

4.b.3.i Furthermore, while the Company claims its operations have been interrupted by the bad weather in Beijing, other businesses in the area have not experienced business interruption. For instance, the Starbucks in the same building as CIH and Fang allowed one of our clients' associates to place and pick up an order. ***(See Appendix 1)***

4.b.3.ii The Company's office is a few minutes' walk from Guogongzhuang station. The station is underground and is serviced by Line 9 trains and the Fangshan Line trains. One might expect that an area suffering from severe flooding would see its underground subway system temporarily out of service or disrupted in some way. However, the Beijing subway website clearly indicates that both trains lines continue to have normal operations. ***(See Appendix 2)***

4.b.3.iii Maps of the precipitation levels show that the area most affect by the rainfall is approximately 40 km north of where the CIH offices are located and that CIH's

offices are in a green zone that saw less than 10 millimetres of precipitation. ***(See Appendix 3)***

5. It is inconceivable that the weather and flooding in the vicinity of the Company's headquarters is purportedly so bad as to prevent the Company – which operates on the 11th floor - from uploading electronic data to the data room while at the same time, not bad enough to cause business interruptions for Starbucks on the ground floor the same building. Further, if the purported flooding in the vicinity of the Company's operations is as severe as claimed, it begs the question as to why the underground Guogongzhuang train lines operating within 10 minutes' walk from the Company's headquarters have experienced no disruption of service.

6. If the Company is trying to use the grave misfortune of those 40 km to the North as an excuse for causing further delays to this process, it is anticipated that the Company will have to provide substantive evidence describing why their operations have been interrupted while those of other businesses in the area have not. Our clients do not accept that the circumstances warrant extension of any of the deadlines in the Directions Order. If the Company believes there is sufficient evidence to the contrary, we invite the Company to file a Summons and a sworn affidavit of evidence to the Court as part of a formal process of seeking time extension.

Yours faithfully

Carey Olsen

Carey Olsen
Telephone: +1 345 749 2031
Email: denis.olarou@careyolsen.com

**APPENDIX 1: Order from Starbucks in CIH's Building**

Starbucks https://j.map.baidu.com/7b/__xk




Order Details

Ready for Pickup
Your order has been prepared. Please go to the store to pick it up.

Pickup Code
4. Wonderful Unexpected Encounter
When you arrive at the store, please inform the partner and provide the pickup code to collect your order.

Starbucks (Beijing GuoGongZhuang Beijing Direction Store)
Address: 1st Floor, No. 20 GuoGongZhuang Zhong Jie (Middle Street), Fengtai District, Beijing

My Order
Golden Osmanthus Americano – ¥33

- Medium cup / Hot / Golden Osmanthus-flavored concentrated (light roast) / Original espresso

Total: ¥33

Order Information

- Meituan Order Number: 4999001803729991844
- Starbucks Order Number: 720576134545490
- Order Time: 2025.08.07 23:28:57

**APPENDIX 2: Subway System Operations**




https://en.wikipedia.org/wiki/Guogongzhuang_station




https://www.bjsubway.com/support/ywgz/

**APPENDIX 3: Precipitation Levels in Beijing**



Gmail

Henry Patner <hpatner@koacapital.com>

**FW: Activity in Case 1:25-mc-00235-GHW-KHP 507 Summit LLC and KOA CapitaL L.P. v. Balance Law PLLC Notice of Appearance**

**Jeffrey Chubak** <jchubak@aminillc.com> Fri, Aug 22, 2025 at 7:27 AM
To: Henry Patner <hpatner@koacapital.com>

**From:** Jeffrey Chubak <jchubak@aminillc.com>
**Sent:** Thursday, July 31, 2025 10:23 PM
**To:** B. Robert Liu, Esq. <robert.liu@balancelawfirm.com>
**Subject:** RE: Activity in Case 1:25-mc-00235-GHW-KHP 507 Summit LLC and KOA CapitaL L.P. v. Balance Law PLLC Notice of Appearance

We are confused as to why you continue to try to combine two different subpoenas from two different legal proceedings. As we said, we are happy to engage on both but neither is contingent on the other.

This email is with regards to the pursuit of appraisal rights in Cayman as to CIH, and Balance Law Firm is in possession of documents relevant to that proceeding.

We are engaging in good faith as we have simply asked that you kindly furnish the specific documents we have requested or provide reasons as to why you don't think you should or don't think you can. We have asked for this now multiple times and have not yet received any of the documents or any reasons as to why you cannot or should not provide the documents we have requested.

If there is no reason for not providing the information we have requested, kindly provide it. If you do have reasons for not providing any of the documents we have asked for, kindly provide your reasons so that we can discuss and address.

**From:** B. Robert Liu, Esq. <robert.liu@balancelawfirm.com>
**Sent:** Thursday, July 31, 2025 3:00 PM

**To:** Jeffrey Chubak <jchubak@aminillc.com>
**Subject:** Re: Activity in Case 1:25-mc-00235-GHW-KHP 507 Summit LLC and KOA CapitaL L.P. v. Balance Law PLLC Notice of Appearance

Jeffrey,

I'm confused as to why you're obsessed with a different email thread. The court specifically asked us to try to work out a deal, which means that both subpoena need to be dealt with at the same time. If you want to start a new email thread, please feel free to do so, but please do not evade your obligation to negotiate in good faith and dodge my client's request for your client's documents, which the New York Supreme Court has clearly found to be relevant.

I'm also tired of playing the wordsmith game. You know that I'm not offering categorization of documents. In fact, it was Oasis that put these documents into categories, and you adopted their categorization, and are asking me to respond to that categorization. Instead, I'm offering your client specific documents, and you know that.

My client still intends to negotiate in good faith to resolve this issue, and has been making efforts to do so. But please let me know if you're not interested in good-faith negotiations, and if that's the case, then we don't need to pretend to negotiate.

Thank you and all the best,

Robert

On Thu, Jul 31, 2025 at 1:08 PM Jeffrey Chubak <jchubak@aminillc.com> wrote:

> Hi Robert,
>
> Your client's request for my client's documents is a separate matter and needs to be dealt with separately. We are happy to engage on that in a different thread. The matter at hand here is our proposed subpoena for specific documents produced in Oasis Investments II Master Fund Ltd. v. Vincent Tianquan Mo et al, N.Y. Co. Sup. Ct. Index 652607/2023.
>
> To be clear, we are not requesting a "categorization of documents". Our request is narrower as we are only asking for the specific documents that have already been produced and are identified in the spreadsheet that we have referenced. You are invited to provide reasons or arguments as to why these specific documents should not be produced but absent compelling arguments or reasons, we kindly ask that you agree to produce the subject documents.

**From:** B. Robert Liu, Esq. <robert.liu@balancelawfirm.com>
**Sent:** Wednesday, July 30, 2025 11:50 AM
**To:** Jeffrey Chubak <jchubak@aminillc.com>
**Subject:** Re: Activity in Case 1:25-mc-00235-GHW-KHP 507 Summit LLC and KOA CapitaL L.P. v. Balance Law PLLC Notice of Appearance

Hi Jeffrey,

Your response is completely silent on Respondent's subpoena for your client's documents, and that's not productive to reach an agreement as encouraged by the court. Please respond to Respondent's more tailored requests to your client's documents.

As to your subpoena, during our meeting after the conference with the court, I told you the current categorization of documents in the spreadsheet was provided by Oasis, the plaintiff in the NY state court case, not by my clients in that case. Then you specifically agreed that your request is not wedded to that categorization of documents and you'll be open to entertain a proposal with a different way of categorizing and organizing documents. And that's what I did in my proposal. To wit, I proposed that Respondent produce the following categories of documents in exchange for your client's production of responsive documents in good faith:

1. Documents related to CIH's entering into the Merger Agreement on December 22, 2022;

2. Documents related to $1.00 per share Merger Consideration; and

3. Documents related to the filing of the Merger Agreement and the Plan of Merger with the Registrar on April 17, 2023.

I consider my proposal to be reasonable and I'm negotiating with you in good faith. I expect reciprocity in this negotiation unless you tell me you're not interested.

Thank you and all the best,

Robert

On Wed, Jul 30, 2025 at 11:03 AM Jeffrey Chubak <jchubak@aminillc.com> wrote:

> Thank you for your offer. It does not speak to any of the documents we've requested from the chart attached to our proposed subpoena. The items we've requested are specific in nature and not burdensome to produce as they've already been produced and are highly relevant to the Cayman proceedings. If there are specific documents that we've asked for that you'd like to not produce, please provide the reason(s) why for our consideration.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/26/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

507 SUMMIT LLC, et al.,

Applicants,

-against-

BALANCE LAW PLLC *d/b/a* BALANCE LAW FIRM.

Respondent.

**25-MC-235 (KHP)**

**OPINION AND ORDER ON APPLICATION FOR DISCOVERY FOR USE IN A FOREIGN PROCEEDING**

**KATHARINE H. PARKER, UNITED STATES MAGISTRATE JUDGE**

507 Summit LLC and KOA Capital L.P. (collectively, the "Petitioners"), submitted an application requesting that the Court, pursuant to 28 U.S.C. § 1782, authorize Petitioners to issue subpoenas demanding that Balance Law PLLC d/b/a Balance Law Firm ("Respondent"), produce documents for use in an appraisal proceeding in the Grand Court of the Cayman Islands ("Cayman Court"), brought under Section 238 of the Cayman Islands Companies Act, to determine the fair value of Petitioners' Class A ordinary shares in China Index Holdings Limited ("CIH"). Respondent objects to the application. For the reasons set forth below, after consideration of the parties' submissions, Petitioner's application for discovery is GRANTED, but the scope of the discovery is modified as set forth below.

## BACKGROUND

### 1. The Parties

Petitioners are investment entities that were holders of Class A ordinary shares of CIH, a Cayman Islands exempted company. Petitioners acquired their interests through American Depositary Shares and later converted those interests into Class A ordinary shares. Petitioners

dissented from a take-private transaction involving CIH and thereafter commenced an appraisal proceeding in the Grand Court of the Cayman Islands pursuant to Section 238 of the Cayman Islands Companies Act, seeking a judicial determination of the fair value of their shares.

Respondent Balance Law PLLC ("Balance Law") is a New York law firm that represents Vincent Tianquan Mo ("Mo") and Richard Jiangong Dai ("Dai") – current and former controlling persons of Fang Holdings Limited ("FHL") – in a shareholder derivative action pending in the Supreme Court of the State of New York, New York County. Respondent is not a party to the Cayman appraisal proceeding.

**B. CIH, FHL, and the Take-Private Transaction**

CIH was originally formed as a subsidiary of FHL and was spun off as a separate publicly traded company in 2019. Following the spin-off, FHL and CIH continued to maintain significant operational and governance overlap, including shared directors and management. At all relevant times, Mo exercised effective voting control over both FHL and CIH through his ownership interests and affiliated entities.

FHL retained a substantial equity position in CIH following the spin-off, including both Class A and Class B ordinary shares, with the latter carrying enhanced voting rights. As a result, FHL and Mo retained significant influence over CIH's strategic direction and any extraordinary corporate transactions involving the company. In November 2020, General Atlantic proposed acquiring CIH at a price materially higher than the price ultimately paid to minority shareholders. That proposal was not pursued. Instead, in August 2022, FHL proposed a take-private transaction at a substantially lower valuation. CIH's board subsequently formed a special committee to evaluate the proposal. In October 2022, FHL, Mo, and General Atlantic

entered into a consortium agreement pursuant to which the consortium renewed the take-private proposal at a price of $0.84 per share. After further negotiations, the consortium increased the consideration to $1.00 per share, which it characterized as its best and final offer. The special committee approved the transaction on December 22, 2022, and the CIH board approved the merger the same day. The transaction closed in April 2023.

Petitioners dissented from the merger and invoked their appraisal rights under Cayman law.

**D. Subsequent Litigation in the Cayman Islands and New York**

Petitioners commenced an appraisal proceeding in the Grand Court of the Cayman Islands seeking a judicial determination of the fair value of their CIH shares as of the effective date of the merger. Under Cayman law, appraisal proceedings are largely expert-driven. *See generally In the matter of Homeinns Hotel Group* (unreported Aug. 12, 2016) (explaining that the Cayman Court is not a specialist valuation body and must therefore rely on expert evidence from experienced valuers who require access to relevant historical data, documents, and company information to assist them in determining fair value). Discovery in the Cayman appraisal proceeding is ongoing, and CIH is expected to produce documents to Petitioners pursuant to the Cayman Court's procedures. The Cayman Court cannot compel a non-party to provide evidence for an appraisal proceeding but permits the submission of evidence obtained through foreign judicial assistance, including evidence obtained pursuant to 28 U.S.C. § 1782. *See In re 507 Summit*, No. 23 Misc. 427 (KHP), 2024 WL 81842, at *2 (S.D.N.Y. Jan. 8, 2024) (Parker J.,) (granting Petitioner's Section 1782 application for discovery in the same foreign proceeding at issue here). "In assessing the fair value of the shares, the Cayman Court will

evaluate the fairness of the process that lead to the board's approval of the transaction and may consider objective valuations of the shares and the process by which the special committee and board concluded that the price of $1 per share was appropriate." *Id.*, at *1.

Separately, a shareholder derivative action is pending in New York Supreme Court against Mo, Dai, and affiliated entities, asserting claims for breach of fiduciary duty and related misconduct arising out of several transactions involving FHL and CIH. *See Oasis Inv.'s II Master Fund Ltd. V. Mo et al.*, Sup. Ct., Com. Div., No. 652607/2023. Those transactions include the CIH spin-off, FHL's purchase of CIH shares from affiliated entities, FHL's delisting from the New York Stock Exchange, insider share acquisitions following that delisting, and the CIH take-private transaction.

Respondent represents the defendants in the New York action. In that proceeding, the defendants have produced more than 300,000 pages of documents pursuant to state-court discovery orders. As part of discovery disputes in the New York action, Respondent produced a chart identifying categories of documents responsive to issues raised by the derivative plaintiffs. (NYSECF No. 380) The court in the New York action has authorized non-party discovery directed to minority shareholders, including Petitioners, concerning their understanding of the challenged transactions. (ECF No. 16 ("Resp. Mem."), at 2) Pursuant to that authorization, Respondent served a subpoena on Petitioners seeking documents and communications relating to their investments and litigation activities specifically for the New York action. (*Id.*) Shortly thereafter, Petitioners filed the instant application. (*Id.*)

**THE PROPOSED SUBPOENAS**

Petitioners filed the present application under 28 U.S.C. § 1782 seeking authorization to subpoena Respondent for documents identified in the discovery chart produced in the New York derivative action. Petitioners assert that the requested documents are relevant to determining the fair value of CIH shares in the Cayman appraisal proceeding, including evidence bearing on valuation, transaction process, and alleged suppression of CIH's market price.

The requested discovery is not framed as traditional document requests drafted specifically for the Cayman proceeding. Instead, Petitioners seek production of a defined universe of documents previously produced by FHL and its affiliates through Respondent in connection with discovery in the New York shareholder derivative action.

The document subpoena on Respondent seeks production of all documents identified by Bates number in the discovery chart produced by Balance Law in the New York shareholder derivative action and filed as NYSCEF No. 380. These documents include:

- Documents concerning the impetus for the spin-off of CIH;
- Documents concerning the selection of independent directors or committee members for the CIH spin-off;
- Documents concerning the selection of independent directors or committee members for the approval of CIH buybacks;
- Documents concerning the decision for Next Decade and Media Partner to enter the 2019 CIH Share Purchase Agreement with Fang;
- Documents concerning the rationale for the 2019 CIH Share Purchase Agreement's $5.99 CIH per share option price;
- Documents concerning any alleged suppression, manipulation, or distortion of CIH's market price prior to the merger;
- Documents concerning the selection of the China Enterprise Appraisals ("CEA") and the evaluation of other firms mentioned in email correspondence for the valuation of the 2019 CIH Share Purchase Agreement;
- Documents concerning CEA's CIH value conclusion;
- Documents concerning Fang's decision to drive up the open market price of CIH in the lead up to the CIH Share Purchase Agreement option exercise in December 2019 and June 2020 through a series of open market purchases;

- Documents concerning Fang's decision to exercise its CIH Share Purchase Agreement option in both December 2019 and June 2020;
- Documents concerning the decision not to file Fang's annual SEC filings for the years 2020 onward;
- Documents concerning the decision not to file SEC filing extension requests;
- Documents concerning Ace's and True Knight's purchases of Fang and CIH interest from eleven sellers through over 20 transactions in June 2021 through May 2022 while Fang was no longer making its annual securities filings;
- Documents concerning the timing and purchase price amounts for Ace's and True Knight's purchases of Fang's and CIH interest from eleven sellers through over 20 transactions in June 2021 through May 2022 while Fang was no longer making its annual securities filing;
- Documents concerning the rationale for the CIH take private transaction;
- Documents concerning the selection of Roth Capital Partners to provide a valuation of CIH for the CIH take private;
- Documents concerning hiring Malone Bailey or interviews of other audit firms despite documents describing months of efforts to secure an auditor;
- Communications between the independent directors/committee members who approved the CIH spin-off and the 2019 CIH Share Purchase Agreement;
- Communications with Mo regarding why he wanted to sell "around $50-$100 million of [his] CIH shares" to Fang before September 30, 2019 (3 months before Fang entered the 2019 CIH Share Purchase Agreement), because of a "window issue";
- Communications with Media Partner and Next Decade regarding entering the 2019 Share Purchase Agreement;
- Communications with Media Partner and Next Decade regarding the $5.99 CIH per share option price, despite documents referencing negotiations with the "sellers" regarding the $5.99 CIH share price;
- Communications from Fang to CEA regarding CEA's value conclusion for CIH;
- Communications with any other valuation firms for CIH despite emails purporting that Fang "contacted with three well-known appraisal firms";
- Communications with Roth Capital Partners regarding report drafts or the valuation of CIH for the take private transaction;
- Documents concerning communications with members of the buyer group consortium and rollover shareholders regarding the CIH take private transaction or CIH's value;
- Communications with any of the eleven sellers relating to the over 20 transactions whereby they sold their Fang and CIH interests to Mo and Dai and their respective entities, Ace and True Knight, from June 2021 through May 2022 while Fang was no longer making its annual securities filings; and
- Communications with outside auditors regarding their hiring despite documents describing months of efforts to secure an auditor.

In addition to the instant application, Respondent has noted that Petitioners have applied for discovery under Section 1782 in several other Districts seeking to obtain evidence for the

appraisal proceeding in Cayman. All of Petitioners' applications across these Districts have been granted or were voluntarily dismissed. *See In re 507 Summit*, 2024 WL 81842, at *3 (authorizing Petitioners to issue the proposed subpoena in full); *507 Summit v. Hayes*, No. 24 Civ. 10260 (MAS) (RLS), 2024 WL 6847468, at *1 (D.N.J. Nov. 22, 2024) (granting Petitioners' application to take deposition of foreign respondent Jie Jiao Hayes at Dkt. No. 6); *507 Summit LLC v. Kroll LLC et al.*, 23 Misc. 43 (D. Del. 2023) (granting Petitioners' Section 1782 application for document production and depositions at Dkt. No. 9); *In re Application of 507 Summit LLC, et al.*, 23 Misc. 40 (MTL) (D. Ariz. 2023) (voluntarily dismissing the application at Dkt. No. 13); *In re Application of 507 Summit LLC*, No. 23 Misc. 80243 (DMR) (N. D. Cal 2023) (voluntarily dismissing the application at Dkt. No. 28).

Respondent describes the scope of the requested discovery differently. Specifically, Respondent says that the chart encompasses a substantial portion of the more than 300,000 pages of documents produced in the New York derivative action, many of which relate to transactions and events that postdate the CIH take-private transaction or concern FHL conduct unrelated to CIH's fair value as of the merger date. Respondent asserts that the chart includes documents that are not directly at issue in the Cayman appraisal proceeding. Respondent further represents that discovery in the Cayman appraisal proceeding is ongoing and that Petitioners are scheduled to receive document production directly from CIH pursuant to the Cayman Court's procedures. Consequently, to the extent documents responsive to valuation issues exist, Respondent avers those materials will either be produced by CIH in the appraisal proceeding or are duplicative of documents already available to Petitioners through other means.

Following a case management conference in this matter, the parties discussed a potential compromise. Respondent proposed producing documents limited to the CIH take-private transaction, including materials relating to the merger agreement, the $1.00 per share consideration, and the filing of the merger with Cayman authorities, subject to appropriate confidentiality protections. Respondent proposed this production on the condition that Petitioners provide reciprocal discovery in response to a non-party subpoena served on them in the New York action. Petitioners declined that proposal and maintained their request for production of all documents identified in the chart, without limitation. As a result, Respondent now asserts that the instant application is retaliatory in nature and indicates forum shopping to obtain evidence that is unavailable in Cayman.

Ultimately, the discovery sought in this application consists of a discrete but substantial body of documents previously produced in domestic litigation, the relevance and proportionality to the Cayman appraisal proceeding are disputed by the parties.

**LEGAL STANDARD**

Section 1782 empowers a United States district court to order any person residing within its jurisdiction to provide discovery for use in a foreign proceeding pursuant to the application of an interested party. 28 U.S.C. § 1782(a). Applicants for discovery under Section 1782 must meet three statutory requirements: "(1) the person from whom discovery is sought must reside or be found in the district in which the application was made, (2) the discovery must be 'for use in a foreign proceeding before a foreign tribunal', and (3) the applicant must be either a foreign tribunal or an 'interested person.'" *In re Accent Delight Int'l Ltd.*, 869 F.3d

121, 128 (2d Cir. 2017) (citing *Certain Funds, Accounts and/or Inv. Vehicles v. KPMG, LLP*, 798 F.3d 113, 117 (2d Cir. 2015)).

Provided the statutory requirements for discovery are met, the Court must then determine, in its discretion, whether the discovery should be permitted in light of the four so-called *Intel* factors. *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004). These factors are as follows:

- Whether the person from whom discovery is sought is a participant in the foreign proceeding;
- The nature and character of the foreign tribunal and proceedings before it, as well as the tribunal's receptivity to U.S. federal-court judicial assistance;
- Whether the discovery request is an attempt to circumvent foreign proof-gathering restrictions or policies of a foreign country or the United States; and
- Whether the discovery is unduly intrusive or burdensome.

*Id.*, at 264-65. When evaluating these factors, the Court must be mindful of the goals of Section 1782: to provide efficient means of assistance to participants in international litigation and to encourage foreign countries by example to provide similar means of assistance to U.S. courts. *Mangouras v. Squire Patton Boggs*, 980 F.3d 88, 97 (2d Cir. 2020).

**DISCUSSION**

Respondent concedes that it resides in or can be found in the Southern District of New York and that Petitioners are "interested" in the Cayman proceeding within the meaning of 28 U.S.C. § 1782(a), (Resp. Mem., at 4) but argues the second statutory requirement is not met. (*Id.*) I address the remaining statutory and discretionary factors below.

**1. Statutory Factor**

Respondent argues that Petitioners have not shown that the requested documents are "for use" in the Civil Action because many, if not all the documents identified and being used in

the New York derivative action are irrelevant to share valuation, thus outside the scope of the Cayman litigation.

Satisfaction of the "for use" element requires that there be a foreign proceeding[1] and that the proceeding be adjudicative in nature. *Euromepa, S.A. v. R. Esmerian, Inc.*, 154 F.3d 24, 27 (2d Cir. 1998). Assuming this threshold is met, a petitioner can demonstrate that discovery is for "use" in a foreign proceeding by showing that it can employ the information sought "with some advantage" in the foreign proceeding. *Accent Delight Int'l Ltd.*, 869 F.3d at 131-32. The information need be only "minimally relevant" and there must be a "procedural mechanism by which petitioner may inject the discovery it seeks" into the foreign proceeding. *In re Ativos Especiais II – Fundo de Investimento em Direitos Creditorios – NP*, No. 24 Misc. 119, 2024 WL 4169550, at *4 (S.D.N.Y. Sept. 12, 2024) (cleaned up); *Certain Funds*, 798 F.2d at 120-21.

Whether a foreign proceeding is adjudicative in nature must be determined on a case-by-case basis with careful consideration of whether the information sought through the Section 1782 application can be used to some advantage in the foreign proceeding. *In re YS GM Marfin II LLC*, 20 Misc. 182, 2022 WL 624291, *5; *Union Fenosa Gas, S.A. v. Depository Tr. Co.*, No. 20 Misc. 188 (PAE), 2020 WL 2793055, at *4 (S.D.N.Y. May 29, 2020); *In re Accent Delight Int'l Ltd.*, 869 F.3d at 132. When the foreign tribunal engages in factfinding then it is adjudicative. *Union Fenosa Gas, S.A.*, 2020 WL 2793055, *5; *Fed. Republic of Nigeria v. VR Advisory Servs., Ltd.*, 25 F.4th 99 (2d Cir. 2022) (no categorical bar to obtaining Section 1782 relief in connection with post-judgment proceeding).

---

[1] There is no articulated dispute that there is, in fact, a foreign proceeding associated with the instant matter.

Here, Respondent does not – nor can it – dispute that the pending Civil Action *is* adjudicative in nature because the Cayman Court is tasked with determining the fair value of Petitioners' CIH shares and ruling on the issue.

The term "for use" is afforded "a broad interpretation," *Deposit Ins. Agency v. Leontiev*, No 17 Misc. 414 (GBD) (SN) 2018 WL 3536083, at *3 (S.D.N.Y. July 23, 2018). Intrinsically, the "for use" requirement may be satisfied so long as the materials sought are "to be used at some stage of a foreign proceeding." *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 132 (2d Cir. 2017).

Respondent's argument, as noted, hinges on the premise that not all the documents requested would be relevant to a share value determination by the Cayman Court. However, the alleged overbreadth of the Subpoenas is better addressed when considering the fourth *Intel* factor, particularly when, as here, Respondent concedes that at least some of the documents sought are relevant to a share value determination to be made by the Cayman Court. *In re Kingstown Partners Master Ltd.*, No. 21 Misc. 691 (LTS), 2022 WL 1081333, at *5 (S.D.N.Y. Apr. 8, 2022) (finding that the "for use" requirement is satisfied "so long as the materials sought are 'to be used at some stage of a foreign proceeding.'") (quoting *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 132 (2d Cir. 2017). Thus, because some of the documents sought are relevant to share value – the core of the Cayman Court action – the subpoena meets the "for use" prong of the statute.

Petitioners have therefore met the statutory preconditions for their discovery motion. The Court now turns to its application of the discretionary *Intel* factors and concludes, for the reasons that follow, that those factors weigh in favor of granting Petitioners' motion, with certain limitations.

**2. *Intel* Factors**

Respondent asserts that the *Intel* factors caution against granting the application because Petitioners' application is overbroad, evinces a retaliatory attempt to circumvent foreign proof-gathering restrictions, and is overly intrusive and burdensome.

**A. Whether Respondent is a Participant in the Foreign Proceeding**

When the party from whom information is sought is not a participant in the foreign proceeding, then the party may be outside of the foreign tribunal's reach and unobtainable absent Section 1782 aid. *Intel*, 542 U.S. at 264. Thus, this factor evaluates whether the information sought is within the jurisdiction of the foreign court. *In re Postalis*, 2018 WL 6725406, *5. Here, Respondent is not a participant in the pending foreign proceeding, and it is unclear whether they would be participants in any future action. Also, Petitioner has not articulated any basis for a court in the Cayman Islands to have jurisdiction over the Respondent. Thus, this factor militates in favor of discovery.

**B. The Nature and Character of the Foreign Tribunal, the, Proceedings Before It, and the Tribunal's Receptivity to U.S. Federal-Court Judicial Assistance**

The second *Intel* factor – the nature of the foreign proceedings and receptivity of the foreign tribunal to federal-court assistance – requires courts to consider "(1) whether United States assistance would offend the foreign country ... and (2) whether the material sought is admissible in the foreign tribunal." *In re Application of Gemeinshcaftspraxis Dr. Med. Schottdorf*, No. Civ. 19 Misc. 88 (BSJ), 2006 WL 3844464, at *6 (S.D.N.Y. Dec. 29, 2006). "The Second Circuit has instructed this Court to consider 'only authoritative proof' in considering these factors." *Id.* at *6 (quoting *In re Application of Euromepa S.A.*, 51 F.3d 1095, 1099-1100 (2d Cir.1995)). "[M]ost courts frame the second *Intel* factor's inquiry as focused on 'the

receptivity to U.S. federal-court judicial assistance' 'more generally,' not whether the specific court would admit each specific piece of evidence sought, since such an analysis would involve domestic courts in narrow questions of foreign law better suited to their foreign counterparts." *In re Kingstown Partner Master Ltd*, 2022 WL 1081333, at *5 (quoting *In re O'Keeffe*, 646 F. App'x 263, 267 (3d Cir. 2016)).

Respondent does not dispute that courts in the Cayman Islands are typically receptive to considering discovery sought and obtained in the United States through Section 1782. Instead, it argues that Cayman Courts "prefer their own procedures in appraisals, which limit discovery to expert exchanges. (*Id.* (citing *In re Application of Microsoft Corp.*, 428 F. Supp. 2d 188, 194 (S.D.N.Y. 2006)). Respondent's reliance on *In re Application of Microsoft Corp* is inapposite for the purposes of adjudicating this factor. The case was cited for the premise that the Court denied the Section 1782 application because it found that Microsoft's discovery request was "not objectively necessary but rather an attempt to circumvent the established rules." This argument goes to the third *Intel* factor rather than the second. Respondent further argues, without support, that Cayman Courts are receptive to "expert exchanges" and "targeted aid, not broad production." However, evidence that depends on equivocal readings of foreign law or foreign policy is ordinarily inadequate to justify the denial of discovery in a Section 1782 action. *See e.g., In re Application of Grupo Qumma, S.A.*, No. M8-85 (DC), 2005 WL 937486, at * 3 (S.D.N.Y. Apr. 22, 2005) (authorizing discovery under Section 1782 despite disagreement over whether the foreign tribunal would accept the evidence). In circumstances like this, the Second Circuit has made clear that district courts should generally resolve any doubt in favor of allowing the requested discovery to proceed. *See Euromepa,* 51 F.3d at 1101 (2d Cir.1995) ("[I]t

is far preferable for a district court to reconcile whatever misgivings it may have about the impact of its participation in the foreign litigation by issuing a closely tailored discovery order rather than by simply denying relief sought."); *In re Grupo Qumma,* 2005 WL 937486, at *2-3 (approving the § 1782 discovery request and leaving questions of admissibility to the Mexican court, notwithstanding the parties' submission of dueling expert declarations addressing the significance of prior Mexican judicial rulings and the requirements of Mexican evidentiary law). Consequently, the second *Intel* factor weighs in favor of granting Petitioners' motion.

**C. Whether the Discovery Request is an Attempt to Circumvent Foreign Proof-Gathering Restrictions or Policies of a Foreign Country or the United States**

"The third discretionary factor aims to protect against abuse of § 1782 as a vehicle to end-run foreign proof-gathering restrictions or other foreign policies." *In re Application of Gemeinshcaftspraxis*, 2006 WL 3844464, at *7 (citing *Intel,* 524 U.S. at 265) Respondents argue that the third *Intel* factor is not met because the instant application is yet another attempt by Petitioners to obtain evidence unavailable in the Caymans. However, Respondent points to no proof-gathering restriction under Cayman law and instead references, without support, the Cayman Court's preference for limited discovery and a focus on experts in appraisal proceedings. This is insufficient. The law is clear that it is "[o]nly where materials being sought are privileged or otherwise prohibited from being discovered or used is the third *Intel* factor implicated." *In re Tiberius Group*, 2020 WL 1140784, at *4 (citing *In re Accent Delight Int'l Ltd.*, 791 F. App'x 247 (2d Cir. 2019)). Though Respondent has made the argument that because it is a law firm, it is entitled to additional scrutiny under Section 1782, it does not make the argument that any of the documents Petitioners seek are privileged or otherwise undiscoverable. (Resp. Mem., at 8) Moreover, a mere preference by the Cayman Court for

expert discovery in appraisal proceedings does not mean that the Cayman Court prohibits the obtaining of fact information such as the kind sought here upon which an expert might rely. *See In re Qunar Cayman Is. Ltd.*, at *1 (expert testimony and methodology based upon review of documentary evidence was dispositive in determining fair value of shares in an analogous appraisal proceeding under Section 238). Undoubtedly, Petitioners' application represents an effort to obtain discovery that they could not secure through foreign proceedings. Indeed, the Cayman Court, does not have the authority to order nonparties – like respondent – outside of its jurisdiction to produce evidence. *See In re 507 Summit*, 2024 WL 81842, at *2. That circumstance, however, does not render the application an "impermissible" use of Section 1782. On the contrary, facilitating access to evidence unavailable or unobtainable by a foreign court is exactly the kind of support the statute was intended to provide. Respondent need not argue that Petitioners are attempting to circumvent proof-gathering restrictions simply because they have applied for discovery pursuant to Section 1782 against several parties in several Districts. *See In re Application of Imanagement Serv., Ltd.*, No. M5-89 (FB), 2005 WL 1959702, at *5 (E.D.N.Y. Aug. 16, 2005) (granting Section 1782 application where "resort to § 1782 may be the only avenue by which [the requesting party] can obtain the discovery it seeks."). It is clearly established that the Cayman Court permits some document discovery in appraisal proceedings. *E.g. Lyxor Asset Mgm't S.A. v. Phoenix Meridian Equity Limited* [2009] CILR 553; *In re Nord Anglia Education, Inc.* (Unreported, March 17, 2020). And, Respondent has not articulated what ulterior motive, Petitioners have for making this request other than the allegation that Petitioners would only comply with the New York subpoena if Respondent capitulates to the instant application. (Resp. Mem., at 3, 4) Absent any other indication of bad

faith on Petitioners' part, the request for Section 1782 assistance in other Districts cannot be deemed a negative discretionary factor. It is at most a neutral consideration.

### D. Whether the Discovery is Unduly Intrusive or Burdensome

The final *Intel* factor requires a court to consider "[w]hether the subpoena contains unduly intrusive or burdensome requests." *In re Warren*, No. 20 MISC. 208 (PGG), 2020 WL 6162214, at *5 (S.D.N.Y. Oct. 21, 2020) (citing *In re Microsoft Corp.*, 428 F. Supp. 2d 188, 193 (S.D.N.Y. 2006) and *Intel*, 542 U.S. at 264-65). When evaluating this factor, the Court is guided by the standards of Rule 26 of the Federal Rules of Civil Procedure. *Mees*, 793 F.3d at 302.

Respondents argue that the discovery sought is overbroad insofar as it seeks information not relevant to the pending Cayman action and that it constitutes an improper fishing expedition.

Rule 26(b)(1) provides that a party may obtain discovery of information "relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Factors relevant to proportionality are the "importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.*

While the proposed subpoenas are broad and seek more information than required to evaluate the price of CIH shares, the Court finds that the New York derivative action and the Cayman action are linked and that many of the documents produced in the New York suit bears directly on CIH equity valuation. This is particularly true to the extent Petitioners seek information in the chart that explicitly discuss CIH value or deliberate attempts to drive share

price up or down. On the other hand, fiduciary duty claims rather than information related to share valuation or suppression of CIH's market price are outside the scope of what is relevant for an appraisal proceeding.

Thus, the Court finds, that this *Intel* factor is met for some of the information sought and that it can and should narrow the discovery sought to be consistent with the purposes of Section 1782.[2] Namely, the Court finds the following categories of information to be relevant to the CIH share valuation and proportional to the needs of the case:

- Documents concerning the rationale for the 2019 CIH Share Purchase Agreement's $5.99 CIH per share option price;
- Documents concerning any alleged suppression, manipulation, or distortion of CIH's market price prior to the merger;
- Documents concerning the selection of independent directors or committee members for the CIH spin-off;
- Documents concerning the selection of the China Enterprise Appraisals ("CEA") and the evaluation of other firms mentioned in email correspondence for the valuation of the 2019 CIH Share Purchase Agreement;
- Documents concerning CEA's CIH value conclusion;
- Documents concerning Fang's decision to drive up the open market price of CIH in the lead up to the CIH Share Purchase Agreement option exercise in December 2019 and June 2020 through a series of open market purchases;
- Documents concerning the rationale for the CIH take private transaction;
- Documents concerning the selection of Roth Capital Partners to provide a valuation of CIH for the CIH take private;
- Documents concerning hiring Malone Bailey or interviews of other audit firms despite documents describing months of efforts to secure an auditor;
- Communications with Mo regarding why he wanted to sell "around $50-$100 million of [his] CIH shares" to Fang before September 30, 2019 (3 months before Fang entered the 2019 CIH Share Purchase Agreement), because of a "window issue";
- Communications with Media Partner and Next Decade regarding entering the 2019 Share Purchase Agreement;
- Communications with Media Partner and Next Decade regarding the $5.99 CIH per share option price, despite documents referencing negotiations with the "sellers" regarding the $5.99 CIH share price;
- Communications from Fang to CEA regarding CEA's value conclusion for CIH;

[2] Because the Court will narrow the discovery requests, it does not address Respondents' argument that the discovery is retaliatory, as that argument goes principally to the burden of the discovery sought.

- Communications with any other valuation firms for CIH despite emails purporting that Fang "contacted with three well-known appraisal firms";
- Communications with Roth Capital Partners regarding report drafts or the valuation of CIH for the take private transaction;
- Communications between the independent directors/committee members who approved the CIH spin-off and the 2019 CIH Share Purchase Agreement;
- Documents concerning communications with members of the buyer group consortium and rollover shareholders regarding the CIH take private transaction or CIH's value;

The Court finds the following categories to be of little or no relevance to the CIH valuation because they seek information concerning corporate governance processes unrelated to the approval of the spin-off transaction, regulatory compliance issues, or unrelated third-party transactions that do not bear on the determination of CIH's fair value as of the valuation date. They are, therefore, not relevant to Petitioners' claims and are disproportionate to the needs of the case:

- Documents concerning the selection of independent directors or committee members for the approval of CIH buybacks;
- Documents concerning the decision for Next Decade and Media Partner to enter the 2019 CIH Share Purchase Agreement with Fang;
- Documents concerning Fang's decision to exercise its CIH Share Purchase Agreement option in both December 2019 and June 2020;
- Documents concerning the decision not to file Fang's annual SEC filings for the years 2020 onward;
- Documents concerning the decision not to file SEC filing extension requests;
- Documents concerning Ace's and True Knight's purchases of Fang and CIH interest from eleven sellers through over 20 transactions in June 2021 through May 2022 while Fang was no longer making its annual securities filings;
- Documents concerning the timing and purchase price amounts for Ace's and True Knight's purchases of Fang's and CIH interest from eleven sellers through over 20 transactions in June 2021 through May 2022 while Fang was no longer making its annual securities filing;
- Communications with any of the eleven sellers relating to the over 20 transactions whereby they sold their Fang and CIH interests to Mo and Dai and their respective entities, Ace and True Knight, from June 2021 through May 2022 while Fang was no longer making its annual securities filings; and
- Communications with outside auditors regarding their hiring despite documents describing months of efforts to secure an auditor.

**3. Costs**

A district court may determine how the costs arising from a non-party's compliance with a subpoena issued pursuant to Section 1782 are to be allocated. "In evaluating the allocation of costs under Section 1782, the Court can look to cases considering similar issues under Fed. R. Civ. P. 45." *In re T-Sys. Scheiz AG*, No. 20 Misc. 308 (GHW), 2020 WL 7384007, at *2 (S.D.N.Y. Dec. 16, 2020). Determining each party's share of the cost of compliance in such circumstances "turns on three factors: (1) whether the nonparty has an interest in the outcome of the case; (2) whether the nonparty can more readily bear the costs; and (3) whether the litigation is of public importance." *Id.* (citing *In re World Trade Ctr. Disaster Site Litig.*, No. 21 Misc. 100 (AKH), 2010 WL 3582921, at *1 (S.D.N.Y. Sept. 14, 2010)).

Here, Respondent had no articulable role in the take-private transaction and there is no discernible evidence that it has any direct financial interest in the outcome of the Cayman proceeding. While, Respondent has expressed that the costs of producing discovery would present an "undue burden," and that costs should shift entirely to Petitioners, Respondent does not represent whether or not it can readily "bear the costs" of production. ((Resp. Mem., at 8); *Id.* Finally, the outcome of the appraisal proceeding is not of significant public importance. Accordingly, the Court determines that, in light of the specific circumstances presented here, requiring Petitioners to assume fifty percent of the costs incurred by Respondent in the production of documents requested appropriately reconciles the broad and permissive discovery regimes embodied by Section 1782 and Rule 26 with the imperative of shielding non-parties from excessive burden, financial or otherwise. *See In re Kingstown Partners Master Ltd.*,

2022 WL 1081333, at *7 (granting 1782 application and ordering the petitioner to assume half the costs incurred by the respondent in production).

**CONCLUSION**

For the above-stated reasons, the Petition is GRANTED in part and DENIED in part. Any motion to quash, modify or for other relief by Respondent shall be filed within thirty days of this Order.

**The Clerk of Court is respectfully directed to terminate the pending motion at ECF No. 1.**

**SO ORDERED.**

Dated: January 26, 2026
New York, New York

Katharine H Parker

KATHARINE H. PARKER
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| 507 SUMMIT LLC, *et al.*,<br><br>Petitioners,<br><br>v.<br><br>BALANCE LAW PLLC d/b/a Balance Law Firm,<br><br>Respondent. | Case No. 1:25-mc-00235-KHP<br><br>Honorable Katharine H. Parker |

**RESPONDENT BALANCE LAW PLLC'S**
**NOTICE OF MOTION TO QUASH PETITIONERS' SUBPOENA**

**PLEASE TAKE NOTICE** that, upon the accompanying memorandum of law and the Declaration of B. Robert Liu (with exhibits thereto), both dated February 25, 2026, Respondent Balance Law PLLC d/b/a Balance Law Firm respectfully moves this Court, before the Honorable Katharine Parker, at the Daniel Patrick Moynihan United States Courthouse, located at 500 Pearl St., New York, NY 10007-1312, as soon as counsel may be heard, pursuant to Federal Rule of Civil Procedure 45(d)(3), *Kiobel by Samkalden v. Cravath, Swain & Moore LLP*, 895 F.3d 238 (2d Cir. 2018), and other cases cited in the memorandum of law, for an Order quashing the subpoena duces tecum served on Balance Law PLLC d/b/a Balance Law Firm in the above-captioned case, and for such other and further relief as the Court deems just and proper.

Dated: New York, New York
February 25, 2026

Respectfully submitted,

B. Robert Liu

B. Robert Liu (Bar No. 5697552)
Balance Law Firm
1 World Trade Center, Suite 8500
New York, NY 10007
(212) 741-8080
(646) 558-4889 (fax)
robert.liu@balancelawfirm.com

*Attorneys for Respondent Balance Law Firm PLLC d/b/a Balance Law Firm*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| 507 SUMMIT LLC, *et al.*,<br><br>Petitioners,<br><br>v.<br><br>BALANCE LAW PLLC d/b/a Balance Law Firm,<br><br>Respondent. | Case No. 1:25-mc-00235-KHP<br><br>Honorable Katharine H. Parker |

**DECLARATION OF B. ROBERT LIU IN SUPPORT OF RESPONDENT BALANCE LAW PLLC'S MOTION TO QUASH PETITIONERS' SUBPOENA**

I, B. Robert Liu, Esq., state the following as true under the penalty of perjury:

1. I am the Managing Partner of Balance Law PLLC ("Balance Law"), Respondent in the above-captioned case. I make this declaration based on my personal knowledge.

2. In response to the Order issued by this Court on January 26, 2026 Order in the above-captioned case, Petitioners served a subpoena duces tecum ("the Subpoena") on Balance Law. A true and correct copy of the Subpoena is attached as Exhibit 1.

3. On February 25, 2026, I had a meet-and-confer call with Petitioners' counsel, but we did not agree on a resolution to this dispute.

4. Balance Law is a U.S. law firm. Many of Balance Law's clients are foreign companies or individuals.

5. Petitioners in the above-captioned case, 507 Summit LLC and KOA Capital L.P. (collectively, "Petitioners"), commenced an appraisal proceeding in the Cayman Islands after dissenting from a take-private transaction. Balance Law was not responsible for—and has had no

financial interest or any other involvement in—the events that gave rise to, and/or are at issue in, that Cayman Islands appraisal proceeding.

6. Balance Law has been representing certain foreign clients ("the Foreign Clients") in a shareholder derivative lawsuit pending in New York state court ("the State Court Action").

7. The documents sought by the Subpoena were received by Balance Law from the one of Foreign Clients for the purpose of Balance Law providing legal advice to that client. Balance Law did not create those documents and has them in its possession only because they were transmitted from abroad to Balance Law.

8. The documents sought by the Subpoena were produced in discovery to the plaintiff in the State Court Action, by Balance Law acting as counsel for the Foreign Clients, pursuant to a Stipulation and Order for the Production and Exchange of Confidential Information ("the Confidentiality Protective Order") that required the documents to be utilized "only for purposes of this litigation [*i.e.*, the State Court Action] and for no other purposes." Confidentiality Protective Order ¶ 6. A true and correct copy of the Confidentiality Protective Order is attached as Exhibit 2.

9. When the documents were transmitted from abroad to Balance Law and then produced to the plaintiff in the State Court Action, the Foreign Clients relied on the protections provided by the Confidentiality Protective Order to ensure that the documents would be produced only to the plaintiff in the State Court Action and for use only in that lawsuit. When agreeing to have the documents transmitted from abroad to Balance Law for the purpose of being assessed by Balance Law for (among other things) discoverability and then produced to the plaintiff in the State Court Action, Balance Law relied on the Confidentiality Protective Order to

ensure that the documents would be produced only to the plaintiff in that lawsuit and for use in only that lawsuit.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 25, 2026 in New York, NY.

B. Robert Liu

B. Robert Liu

# EXHIBIT 1

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Southern District of New York

| | | |
|---|---|---|
| 507 SUMMIT LLC and KOA CAPITAL L.P. | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. 25-mc-00235 |
| BALANCE LAW PLLC dba Balance Law Firm | ) | |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Balance Law PLLC dba Balance Law Firm

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: All documents identified in Oasis Investments II Master Fund Ltd. v. Vincent Tianquan Mo et al, Sup. Ct. N.Y. Co. Index 652607/2023 NYSCEF #380, a copy of which is attached, except for those documents excluded from scope of discovery pursuant to the Opinion and Order entered at ECF #21

| Place: Amini LLC, 131 West 35th Street, 12th Floor New York, NY 10001, Attn: Jeffrey Chubak | Date and Time: February 26, 2026, at 9:30 a.m. |
|---|---|

❒ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: January 27, 2026

*CLERK OF COURT*

_______________________
*Signature of Clerk or Deputy Clerk*

OR

[signature]
*Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* 507 Summit LLC and KOA Capital L.P., who issues or requests this subpoena, are:

Jeffrey Chubak, Amini LLC, 131 West 35th St., 12th Floor, New York, NY 10001 (212) 497-8247 jchubak@aminillc.com

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No.

**PROOF OF SERVICE**

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

I received this subpoena for *(name of individual and title, if any)* ______________________________

on *(date)* ______________ .

❒ I served the subpoena by delivering a copy to the named person as follows: ______________________

______________________________________________________________________

__________________________________________ on *(date)* ______________ ; or

❒ I returned the subpoena unexecuted because: ______________________________________

______________________________________________________________________ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ ____________________ .

My fees are $ ______________ for travel and $ ______________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ______________

______________________________________
*Server's signature*

______________________________________
*Printed name and title*

______________________________________
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** ***For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** ***For Other Discovery.*** A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** ***Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** ***Command to Produce Materials or Permit Inspection.***
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** ***Quashing or Modifying a Subpoena.***
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** ***Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** ***Claiming Privilege or Protection.***
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

| Issue Number | Plaintiffs' OSC Issues | Responsive Documents Total | Responsive Documents New | Responsive Pages Total | Responsive Pages New | Production Locations |
|---|---|---|---|---|---|---|
| 1 | The impetus for the spin-off of CIH | 190 | **140** | 2,373 | **1950** | FANG-0003155, FANG-0003156, FANG-0003157—FANG-0003158, FANG-0003159—FANG-0003161, FANG-0011863, FANG-0011864, FANG-0011865, FANG-0011866, FANG-0011867, FANG-0011868, FANG-0011869, FANG-0011870, FANG-0011871, FANG-0011872, FANG-0011935—FANG-0011945, FANG-0011946—FANG-0011949, FANG-0040947, FANG-0040948—FANG-0040961, FANG-0040962, FANG-0040963, FANG-0040964, FANG-0040965, FANG-0041502—FANG-0041526, FANG-0043731—FANG-0043761, FANG-0043762—FANG-0043791, FANG-0043792—FANG-0043800, FANG-0043801—FANG-0043814, FANG-0043815, FANG-0043816, FANG-0043817, FANG-0043818, FANG-0049741—FANG-0049771, FANG-0049775—FANG-0049805, FANG-0049809—FANG-0049839, FANG-0089018—FANG-0089048, FANG-0089049, FANG-0089050, FANG-0089051, FANG-0089052, FANG-0089053, FANG-0091990, FANG-0091999—FANG-0092029, FANG-0092033—FANG-0092063, FANG-0093784—FANG-0093813, FANG-0132549—FANG-0132580, FANG-0132581, FANG-0132582, FANG-0132583, FANG-0132584, FANG-0132585, FANG-0162039, FANG-0162040—FANG-0162051, FANG-0162052, FANG-0162053, FANG-0162054, FANG-0162055, FANG-0162056, FANG-0162057, FANG-0162058—FANG-0162069, FANG-0162070, FANG-0162071—FANG-0162081, FANG-0162082—FANG-0162092, FANG-0162093, FANG-0162094, FANG-0162095, FANG-0162096, FANG-0162097, FANG-0162098, FANG-0162099, FANG-0162100—FANG-0162112, FANG-0162113—FANG-0162125, FANG-0162126, FANG-0162127, FANG-0162128, FANG-0162129, FANG-0175128—FANG-0175129, FANG-0185113—FANG-0185115, FANG-0185116, FANG-0277047—FANG-0277049, FANG-0277050—FANG-0277053, FANG-0284119, FANG-0284120—FANG-0284121, FANG-0284122—FANG-0284123, FANG-0284124—FANG-0284132, FANG-0284133—FANG-0284144, FANG-0284145—FANG-0284148, FANG-0284149—FANG-0284150, FANG-0284151—FANG-0284152, FANG-0284153—FANG-0284184, FANG-0284185, FANG-0284186—FANG-0284188, FANG-0284189—FANG-0284191, FANG-0284192—FANG-0284193, FANG-0284194—FANG-0284195, FANG-0284196—FANG-0284197, FANG-0284198, FANG-0284199—FANG-0284200, FANG-0284201—FANG-0284202, FANG-0284203—FANG-0284205, FANG-0284209—FANG-0284211, FANG-0284212—FANG-0284213, FANG-0284214—FANG-0284217, FANG-0284218—FANG-0284221, FANG-0284222—FANG-0284224, FANG-0284225—FANG-0284228, FANG-0284231—FANG-0284232, FANG-0284233—FANG-0284234, FANG-0284235—FANG-0284237, FANG-0284238—FANG-0284239, FANG-0284240—FANG-0284242, FANG-0284243—FANG-0284244, FANG-0284245—FANG-0284267, FANG-0284268—FANG-0284269, FANG-0284270—FANG-0284396, FANG-0284397—FANG-0284398, FANG-0284399, FANG-0284400—FANG-0284421, FANG-0284422, FANG-0284423, FANG-0284424—FANG-0284426, FANG-0284427, FANG-0284428—FANG-0284429, FANG-0284430, FANG-0284431, FANG-0284432, FANG-0284433—FANG-0284434, FANG-0284435—FANG-0284702, FANG-0284703—FANG-0284971, FANG-0284972—FANG-0284978, FANG-0284979—FANG-0285015, FANG-0285016—FANG-0285018, FANG- |
| 2 | The selection of independent directors or committee members for the CIH spin-off | 19 | **10** | 96 | **72** | FANG-0030462—FANG-0030463, FANG-0030464—FANG-0030465, FANG-0034742—FANG-0034743, FANG-0034744—FANG-0034750, FANG-0088145, FANG-0088146—FANG-0088148, FANG-0088149—FANG-0088150, FANG-0131078—FANG-0131081, FANG-0131082, FANG-0162037—FANG-0162038, FANG-0186709, FANG-0186710—FANG-0186712, FANG-0186713—FANG-0186714, FANG-0186715, FANG-0186716—FANG-0186753, FANG-0186754, FANG-0186755—FANG-0186761, FANG-0186762—FANG-0186776, FANG-0186874—FANG-0186875 |
| 3 | The selection of independent directors or committee members for the approval of CIH buybacks | 14 | **0** | 132 | **0** | FANG-0049840, FANG-0049841—FANG-0049846, FANG-0099787, FANG-0099788—FANG-0099793, FANG-0099794—FANG-0099795, FANG-0099796—FANG-0099817, FANG-0099818—FANG-0099825, FANG-0099826—FANG-0099827, FANG-0099828—FANG-0099829, FANG-0099830—FANG-0099831, FANG-0099832—FANG-0099833, FANG-0099834—FANG-0099907, FANG-0099908—FANG-0099909, FANG-0099910—FANG-0099911 |
| 4 | The decision for Next Decade and Media Partner to enter the 2019 CIH Share Purchase Agreement with Fang | 2 | **2** | 7 | **7** | FANG-0186913—FANG-0186917, FANG-0211971—FANG-0211972 |
| 5 | The rationale for the 2019 CIH Share Purchase Agreement's $5.99 CIH per share option price | 11 | **9** | 313 | **269** | FANG-0134021—FANG-0134042, FANG-0136027—FANG-0136048, FANG-0168022—FANG-0168043, FANG-0183743, FANG-0183744—FANG-0183817, FANG-0183830—FANG-0183831, FANG-0183832, FANG-0183833—FANG-0183848, FANG-0185502, FANG-0185503—FANG-0185580, FANG-0185725—FANG-0185798 |

| Issue Number | Plaintiffs' OSC Issues | Responsive Documents | | Responsive Pages | | Production Locations |
|---|---|---|---|---|---|---|
| | | Total | New | Total | New | |
| 6 | The selection of the China Enterprise Appraisals (CEA) and the evaluation of other firms mentioned in email correspondence for the valuation of 2019 CIH Share Purchase Agreement | | | | | |
| 7 | CEA's CIH value conclusion | 3 | 1 | 222 | 74 | FANG-0133947—FANG-0134020, FANG-0135953—FANG-0136026, FANG-0167948—FANG-0168021 |
| 8 | Fang's decision to drive up the open market price of CIH in the lead up to the CIH Share Purchase Agreement option exercise in December 2019 and June 2020 through a series of open market purchases | 7 | 6 | 16 | 14 | FANG-0088345—FANG-0088346, FANG-0186911—FANG-0186912, FANG-0162801—FANG-0162803, FANG-0171805—FANG-0171808, FANG-0171823, FANG-0171824, FANG-0176584—FANG-0176586 |
| 9 | Fang's decision to exercise its CIH Share Purchase Agreement option in both December 2019 and June 2020. Aff. ¶21(a)-(h) | 4 | 3 | 23 | 22 | FANG-0172433, FANG-0172434—FANG-0172435, FANG-0172436—FANG-0172442, FANG-0172443—FANG-0172455 |

| Issue Number | Plaintiffs' OSC Issues | Responsive Documents Total | Responsive Documents New | Responsive Pages Total | Responsive Pages New | Production Locations |
|---|---|---|---|---|---|---|
| 10 | The decision not to file Fang's annual SEC filings for the years 2020 onward | 462 | **191** | 14,419 | **4,954** | FANG-0002481—FANG-0002482, FANG-0002877, FANG-0002878, FANG-0002879—FANG-0002883, FANG-0002884—FANG-0002889, FANG-0002890, FANG-0005248—FANG-0005250, FANG-0005251, FANG-0005252—FANG-0005254, FANG-0005255—FANG-0005257, FANG-0005258—FANG-0005262, FANG-0005263—FANG-0005266, FANG-0005267, FANG-0005268—FANG-0005270, FANG-0005271—FANG-0005273, FANG-0005274—FANG-0005275, FANG-0005754, FANG-0005755—FANG-0005760, FANG-0005773, FANG-0005774—FANG-0005776, FANG-0005777, FANG-0031019—FANG-0031021, FANG-0031022, FANG-0031023—FANG-0031024, FANG-0031025—FANG-0031026, FANG-0031027, FANG-0031028—FANG-0031029, FANG-0031030—FANG-0031031, FANG-0031032—FANG-0031033, FANG-0031034, FANG-0031035—FANG-0031037, FANG-0031038—FANG-0031039, FANG-0031040—FANG-0031042, FANG-0031043—FANG-0031045, FANG-0031046—FANG-0031047, FANG-0031048—FANG-0031050, FANG-0031051—FANG-0031053, FANG-0031054, FANG-0031055—FANG-0031060, FANG-0031061—FANG-0031066, FANG-0031067—FANG-0031070, FANG-0031071—FANG-0031073, FANG-0031074—FANG-0031076, FANG-0031077—FANG-0031080, FANG-0031081, FANG-0031082—FANG-0031087, FANG-0031088—FANG-0031093, FANG-0031094, FANG-0031095—FANG-0031096, FANG-0031097, FANG-0031098—FANG-0031103, FANG-0031104—FANG-0031109, FANG-0031110—FANG-0031111, FANG-0031112—FANG-0031113, FANG-0031114, FANG-0031127, FANG-0031128—FANG-0031133, FANG-0031548—FANG-0031557, FANG-0031558—FANG-0031559, FANG-0031560—FANG-0031570, FANG-0031571—FANG-0031581, FANG-0031759—FANG-0031761, FANG-0031842, FANG-0031843—FANG-0031844, FANG-0031845—FANG-0031848, FANG-0031899—FANG-0031900, FANG-0031901—FANG-0031902, FANG-0031903—FANG-0031907, FANG-0031908—FANG-0031913, FANG-0031914—FANG-0031920, FANG-0031921—FANG-0031927, FANG-0031928—FANG-0031934, FANG-0031935—FANG-0031943, FANG-0031944—FANG-0031946, FANG-0031947—FANG-0031950, FANG-0031951—FANG-0031953, FANG-0031954—FANG-0031962, FANG-0031963—FANG-0031964, FANG-0031972—FANG-0031981, FANG-0031982—FANG-0031983, FANG-0031984—FANG-0031993, FANG-0031994—FANG-0031995, FANG-0031996—FANG-0032006, FANG-0032007—FANG-0032015, FANG-0032016—FANG-0032019, FANG-0032020, FANG-0032021—FANG-0032022, FANG-0032023—FANG-0032024, FANG-0032025—FANG-0032026, FANG-0032027—FANG-0032029, FANG-0032030—FANG-0032038, FANG-0032119—FANG-0032135, FANG-0032329—FANG-0032345, FANG-0040993, FANG-0040994—FANG-0041001, FANG-0042284—FANG-0042290, FANG-0042380—FANG-0042462, FANG-0042797—FANG-0042804, FANG-0042860—FANG-0042864, FANG-0042865—FANG-0042866, FANG-0042870—FANG-0042871, FANG-0042889—FANG-0042891, FANG-0042892—FANG-0042894, FANG-0042895—FANG-0042897, FANG-0042898—FANG-0042904, FANG-0042905—FANG-0042911, FANG-0042912—FANG-0042913, FANG-0042914, FANG-0042915, FANG-0042916—FANG-0042917, FANG-0042918—FANG- |
| 11 | The decision not to file SEC filing extension requests | N/A | **N/A** | N/A | **N/A** | N/A |

| Issue Number | Plaintiffs' OSC Issues | Responsive Documents Total | Responsive Documents New | Responsive Pages Total | Responsive Pages New | Production Locations |
|---|---|---|---|---|---|---|
| 12 | Ace's and True Knight's purchases of Fang and CIH interest from eleven sellers through over 20 transactions in June 2021 through May 2022 while Fang was no longer making its annual securities filings | 1,529 | **1,529** | 7,884 | **7,884** | FANG-0161811—FANG-0161827, FANG-0162659—FANG-0162664, FANG-0162665—FANG-0162666, FANG-0162667—FANG-0162668, FANG-0162669—FANG-0162670, FANG-0162712—FANG-0162717, FANG-0162718, FANG-0162719—FANG-0162720, FANG-0162721, FANG-0162722, FANG-0162723, FANG-0162724, FANG-0162725, FANG-0162726, FANG-0162727—FANG-0162728, FANG-0162729, FANG-0162730, FANG-0162731, FANG-0162732, FANG-0162733, FANG-0162734—FANG-0162735, FANG-0162736—FANG-0162737, FANG-0162738, FANG-0162739, FANG-0162740, FANG-0162741, FANG-0162742, FANG-0162743—FANG-0162747, FANG-0163625—FANG-0163626, FANG-0163627—FANG-0163628, FANG-0163629, FANG-0163630—FANG-0163640, FANG-0163641—FANG-0163651, FANG-0163652, FANG-0163653, FANG-0163654, FANG-0163655, FANG-0163656, FANG-0163657, FANG-0163658—FANG-0163662, FANG-0163663, FANG-0163664, FANG-0163665, FANG-0163666—FANG-0163667, FANG-0163668, FANG-0163669—FANG-0163670, FANG-0163671—FANG-0163681, FANG-0163682—FANG-0163686, FANG-0163687—FANG-0163688, FANG-0163689—FANG-0163690, FANG-0163691, FANG-0163692, FANG-0163693, FANG-0163694—FANG-0163695, FANG-0163696, FANG-0163697, FANG-0163698—FANG-0163708, FANG-0163709—FANG-0163710, FANG-0163711—FANG-0163721, FANG-0163722, FANG-0163723, FANG-0163724, FANG-0163725—FANG-0163735, FANG-0163736—FANG-0163746, FANG-0163766—FANG-0163767, FANG-0163768—FANG-0163778, FANG-0163779—FANG-0163789, FANG-0163790—FANG-0163791, FANG-0163792—FANG-0163802, FANG-0163803—FANG-0163813, FANG-0163814, FANG-0163815, FANG-0163816, FANG-0163817, FANG-0163818—FANG-0163821, FANG-0163822—FANG-0163830, FANG-0163831—FANG-0163847, FANG-0163848, FANG-0163849, FANG-0163850, FANG-0163851, FANG-0163852, FANG-0163853, FANG-0163854, FANG-0163855, FANG-0163856—FANG-0163880, FANG-0163881—FANG-0163888, FANG-0163889—FANG-0163892, FANG-0163893—FANG-0163896, FANG-0163897—FANG-0163898, FANG-0163899—FANG-0163907, FANG-0163908—FANG-0163916, FANG-0163917, FANG-0163918, FANG-0163919, FANG-0163920—FANG-0163921, FANG-0163922—FANG-0163929, FANG-0163930—FANG-0163937, FANG-0163938—FANG-0163945, FANG-0163946—FANG-0163953, FANG-0163954—FANG-0163961, FANG-0163962—FANG-0163969, FANG-0163970—FANG-0163977, FANG-0163978—FANG-0163985, FANG-0163986—FANG-0163993, FANG-0163994—FANG-0164001, FANG-0164002—FANG-0164003, FANG-0164004—FANG-0164011, FANG-0164012—FANG-0164019, FANG-0164020—FANG-0164027, FANG-0164028—FANG-0164035, FANG-0164036—FANG-0164043, FANG-0164044—FANG-0164051, FANG-0164052—FANG-0164059, FANG-0164060—FANG-0164067, FANG-0164068—FANG-0164075, FANG-0164076—FANG-0164083, FANG-0164084—FANG-0164091, FANG-0164092—FANG-0164099, FANG-0164100—FANG-0164107, FANG-0164108—FANG-0164115, FANG-0164116—FANG-0164123, FANG-0164124—FANG-0164131, FANG-0164132—FANG-0164139, FANG-0164140—FANG-0164147, FANG- [illegible] |
| 13 | The timing and purchase price amounts for Ace's and True Knight's purchases of Fang and CIH interest from eleven sellers through over 20 transactions in June 2021 through May 2022 while Fang was no longer making its annual securities filing | 25 | **0** | 365 | **0** | FANG-0002907, FANG-0002908—FANG-0002958, FANG-0002959—FANG-0003009, FANG-0003010, FANG-0003011—FANG-0003027, FANG-0003028—FANG-0003038, FANG-0003039—FANG-0003040, FANG-0003041—FANG-0003051, FANG-0003052—FANG-0003053, FANG-0003054—FANG-0003070, FANG-0003071, FANG-0003072—FANG-0003112, FANG-0003113—FANG-0003154, FANG-0076988—FANG-0076991, FANG-0076992, FANG-0076993, FANG-0076994, FANG-0076995—FANG-0076996, FANG-0076997—FANG-0077047, FANG-0077048, FANG-0077049, FANG-0077050, FANG-0077051—FANG-0077101, FANG-0077102—FANG-0077103, FANG-0077104 |
| 14 | The rationale for the CIH take private | 40 | **12** | 188 | **97** | FANG-0000562, FANG-0000563—FANG-0000567, FANG-0002467, FANG-0002468—FANG-0002469, FANG-0002470—FANG-0002480, FANG-0002891, FANG-0002892—FANG-0002899, FANG-0002900—FANG-0002906, FANG-0031697, FANG-0031698, FANG-0031699—FANG-0031702, FANG-0040194—FANG-0040195, FANG-0040196—FANG-0040200, FANG-0077107, FANG-0077108—FANG-0077112, FANG-0077113—FANG-0077114, FANG-0077115, FANG-0077116, FANG-0077117—FANG-0077123, FANG-0077124—FANG-0077127, FANG-0077132—FANG-0077135, FANG-0084279—FANG-0084280, FANG-0084281—FANG-0084285, FANG-0084286—FANG-0084287, FANG-0088993—FANG-0088994, FANG-0088995—FANG-0088996, FANG-0124239—FANG-0124241, FANG-0144749, FANG-0178292, FANG-0178293—FANG-0178294, FANG-0178295—FANG-0178296, FANG-0178297—FANG-0178301, FANG-0178302—FANG-0178303, FANG-0178304, FANG-0178305—FANG-0178306, FANG-0178384—FANG-0178388, FANG-0178389—FANG-0178390, FANG-0185110—FANG-0185112, FANG-0264618, FANG-0264619—FANG-0264689 |

| Issue Number | Plaintiffs' OSC Issues | Responsive Documents | | Responsive Pages | | Production Locations |
|---|---|---|---|---|---|---|
| | | Total | New | Total | New | |
| 15 | The selection of Roth Capital Partners to provide a valuation of CIH for the CIH take private | 14 | 3 | 88 | 22 | FANG-0006056, FANG-0011490—FANG-0011491, FANG-0011492—FANG-0011499, FANG-0084469, FANG-0084470, FANG-0084471, FANG-0084472—FANG-0084480, FANG-0084481—FANG-0084499, FANG-0084500, FANG-0084501—FANG-0084502, FANG-0084503—FANG-0084523, FANG-0185076—FANG-0185079, FANG-0185080—FANG-0185088, FANG-0185089—FANG-0185097 |
| 16 | The selection and inclusion of the buyer group consortium members and rollover shareholders for the CIH take private | 599 | 277 | 7,884 | 2,877 | FANG-0003227—FANG-0003228, FANG-0003229—FANG-0003256, FANG-0003257—FANG-0003258, FANG-0003259—FANG-0003286, FANG-0003287—FANG-0003288, FANG-0003289—FANG-0003316, FANG-0003317—FANG-0003318, FANG-0003319—FANG-0003346, FANG-0003347—FANG-0003348, FANG-0003349—FANG-0003376, FANG-0003377—FANG-0003378, FANG-0003379—FANG-0003406, FANG-0003407—FANG-0003408, FANG-0003409—FANG-0003436, FANG-0003437—FANG-0003438, FANG-0003439—FANG-0003441, FANG-0003442—FANG-0003444, FANG-0003445—FANG-0003447, FANG-0003448—FANG-0003476, FANG-0003477—FANG-0003509, FANG-0003510—FANG-0003512, FANG-0003513—FANG-0003514, FANG-0003515—FANG-0003516, FANG-0003517—FANG-0003518, FANG-0003519—FANG-0003521, FANG-0003522—FANG-0003525, FANG-0003526—FANG-0003528, FANG-0003529—FANG-0003532, FANG-0003533—FANG-0003561, FANG-0003562—FANG-0003591, FANG-0003592—FANG-0003595, FANG-0003596—FANG-0003598, FANG-0003599—FANG-0003628, FANG-0003629—FANG-0003661, FANG-0003662—FANG-0003665, FANG-0003666—FANG-0003697, FANG-0003698—FANG-0003731, FANG-0003732—FANG-0003736, FANG-0003737—FANG-0003741, FANG-0003742—FANG-0003770, FANG-0003771—FANG-0003800, FANG-0003801—FANG-0003805, FANG-0003806—FANG-0003840, FANG-0003841—FANG-0003871, FANG-0003872—FANG-0003876, FANG-0003877—FANG-0003881, FANG-0003882—FANG-0003913, FANG-0003914—FANG-0003947, FANG-0003948—FANG-0003953, FANG-0003954—FANG-0003959, FANG-0003960—FANG-0003966, FANG-0003967—FANG-0003998, FANG-0003999—FANG-0004033, FANG-0004034—FANG-0004040, FANG-0004041—FANG-0004075, FANG-0004076—FANG-0004107, FANG-0004108—FANG-0004112, FANG-0004113—FANG-0004149, FANG-0004150—FANG-0004181, FANG-0004182—FANG-0004186, FANG-0004187—FANG-0004188, FANG-0004189—FANG-0004192, FANG-0004193—FANG-0004197, FANG-0004198—FANG-0004200, FANG-0004201—FANG-0004204, FANG-0004205—FANG-0004207, FANG-0004208—FANG-0004211, FANG-0004212—FANG-0004216, FANG-0004217—FANG-0004248, FANG-0004249, FANG-0004250—FANG-0004255, FANG-0004256—FANG-0004260, FANG-0004261—FANG-0004292, FANG-0004293, FANG-0004294—FANG-0004301, FANG-0004302—FANG-0004308, FANG-0004309—FANG-0004316, FANG-0004317—FANG-0004323, FANG-0004324—FANG-0004330, FANG-0004331—FANG-0004338, FANG-0004339—FANG-0004345, FANG-0004346—FANG-0004351, FANG-0004352—FANG-0004357, FANG-0004358—FANG-0004361, FANG-0004362—FANG-0004365, FANG-0004366—FANG-0004399, FANG-0004400—FANG-0004436, FANG-0004437—FANG-0004464, FANG-0004465—FANG-0004471, FANG-0004472—FANG-0004478, FANG-0004479—FANG-0004485, FANG-0004486—FANG-0004517, FANG-0004518—FANG-0004521, FANG-0004522—FANG-0004529, FANG-0004530—FANG-0004537, FANG-0004538—FANG-0004545, FANG-0004546—FANG-0004581, FANG-0004582—FANG-0004621, FANG-0004622—FANG-0004630, FANG-0004631—FANG-0004639, FANG-0004640—FANG- [illegible] |
| 17 | Hiring Malone Bailey or interviews of other audit firms despite documents describing months of efforts to secure an auditor. | | | | | FANG-0177925—FANG-0177926 |

| Issue Number | Plaintiffs' OSC Issues | Responsive Documents Total | Responsive Documents New | Responsive Pages Total | Responsive Pages New | Production Locations |
|---|---|---|---|---|---|---|
| 18 | Communications between the independent directors/committee members who approved the CIH spin-off and the 2019 CIH Share Purchase Agreement | 219 | 128 | 1,979 | **1,269** | FANG-0006120—FANG-0006124, FANG-0006125—FANG-0006129, FANG-0006130—FANG-0006131, FANG-0006132—FANG-0006133, FANG-0006134—FANG-0006155, FANG-0006156—FANG-0006162, FANG-0006163—FANG-0006168, FANG-0006169—FANG-0006170, FANG-0008020, FANG-0008021—FANG-0008022, FANG-0008024—FANG-0008025, FANG-0012098—FANG-0012102, FANG-0012103—FANG-0012104, FANG-0012105—FANG-0012106, FANG-0012107—FANG-0012128, FANG-0026481—FANG-0026485, FANG-0030246—FANG-0030250, FANG-0030251—FANG-0030252, FANG-0030339, FANG-0030340—FANG-0030341, FANG-0030342—FANG-0030343, FANG-0032376—FANG-0032378, FANG-0032379—FANG-0032380, FANG-0032381—FANG-0032454, FANG-0032455—FANG-0032466, FANG-0032472, FANG-0032473—FANG-0032474, FANG-0032484, FANG-0034375—FANG-0034377, FANG-0034378, FANG-0034379—FANG-0034380, FANG-0034381—FANG-0034382, FANG-0037082—FANG-0037087, FANG-0040980, FANG-0072045—FANG-0072046, FANG-0072047—FANG-0072051, FANG-0072052—FANG-0072053, FANG-0085412, FANG-0085413, FANG-0091641—FANG-0091646, FANG-0124950—FANG-0124951, FANG-0128228—FANG-0128229, FANG-0132675—FANG-0132680, FANG-0132681—FANG-0132692, FANG-0132693—FANG-0132702, FANG-0132703—FANG-0132716, FANG-0132717—FANG-0132719, FANG-0132720—FANG-0132721, FANG-0132722, FANG-0132723, FANG-0132724, FANG-0132725, FANG-0132726—FANG-0132731, FANG-0132732—FANG-0132805, FANG-0132806—FANG-0132827, FANG-0132828, FANG-0132829, FANG-0136256—FANG-0136261, FANG-0136262—FANG-0136267, FANG-0136268—FANG-0136279, FANG-0136280—FANG-0136289, FANG-0136290—FANG-0136303, FANG-0136304—FANG-0136306, FANG-0136307—FANG-0136308, FANG-0136309, FANG-0136310, FANG-0136311, FANG-0136312, FANG-0136313—FANG-0136318, FANG-0136319—FANG-0136392, FANG-0136393—FANG-0136414, FANG-0136415, FANG-0136416, FANG-0143058—FANG-0143063, FANG-0143064—FANG-0143075, FANG-0143076—FANG-0143085, FANG-0143086—FANG-0143099, FANG-0143100—FANG-0143102, FANG-0143103—FANG-0143104, FANG-0143105, FANG-0143106, FANG-0143107, FANG-0143108, FANG-0143109—FANG-0143114, FANG-0143115—FANG-0143188, FANG-0143189—FANG-0143210, FANG-0143211, FANG-0143212, FANG-0143810, FANG-0143811—FANG-0143812, FANG-0144581, FANG-0182565—FANG-0182566, FANG-0182567—FANG-0182578, FANG-0182579—FANG-0182588, FANG-0182589—FANG-0182602, FANG-0182603—FANG-0182605, FANG-0182606—FANG-0182607, FANG-0182608, FANG-0182609, FANG-0182610, FANG-0182611, FANG-0182612—FANG-0182617, FANG-0182618—FANG-0182691, FANG-0182692—FANG-0182713, FANG-0182714, FANG-0182715, FANG-0183375—FANG-0183376, FANG-0183377—FANG-0183382, FANG-0183383—FANG-0183456, FANG-0183457—FANG-0183478, FANG-0183479, FANG-0183480, FANG-0183481—FANG-0183482, FANG-0183483—FANG-0183494, FANG-0183495—FANG-0183504, FANG-0183505—FANG-0183518, FANG-0183519—FANG-0183520, FANG-0183521, FANG- [illegible] |
| 19 | Communications with Defendant Mo regarding why he wanted to sell "around $50-$100 million of [his] CIH shares" to Fang before September 30, 2019 (3 months before Fang entered the 2019 CIH Share Purchase Agreement), because of a "'window' Issue'" | N/A | N/A | N/A | N/A | |
| 20 | Communications with Media Partner and Next Decade regarding entering the 2019 CIH Share Purchase Agreement | N/A | N/A | N/A | N/A | |

| Issue Number | Plaintiffs' OSC Issues | Responsive Documents Total | Responsive Documents New | Responsive Pages Total | Responsive Pages New | Production Locations |
|---|---|---|---|---|---|---|
| 21 | Communications with Media Partner and Next Decade regarding the $5.99 CIH per share option price, despite documents referencing negotiations with the "sellers" regarding the $5.99 CIH share price (Ex. 17) | 38 | **38** | 469 | **469** | FANG-0183720, FANG-0183721—FANG-0183731, FANG-0183732—FANG-0183742, FANG-0183849, FANG-0183850—FANG-0183865, FANG-0183866, FANG-0184639, FANG-0184640—FANG-0184641, FANG-0184642—FANG-0184643, FANG-0184644—FANG-0184645, FANG-0184646—FANG-0184719, FANG-0184720—FANG-0184731, FANG-0162130—FANG-0162133, FANG-0162134—FANG-0162138, FANG-0162148—FANG-0162152, FANG-0162157—FANG-0162159, FANG-0162160—FANG-0162178, FANG-0162179—FANG-0162183, FANG-0175375—FANG-0175377, FANG-0175378—FANG-0175396, FANG-0183669, FANG-0183670—FANG-0183681, FANG-0183682—FANG-0183693, FANG-0183694—FANG-0183695, FANG-0183696—FANG-0183707, FANG-0183708—FANG-0183719, FANG-0183867—FANG-0183871, FANG-0183872—FANG-0183889, FANG-0183890—FANG-0183894, FANG-0183895—FANG-0183898, FANG-0183899—FANG-0183902, FANG-0183903—FANG-0183921, FANG-0183922—FANG-0183924, FANG-0183925—FANG-0184003, FANG-0184004—FANG-0184022, FANG-0184023—FANG-0184078, FANG-0184079—FANG-0184081, FANG-0184732—FANG-0184737 |
| 22 | Communications from Fang to China Enterprise Appraisals (CEA) regarding CEA's value conclusion for CIH | 8 | **3** | 170 | **6** | FANG-0034653, FANG-0034654—FANG-0034659, FANG-0034660—FANG-0034737, FANG-0035208, FANG-0035209—FANG-0035286, FANG-0186518—FANG-0186521, FANG-0186522, FANG-0186523 |
| 23 | Communications with any other valuation firms for CIH despite emails purporting that Fang "contacted with three well-known appraisal firms" | | | | | |
| 24 | Communications with Roth Capital Partners regarding report drafts or the valuation of CIH for the take private transaction | 26 | **7** | 153 | **7** | FANG-0085860, FANG-0085861—FANG-0085888, FANG-0086239—FANG-0086240, FANG-0086261—FANG-0086278, FANG-0086297—FANG-0086313, FANG-0086314—FANG-0086330, FANG-0086368—FANG-0086374, FANG-0086375, FANG-0086376, FANG-0086377—FANG-0086379, FANG-0086383—FANG-0086385, FANG-0086386—FANG-0086390, FANG-0086663, FANG-0086664—FANG-0086667, FANG-0086668—FANG-0086695, FANG-0087145—FANG-0087146, FANG-0087147—FANG-0087148, FANG-0087149, FANG-0127421—FANG-0127425, FANG-0178675, FANG-0178676, FANG-0178677, FANG-0178678, FANG-0178679, FANG-0178680, FANG-0178681 |

| Issue Number | Plaintiffs' OSC Issues | Responsive Documents Total | Responsive Documents New | Responsive Pages Total | Responsive Pages New | Production Locations |
|---|---|---|---|---|---|---|
| 25 | Communications with members of the buyer group consortium and rollover shareholders regarding the CIH take private or CIH's value | 91 | 3 | 903 | 48 | FANG-0083689—FANG-0083692, FANG-0083693—FANG-0083696, FANG-0083697—FANG-0083711, FANG-0083712—FANG-0083724, FANG-0083725—FANG-0083729, FANG-0083730—FANG-0083734, FANG-0083735—FANG-0083749, FANG-0083750—FANG-0083762, FANG-0083829—FANG-0083842, FANG-0083843—FANG-0083860, FANG-0123424—FANG-0123430, FANG-0123431—FANG-0123438, FANG-0123439—FANG-0123446, FANG-0140071—FANG-0140072, FANG-0140073—FANG-0140085, FANG-0140086—FANG-0140087, FANG-0140088—FANG-0140100, FANG-0140101—FANG-0140102, FANG-0140103—FANG-0140115, FANG-0140116—FANG-0140118, FANG-0140119—FANG-0140121, FANG-0140122—FANG-0140124, FANG-0140125—FANG-0140126, FANG-0140127—FANG-0140157, FANG-0140158—FANG-0140177, FANG-0140178—FANG-0140212, FANG-0140213—FANG-0140217, FANG-0140218—FANG-0140223, FANG-0140224—FANG-0140248, FANG-0140249—FANG-0140272, FANG-0140273—FANG-0140276, FANG-0140277—FANG-0140279, FANG-0140280—FANG-0140290, FANG-0140291—FANG-0140300, FANG-0140301—FANG-0140402, FANG-0140403—FANG-0140404, FANG-0140405, FANG-0140406—FANG-0140418, FANG-0140419—FANG-0140431, FANG-0140432—FANG-0140434, FANG-0140435—FANG-0140438, FANG-0140439—FANG-0140440, FANG-0140441—FANG-0140459, FANG-0140460—FANG-0140461, FANG-0140462—FANG-0140463, FANG-0140464—FANG-0140478, FANG-0140533—FANG-0140535, FANG-0140536—FANG-0140550, FANG-0140551—FANG-0140566, FANG-0140574—FANG-0140576, FANG-0140600—FANG-0140602, FANG-0140603—FANG-0140619, FANG-0140620—FANG-0140634, FANG-0140635—FANG-0140638, FANG-0140646—FANG-0140650, FANG-0140692—FANG-0140694, FANG-0140695—FANG-0140719, FANG-0140720—FANG-0140743, FANG-0140744—FANG-0140746, FANG-0140747—FANG-0140753, FANG-0140915—FANG-0140919, FANG-0140920—FANG-0140924, FANG-0140925—FANG-0140939, FANG-0140940—FANG-0140956, FANG-0140971—FANG-0140986, FANG-0140987—FANG-0140988, FANG-0140989—FANG-0140990, FANG-0140991—FANG-0140992, FANG-0140993—FANG-0140994, FANG-0140995—FANG-0140996, FANG-0140997—FANG-0140998, FANG-0140999—FANG-0141002, FANG-0141003—FANG-0141017, FANG-0141018—FANG-0141019, FANG-0141058—FANG-0141063, FANG-0141064—FANG-0141070, FANG-0141071—FANG-0141077, FANG-0141078—FANG-0141079, FANG-0141080—FANG-0141088, FANG-0141089—FANG-0141095, FANG-0141096—FANG-0141101, FANG-0141102, FANG-0141103, FANG-0141104—FANG-0141110, FANG-0141111—FANG-0141117, FANG-0141118—FANG-0141119, FANG-0141120—FANG-0141128, FANG-0144767—FANG-0144779, FANG-0178714—FANG-0178715, FANG-0178716—FANG-0178725, FANG-0185017—FANG-0185052 |
| 26 | Communications with any of the eleven sellers relating to the over 20 transactions whereby they sold their Fang and CIH interests to Defendant Mo and Dai and their respective entities, Defendants Ace and True Knight, from June 2021 through May 2022 while Fang was no longer making its annual securities filings | 31 | 14 | 123 | 23 | FANG-0005943, FANG-0005967—FANG-0005977, FANG-0005978—FANG-0005989, FANG-0005990—FANG-0006000, FANG-0071489, FANG-0071490—FANG-0071491, FANG-0071492—FANG-0071503, FANG-0071504—FANG-0071506, FANG-0071507, FANG-0071508—FANG-0071509, FANG-0143217, FANG-0143218, FANG-0143219—FANG-0143236, FANG-0143237—FANG-0143247, FANG-0143248, FANG-0143249—FANG-0143259, FANG-0143260, FANG-0178211—FANG-0178212, FANG-0178213, FANG-0178214, FANG-0178215, FANG-0178216, FANG-0178217—FANG-0178219, FANG-0178220—FANG-0178222, FANG-0178223, FANG-0178224, FANG-0180670—FANG-0180674, FANG-0180675, FANG-0180676, FANG-0180677, FANG-0180678 |

| Issue Number | Plaintiffs' OSC Issues | Responsive Documents | | Responsive Pages | | Production Locations |
|---|---|---|---|---|---|---|
| | | Total | New | Total | New | |
| 27 | Communications with outside auditors regarding their hiring despite documents describing mention months of efforts to secure an auditor. | 90 | **88** | 1,140 | **1,134** | FANG-0031631—FANG-0031633, FANG-0076875—FANG-0076877, FANG-0219968—FANG-0219969, FANG-0262545, FANG-0262546, FANG-0262547—FANG-0262550, FANG-0262551—FANG-0262553, FANG-0262554—FANG-0262555, FANG-0262556, FANG-0262557—FANG-0262558, FANG-0262559, FANG-0262560—FANG-0262562, FANG-0262563, FANG-0262572—FANG-0262575, FANG-0262576, FANG-0262577—FANG-0262579, FANG-0262598—FANG-0262602, FANG-0262603, FANG-0262604—FANG-0262606, FANG-0262607—FANG-0262610, FANG-0262611, FANG-0262657—FANG-0262659, FANG-0262661, FANG-0262662—FANG-0262669, FANG-0262670—FANG-0262671, FANG-0262672—FANG-0262693, FANG-0262694—FANG-0262709, FANG-0262710—FANG-0262720, FANG-0262743, FANG-0262744—FANG-0262751, FANG-0262752, FANG-0262753—FANG-0262781, FANG-0262782, FANG-0262785—FANG-0262786, FANG-0262791, FANG-0262792, FANG-0262793, FANG-0262794—FANG-0262962, FANG-0262963—FANG-0262991, FANG-0262992, FANG-0262993—FANG-0263028, FANG-0263029—FANG-0263063, FANG-0263064—FANG-0263065, FANG-0263066—FANG-0263234, FANG-0263235, FANG-0263236—FANG-0263259, FANG-0263260—FANG-0263292, FANG-0263293, FANG-0263294—FANG-0263322, FANG-0263323—FANG-0263356, FANG-0263426, FANG-0263427—FANG-0263453, FANG-0263454—FANG-0263480, FANG-0263481—FANG-0263507, FANG-0263508—FANG-0263534, FANG-0263535, FANG-0263536—FANG-0263545, FANG-0263546—FANG-0263575, FANG-0264388, FANG-0264389—FANG-0264391, FANG-0264393—FANG-0264401, FANG-0264402—FANG-0264403, FANG-0264404, FANG-0264405, FANG-0264414, FANG-0264415—FANG-0264422, FANG-0264423—FANG-0264424, FANG-0264425—FANG-0264426, FANG-0264427—FANG-0264428, FANG-0264429—FANG-0264430, FANG-0264448—FANG-0264454, FANG-0264475, FANG-0264476—FANG-0264478, FANG-0264498, FANG-0264499, FANG-0264500—FANG-0264508, FANG-0264509, FANG-0264510—FANG-0264516, FANG-0264517—FANG-0264518, FANG-0264519, FANG-0264690, FANG-0264691—FANG-0264760, FANG-0264766—FANG-0264767, FANG-0264769—FANG-0264771, FANG-0280018—FANG-0280021, FANG-0280022—FANG-0280096, FANG-0280097—FANG-0280125, FANG-0280126, FANG-0280127—FANG-0280135, FANG-0280136—FANG-0280144 |

# EXHIBIT 2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------X

OASIS INVESTMENTS II MASTER FUND LTD. and LORELEI NCC INC., derivatively on behalf of nominal defendant FANG HOLDINGS LIMITED,

Plaintiffs,

-against-

VINCENT TIANQUAN MO, RICHARD JIANGONG DAI, ACE SMART INVESTMENTS LIMITED, NEXT DECADE INVESTMENTS LIMITED, MEDIA PARTNER TECHNOLOGY LIMITED, and TRUE KNIGHT LIMITED,

Defendants.
-----------------------------------------------------------------X

Index No.: 652607/2023

**~~[PROPOSED]~~ STIPULATION AND ORDER FOR THE PRODUCTION AND EXCHANGE OF CONFIDENTIAL INFORMATION**

This matter having come before the Court by stipulation of Plaintiffs Oasis Investments II Master Fund Ltd., and Lorelei NCC Inc. and Defendants, Vincent Tianquan Mo, Richard Jiangong Dai, ACE Smart Investments Limited, Next Decade Investments Limited, Media Partner Technology Limited, True Knight Limited, and Nominal Defendant Fang Holdings Limited (individually "Party" and collectively "Parties")[1] for the entry of a protective order pursuant to CPLR 3103(a), limiting the review, copying, dissemination and filing of confidential and/or proprietary documents and information to be produced in the course of discovery in this matter to the extent set forth below; and the Parties, by, between and among their respective counsel, having stipulated and agreed to the terms set forth herein, and good cause having been shown;

IT IS hereby ORDERED that:

1. This Stipulation is being entered into to facilitate the production, exchange and discovery of documents and information that merits confidential treatment (hereinafter the "Documents" or "Testimony").

2. Any party may designate Documents produced, or Testimony given, in connection with this action as "confidential," either by notation on each page of

[1] Party and Parties are signatories to this Stipulation and Order for the Production and Exchange of Confidential Information, and party and parties are any individuals or entities obligated to produce documents or give testimony in connection with this action.

the Document so designated, statement on the record of the deposition, or written advice to the respective counsel for all affected parties, or by other appropriate means.

3. As used herein:

   a. "Confidential Information" shall mean all Documents and Testimony, and all information contained therein, and other information designated as confidential, if such Documents or Testimony contain trade secrets, proprietary business information, competitively sensitive information, or other information the disclosure of which would, in the good faith judgment of the party designating the material as confidential, be detrimental to the conduct of that party's business or the business of any of that party's customers or clients.

   b. "Producing Party" shall mean the party producing Confidential Information in connection with depositions, document production or otherwise, or the party asserting the confidentiality privilege, as the case may be.

   c. Receiving Party" shall mean the party receiving Confidential Information in connection with depositions, document production or otherwise.

4. The Receiving Party may, at any time, notify the Producing Party in writing that the Receiving Party does not concur in the designation of a document or other material as Confidential Information. If the Producing Party does not agree to declassify such document or material within seven (7) days of the written notification, the Receiving Party may move before the Court for an order declassifying those documents or materials. If no such motion is filed, such documents or materials shall continue to be treated as Confidential Information. If the motion is filed, the documents or other materials shall be deemed Confidential Information unless and until the Court rules otherwise. On such a motion, the Producing Party bears the burden of establishing the propriety of its designation of documents or information as Confidential Information.

5. Except with the prior written consent of the Producing Party or by Order of the Court, Confidential Information shall not be furnished, shown or disclosed to any person or entity except to:

   a. personnel of plaintiff or defendant actually engaged in assisting in the preparation of this action for trial or other proceeding herein and who have

been advised of their obligations hereunder;

b. counsel for the Parties to this action and their associated attorneys, paralegals and other professional and non-professional personnel (including support staff and outside copying services) who are directly assisting such counsel in the preparation of this action for trial or other proceeding herein, are under the supervision or control of such counsel, and who have been advised by such counsel of their obligations hereunder;

c. expert witnesses or consultants retained by the Parties or their counsel to furnish technical or expert services in connection with this action or to give testimony with respect to the subject matter of this action at the trial of this action or other proceeding herein; provided, however, that such Confidential Information is furnished, shown or disclosed in accordance with paragraph 7 hereof;

d. the Court and court personnel;

e. an officer before whom a deposition is taken, including stenographic reporters and any necessary secretarial, clerical or other personnel of such officer;

f. trial and deposition witnesses, if furnished, shown or disclosed in accordance with paragraphs 9 and 10, respectively, hereof; and

g. any other person agreed to by the Producing Party.

6. Confidential Information shall be utilized by the Receiving Party and its counsel only for purposes of this litigation and for no other purposes.

7. Before any disclosure of Confidential Information is made to an expert witness or consultant pursuant to paragraph 5(c) hereof, counsel for the Receiving Party shall provide the expert's written agreement, in the form of Exhibit 1 attached hereto, to comply with and be bound by its terms. Counsel for the Receiving Party obtaining the certificate shall supply a copy to counsel for the other Parties at the time designated for expert disclosure, except that any certificate signed by an expert or consultant who is not expected to be called as a witness at trial is not required to be supplied.

8. All depositions shall presumptively be treated as Confidential Information and subject to this Stipulation during the deposition and for a period of fifteen (15) days after a

transcript of the deposition is received by counsel for each of the parties. At or before the end of such fifteen-day period, the deposition shall be classified appropriately.

9. Should the need arise for any party to disclose Confidential Information during any hearing or trial before the Court, including through argument or the presentation of evidence, such party may do so only after taking such steps as the Court, upon motion of the Producing Party, shall deem necessary to preserve the confidentiality of such Confidential Information.

10. This Stipulation shall not preclude counsel for any Party from using during any deposition in this action any Documents or Testimony which has been designated as Confidential Information under the terms hereof. Any deposition witness who is given access to Confidential Information shall, prior thereto, be provided with a copy of this Stipulation and shall execute a written agreement, in the form of Exhibit 1 attached hereto, to comply with and be bound by its terms. Counsel for the Party obtaining the certificate shall supply a copy to counsel for the other parties to the action. In the event that, upon being presented with a copy of the Stipulation, a witness refuses to execute the agreement to be bound by this Stipulation, the Court shall, upon application, enter an order directing the witness's compliance with the Stipulation.

11. A Party may designate as Confidential Information subject to this Stipulation any document, information, or deposition testimony produced or given by any non-party to this case, or any portion thereof. In the case of Documents produced by a non-party, designation shall be made by notifying all counsel in writing of those documents which are to be stamped and treated as such at any time up to fifteen (15) days after actual receipt of copies of those documents by counsel for the Party asserting the confidentiality privilege. In the case of deposition Testimony, designation shall be made by notifying all counsel in writing of those portions which are to be stamped or otherwise treated as such at any time up to fifteen (15) days after the transcript is received by counsel for the Party asserting the confidentiality privilege. Prior to the expiration of such fifteen (15) day period (or until a designation is made by counsel, if such a designation is made in a shorter period of time), all such Documents and Testimony shall be treated as Confidential Information.

12. (a) A Party or, as appropriate, non-party, who seeks to file with the Court (i) any deposition transcripts, exhibits, answers to interrogatories, or other documents which have previously been designated as comprising or containing Confidential Information, or (ii) any pleading, brief or memorandum which reproduces,

paraphrases or discloses Confidential Information shall file the document, pleading, brief, or memorandum on the NYSCEF system in redacted form until the Court renders a decision on any motion to seal (the "Redacted Filing"). If the Producing Party fails to move to seal within seven (7) days of the Redacted Filing, the Party (or, as appropriate, non-party) making the filing shall take steps to replace the Redacted Filing with its corresponding unredacted version.

(b) In the event that the Party's (or, as appropriate, non-party's) filing includes Confidential Information produced by a Producing Party that is a non-party, the filing Party shall so notify that Producing Party within twenty four (24) hours after the Redacted Filing by providing the Producing Party with a copy of the Redacted Filing as well as a version of the filing with the relevant Producing Party's Confidential Information unredacted.

(c) If the Producing Party makes a timely motion to seal, and the motion is granted, the filing Party (or, as appropriate, non-party) shall ensure that all documents (or, if directed by the court, portions of documents) that are the subject of the order to seal are filed in accordance with the procedures that govern the filing of sealed documents on the NYSCEF system. If the Producing Party's timely motion to seal is denied, then the Party (or, as appropriate, non-party) making the filing shall take steps to replace the Redacted Filing with its corresponding unredacted version.

(d) Any Party filing a Redacted Filing in accordance with the procedure set forth in this paragraph 12 shall, contemporaneously with or prior to making the Redacted Filing, provide the other Parties and the Court with a complete and unredacted version of the filing.

(e) All pleadings, briefs or memoranda which reproduce, paraphrase or disclose any materials which have previously been designated by a party as comprising or containing Confidential Information shall identify such documents by the production number ascribed to them at the time of production.

13. Any person receiving Confidential Information shall not reveal or discuss such information to or with any person not entitled to receive such information under the terms hereof.

14. Any document or information that may contain Confidential Information that has been inadvertently produced without identification as to its "confidential" nature as provided in paragraphs 2 and/or 11 of this Stipulation, may be so designated by the party asserting the confidentiality

privilege by written notice to the undersigned counsel for the Receiving Party identifying the document or information as "confidential" within a reasonable time following the discovery that the document or information has been produced without such designation.

15. In connection with the review of electronically stored information and hard copy documents for production (the "Documents Reviewed") the Parties agree as follows:

a. to implement and adhere to reasonable procedures to ensure Documents Reviewed that are protected from disclosure pursuant to CPLR 3101(c), 3101(d)(2) and 4503 ("Protected Information") are identified and withheld from production.

b. if Protected Information is inadvertently produced, the Producing Party shall take reasonable steps to correct the error, including a request to the Receiving Party for its return.

c. upon request by the Producing Party for the return of Protected Information inadvertently produced the Receiving Party shall promptly return the Protected Information and destroy all copies thereof. Furthermore, the Receiving Party shall not challenge either the adequacy of the Producing Party's document review procedure or its efforts to rectify the error, and the Receiving Party shall not assert that its return of the inadvertently produced Protected Information has caused it to suffer prejudice.

16. Extracts and summaries of Confidential Information shall also be treated as confidential in accordance with the provisions of this Stipulation.

17. The production or disclosure of Confidential Information shall in no way constitute a waiver of each Producing Party's right to object to the production or disclosure of other information in this action or in any other action.

18. This Stipulation shall continue to be binding after the conclusion of this litigation except (a) that there shall be no restriction on documents that are used as exhibits in Court (unless such exhibits were filed under seal); and (b) that a Receiving Party may seek the written permission of the Producing Party or further order of the Court with respect to dissolution or modification of any part of the Stipulation. The provisions of this Stipulation shall, absent prior written consent of both parties, continue to be binding after the conclusion of this action.

19. Nothing herein shall be deemed to waive any privilege recognized by law or

shall be deemed an admission as to the admissibility in evidence of any facts or documents revealed in the course of disclosure.

20. Within sixty (60) days after the final termination of this litigation by settlement or exhaustion of all appeals, all Confidential Information produced or designated and all reproductions thereof, shall be returned to the Producing Party or shall be destroyed. In the event that any Receiving Party chooses to destroy physical objects and documents, such Party shall certify in writing within sixty (60) days of the final termination of this litigation that it has undertaken its best efforts to destroy such physical objects and documents, and that such physical objects and documents have been destroyed to the best of its knowledge. Notwithstanding anything to the contrary, counsel of record for the Parties may retain one copy of documents constituting work product, a copy of pleadings, motion papers, discovery responses, deposition transcripts and deposition and trial exhibits. This Stipulation shall not be interpreted in a manner that would violate any rules of professional conduct. Nothing in this Stipulation shall prohibit or interfere with the ability of counsel for any Receiving Party, or of experts specially retained for this case, to represent any individual, corporation, or other entity adverse to any party or their affiliate(s) in connection with any other matters.

21. This Stipulation may be changed by further order of this Court, and is without prejudice to the rights of a Party to move for relief from any of its provisions, or to seek or agree to different or additional protection for any particular material or information.

Dated:
November 19, 2024

**REID COLLINS & TSAI LLP**

*/s/ Aaron A. Brown*
William T. Reid, IV
Yonah Jaffe
Aaron A. Brown
420 Lexington Avenue, Suite 2731
New York, New York 10170
T: 212-344-5200
F: 212-344-5299
wreid@reidcollins.com
yjaffe@reidcollins.com
abrown@reidcollins.com

Nathaniel J. Palmer (admitted *pro hac vice*)
Michael Yoder (admitted *pro hac vice*)
1301 S. Capital of Texas Hwy, C-300
Austin, Texas 78746
T: 512-647-6100
F: 512-647-6129
npalmer@reidcollins.com
myoder@reidcollins.com

*Counsel for Plaintiffs Oasis Investments II Master Fund Ltd. and Lorelei NCC Inc.*

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

*/s/ Silpa Maruri*
Michael B. Carlinsky
Silpa Maruri
Tom Barnes
51 Madison Avenue, 22nd Floor
New York, New York 10010
Tel: +1 212 849 7000
Fax: +1 212 849 7100
michaelcarlinsky@quinnemanuel.com
silpamaruri@quinnemanuel.com
tombarnes@quinnemanuel.com

*Counsel for Defendants Vincent Tianquan Mo, Richard Jiangong Dai, Media Partner Technology Limited, Next Decade Investments Limited, True Knight Limited, ACE Smart Investment Limited, and Nominal Fang Holdings Limited*

Dated: 11/19/24

SO ORDERED ______________________
Hon. Andrew Borrok, J.S.C.

HON. ANDREW BORROK
J.S.C.

EXHIBIT 1

SUPREME COURT OF THE STATE OF NEW YORK COUNTY

-----------------------------------------------------------------X

OASIS INVESTMENTS II MASTER FUND LTD. and LORELEI NCC INC., derivatively on behalf of nominal defendant FANG HOLDINGS LIMITED,

Plaintiffs,

-against-

VINCENT TIANQUAN MO, RICHARD JIANGONG DAI, ACE SMART INVESTMENTS LIMITED, NEXT DECADE INVESTMENTS LIMITED, MEDIA PARTNER TECHNOLOGY LIMITED, and TRUE KNIGHT LIMITED,

Defendants.

-----------------------------------------------------------------X

Index No.: 652607/2023

**AGREEMENT TO RESPECT CONFIDENTIAL MATERIAL**

I, ____________________________________________, state that:

1. My address is

   ________________________________________________________________.

2. My present employer is

   ________________________________________________________.

3. My present occupation or job description is

   ____________________________________.

4. I had received a copy of the Stipulation for the Production and Exchange of Confidential Information ("Stipulation") entered in the above-entitled action on

   _________________.

5. I have carefully read and understand the provisions of the Stipulation.

6. I will comply with all of the provisions of the Stipulation.

7. I will hold in confidence, will not disclose to anyone not qualified under the Stipulation, and will use only for purposes of this action, any Confidential Information that is disclosed to me.

8. I will return all Confidential Information that comes into my possession, and documents or things that I have prepared relating thereto, to counsel for the party by whom I am employed or retained, or to counsel for whom I received the Confidential Information.

9. I hereby submit to the jurisdiction of this court for the purpose of enforcement of the Stipulation in this action.

Dated: _____________ ______________________________

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| 507 SUMMIT LLC, *et al.*,<br><br>Petitioners,<br><br>v.<br><br>BALANCE LAW PLLC d/b/a Balance Law Firm,<br><br>Respondent. | Case No. 1:25-mc-00235-KHP<br><br>Honorable Katharine H. Parker |

**RESPONDENT BALANCE LAW PLLC'S MEMORANDUM OF**
**LAW IN SUPPORT OF MOTION TO QUASH PETITIONERS' SUBPOENA**

Beixiao Robert Liu
Balance Law Firm
1 World Trade Center, Suite 8500
New York, NY 10007
(212) 741-8080
(646) 558-4889 (fax)
robert.liu@balancelawfirm.com

*Attorneys for Respondent Balance Law*
*Firm PLLC d/b/a Balance Law Firm*

## Table of Contents

**PRELIMINARY STATEMENT** .......... **1**

**BACKGROUND AND PROCEDURAL HISTORY** .......... **2**

**ARGUMENT** .......... **3**

I. AFTER SUBJECTING THE SUBPOENA TO HEIGHTENED SCRUTINY BASED ON THE SPECIAL LEGAL/POLICY CONCERNS IDENTIFIED BY THE *KIOBEL* SECOND CIRCUIT CASE AND OTHER CASES, THIS COURT SHOULD QUASH THE SUBPOENA BECAUSE IT IMPROPERLY SEEKS DOCUMENTS FROM A U.S. LAW FIRM THAT WERE TRANSMITTED TO IT FROM ABROAD BY A FOREIGN CLIENT FOR THE PURPOSE OF OBTAINING LEGAL ADVICE. .......... 4

II. THE COURT SHOULD QUASH THE SUBPOENA BECAUSE PETITIONERS FILED THIS ABUSIVE SECTION 1782 APPLICATION TO HARASS BALANCE LAW IN RETALIATION FOR BALANCE LAW HAVING SERVED A SUBPOENA ON PETITIONER 507 SUMMIT LLC IN THE STATE COURT ACTION. .......... 10

**CONCLUSION** .......... **11**

TABLE OF AUTHORITIES

Page(s)

Cases

*507 Summit LLC v. Balance Law PLLC*,
No. 25-MC-235 (KHP), 2026 WL 205837 (S.D.N.Y. Jan. 26, 2026) .............................. passim
*Application of Sarrio, S.A.*,
119 F.3d 143 (2d Cir. 1997) .............................................................................................. 4, 5, 7
*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
673 F.3d 76 (2d Cir. 2012) .................................................................................................. 10
*In re Alghanim*,
No. 21-MC-00167, 2022 WL 1423088 (S.D.N.Y. May 5, 2022) .............................................. 8
*In re B&C KB Holding GmbH*,
No. 23-1014(L), No. 24-887(con), 2024 WL 3170983 (2d Cir. June 26, 2024)...................... 10
*In re Genial Institucional Corretora de Cambio, Titulos e Valores Mobiliarios S.A.*,
No. 24-MC-348 (JMF), 2025 WL 40783 (S.D.N.Y. Jan. 7, 2025) ........................................... 3
*In re Hulley Enterprises, Ltd.*,
358 F. Supp. 3d 331 (S.D.N.Y. 2019)........................................................................................ 8
*In re Klein*,
No. 223 Misc. 211 (PAE), 2023 WL 8827847 (S.D.N.Y. Dec. 21, 2023)................................ 7
*In re Warren*,
No. 20 Misc. 208 (PGG), 2020 WL 6162214 (S.D.N.Y. Oct. 21, 2020) .................................. 8
*Intel Corp. v. Advanced Micro Devices, Inc.*,
542 U.S. 241 (2004) ........................................................................................................ 3, 6, 10
*Kiobel by Samkalden v. Cravath, Swain & Moore LLP*,
895 F.3d 238 (2d Cir. 2018) ............................................................................................ passim
*Klein v. Altara RK Investments Ltd.*,
No. 24-228-cv, 2025 WL 560105 (2d Cir. Feb. 20, 2025)......................................................... 7
*Lelchook v. Lebanese Canadian Bank*,
670 F. Supp. 3d 51 (S.D.N.Y. 2023)........................................................................... 6, 7, 10

Statutes

28 U.S.C. § 1782............................................................................................................... passim

In accordance with the deadline set by the Court's Opinion and Order (ECF No. 21), *507 Summit LLC v. Balance Law PLLC*, No. 25-MC-235 (KHP), 2026 WL 205837 (S.D.N.Y. Jan. 26, 2026) ("1/26/26 Order"), Respondent Balance Law PLLC ("Balance Law") hereby requests that the Court quash the subpoena duces tecum ("the Subpoena") issued by Petitioners 507 Summit LLC and KOA Capital L.P. (collectively, "Petitioners").

**PRELIMINARY STATEMENT**

This is not a run-of-the-mill 28 U.S.C. § 1782 proceeding, and the Subpoena is not a run-of-the-mill subpoena. Balance Law, the target of the Subpoena, is a law firm that "is not a party," 1/26/26 Order, 2026 WL 205837, at *1, to the underlying Cayman Islands appraisal proceeding that Petitioners commenced after dissenting from a take-private transaction. Balance Law (a U.S. law firm) was not responsible for—and has had no financial interest or any other involvement in—the events that gave rise to, and/or are at issue in, that Cayman Islands proceeding. Instead, Balance Law is an innocent bystander to the Cayman Islands appraisal proceeding. Balance Law has been representing certain foreign defendants ("the Foreign Defendants") in a New York state court shareholder derivative lawsuit ("the State Court Action"). The Subpoena seeks documents that are held by Balance Law in its capacity as counsel for the Foreign Clients. Balance Law did not create the documents, and they are in Balance Law's possession only because one of the Foreign Clients provided them to Balance Law to enable it to provide legal advice in the State Court Action and produce the documents to the plaintiff in that lawsuit, pursuant to a confidentiality protective order (issued by the court presiding over that lawsuit) that required the documents to be used only for purposes of that lawsuit.

In these circumstances, this Court should subject the Subpoena to heightened scrutiny based on the special legal/policy concerns identified by *Kiobel by Samkalden v. Cravath, Swain*

*& Moore LLP*, 895 F.3d 238 (2d Cir. 2018), and other cases involving documents provided to U.S. law firms by foreign clients for the purpose of obtaining legal advice—namely, the need to avoid disturbing communications and relationships between U.S. law firms and their foreign clients and to avoid otherwise harming our system of litigation. When subjected to that heightened scrutiny, the Subpoena should be quashed because it improperly seeks documents from Balance Law that were transmitted to Balance Law from abroad by a foreign client for the purpose of obtaining legal advice from Balance Law and it implicates the other legal/policy concerns discussed below.

There is another reason for this Court to quash the Subpoena; Petitioners instituted this abusive Section 1782 proceeding to harass Balance Law in retaliation for a subpoena that Balance Law, on behalf of the Foreign Clients, had served on Petitioner 507 Summit LLC in accordance with non-party discovery authorized by the court presiding over the State Court Action. Shortly after Balance Law served that subpoena, Petitioners filed their Section 1782 application against Balance Law.

Each of the two arguments summarized above independently provide ample justification for the Court to quash the Subpoena, and—when viewed together—they provide even more support for the conclusion that the Subpoena should be quashed.

## BACKGROUND AND PROCEDURAL HISTORY

After Petitioners and Balance Law conferred about a potential resolution to this dispute (following a case management conference with the Court) and did not reach agreement, *see* 1/26/26 Order, 2026 WL 205837, at *5, the parties briefed whether the Court should grant the relief sought by Petitioners.

On January 26, 2026, this Court held that Petitioners satisfied the requirements of Section 1782; granted in part and denied in part Petitioner's application; and narrowed the scope of permissible discovery. 1/26/26 Order, 2026 WL 205837, at *8-10. The Court correctly stated that Balance Law "had no articulable role in the take-private transaction and there is no discernable evidence that it has any direct financial interest in the outcome of the Cayman proceeding." *Id.* at *10. The Court gave Balance Law thirty days to file a motion to quash the Subpoena. *Id.*

In response to the 1/26/26 Order, Petitioners served the Subpoena on Balance Law. Declaration of B. Robert Liu ("2026 Liu Declaration") ¶ 2 & Exhibit 1 (copy of the Subpoena) (filed this same date).

On February 25, 2026, counsel for Balance Law and counsel for the Petitioners had a meet-and-confer call with Petitioners' counsel, but we did not agree on a resolution to this dispute. 2026 Liu Declaration ¶ 3.

## ARGUMENT

Although the Supreme Court's *Intel* case articulated four factors that a district court should consider when deciding whether to exercise its discretion to allow discovery in a Section 1782 proceeding, *see Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264-64 (2004), those factors do not end the analysis. As the Second Circuit explained, those four *Intel* factors are "non-exclusive," *Kiobel*, 895 F.3d at 244, and they "are not to be applied mechanically," *id.* at 245. "A district court should also take into account any other pertinent issues arising from the facts of the particular dispute." *Id.* In other words, those *Intel* factors "are neither exhaustive nor dispositive." *In re Genial Institucional Corretora de Cambio, Titulos e Valores Mobiliarios S.A.*, No. 24-MC-348 (JMF), 2025 WL 40783, at *2 (S.D.N.Y. Jan. 7, 2025).

Thus, merely because this Court applied the four *Intel* factors in the 1/26/26 Order and granted Petitioner's application in part does not mean that the Court is required to deny this motion to quash. Instead, the Court should exercise its discretion to grant this motion because, as discussed below, "other pertinent issues arising from the facts of th[is] particular dispute." *Kiobel*, 895 F.3d at 245, lead inexorably to the conclusion that the Subpoena should be subjected to heightened scrutiny and quashed.

## I. After Subjecting The Subpoena To Heightened Scrutiny Based On The Special Legal/Policy Concerns Identified By The *Kiobel* Second Circuit Case And Other Cases, This Court Should Quash The Subpoena Because It Improperly Seeks Documents From A U.S. Law Firm That Were Transmitted To It From Abroad By A Foreign Client For The Purpose Of Obtaining Legal Advice.

***First***, when reviewing an appeal of an order issued in a Section 1782 proceeding, the Second Circuit has recognized that a subpoena seeking documents that were maintained abroad and sent to a lawyer in the United States for legal advice regarding their discoverability presents a special legal/policy concern that is not presented by subpoenas seeking other kinds of documents in other circumstances. The court acknowledged the "policy of promoting open communications between lawyers and their clients" in those circumstances and stated that it "would be jeopardized if documents unreachable in a foreign country became discoverable because the person holding the documents sent them to a lawyer in the United States for advice as to whether they were subject to production." *Application of Sarrio, S.A.*, 119 F.3d 143, 146 (2d Cir. 1997). That special legal/policy concern identified in *Sarrio* was not limited to, and was broader than, the attorney-client privilege.

In *Kiobel*, the Second Circuit reaffirmed, and expanded upon, the special legal/policy concern discussed in *Sarrio*. The *Kiobel* court stated that a "law firm's representation of a foreign client is a factor worth considering," 895 F.3d at 244, by a district court when deciding

whether to exercise its discretion to allow or preclude discovery in a Section 1782 proceeding. *Kiobel* held that the district court had abused its discretion when granting a Section 1782 petition involving a document subpoena issued to a law firm that was "holding the documents because it represented [Royal Dutch] Shell [("Shell")] in prior litigation brought by Kiobel against Shell," 895 F.3d at 240. As the *Kiobel* court explained, *Sarrio* stands for the proposition that "a district court should not exercise its discretion to grant a Section 1782 petition for documents held by a U.S. law firm in its role as counsel for a foreign client if the documents are undiscoverable from the client abroad, ***because this would disturb attorney-client communications and relations***." *Kiobel*, 895 F.3d at 246 (emphasis added). In other words, "an order compelling American counsel to deliver documents that would not be discoverable abroad, and that are in counsel's hands solely because they were sent to the United States for the purpose of American litigation, would jeopardize 'the policy of promoting open communications between lawyers and their clients.'" *Id.* at 241 (quoting *Sarrio*, 119 F.3d at 146)).

The special legal/policy concerns addressed by the Second Circuit in *Kiobel* were not limited to, and were broader than, the attorney-client privilege. The documents at issue in *Kiobel* previously had been produced by the respondent law firm's client (Shell) to Shell's litigation adversary Kiobel, albeit pursuant to "a confidentiality order that expressly barred Kiobel from using the documents in any other litigation," *Kiobel*, 895 F.3d at 246, so the law firm did not argue that the documents were protected from discovery by the attorney-client privilege. The confidentiality order presented another special legal/policy concern for the Second Circuit: "It is perilous to override the confidentiality order; doing so would inhibit foreign companies from producing documents to U.S. law firms, even under a confidentiality order, lest Section 1782 become a workaround to gain discovery." *Kiobel*, 895 F.3d at 247.

The *Kiobel* court identified additional special legal/policy concerns implicated by "unintended consequences," 895 F.3d at 247, that would result from allowing litigants to use Section 1782 as a workaround to gain discovery from U.S. law firms. For example, after addressing "the need for full and frank communications between attorneys and their clients, which promote[s] broader public interests in the observance of law and administration of justice," *id.* (quotation marks omitted; alteration in original), the court explained that, "[i]f foreign clients have reason to fear disclosing all pertinent documents to U.S. counsel, the likely results are bad legal advice to the client, and harm to our system of litigation," *id.* Moreover, "to avoid potential disclosure issues under Section 1782, U.S. law firms with foreign clients may be forced to store documents and servers abroad, which would result in excessive costs to law firms and clients." *Kiobel*, 895 F.3d at 247. "Alternatively, U.S. law firms may have to return documents to foreign clients (or destroy them) as soon as litigation concludes." *Id.* That would be problematic because "law firms have an interest in retaining documents where needed to protect themselves from accusations of wrongful conduct[,]" *id.* "[s]o U.S. law firms may be harmed if they must destroy or return a foreign client's documents as soon as possible once a proceeding is completed," *id.* at 248. Or, as the Second Circuit stated, "foreign entities may simply be less willing to engage with U.S. law firms." *Id.*

This Court discussed the special legal/policy concerns addressed by the Second Circuit in *Kiobel* and *Sarrio* when the Court granted a non-party law firm's motion to quash a subpoena seeking documents that the law firm "acquired in the course of representing [foreign clients]," *Lelchook v. Lebanese Canadian Bank*, 670 F. Supp. 3d 51, 52 (S.D.N.Y. 2023) (Parker, J.). As the Court stated, "courts have rejected efforts to obtain discovery from foreign entities and persons whose documents are in the U.S. solely for purposes of seeking legal advice in the

context of 28 U.S.C. § 1782, because allowing such discovery would be contrary to public policy seeking to promote full and frank communication between attorneys and clients and observance of the rule of law and administration of justice." *Lelchook*, 670 F. Supp. 3d at 55 (citing *Kiobel*, 895 F.3d at 245-46; *Sarrio*, 119 F.3d at 143).[1] Moreover, this Court acknowledged the potential harms addressed by *Kiobel*: "causing foreign clients to fear disclosing documents to U.S. counsel, likely leading to 'bad legal advice and harm to our system of litigation,' as well as potential excessive costs to store documents abroad and decrease foreign entities' willingness to engage with U.S. law firms." *Lelchook*, 670 F. Supp. 3d at 57 (citing *Kiobel*, 895 F.3d at 247-48); *see In re Klein*, No. 223 Misc. 211 (PAE), 2023 WL 8827847, at *11 (S.D.N.Y. Dec. 21, 2023) (stating that *Kiobel* involved a subpoena to legal counsel, which "implicate[s] unique concerns about lawyer-client relations (and the need for candor and confidentiality) not presented by subpoenas to U.S. financial institutions"), *aff'd sub nom. Klein v. Altara RK Investments Ltd.*, No. 24-228-cv, 2025 WL 560105 (2d Cir. Feb. 20, 2025) (summary order).

Other Southern District of New York judges repeatedly have relied on the special legal/policy concerns identified by the Second Circuit in *Kiobel* to block discovery efforts to obtain documents from U.S. law firms that received the documents from their foreign clients for the purpose of rendering legal advice to those clients. For example, in one Section 1782 case, the court rejected the petitioner's effort to subpoena such client documents from a U.S. law firm and stated: "In sum, the primary concern that motivated the *Kiobel* court – that documents of a foreign entity would become discoverable under Section 1782(a) solely because they were produced by the foreign entity to its U.S. counsel in connection with U.S. litigation – is present

[1] Although *Lelchook* involved a Rule 45 subpoena that was not issued in a Section 1782 proceeding, this Court stated that the "rationale for declining discovery aimed at foreign entities' U.S. law firms under Section 1782 applies with equal force to the same type of discovery sought pursuant to Rule 45." *Lelchook*, 670 F. Supp. 3d at 55.

here." *In re Warren*, No. 20 Misc. 208 (PGG), 2020 WL 6162214, at *10 (S.D.N.Y. Oct. 21, 2020); *see also, e.g.*, *In re Alghanim*, No. 21-MC-00167, 2022 WL 1423088, at *3 (S.D.N.Y. May 5, 2022) (denying Section 1782 application seeking documents from law firm that it had received from foreign client; stating that "the Court shares the concerns for lawyer-client relations that the Second Circuit expressed in *Kiobel*" (quotation marks omitted)); *In re Hulley Enterprises, Ltd.*, 358 F. Supp. 3d 331, 346-47 (S.D.N.Y. 2019) (same; stating that "policy considerations articulated in *Kiobel* apply to this situation to the extent that attorneys located in the United States should not have to fear that section 1782 will be used to require them to produce materials belonging to their foreign client").

***Second***, the special legal/policy concerns that are implicated, as discussed in *Kiobel* and other cases discussed above, when a party seeks documents from a U.S. law firm that it received from a foreign client for the purpose of providing legal advice to that client should cause this Court to subject the Subpoena to heightened scrutiny and quash it because it presents those special legal/policy concerns. Like the documents at issue in *Kiobel* and other cases cited above, the documents sought by the Subpoena were received by Balance Law—a U.S. law firm—from one of the Foreign Clients for the purpose of Balance Law providing legal advice to that client with respect to the State Court Action. 2026 Liu Declaration ¶¶ 4, 6, 7, 9. Balance Law did not create those documents and has them in its possession only because they were transmitted from abroad to Balance Law. *Id.* ¶ 7. Balance Law was not responsible for—and has had no financial interest or any other involvement in—the events that gave rise to, and/or are at issue in, the Cayman Islands appraisal proceeding. *Id.* ¶ 5. Moreover, the documents sought by the Subpoena were produced in discovery to the plaintiff in the State Court Action, by Balance Law acting as counsel for the Foreign Clients, pursuant to a Confidentiality Protective Order that required the

documents to be utilized "only for purposes of this litigation [*i.e.*, the State Court Action] and for no other purposes." *Id.* ¶ 8 & Exhibit 2, ¶ 6. When the documents were transmitted from abroad to Balance Law and then produced to the plaintiff in the State Court Action, the Foreign Clients relied on the protections provided by the Confidentiality Protective Order to ensure that the documents would be produced only to the plaintiff in the State Court Action and for use only in that lawsuit. 2026 Liu Declaration ¶ 9. When agreeing to have the documents transmitted from abroad to Balance Law for the purpose of being assessed by Balance Law for (among other things) discoverability and then produced to the plaintiff in the State Court Action, Balance Law relied on the Confidentiality Protective Order to ensure that the documents would be produced only to the plaintiff in that lawsuit and for use in only that lawsuit. *Id.*

In these circumstances, allowing the Petitioners to obtain the documents they seek by declining to quash the Subpoena would implicate the special legal/policy concerns discussed in *Kiobel* and other cases. Such a ruling would create a significant chilling effect on communications and relationships between U.S. law firms and their foreign clients by "disturb[ing] attorney-client communications and relations," *Kiobel*, 895 F.3d at 246, and "jeopardiz[ing] the policy of promoting open communications between lawyers and their clients," *id.* at 241 (quotation marks omitted). Declining to quash the Subpoena also would override the Confidentiality Protective Order, creating the kind of "workaround [for Petitioners] to gain discovery [from Balance Law]," *id.* at 247, that concerned the *Kiobel* court because that would "inhibit foreign companies from producing documents to U.S. law firms," *id.* Moreover, if the Court does not quash the Subpoena, that ruling also would lead to the "unintended consequences," *id.*, that the *Kiobel* court wanted to avoid:

- "foreign clients hav[ing] reason to fear disclosing all pertinent documents to U.S. counsel," likely resulting in "bad legal advice to the client, and harm to our system of litigation," *id.*;

- U.S. law firms with foreign clients being forced "to store documents and servers abroad, which would result in excessive costs to law firms and clients" or U.S. law firms having "to return documents to foreign clients (or destroy them) as soon as litigation concludes," id., which may harm those firms, *id.* at 248;

- foreign entities "be[ing] less willing to engage with U.S. law firms," *id.*

The important legal/policy concerns discussed above far outweigh any need that Petitioners claim for the documents sought by the Subpoena, because the outcome of the Cayman Islands appraisal proceeding is, as this Court correctly stated, "not of significant public importance," 1/26/26 Order, 2026 WL 205837, at *10.

In sum, allowing the discovery at issue here "would be contrary to public policy seeking to promote full and frank communication between attorneys and clients and observance of the rule of law and administration of justice," *Lelchook*, 670 F. Supp. 3d at 55, so this Court should quash the Subpoena.[2]

**II. The Court Should Quash The Subpoena Because Petitioners Filed This Abusive Section 1782 Application To Harass Balance Law In Retaliation For Balance Law Having Served A Subpoena On Petitioner 507 Summit LLC In The State Court Action.**

A district court is permitted to prevent Section 1782 discovery if the court "suspects that the discovery is being sought for the purposes of harassment." *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 81 (2d Cir. 2012). Thus, the Second Circuit has "entrusted district courts to weed out abusive Section 1782 applications in their discretionary review of applications that satisfy the statutory criteria." *In re B&C KB Holding GmbH*, No. 23-1014(L),

[2] Although this Court cited various other Section 1782 applications filed by Petitioners to seek evidence for the Cayman Islands appraisal proceeding, *see* 1/26/26 Order, 2026 WL 205837, at *4, those applications differed—in an important respect—from the application at issue here because those applications did not seek discovery from a law firm.

No. 24-887(con), 2024 WL 3170983, at *3 (2d Cir. June 26, 2024) (summary order) (quotation marks omitted).

This Court should quash the Subpoena because Petitioners filed this abusive Section 1782 application to harass Balance Law in retaliation for Balance Law having served a subpoena on Petitioner 507 Summit LLC in the State Court Action in accordance with non-party discovery authorized by the court presiding over that lawsuit. *See* 8/8/25 Declaration of B. Robert Liu ("2025 Liu Declaration") ¶¶ 21-23 (ECF No. 17) & Exhibit A (ECF No. 17-1). "Shortly thereafter" (*i.e.*, after Balance Law served that subpoena), Petitioners filed the Section 1782 application at issue here. 1/26/26 Order, 2026 WL 205837, at *2. Petitioners' refusal to engage in good-faith negotiations regarding a potential agreement to resolve this dispute and the unreasonable, overbroad, and burdensome document requests made by Petitioners provide further evidence of their retaliatory intent. *See* 2025 Liu Declaration ¶¶ 24–29.

## CONCLUSION

The two arguments presented above each independently lead to the conclusion that the Subpoena should be quashed, and—when viewed together—they provide even stronger support for that conclusion. For the foregoing reasons, the Court should quash the Subpoena in its entirety.

In the alternative, if the Court declines to quash the Subpoena, the Court should order the parties to meet and confer in a good-faith effort to reach agreement regarding a proposed protective order, to be submitted to the Court, that would protect the confidentiality of the documents, along the lines of the Confidentiality Protective Order that governed the production of the documents in the State Court Action.

Dated: New York, New York
February 25, 2026

Respectfully submitted,

*B. Robert Liu*

B. Robert Liu (Bar No. 5697552)
Balance Law Firm
1 World Trade Center, Suite 8500
New York, NY 10007
(212) 741-8080
(646) 558-4889 (fax)
robert.liu@balancelawfirm.com

*Attorneys for Respondent Balance Law Firm PLLC d/b/a Balance Law Firm*

**Certificate Regarding Local Civil Rule 7.1 Compliance**

Relying on the word count of the word-processing program used to prepare this document, the undersigned states that the number of words in this document is 3,524 and certifies that this document complies with the word-count limitation as set forth in Local Civil Rule 7.1.

B. Robert Liu

B. Robert Liu (Bar No. 5697552)
Balance Law Firm
1 World Trade Center, Suite 8500
New York, NY 10007
(212) 741-8080
(646) 558-4889 (fax)
robert.liu@balancelawfirm.com

Attorneys for Respondent Balance Law Firm PLLC d/b/a Balance Law Firm

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| 507 SUMMIT LLC et al<br>Applicants<br>v.<br>BALANCE LAW PLLC d/b/a Balance Law Firm<br>Respondent | Case 25-mc-235-KHP |

**MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO QUASH**

Jeffrey Chubak
Amini LLC
131 West 35th Street
12th Floor
New York, NY 10001
(212) 490-4700
jchubak@aminillc.com
Attorneys for Applicants

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

ARGUMENT ..... 2

I. LEGAL STANDARD ..... 2

II. THE SUBPOENA SHOULD NOT BE QUASHED OR MODIFIED ..... 2

CONCLUSION ..... 6

WORD COUNT CERTIFICATION .....

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*507 Summit LLC v. Balance Law PLLC*
2026 WL 205837 (S.D.N.Y. Jan. 26, 2026) ........ 1, 2, 5

*Intel Corp. v. Advanced Micro Devices, Inc.*,
542 U.S. 241 (2004). ........ 3

*Jones v. Hirschfeld*,
219 F.R.D. 71 (S.D.N.Y. Dec. 9, 2003) ........ 2

*Kiobel by Samkalden v. Cravath, Swaine & Moore L.L.P.*,
895 F.3d 238 (2d Cir. 2018) ........ 1, 2, 3, 5

*Lelchook v. Lebanese Canadian Bank, SAL*,
670 F. Supp. 3d 51 (S.D.N.Y. 2023) ........ 2, 5

*In re Lifetrade Litig.*,
2022 WL 3644357 (S.D.N.Y. Aug. 24, 2022) ........ 4

*In re Application of Orthogen Int'l GmbH*,
2026 WL 311482 (S.D.N.Y. Feb. 5, 2026) ........ 2

*Application of Sarrio, S.A.*,
119 F.3d 143 (2d Cir. 1997) ........ 2, 5

*In re SBK ART LLC*,
2026 WL 478787 (2d Cir. Feb. 20, 2026) ........ 1, 3, 4

*Universitas Educ., LLC v. Nova Group, Inc.*,
2013 WL 57892 (S.D.N.Y. Jan. 4, 2013) ........ 4

**Statues and Rules**

28 U.S.C. § 1782 ........ 1, 2, 3

Fed. R. Civ. P. 45 ........ 1, 2

## INTRODUCTION[1]

The motion to quash relies principally on *Kiobel by Samkalden v. Cravath, Swaine & Moore L.L.P.*, 895 F.3d 238, 249 (2d Cir. 2018). But *Kiobel* was a § 1782 decision, not a FRCP 45(d)(3) decision. Once § 1782 discovery is authorized, § 1782 issues "drop out" and discovery is guided by the Federal Rules. In any event, the Second Circuit made clear in *In re SBK ART LLC*, 2026 WL 478787 (2d Cir. Feb. 20, 2026) that *Kiobel* does not prohibit § 1782 discovery of law firms. The issues presented in *Kiobel*—privilege and confidentiality—do not present here. None of the documents at issue are privileged, as they were all produced to the derivative plaintiff. The notion that they "were transmitted to it [respondent] from abroad by a foreign client for the purpose of obtaining legal advice" (ECF #24 "Moving Br." at 5) is inherently incredible, given the circumstances under which the chart attached to the subpoena was generated. As to confidentiality, petitioners are amenable to entering into a confidentiality order, as they did in the General Atlantic § 1782 proceeding (23-mc-427, ECF #33), including one that provides all the protections included in the state court (ECF #23-2) derivative action, had only respondent asked rather than burden the Court with discovery motions. Simply put, there is no risk of § 1782 discovery undermining or circumventing an existing confidentiality order.

Respondent otherwise argues that the subpoena is abusive because it is retaliatory. That is false. The requested documents are clearly relevant, and in any event no undue burden is presented by the requested document discovery given that the subject documents are already identified by Bates number.

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Opinion and Order on Application for Discovery for Use in a Foreign Proceeding, entered January 26, 2026 (ECF #21, 2026 WL 205837, the "Order").

Petitioners request that the Court promptly determine this motion as the May 2025 directions order (ECF #18-1, "Directions Order") requires the parties' experts to exchange their reports by May 12, 2026, and the experts will need sufficient time to review the produced documents in advance of that deadline.

## ARGUMENT

### I. LEGAL STANDARD

"Any discovery permitted under Section 1782 is subject to the Federal Rules of Civil Procedure." *In re Application of Orthogen Int'l GmbH*, 2026 WL 311482, at *2 (S.D.N.Y. Feb. 5, 2026). "Thus, the Court looks to Federal Rule of Civil Procedure 45 when evaluating a motion to quash." *Id.*

Pursuant to FRCP 45(d)(3), the Court "must quash or modify a subpoena that … requires disclosure of privileged or other protected matter, if no exception or waiver applies".

Having prevailed in this § 1782 proceeding, petitioners have satisfied their initial burden of proving that the documents sought are relevant and proportional (Order at 17-18), so the burden is now on respondent to show the documents sought are privileged or otherwise protected from disclosure. *Orthogen*, 2026 WL 311482, at *2 (citing *Lelchook v. Lebanese Canadian Bank, SAL*, 670 F. Supp. 3d 51, 54-55 (S.D.N.Y. 2023)). *See also Jones v. Hirschfeld*, 219 F.R.D. 71, 74-75 (S.D.N.Y. Dec. 9, 2003) ("The burden of persuasion in a motion to quash a subpoena … is borne by the movant") (collecting cases).

### II. THE SUBPOENA SHOULD NOT BE QUASHED OR MODIFIED

Respondent argues (Moving Br. at 5-7) that the Second Circuit decisions *Kiobel* and before that *Application of Sarrio, S.A.*, 119 F.3d 143, 146 (2d Cir. 1997) essentially prohibit § 1782 discovery of law firms on public policy grounds.

In *SBK*, the Second Circuit rejected a similar argument interposed by Akin Gump as § 1782 respondent, that *Kiobel* categorically limits § 1782 discovery of law firms.

In affirming a decision authorizing § 1782 discovery of Akin Gump, the Second Circuit observed "[t]he *Intel* factors and the confidentiality order were essential to the *Kiobel* decision." *Id*. at *10. Neither warrants limiting discovery here.

As to the *Intel* factors, in *Kiobel*, the petitioner sought discovery from counsel for its litigation opponent in the foreign proceeding, and the Second Circuit held the district court abused its discretion in authorizing § 1782 discovery because the litigation opponent—who is of course a party to the foreign proceeding, for purposes of the first *Intel* factor—was "the real party from whom documents are sought." Here, the *Intel* factors have no application at this stage. "[O]nce a district court has opened the statutory gate to discovery, any disputes around its proper scope are governed by ordinary rules of discovery." *SBK*, 2026 WL 478787, at *7. At that point, "section 1782 drops out." *Id*. *See also id*. at *12 ("Section 1782 merely acts as a gate designed to prevent abuses …. The District Court, in granting SBK's petition, opened the gate to permit SBK to seek discovery from Akin; once the discovery requests are formally issued, the ordinary rules of discovery will govern any disputes regarding specific materials. Those rules will adequately protect Akin").

As to the confidentiality order, in *Kiobel*, the Second Circuit prohibited § 1782 discovery that would serve to evade restrictions in a stipulated confidentiality order in the foreign proceeding. *Id*. at *10-11. This rationale has no application, not just because in *Kiobel*, discovery was sought of counsel for the litigation opponent in the foreign proceeding, whereas here the respondent is not counsel for CIH, but also because petitioners are amenable to entering into a confidentiality order, as they did in the General Atlantic § 1782 proceeding (23-mc-427, ECF #33), including one that

provides all the protections included in the state court (ECF #23-2) derivative action. Respondent did not so much as ask petitioners to enter into a confidentiality order prior to making this motion but instead used confidentiality as a pretext to delay.

In addition, no showing has been made that the subject documents actually include FRCP 26(c)(1)(G) commercial information, or otherwise constitute Confidential Information under the stipulated confidentiality order entered in the derivative action (ECF #23-2 ¶3.a) which is itself grounds to deny the motion. *E.g. Universitas Educ., LLC v. Nova Group, Inc.*, 2013 WL 57892, at *5 (S.D.N.Y. Jan. 4, 2013) (denying motion to quash where defendant made "no attempt to establish any proprietary or other confidentiality related interest it may have in the requested documents beyond a conclusory assertion that the subpoenas seek documents that are 'private, confidential and commercially sensitive'").

Further, respondent's claim that the confidentiality order in the derivative action "required the documents to be used only for purposes of that lawsuit" (Moving Br. at 1) is wrong. That order only imposes limits on the receiving party (ECF #23-2 ¶6), not the producing party: "Confidential Information shall be utilized by the Receiving Party and its counsel only for purposes of this litigation and for no other purposes." The derivative defendants, represented by the respondent herein, were the producing party. (Liu Decl. ¶8.)

As in *SBK*, in which "the District Court limited the scope of the subpoenas to topics that it found relevant ... and ... limited production to only non-privileged materials", the materials sought by the subpoena are limited to those this Court already found relevant, and which are necessarily non-privileged in that they were produced to the derivative plaintiff (ECF #23, "Liu Decl." ¶8), abrogating any conceivable privilege. *In re Lifetrade Litig.*, 2022 WL 3644357, at *2 (S.D.N.Y. Aug. 24, 2022) ("the privilege is waived if the holder of the privilege discloses or consents to the

disclosure of the privileged communication to a third party", unless "the third party is an agent of the attorney or client"). Respondent does not claim the documents are protected from disclosure under the work product doctrine or other protection from disclosure.

*Lelchook* is easily distinguished. In *Lelchook*, the plaintiffs subpoenaed Covington & Burling seeking documents concerning Lebanese Canadian Bank that two former clients Nest and Nahl shared with the firm in connection with a lawsuit it brought on their behalf which was dismissed after a motion on the pleadings. The Court rejected efforts to obtain those documents from Covington, based on policy concerns. 670 F. Supp. 3d at 55 (citing *Kiobel* and *Sarrio*) ("allowing such discovery would be contrary to public policy seeking to promote full and frank communication between attorneys and clients and observance of the rule of law and administration of justice"). These concerns are not presented here because, as noted above, the documents sought are not privileged.

No evidence is shown, beyond respondent's say-so (Liu Decl. ¶7, Moving Br. at 7-8),[2] that the subject documents were produced to respondent for the purpose of rendering legal advice. Even if so, the subject documents would not be protected from disclosure because any conceivable privilege was abrogated when they were produced in discovery (Liu Decl. ¶8) in the derivative action.

Nor is any evidence shown, beyond respondent's say-so (Moving Br. at 7-8, citing ECF #17 ¶¶21-30), that the subject discovery is retaliatory in nature. It is not. The Court already found it relevant to the issue of CIH share valuation. (Order at 17-18.) In any event, "that argument goes principally to the burden of the discovery sought" (id. at n.2) which is minimal as (id. at 5) "[t]he

---

[2] Mr. Liu's declaration concerning his client's motivation for sharing documents with respondent is inadmissible hearsay, as to which no exception applies.

requested discovery is not framed as traditional document requests … Instead, Petitioners seek production of a defined universe of documents previously produced by FHL and its affiliates through Respondent in connection with discovery in the New York shareholder derivative action". No explanation is provided by respondent as to how the subject discovery is "burdensome" (Moving Br.at 11) particularly given that the subject documents are already identified by Bates number.

## CONCLUSION

The motion to quash should be denied. Petitioners respectfully request prompt determination of this motion so that they can obtain the subject document discovery and produce the subject documents back to CIH in the Cayman appraisal proceeding within the time period needed under the Directions Order.

Dated: New York, New York
March 1, 2026

Amini LLC

/s/ Jeffrey Chubak
Jeffrey Chubak
131 West 35th Street
12th Floor
New York, NY 1001
(212) 490-4700
jchubak@aminillc.com
Attorneys for Applicants

**WORD COUNT CERTIFICATION**

I hereby certify under penalty of perjury that the foregoing memorandum of law in opposition has 1,666 words, excluding the cover page, table of contents, table of authorities and signature block, as calculated using the word-count feature of the word-processing program used to prepare the same, and so complies with Local Civil Rule 7.1(c).

/s/ Jeffrey Chubak

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| 507 SUMMIT LLC, *et al.*,<br><br>Applicants,<br><br>v.<br><br>BALANCE LAW PLLC d/b/a Balance Law Firm,<br><br>Respondent. | Case No. 1:25-mc-00235-KHP<br><br>Honorable Katharine Parker |

**SUPPLEMENTAL DECLARATION OF B. ROBERT LIU**

I, B. Robert Liu, Esq., state the following as true under the penalty of perjury:

1. I am the Managing Partner of Balance Law PLLC ("Balance Law"), Respondent in the above-captioned case. I make this declaration based on my personal knowledge, to supplement and clarify statements made in the declaration that I signed on February 25, 2026 ("2/25/26 Declaration") (ECF No. 23).

2. The documents sought by the Subpoena at issue here were produced in discovery in the New York state court shareholder derivative action ("the State Court Action"), by Balance Law acting as counsel for its foreign clients, pursuant to a Stipulation and Order for the Production and Exchange of Confidential Information ("the Confidentiality Protective Order") issued by the court presiding over the State Court Action. That Confidentiality Protective Order is attached as Exhibit 2 (ECF No. 23-2) to my 2/25/26 Declaration.

3. As is common in complex lawsuits when a large volume of documents is produced pursuant to a confidentiality protective order, Balance Law designated the documents at issue here as confidential under the Confidentiality Protective Order, in reliance on that order and the

process set forth therein (see Confidentiality Protective Order ¶ 4) for resolving by agreement, and if necessary litigating, any disputes about whether any particular document actually was "Confidential Information" within the meaning of that order.

4. The State Court Action has been settled and a final judgment has been entered in that case, and none of the documents produced by Balance Law as confidential under the Confidentiality Protective Order were removed from the protections of that order (whether by agreement or due to court rulings).

5. The documents at issue here were produced by Balance Law to both plaintiffs that filed the State Court Action. One of those plaintiffs, Lorelei NCC Inc. ("Lorelei"), is a New York corporation. *See* attached Exhibit A.

6. Lorelei was dismissed from the State Court Action on March 31, 2025. *See* Stipulation (attached as Exhibit B). That dismissal occurred after the spreadsheet that is attached to the Subpoena was filed in the State Court Action on March 10, 2025, *see* Exhibit 1 (ECF No. 23-1) to my 2/25/26 Declaration, so the documents at issue here were produced to Lorelei before it was dismissed from the State Court Action.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 3, 2026 in New York, NY.

B. Robert Liu

B. Robert Liu

# EXHIBIT A

# STATE OF NEW YORK
# DEPARTMENT OF STATE

I hereby certify that the annexed copy for LORELEI NCC INC., File Number 230306000711 has been compared with the original document in the custody of the Secretary of State and that the same is true copy of said original.

WITNESS my hand and official seal of the Department of State, at the City of Albany, on March 03, 2026.

WALTER T. MOSLEY
Secretary of State

BRENDAN C. HUGHES
Executive Deputy Secretary of State

Authentication Number: 100009794314 To Verify the authenticity of this document you may access the Division of Corporation's Document Authentication Website at http://ecorp.dos.ny.gov

CT07

NEW YORK STATE OF OPPORTUNITY. | Division of Corporations, State Records and Uniform Commercial Code

New York State
**Department of State**
**DIVISION OF CORPORATIONS, STATE RECORDS AND UNIFORM COMMERCIAL CODE**
One Commerce Plaza
99 Washington Ave.
Albany, NY 12231-0001
https://dos.ny.gov

# CERTIFICATE OF INCORPORATION
# OF

LORELEI NCC INC.
*(Insert Name of Corporation)*

Under Section 402 of the Business Corporation Law

FIRST: The name of the corporation is:

Lorelei NCC Inc.

SECOND: The purpose of the corporation is to engage in any lawful act or activity for which a corporation may be organized under the Business Corporation Law. The corporation is not formed to engage in any act or activity requiring the consent or approval of any state official, department, board, agency or other body without such consent or approval first being obtained.

THIRD: The county, within this state, in which the office of the corporation is to be located is: Westchester County.

FOURTH: The corporation shall have authority to issue one class of shares consisting of 200 common shares without par value.

FIFTH: The Secretary of State is designated as agent of the corporation upon whom process against the corporation may be served.

The post office address to which the Secretary of State shall mail a copy of any process against the corporation served upon the Secretary of State by personal delivery is:

32 Elm Place, 3rd Floor, Rye, NY 10580

(Optional) The email address to which the Secretary of State shall email a notice of the fact that process against the corporation has been served electronically upon the Secretary of State is:

compliance@twoseascap.com

Lawrence V. Palermo
*(Print or Type Name of Incorporator)*

X [signature]
*(Signature of Incorporator)*

C/O Two Seas Capital LP, 32 Elm Place, 3rd Floor
*(Address of Incorporator)*

Rye, NY 10580
*(City, State, Zip Code)*



Filed with the NYS Department of State on 03/06/2023
Filing Number: 230306000711 DOS ID: 6755945

CT07

# CERTIFICATE OF INCORPORATION
# OF

LORELEI NCC INC.

*(Insert Corporate Name)*

Under Section 402 of the Business Corporation Law

Filer's Name and Mailing Address:

Shuli Wang

*Name:*

Mayer Brown LLP

*Company, if Applicable:*

1221 Avenue of the Americas

*Mailing Address:*

New York, NY 10020

*City, State and Zip Code:*

**Notes:**

1. This form was prepared by the New York State Department of State for filing a certificate of incorporation for a business corporation. It does not contain all optional provisions under the law. You are not required to use this form. You may draft your own form or use forms available at legal stationery stores.
2. The Department of State recommends that legal documents be prepared under the guidance of an attorney.
3. The fee for filing a certificate of incorporation is **$125**. Preferred payment methods include money order, Visa or Mastercard. Money orders should be made payable to the Department of State.
4. The incorporator must be a natural person, not a corporation or other business entity.
5. The filer may not be the corporation being formed.

For DOS use only

DRAWDOWN:
CST REF: 14814621YV



**Filed with the NYS Department of State on 03/06/2023**
**Filing Number: 230306000711 DOS ID: 6755945**

# STATE OF NEW YORK
# DEPARTMENT OF STATE

I hereby certify that the annexed copy for LORELEI NCC INC., File Number 250401047943 has been compared with the original document in the custody of the Secretary of State and that the same is true copy of said original.

WITNESS my hand and official seal of the Department of State, at the City of Albany, on March 03, 2026.

WALTER T. MOSLEY
Secretary of State

BRENDAN C. HUGHES
Executive Deputy Secretary of State

Authentication Number: 100009794316 To Verify the authenticity of this document you may access the Division of Corporation's Document Authentication Website at http://ecorp.dos.ny.gov

**Biennial Statement**
NYS Department of State
Division of Corporations, State Records &
Uniform Commercial Code
www.dos.ny.gov

BUSINESS NAME: LORELEI NCC INC.
FILING PERIOD: 03/01/2025 12:00:00 AM

**Part 1 - Chief Executive Officer's Name and Business Address**

| | | |
|---|---|---|
| Name<br>SINA TOUSSI | | |
| Address Line 1<br>32 ELM PLACE, 3RD FL | | |
| Address Line 2 | | |
| City<br>RYE | State<br>NY | Zip Code<br>10580 |

**Part 2 - Street Address of Principal Executive Office (A Post Office Box cannot be used)**

| | | |
|---|---|---|
| Corporation Name | | |
| Address Line 1<br>32 ELM PLACE, 3RD FL | | |
| Address Line 2 | | |
| City<br>RYE | State<br>NY | Zip Code<br>10580 |

**Part 3 - Service of Process Address (Address must be within the United States or its territories)**

| | | |
|---|---|---|
| Name<br>THE CORPORATION | | |
| Address Line 1<br>32 ELM PLACE, 3RD FL | | |
| Address Line 2 | | |
| City<br>RYE | State<br>NY | Zip Code<br>10580 |

**Part 4 - Number of Directors**

| | |
|---|---|
| Number of Directors Constituting the Board of Directors<br>2 | Number of Directors on the Board of Directors that are Women 0 |

**Signer Information**

I affirm that the statements contained herein are true to the best of my knowledge, that I am authorized to sign this Biennial Statement and that my signature typed below constitutes my electronic signature.

| |
|---|
| Electronic Signature<br>LAWRENCE PALERMO |
| Capacity of Signer<br>DIRECTOR |

Filed with the NYS Department of State on 04/01/2025
Filing Number: 250401047943 DOS ID: 6755945

# EXHIBIT B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| OASIS INVESTMENTS II MASTER FUND LTD. and LORELEI NCC INC., derivatively on behalf of nominal defendant FANG HOLDINGS LIMITED, | Index No. 652607/2023 |
| Plaintiffs, | Justice Andrew Borrok |
| -against- | Commercial Part 53 |
| VINCENT TIANQUAN MO, RICHARD JIANGONG DAI, ACE SMART INVESTMENTS LIMITED, NEXT DECADE INVESTMENTS LIMITED, MEDIA PARTNER TECHNOLOGY LIMITED, and TRUE KNIGHT LIMITED, | **STIPULATION** |
| Defendants. | |

Plaintiffs Oasis Investment II Master Fund Ltd. ("Oasis") and Lorelei NCC Inc. ("Lorelei") (collectively, "Plaintiffs"), nominal Defendant Fang Holdings Limited ("Fang") and Defendants Vincent Tianquan Mo, Richard Jiangong Dai, ACE Smart Investments Limited, Next Decade Investments Limited, Media Partner Technology Limited, and True Knight Limited (together, "Defendants") hereby stipulate and agree as follows:

**WHEREAS**, Plaintiffs filed this shareholder derivative action on behalf of nominal Defendant Fang against Defendants on May 29, 2023 [NYSCEF No. 1] (the "Action");

**WHEREAS**, by Order of the Court, Plaintiffs corrected the caption of the original May 29, 2023 Summons and Complaint and the operative Summons and Complaint is NYSCEF No 15 [NYSCEF No. 44];

**WHEREAS**, the Court denied Defendants' motions to dismiss on May 2, 2024 [NYSCEF Nos. 230, 231, 232];

**WHEREAS**, the Defendants filed their Answers on July 19, 2024 [NYSCEF Nos. 245, 246, 247]

**WHEREAS**, Lorelei through parent Two Seas Global (Master) Fund LP ("Two Seas"), initially acquired its Fang ADSs on February 24, 2023;

**WHEREAS**, Two Seas transferred its Fang ADSs to Lorelei on April 12, 2023;

**WHEREAS**, Lorelei disposed of all its Fang interests, except for one registered share, on December 1, 2023;

**WHEREAS**, Oasis will continue to serve as a Plaintiff in this Action and pursue the claims set forth in the operative Summons and Complaint against Defendants on behalf of Fang;

**WHEREAS**, no party is an infant, incompetent person for whom a committee has been appointed or conservatee; and

**WHEREAS**, the attorneys of record for all parties in this Action have signed this stipulation;

**NOW, THEREFORE**, the parties hereby **STIPULATE AND AGREE** as follows:

1. Plaintiff Lorelei voluntarily discontinues its pursuit of this Action pursuant to CPLR 3217, and as a result, no longer will serve as a Plaintiff in this Action.

2. Plaintiff Lorelei's withdrawal as a Plaintiff in this Action is without prejudice as to any future claims Defendants may assert against Lorelei.

3. The parties will amend the case caption to remove Lorelei therefrom.

Date: March 31, 2025

**REID COLLINS & TSAI LLP**

*/s/ Aaron A. Brown*
William T. Reid, IV
Yonah Jaffe
Aaron A. Brown
420 Lexington Avenue, Suite 2731
New York, New York 10170
T: 212-344-5200
F: 212-344-5299
wreid@reidcollins.com
yjaffe@reidcollins.com
abrown@reidcollins.com

Nathaniel J. Palmer*
Michael Yoder*
1301 S. Capital of Texas Hwy, C-300
Austin, Texas 78746
T: 512-647-6100
F: 512-647-6129
npalmer@reidcollins.com
myoder@reidcollins.com

* admitted *pro hac vice*

*Counsel for Plaintiffs Oasis Investments II Master Fund Ltd. and Lorelei NCC Inc.*

**BALANCE LAW FIRM**

*/s/ B. Robert Liu, Esq.*
Beixiao Robert Liu, Esq.
Stephen Hudspeth, Esq.
One World Trade Center, Suite 8500
New York, NY 1007
(212) 741-8080
(631) 490-4465 fax
rober.liu@balancelawfirm.com
stephen.hudspeth@balancelawfirm.com

*Counsel for Defendants Vincent Tianquan Mo, Richard Jiangong Dai, Media Partner Technology Limited, Next Decade Investments Limited, True Knight Limited, and ACE Smart Investment Limited, and Nominal Defendant Fang Holdings Limited*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| 507 SUMMIT LLC, *et al.*,<br><br>Applicants,<br><br>v.<br><br>BALANCE LAW PLLC d/b/a Balance Law Firm,<br><br>Respondent. | Case No. 1:25-mc-00235-KHP<br><br>Honorable Katharine Parker |

**RESPONDENT BALANCE LAW PLLC'S REPLY**
**IN SUPPORT OF MOTION TO QUASH PETITIONERS' SUBPOENA**

B. Robert Liu (Bar No. 5697552)
Balance Law Firm
1 World Trade Center, Suite 8500
New York, NY 10007
(212) 741-8080
(646) 558-4889 (fax)
robert.liu@balancelawfirm.com

*Attorneys for Respondent Balance Law Firm PLLC d/b/a Balance Law Firm*

## Table of Contents

**PRELIMINARY STATEMENT** ........................................ 1

**ARGUMENT** ........................................ 1

I. THE OPPOSITION FAILS TO PRESENT ANY PERSUASIVE REBUTTAL TO BALANCE LAW'S SHOWING THAT THIS COURT SHOULD SUBJECT THE SUBPOENA TO HEIGHTENED SCRUTINY AND QUASH IT ........................................ 1

II. THE OPPOSITION FAILS TO PRESENT ANY PERSUASIVE REBUTTAL TO BALANCE LAW'S SHOWING THAT PETITIONERS FILED THIS ABUSIVE SECTION 1782 APPLICATION TO HARASS BALANCE LAW IN RETALIATION FOR A SUBPOENA SERVED BY BALANCE LAW IN THE STATE COURT ACTION. ........................................ 8

**CONCLUSION** ........................................ 10

Table of Authorities

Page(s)

Cases

*507 Summit LLC v. Balance Law PLLC*,
2026 WL 205837 (S.D.N.Y. Jan. 26, 2026) ..... 2, 5, 9
*Application of Sarrio, S.A.*,
119 F.3d 143 (2d Cir. 1997) ..... 1
*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
673 F.3d 76 (2d Cir. 2012) ..... 10
*Cohen v. Group Health Inc.*,
No. 22-MC-0200 (PAE)(KHP), 2022 WL 4534552 ..... 5
*Eletson Holdings Inc. v. Levona Holdings Ltd.*,
23-cv-7331 (LJL), 2025 WL 2294589 (S.D.N.Y. Aug. 8, 2025) ..... 5
*In re Klein*,
No. 223 Misc. 211 (PAE), 2023 WL 8827847 (S.D.N.Y. Dec. 21, 2023) ..... 3
*In re SBK ART LLC*,
No. 25-1563-cv, 2026 WL 478787 (2d Cir. Feb. 20, 2026) ..... 1, 7, 8
*In re Subpoena Issued to Dennis Friedman*,
350 F.3d 65 (2d Cir. 2003) ..... 5
*In re Warren*,
No. 20 Misc. 208 (PGG), 2020 WL 6162214 (S.D.N.Y. Oct. 21, 2020) ..... 3
*Kiobel by Samkalden v. Cravath, Swain & Moore LLP*,
895 F.3d 238 (2d Cir. 2018) ..... passim
*Lelchook v. Lebanese Canadian Bank*,
670 F. Supp. 3d 51 (S.D.N.Y. 2023) ..... 4, 5
*Liner Freedman Taitelman Cooley, LLP v. Lively*,
No. 25-mc-289 (LJL), 2025 WL 2205973 (S.D.N.Y. Aug. 4, 2025) ..... 5, 9

Statutes

28 U.S.C. § 1782 ..... 1, 5

Rules

Rule 45(d)(3) of the Federal Rules of Civil Procedure ..... 5

## PRELIMINARY STATEMENT

In its Memorandum of Law in Support of Motion to Quash Petitioners' Subpoena ("Opening Memorandum") (ECF No. 24), Respondent Balance Law PLLC ("Balance Law") presented compelling reasons why this Court should quash the Petitioners' subpoena ("the Subpoena"). Petitioners' Opposition ("Opposition") mischaracterizes Balance Law's arguments; misconstrues *Kiobel by Samkalden v. Cravath, Swain & Moore LLP*, 895 F.3d 238 (2d Cir. 2018); and otherwise fails to provide any persuasive basis for this Court to decline to quash the Subpoena.

## ARGUMENT

### I. The Opposition Fails To Present Any Persuasive Rebuttal To Balance Law's Showing That This Court Should Subject The Subpoena To Heightened Scrutiny And Quash It.

The Opposition fails to present any persuasive rebuttal to Balance Law's showing, based on *Kiobel* and a string of other cases, that the Court should subject the Subpoena to heightened scrutiny and quash it.

***First***, the Opening Memorandum showed that this Court should subject the Subpoena to heightened scrutiny based on the special legal/policy concerns addressed in *Kiobel* and other cases, but Petitioners mischaracterize that argument by creating a straw man argument. They claim: (a) that Balance Law argues that *Kiobel* and *Application of Sarrio, S.A.*, 119 F.3d 143, 146 (2d Cir. 1997), "essentially prohibit [28 U.S.C.] § 1782 discovery of law firms on public policy grounds," Opp'n at 2; and (b) that *In re SBK ART LLC*, No. 25-1563-cv, 2026 WL 478787 (2d Cir. Feb. 20, 2026), rejected a similar argument made by the law firm respondent in that case, "that *Kiobel* categorically limits § 1782 discovery of law firms," *id.* at 3. However, that is ***not***

Balance Law's argument. Balance Law relied not only on *Kiobel* and *Sarrio* but also on Southern District of New York cases—including a ruling by this member of the Court—that establish the need for heightened judicial scrutiny of the Subpoena in this case. Moreover, Balance Law does not contend that *Kiobel* and *Sarrio* "essentially prohibit" or "categorically limit" discovery from law firms. Petitioners accuse Balance Law of making, in effect, a meat cleaver argument, but Balance Law makes a scalpel argument that is nuanced, takes into account the particular circumstances presented here, and would not prohibit discovery from law firms in all cases.[1] Balance Law urges this Court to subject the Subpoena to heightened scrutiny based on the special legal/policy concerns identified by *Kiobel* and other cases involving documents provided to U.S. law firms by foreign clients for the purpose of obtaining legal advice—namely, the need to avoid disturbing communications and relationships between U.S. law firms and their foreign clients and to avoid otherwise harming our system of litigation.

*Kiobel* and other cases cited by Balance Law lead inexorably to the conclusion that this Court should apply a heightened scrutiny standard here because those cases address legal/policy concerns that apply when the target of discovery is a law firm (or a lawyer) but not when the

---

[1] A party to litigation might seek documents from a law firm in various circumstances, including when the law firm: (a) has been accused of malpractice; (b) was directly involved in the facts at issue in the underlying litigation (*e.g.*, by having drafted the contract at issue); or (c) otherwise created documents that are important to the underlying litigation (*e.g.*, by having provided an opinion letter about an issue for which an advice-of-counsel defense has been asserted). None of those circumstances, or anything comparable, are present here. Balance Law and its attorneys are not percipient witnesses to the events at issue in the Cayman Islands appraisal proceeding. Balance Law "had no articulable role in the take-private transaction and there is no discernable evidence that it has any direct financial interest in the outcome of the Cayman proceeding." 1/26/26 Order, *507 Summit LLC v. Balance Law PLLC*, 2026 WL 205837, at *10 (S.D.N.Y. Jan. 26, 2026). The Opposition does not contend otherwise. Balance Law was not responsible for—and has had no financial interest or any other involvement in—the events that gave rise to, and/or are at issue in, that Cayman Islands appraisal proceeding. 2/25/26 Declaration of B. Robert Lui ("Liu Declaration") ¶ 5 (ECF No. 23). The Opposition does not dispute that sworn statement. Balance Law did not create the documents sought by the Subpoena and has them in its possession only because they were transmitted from abroad to Balance Law by one of its clients. *Id.* ¶¶ 7, 9. The Opposition also does not dispute those sworn statements.

discovery target is a non-law-firm entity (or a non-lawyer). *See* Opening Mem. at 4-8. Thus, a "law firm's representation of a foreign client is a factor worth considering," *Kiobel*, 895 F.3d at 244, when a district court decides whether to exercise its discretion to allow discovery. That makes sense because subpoenas to lawyers "implicate unique concerns about lawyer-client relations (and the need for candor and confidentiality) not presented by subpoenas to [, for example,] U.S. financial institutions." *In re Klein*, No. 223 Misc. 211 (PAE), 2023 WL 8827847, at *11 (S.D.N.Y. Dec. 21, 2023) (relying, *inter alia*, on *Kiobel*), *aff'd sub nom. Klein v. Altara RK Investments Ltd.*, No. 24-228-cv, 2025 WL 560105 (2d Cir. Feb. 20, 2025) (summary order); *see In re Warren*, No. 20 Misc. 208 (PGG), 2020 WL 6162214 (S.D.N.Y. Oct. 21, 2020) (applying different analyses and making different rulings regarding discovery directed at law-firm respondent (denied, based on *Kiobel*) and discovery directed at non-law-firm respondent (allowed), which supports the conclusion that discovery directed to law firms should be subject to heightened judicial scrutiny).

***Second***, Petitioners try to evade the impact of *Kiobel* by claiming that attorney-client privilege was one of "[t]he issues presented in *Kiobel*" and that "[n]one of the documents at issue here are privileged," Opp'n at 1, but that materially misconstrues *Kiobel*. In fact, attorney-client privilege was ***not*** at issue for the documents in *Kiobel* because they previously had been produced by the respondent law firm's client (Shell) to Shell's litigation adversary Kiobel, 895 F.3d at 246, so the law firm's appeal was not based the attorney-client privilege. The only instances where the *Kiobel* court addressed privilege arose when it discussed two cases (including *Sarrio*) where privilege claims had been asserted. *See Kiobel*, 895 F.3d at 245-46. The rest of the opinion makes clear that the *Kiobel* court's concerns—about potential harms to U.S. law firms, lawyer-client relations, and our system of litigation—apply to cases that do not

involve documents allegedly protected from disclosure by the attorney-client privilege. Thus, Southern District of New York judges repeatedly have relied on *Kiobel* to block efforts to obtain discovery from law firms in cases where attorney-client privilege was not claimed as a basis to resist such discovery. *See* Opening Mem. at 7-8 (citing cases). Petitioners ignore those cases because they have no basis to avoid the impact of those cases. In sum, the documents addressed in *Kiobel* were not covered by a privilege claim, and the documents at issue here likewise are not covered by a privilege claim, so Petitioners cannot use the lack of a privilege claim to argue that Balance Law is precluded from relying on *Kiobel*.

***Third***, Petitioners also fail when trying to distinguish the ruling issued by this member of the Court in *Lelchook v. Lebanese Canadian Bank*, 670 F. Supp. 3d 51 (S.D.N.Y. 2023) (Parker, J.). They correctly state that *Lelchook* (citing *Kiobel* and *Sarrio*) rejected efforts to obtain documents by subpoena from a law firm "based on policy concerns," Opp'n at 5 (citing *Lelchook*, 670 F. Supp. 3d at 55), but then Petitioners proceed to make the false, unsupported assertion that "[t]hese concerns are not presented here because, as noted above, the documents sought are not privileged," Opp'n at 5. In fact, the part of the *Lelchook* opinion that discussed the policy concerns addressed in *Kiobel* and *Sarrio*—*i.e.*, the part of the opinion upon which Balance Law relies, *see* Opening Mem. at 6-7—was ***not*** based on the attorney-client privilege, so Petitioners cannot use the lack of a privilege claim by Balance Law to try to distinguish *Lelchook* from this case. Contrary to Petitioners' mischaracterization of *Lelchook*, the same policy concerns discussed in that opinion apply here and support the conclusion that the Subpoena should be subjected to heightened scrutiny and quashed. Likewise, other cases have recognized that document subpoenas to law firms can create potential problems even when the attorney-client privilege and/or the work-product doctrine are not implicated, including "interfer[ing] with

the attorney-client relationship," *Liner Freedman Taitelman Cooley, LLP v. Lively*, No. 25-mc-289 (LJL), 2025 WL 2205973, at *5 (S.D.N.Y. Aug. 4, 2025); *see, e.g.*, *In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 70 (2d Cir. 2003) (stating that "[c]ourts have been especially concerned about the burdens imposed on the adversary process when lawyers themselves have been the subject of discovery"); *Eletson Holdings Inc. v. Levona Holdings Ltd.*, 23-cv-7331 (LJL), 2025 WL 2294589, at *8 (S.D.N.Y. Aug. 8, 2025) (declining to enforce document subpoena served on a law firm because intervenors that served subpoena did not "show[] that the need to take discovery of [the law firm] justifies the burden and hardship imposed by the intrusion into the attorney-client relationship in these circumstances" (citing *Friedman*, 350 F.3d at 72)); *Cohen v. Group Health Inc.*, No. 22-MC-0200 (PAE)(KHP), 2022 WL 4534552, at * (S.D.N.Y. Sept. 28, 2022) (Parker, J.) ("Courts recognize a special concern about the burdens imposed on the adversary process when lawyers themselves are the subject of discovery requests." (citing *Friedman*, 350 F.3d at 70)).

***Fourth***, Petitioner's misguided effort to conjure up a material difference between a Section 1782 ruling and a ruling based on Rule 45(d)(3) of the Federal Rules of Civil Procedure, *see* Opp'n at 1, is directly contrary to this Court's *Lelchook* opinion. If a subpoena seeks documents from a U.S. law firm that were provided to it from abroad by a foreign client, the same concerns addressed in *Kiobel*, *Sarrio*, and other cases cited in the Opening Memorandum apply regardless of whether the discovery ruling is made under Section 1782 or Rule 45(d)(3). The "rationale for declining discovery aimed at foreign entities' U.S. law firms under Section 1782 ***applies with equal force*** to the same type of discovery sought pursuant to Rule 45." *Lelchook*, 670 F. Supp. 3d at 55 (emphasis added).[2]

[2] Balance Law respectfully submits that this Court's 1/26/26 Order, *507 Summit LLC v. Balance Law PLLC*, 2026 WL 205837 (S.D.N.Y. Jan. 26, 2026), erroneously applied the four *Intel* factors

***Fifth***, Petitioners' confusing discussion of confidentiality order issues does not help their argument and shows that they want to have their cake and eat it too. In a purported effort to allay the concern that their discovery efforts here would evade restrictions in the Confidentiality Protective Order pursuant to which Balance Law produced the documents to the plaintiffs in the New York state court shareholder derivative lawsuit (the "State Court Action"), Petitioners state that they "are amenable to entering into a confidentiality order …, including one that provides all the protections in the state court … derivative action," Opp'n at 3-4. However, that promise does not "provide [this] U.S. [C]ourt[] with assurance that [Cayman Islands] courts will enforce [a] protective order[] [issued by this Court]," *Kiobel*, 895 F.3d at 247. Then, in the next breath, Petitioners question the confidentiality of documents that Balance Law, in its capacity as defense counsel in the State Court Action, produced to the plaintiffs in that case. *See* Opp'n at 4.[3] As is common in complex lawsuits when a large volume of documents is produced pursuant to a confidentiality protective order, Balance Law designated the documents as confidential under the Confidentiality Protective Order issued in the State Court Action, in reliance on that order and the process set forth therein for resolving by agreement, and if necessary litigating, any disputes about whether any particular document actually was "Confidential Information" within the meaning of that order. Supplemental Declaration of B. Robert Liu ("Supplemental Liu Declaration") ¶ 4 (filed this same date). The State Court Action has been settled; a final

mechanically, *see Kiobel*, 895 F.3d at 244, 245 (stating that four *Intel* factors are "non-exclusive" and "are not to be applied mechanically"), and did not apply the heightened scrutiny required by *Kiobel*, *Sarrio*, and the other cases cited in the Opening Memorandum. Even assuming for the sake of argument that Petitioners are correct that there is a material difference between a Section 1782 ruling and a Rule 45(d)(3) ruling, the 1/26/26 Order was an interlocutory (*i.e.*, non-final) order, so this Court is free to revisit that ruling and subject Petitioner's Section 1782 application to the requisite heightened scrutiny.

[3] That argument shows that Petitioners want to harass and retaliate against Balance Law by imposing additional burdens on it and its clients by creating a litigation side-show regarding whether the documents are confidential.

judgment has been entered in that case; and none of the documents produced by Balance Law as confidential under the Confidentiality Protective Order were removed from the protections of that order (whether by agreement or due to court rulings). *Id.* ¶ 5.

***Sixth***, Petitioners rely heavily on the Second Circuit's recent *SBK ARK* opinion, but it does not undermine the conclusion that this Court should subject the Subpoena to heightened scrutiny and quash it. That ruling is distinguishable in material respects from, and thus inapposite, to the issues presented here. It is undisputed that Balance Law was an innocent bystander to, and was not involved in any way, in the events at issue in the underlying Cayman Islands appraisal proceeding. By contrast, the law firm that tried to resist the discovery addressed in *SBK ARK* was directly and extensively involved in the events at issue in the underlying proceedings for which that discovery was sought. *See SBK ART*, 2026 WL 478787, at *2-3. Indeed, according to the petitioner in that case, an opinion memorandum prepared by the law firm allegedly "was one of the key documents." *Id.* at *3 (quotation marks omitted); *see id.* at *11 (quoting statement in the law firm's brief regarding "[n]umerous documents created by [the law firm] in its role as a legal advisor, negotiator, or evaluator for Fortenova" (quotation marks omitted; alteration in original)). Moreover, in *SBK ARK*, the law firm did not argue that the Section 1782 petition "was made in faith, for the purpose of harassment, or unreasonably [sought] cumulative or irrelevant materials," *id.* at *11 (quotation marks omitted; alteration in original), but Balance Law ***has made those arguments*** regarding the discovery sought by Petitioners in this case. Another important difference between *SBK ARK* and this case is that the law firm in that case asked the Second Circuit to "impose categorical limitations on Section 1782's reach," *id.*, but Balance Law does not make such a far-reaching argument and merely asks this Court to apply a heightened-scrutiny standard. That is consistent with *Kiobel* and the

other cases cited in the Opening Memorandum, and is not inconsistent with the *SBK ARK* opinion, which re-affirmed "the strong policy concerns surrounding protection of attorney-client relations," 2026 WL 478787, at *11, and acknowledged that the law firm "is entitled to object to any discovery" sought by the petitioner on the grounds that production "unduly interferes in its attorney-client relationship," *id.* at *1.[4]

***Finally***, Petitioners miss the mark by questioning the statement in the Opening Memorandum that the documents at issue here were transmitted to Balance Law from abroad by a foreign client for the purpose of obtaining legal advice. *See* Opp'n at 1 (quoting Opening Memorandum). Without a declaration or any other evidence, Petitioners denigrate that statement as "inherently incredible." Opp'n at 1. Not so. In fact, it would be inherently incredible (and contrary to "Litigation 101" principles) for Balance Law to produce its foreign client's documents to the plaintiffs in the State Court Action without first assessing discoverability—namely, which documents were within the scope of applicable discovery requests and whether any documents should be withheld as privileged. That clearly constitutes rendering legal advice to the client. Thus, the documents at issue here: (a) were received from Balance Law from one of its foreign clients; and (b) were transmitted from abroad to Balance Law for the purpose of being assessed by Balance Law for (among other things) discoverability. Liu Declaration ¶¶ 7, 9. Petitioners do not, and cannot, present any evidence to rebut those sworn statements.

## II. The Opposition Fails To Present Any Persuasive Rebuttal To Balance Law's Showing That Petitioners Filed This Abusive Section 1782 Application To Harass Balance Law In Retaliation For A Subpoena Served By Balance Law In The State Court Action.

The Opening Memorandum showed—based on when this Section 1782 proceeding was

[4] A Second Circuit panel cannot overrule a prior Second Circuit panel opinion, so *SBK ARK* did not, and does not purport to, overrule *Kiobel*.

filed and other conduct by Petitioners and their counsel—that they filed this abusive Section 1782 application to harass Balance Law in retaliation for a subpoena that Balance Law served in the State Court Action. As another member of this Court recognized, document subpoenas to law firms can create various problems, including "run[ning] the risk of harassment." *Liner Freedman Taitelman Cooley, LLP*, 2025 WL 2205973, at *5. That risk has materialized in this case because that was Petitioners' goal.

Petitioners do not have any persuasive rebuttals to Balance Law's retaliation/harassment argument. Their assertion that this Court "already found [the subject discovery] relevant to the issue of CIH share valuation," Opp'n at 5, misses the mark and mischaracterizes the 1/26/26 Order. In fact, the Court ***substantially limited*** the scope of discovery sought by Petitioners and blocked their effort to obtain nine categories of documents that are "of little or no relevance to the CIH valuation" and therefore are "not relevant to Petitioners' claims." 1/26/26 Order, 2026 WL 205837, at *9. Thus, that part of the 1/26/26 Order actually supports the conclusion that Petitioners filed the Section 1782 proceeding to harass and retaliate against Balance Law.

Moreover, although the Court held that some of the categories of documents sought by Petitioners are relevant to the CIH share valuation, that holding does not rebut the conclusion that Petitioners filed the Section 1782 proceeding to harass and retaliate against Balance Law. The important issue is not whether some of the documents sought are relevant but why Petitioners decided to seek the documents from Balance Law, as opposed to a non-law-firm entity that also has the documents in its possession, custody, or control. The documents at issue here were produced by Balance Law to both plaintiffs that filed the State Court Action. Supplemental Liu Declaration ¶¶ 5-6. One of those plaintiffs, Lorelei NCC Inc. ("Lorelei"), is a New York corporation, *id.* ¶ 6 & Exhibit A, so Petitioners could have filed a Section 1782

proceeding against Lorelei to seek the documents that they seek here from Balance Law. Seeking the documents from Lorelei would have avoided the special legal/policy concerns that are implicated by discovery directed to a U.S. law firm for documents that it received from a foreign client. The decision by Petitioners (and/or their counsel) to seek the documents from Balance Law—not Lorelei—further supports the conclusion that they did so to harass and retaliate against Balance Law.

Petitioners' argument that the burden of the discovery sought is "minimal," Opp'n at 5, also lacks merit. As Petitioners (and their counsel) know full well, the time and expense required for Balance Law to respond to this Section 1782 proceeding and establish that Petitioners seek unduly broad, irrelevant discovery is itself burdensome. Unnecessarily imposing that litigation burden on Balance Law was part and parcel of Petitioners' harassment/retaliation scheme.

Balance Law is not required to prove definitively that Petitioners intended to harass and retaliate against it for serving a subpoena in the State Court Action. It is enough for Balance Law to make a showing sufficient to cause this Court to "suspect[] that the discovery is being sought for the purposes of harassment." *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 81 (2d Cir. 2012). The record before this Court easily satisfies that standard.

## CONCLUSION

The case law regarding discovery sought from law firms establishes that, due to the special legal/policy reasons implicated by such discovery, it should be subjected to heightened scrutiny by courts when deciding whether to allow such discovery. Such discovery should be a last resort when—as is the case here—the law firm: (a) had no involvement in the events that give rise to the underlying litigation for which the documents are sought; (b) did not create any

of those documents; and (c) has the documents in its possession only because they were transmitted to the law firm from abroad by a foreign client.

For the reasons set forth above and in the Opening Memorandum, the Court should subject the Subpoena to heightened scrutiny and quash it or, in the alternative, should issue an order along the lines addressed in the Conclusion of the Opening Memorandum.

Dated: New York, New York
March 3, 2026

Respectfully submitted,

B. Robert Liu

B. Robert Liu (Bar No. 5697552)
Balance Law Firm
1 World Trade Center, Suite 8500
New York, NY 10007
(212) 741-8080
(646) 558-4889 (fax)
robert.liu@balancelawfirm.com

Attorneys for Respondent Balance Law Firm PLLC d/b/a Balance Law Firm

**Certificate Regarding Local Civil Rule 7.1 Compliance**

Relying on the word count of the word-processing program used to prepare this document, the undersigned states that the number of words in this document is 3,498 and certifies that this document complies with the word-count limitation as set forth in Local Civil Rule 7.1.

B. Robert Liu

B. Robert Liu (Bar No. 5697552)
Balance Law Firm
1 World Trade Center, Suite 8500
New York, NY 10007
(212) 741-8080
(646) 558-4889 (fax)
robert.liu@balancelawfirm.com

Attorneys for Respondent Balance Law Firm PLLC d/b/a Balance Law Firm

March 5, 2026

**BY ECF**

Hon. Katherine H. Parker
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

Re: 1:25-mc-00235-KHP 507 Summit LLC and KOA Capital L.P. v. Balance Law PLLC

Dear Judge Parker:

Pursuant to Rule III.E of the Individual Rules of Practice in Civil Cases, petitioners request oral argument on respondent's motion to quash (ECF #22) the § 1782 subpoena.

/s/ Jeffrey Chubak

cc: counsel of record

AMINI LLC

Jeffrey Chubak
MEMBER NY & NJ BARS

212.497.8247
jchubak@aminillc.com

March 9, 2026

**BY ECF**

Hon. Katherine H. Parker
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

Re: 1:25-mc-00235-KHP 507 Summit LLC and KOA Capital L.P. v. Balance Law PLLC
Letter Motion for Leave to File Sur Reply

Dear Judge Parker:

We are counsel for petitioners, 507 Summit LLC and KOA Capital L.P., and write to request leave to file 1.5-page sur reply attached as Exhibit 1, in opposition to respondent Balance Law PLLC's motion to quash.

Although courts need not consider matters raised for the first time in reply (*Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999)), this Court has discretion to do so (*Ashby v. Murphy*, 2022 WL 18135242, at *7 (W.D.N.Y. Nov. 28, 2022), citing *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 252 (2d Cir. 2005)) when the adverse party is not considered to have been surprised or prejudiced.

Respondent's motion was not accompanied by evidence to support its claim (ECF #24 at 10) that this § 1782 proceeding and the resulting subpoena were filed/served in retaliation for having served a subpoena on petitioner 507 Summit LLC (but not KOA Capital L.P.) in the derivative action. The attorney declaration in support (ECF #23) concerned only the purported reason the documents at issue were provided to respondent, not petitioners' intent. Then in reply, respondent submitted corporate records (ECF #26-1) and state court filings (ECF #26-2) to support its claim "that Petitioners filed the Section 1782 proceeding to harass and retaliate" (ECF #27 at 9). The requested sur-reply responds to this argument.

We thank the Court for its consideration of this request.

/s/ Jeffrey Chubak

cc: counsel of record

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| 507 SUMMIT LLC and KOA CAPITAL L.P.<br>Applicants<br>v.<br>BALANCE LAW PLLC dba Balance Law Firm<br>Respondent | Case 25-mc-235-KHP<br><br>**SUR REPLY** |

This sur reply is submitted in response to evidence respondent submitted in reply, to support its claim that the § 1782 subpoena should be quashed because it was in retaliation for respondent having served a subpoena on 507 Summit LLC in the state court derivative action.

Contrary to respondent's claim (ECF #27 at 9-10), the new evidence submitted—corporate records (ECF #26-1) showing one derivative plaintiff, Lorelei NCC Inc., is organized under New York law, and notice of voluntarily discontinuance (ECF #26-2) by that plaintiff, filed under cover of an attorney affirmation (ECF #26) that does not purport to provide evidence of intent—does not show, or support an inference, that the § 1782 subpoena was served to harass or retaliate. At best, it shows only that a § 1782 proceeding could have been commenced against another entity. In any event, the issue of retaliation was previously addressed (NYSCEF #19 at 10-12) and rejected. As previously noted, no evidence is provided in support of the retaliation claim; said claim cannot be made as to KOA Capital L.P. which was not issued a state court subpoena; and the state court subpoena to 507 Summit LLC was made after the close of discovery in the derivative action. To date, no substantive response to the foregoing has been given by respondent.

Respondent's new evidence also underscores the weakness of its confidentiality argument. *Kiobel* denied § 1782 discovery of documents held by Cravath (counsel for litigation opponent Shell in the underlying Dutch action) because Shell was "the real party from whom documents are sought" and Kiobel sought to circumvent the more restrictive discovery practices of the Netherlands and the confidentiality agreement by which Kiobel was bound. 895 F.3d at 245. These

concerns are simply not presented when the subject documents are sought from nonparties to the derivative action, when neither the petitioners nor the respondent are bound by the confidentiality stipulation (ECF #23-2, it bound Oasis Investments and Lorelei—the receiving parties—not the producing party) and where it has been established that Cayman courts invite and rely "on 1782 discovery to produce evidence for Cayman proceedings" (ECF #19 at 8) in contrast to the more restrictive discovery regime in the Netherlands. Hence, the "special legal/policy concerns addressed in *Kiobel*" (ECF #27 at 1) are not even presented here. Further, the commercial division confidentiality order at 22 NYCRR §202.70 Appendix B (at ¶23) expressly contemplates, and the confidentiality stipulation (ECF #23-2) does not purport to prohibit, the production of documents designated confidential pursuant to a subpoena made by a nonparty in another action.

Dated: New York, NY
March 9, 2026

Amini LLC

/s/ Jeffrey Chubak
Jeffrey Chubak
131 West 35th Street
12th Floor
New York, NY 1001
(212) 490-4700
jchubak@aminillc.com
Attorneys for Applicants

**WORD COUNT CERTIFICATION**

I certify under penalty of perjury that the foregoing document has 429 words as calculated using the word-count feature of the word-processing program used to prepare the same, and so complies with Local Civil Rule 7.1(c).

/s/ Jeffrey Chubak

# Balance Law Firm

Telephone: +1(212) 741-8080
Facsimile: +1(646) 558-4889
https://balancelawfirm.com

One World Trade Ctr Ste 8500
New York, NY 10007-0089
DC, CT, NJ, MD, WA, AK

March 12, 2026

Via Email Only
Honorable Katharine H. Parker
U.S. District Court for the Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, NY 10007

Re: *507 Summit LLC, et al. v. Balance Law PLLC*, No. 1:25-mc-00235-KHP
Respondent's Response to Petitioners' Letter Motion for Leave to File Surreply

Dear Judge Parker:

Respondent Balance Law PLLC ("Balance Law") hereby responds to Petitioners' 3/9/26 letter motion ("Letter Motion") (ECF No. 29) for leave to file the surreply attached to the Letter Motion. Balance Law does not object to Petitioners' being granted leave to file that surreply, so long as the Court allows Balance Law to file a brief response to that surreply.

Moreover, the Letter Motion itself makes a substantive argument in opposition to Balance Law's Motion to Quash Petitioners' Subpoena ("Motion to Quash"), which is a clever ploy that presents Petitioners' argument to the Court, even if it were to deny the Letter Motion. To correct the record, Balance Law responds briefly here to Petitioners' assertion that the Motion to Quash "was not accompanied by evidence to support its claim…that this § 1782 proceeding and the resulting subpoena were filed/served in retaliation" for Balance Law previously having served a subpoena in the New York state court shareholder derivative action. In fact, Balance Law's memorandum of law (ECF No. 24 at 11) in support of the Motion to Quash ***did*** present evidence in support of that argument—namely, the timing of when Petitioners filed this Section 1782 application in relation to when Balance Law served that subpoena; their refusal to engage in good-faith negotiations to resolve this dispute; and their unreasonable, overbroad, burdensome document requests. Perhaps the assertion in the Letter Motion regarding alleged lack of evidence was imprecise and merely meant that Balance Law did not present ***direct*** evidence, but that does not undermine Balance Law's argument. Of course, there is no signed confession by Petitioners (and/or their counsel) admitting their retaliatory intent, motive to harass, and/or bad faith, so Balance Law has presented ***circumstantial*** evidence. As courts repeatedly have recognized, circumstantial evidence can be used to prove intent, motive, and/or bad faith. *See, e.g., U.S. v. Clarke*, 573 U.S. 248, 254 (2014); *Hartman v. Moore*, 547 U.S. 250, 261 (2006); *Poor for and on Behalf of National Labor Relations Bd. v. Parking Systems Plus, Inc.*, 162 F.4th 335,

**Balance Law Firm**

Telephone: +1(212) 741-8080
Facsimile: +1(646) 558-4889
https://balancelawfirm.com

One World Trade Ctr Ste 8500
New York, NY 10007-0089
DC, CT, NJ, MD, WA, AK

347 (2d Cir. 2025). Juries rely on circumstantial evidence to make important decisions every week in courts throughout the country—including issuing beyond-a-reasonable-doubt verdicts in criminal cases—so there is no reason why this Court cannot rely on circumstantial evidence presented by Balance Law to decide whether the Court "suspects that the discovery [sought by Petitioners] is being sought for the purposes of harassment," *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 81 (2d Cir. 2012).

Respectfully submitted,

BALANCE LAW FIRM

B. Robert Liu

Beixiao Robert Liu, Esq.
(212) 741-8080
robert.liu@balancelawfirm.com
*Attorneys for Respondent*

cc: counsel of record

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/12/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

507 SUMMIT LLC, et al.,

Applicants,

-against-

BALANCE LAW PLLC *d/b/a* BALANCE LAW FIRM.

Respondent.

**ORDER**

**25-MC-235 (GHW)(KHP)**

**KATHARINE H. PARKER, UNITED STATES MAGISTRATE JUDGE**

On March 5, 2026 Petitioners filed a letter requesting oral argument on Respondent's pending motion to quash the § 1782 subpoena authorized by the Court. (ECF No. 28) On March 9, 2026, Petitioners filed another letter seeking leave to file a sur-reply in opposition to the pending motion to quash. (ECF No. 29) Those requests are DENIED. The issues which the Court must review are clear and the briefing is sufficient for the Court's consideration.

**The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 28 and 29.**

**SO ORDERED.**

Dated: March 12, 2026
New York, New York

Katharine H Parker

KATHARINE H. PARKER
United States Magistrate Judge

April 16, 2026

**By ECF**

Hon. Katherine H. Parker, U.S.M.J.
U.S. District Court for the Southern District of New York
500 Pearl Street
New York, NY 10007

Re: 1:25-mc-00235 507 Summit LLC and KOA Capital L.P. v. Balance Law PLLC
Joint Letter Pursuant to ECF #32 (Opinion and Order) at 9

Dear Judge Parker:

This joint letter is submitted to indicate the parties' positions on whether there are any outstanding issues to address or whether this matter can be closed.

Petitioners request this case be kept open at least through May 11, 2026, so as to afford them the opportunity to consider whether to move to reconsider or appeal. Respondent consents to this case remaining open through such date. There are otherwise no outstanding issues for the Court to address.

Sincerely,

/s/ Jeffrey Chubak

/s/ B. Robert Liu

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/17/2026

April 16, 2026

**By ECF**

Hon. Katherine H. Parker, U.S.M.J.
U.S. District Court for the Southern District of New York
500 Pearl Street
New York, NY 10007

Re: 1:25-mc-00235 507 Summit LLC and KOA Capital L.P. v. Balance Law PLLC
Joint Letter Pursuant to ECF #32 (Opinion and Order) at 9

Dear Judge Parker:

This joint letter is submitted to indicate the parties' positions on whether there are any outstanding issues to address or whether this matter can be closed.

**Petitioners request this case be kept open at least through May 11, 2026, so as to afford them the opportunity to consider whether to move to reconsider or appeal.** Respondent consents to this case remaining open through such date. There are otherwise no outstanding issues for the Court to address.

Sincerely,

/s/ Jeffrey Chubak

/s/ B. Robert Liu

APPLICATION GRANTED

Katharine H Parker

Hon. Katharine H. Parker, U.S.M.J.

4/17/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| 507 SUMMIT LLC, KOA CAPITAL L.P.<br>Applicants<br>v.<br>BALANCE LAW PLLC dba Balance Law Firm<br>Respondent | Case 25-mc-235-KHP<br><br>**NOTICE OF APPEAL** |

Notice is hereby given that applicants 507 Summit LLC and KOA Capital L.P. (together, the "Applicants"), appeal to the United States Court of Appeals for the Second Circuit from the Opinion and Order on Motion to Quash entered April 10, 2026 (ECF #32), that quashed Applicants' 28 U.S.C. § 1782 document subpoena to respondent Balance Law PLLC dba Balance Law Firm.

Dated: New York, New York
May 11, 2026

Amini LLC

/s/ Jeffrey Chubak
Jeffrey Chubak
131 West 35th Street
12th Floor
New York, NY 1001
(212) 490-4700
jchubak@aminillc.com
Attorneys for Applicants

**CERTIFICATE OF SERVICE**

I hereby certify that on August 18, 2026, I electronically filed the foregoing Joint Appendix Volumes I-II with the Clerk of Court for the United States Court of Appeals for the Second Circuit using the Court's Appellate Case Management System (ACMS). I further certify that all participants in the case are registered ACMS users and that service will be accomplished through ACMS.

/s/ Jeffrey Chubak
Jeffrey Chubak

August 18, 2026